UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

TARA MILLER, ) Case No. 22-cv-12865
) Honorable F. Kay Behm
Plaintiff, )
Mag. Kimberly G. Altman
v. )
)
DENNIS MCDONOUGH, )
Secretary, )
U.S. Department )
of Veteran Affairs Agency, )
)
Defendant. )
____________________________)

ZOOM VIDEOCONFERENCE DEPOSITION OF TARA MILLER

DATE: Wednesday, January 17, 2024

TIME: 12:13 p.m. to 4:57 p.m.

FACILITATED BY: Modern Court Reporting & Video, LLC

PURSUANT TO: Notice by counsel for the Defendant for purposes of discovery, use at trial, or such other purposes as permitted under the Federal Rules of Civil Procedure and Federal Rules of Evidence

REPORTED BY: KRISTEN SHANKLETON
Notary Public, State of Michigan

A P P E A R A N C E S

On Behalf of the Plaintiff:

D. RICK MARTIN
220 Bagley
Suite 808
Detroit, Michigan 48226-1409
(313) 963-1320
drickmartin@glottaassociates.com

On Behalf of the Defendant:

CHRISTOPHER DOYLE
Assistant United States Attorney
211 W. Fort Street
Detroit, Michigan 48226
(248) 420-7247
Christopher.doyle@usdoj.gov



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

I N D E X


| Witness | Examination | Page |
|---|---|---|
| Tara Miller | Direct Examination | 5 |


E X H I B I T S


| Exhibit No. | Description | Marked |
|---|---|---|
| 1. | Affidavit | 88 |
| 2. | Documents Viewed | 88 |
| 3. | Screenshot | 102 |




Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

P R O C E E D I N G S

THE COURT REPORTER: We are on the record at 12:13 p.m.

This is the Zoom deposition of Tara Miller taken Wednesday, January 17, 2024 by the firm of Modern Court Reporting & Video, LLC, SCAO firm number 08228. My name is Kristen Shankleton. I am a Notary in the state of Michigan, county of Washtenaw. My commission expires July 26, 2024.

Will counsel please state their appearances for the record, for the Plaintiff?

MR. MARTIN: Yes, good afternoon, Dewey Rick Martin appearing on behalf of the Plaintiff, Tara D. Miller.

THE COURT REPORTER: Thank you.

MR. MARTIN: You're welcome.

MR. DOYLE: And Chris Doyle, I'm here for the Defendant.

THE COURT REPORTER: Thank you.

And Ms. Miller, I will now administer you an oath. Will you raise your right hand, please? Do you solemnly swear or affirm that: the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

MS. MILLER: Yes, I affirm.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

(Whereupon,

TARA MILLER

was called as a witness and, after having been first duly sworn, was examined and testified as follows:)

THE COURT REPORTER: Thank you. And can you please state your name for the record?

THE WITNESS: Tara D. Miller.

THE COURT REPORTER: Thank you.

And counsel, you can proceed.

THE WITNESS: You're welcome.

MR. DOYLE: Okay.

DIRECT EXAMINATION - 12:14 p.m.

BY MR. DOYLE:

Q. Good afternoon, Mrs. Miller.

A. Good afternoon.

Q. My name is -- my name is Chris Doyle, and I represent the Defendant in the case. Have -- have you given a deposition before?

A. Yes.

Q. Okay. So, some of this might be a little bit familiar to you, but I'd like to just run through a couple of guidelines that make things, in my experience, run a little bit more smoothly. So, the first thing is that this is being transcribed for later use in the case so it's important that you give verbal responses as



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

opposed to gesturing as we might do in normal conversation, okay?

A. Okay.

Q. Another thing that helps is if we speak relatively slowly and try to avoid talking over one another. Even if you might know where my question is going, please wait for me to finish the whole question, and likewise, I'll wait for you to finish your whole answer being asking a new question, okay?

A. Okay.

Q. And then sometimes I might ask a question in a way that's confusing or poorly phrased, and in that case, please just go ahead and ask me to clarify or rephrase the question, I don't mind. But if you do just answer my question, I'll assume that you understood it, is that okay?

A. Yes.

Q. Okay. And then, it's fine at any time if you just -- if you need to take a break, but I would prefer if there's a question pending, that you answer the question before we go onto a break, okay?

A. Okay.

Q. And then just as a practical matter, are you taking any medications today that would affect your memory or ability to answer questions truthfully?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. I am on medications for an ailment that I'm currently suffering from.

Q. Okay. And I'm really just asking this question to know whether your ability to do the deposition today is going to be better than any other day, or worse than any other day. So, is -- is it a medication that affects your memory or your ability to respond to --

A. No.

Q. -- questions and answers?

A. No.

Q. No, okay. All right. That's fine then.

Okay, now, when I ask this next question, I don't want to know anything that you talked about with your attorney because that -- that would be privileged, okay, but other than speaking to your attorney, did you do anything to prepare for the deposition today?

A. I looked over the lawsuit, and also the interrogative questions, and an old document, ADS. I looked over a third form as it related to questions that I answered back in 2021, and the title of the document is Department of Veteran Affairs Office of Resolution Management affidavit -- affidavit.

Q. Okay. I think I am familiar with that one as well. So, when you say the lawsuit, you looked over the complaint in this lawsuit?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Yes.
Q. Is that what you mean?
A. Yes.
Q. Okay. And then you looked at some of your interrogatory responses that were --
A. Yes.
Q. -- already sent in the case?
A. Yes.
Q. Okay. Okay, how about emails or texts or anything like that?
A. No.
Q. Okay. Have you kept any sort of journal or diary regarding the events you allege in this lawsuit?
A. No.
Q. Okay. Do you keep one in general?
A. No.
Q. Okay. Have you spoken with any VA employees about the lawsuit?
A. Maybe two years ago, 2021, when the situation took place with all the events, but I haven't been in contact with any since the lawsuit.
Q. Any since 2021, nobody since then?
A. Yes. No.
Q. Okay. Okay, now, to follow up on the question I asked earlier, in what context have you given a



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

deposition before?

A. In 2013 I had to deliver a deposition with an attorney in Atlanta, Georgia, Michael B. King, as it related to a military discrimination suit. I was a new military personnel and my military duties were conflicting with my full-time duties, and as a result of that, I was discriminated against. So, I solicited legal counsel back in 2013 and Michael B. King took my case, and at one point in time when I was stationed over in Kuwait, I had to fly from Kuwait back to Atlanta, Georgia, I think that was in 2015 or 2016, to be a part of a deposition.

Q. Okay. And did that case become an actual lawsuit as opposed to just an EEO claim or something?

A. It -- my attorney at the time did file a motion and we did end up going to court at one point in time, but unfortunately, the case did not progress in any type of award because my counsel ended up transitioning, and the case was, I guess, dismissed as a result of it being not pursued.

Q. Okay. Okay, now, I want to just ask you some general background questions. This is just to sort of get the context for the case. So, have you ever gone by any other names other than the one you stated on the record?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. At one point in time I was married in 2011, December, up until 2013 and my last name was McKnight.
Q. Okay. Anything other than that?
A. No, none other than in military titles and maybe titles from academia.
Q. Okay. Yeah, I just meant other actual names, not titles.
A. Oh, okay. Okay.
Q. Okay. And then what is your date of birth?
A. July 8th, 1969.
Q. Okay. And your current home address?
A. 20159 Gallagher, Detroit, Michigan 48234.
Q. Okay. Does anyone live there with you?
A. Yes.
Q. Okay, who else?
A. A parent.
Q. Okay. And you -- are you currently married?
A. No, I'm divorced.
Q. Okay. Okay, did you graduate from high school?
A. Yes.
Q. Okay, where?
A. Pershing High School on Ryan Road in Detroit, Michigan back in 1987.
Q. Okay. Did you attend college?
A. Yes.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay, where was that?

A. In 1987 I attended Tallahassee Community College where I earned an associate of arts degree.

Q. Okay.

A. And after I graduated with my associate of arts degree, I earned a bachelor's in broadcast journalism, and then I pursued a master's in secondary English education. And after that I pursued a Doctorate of Arts in humanities, and the last -- and I also pur -- and earned that degree. I also pursued a Ph.D. in Africana Women's Studies under the humanities program. And then the last time I was in college was when I was employed at the John. D. Dingell VA Medical Center in the HR Department, I attended Eastern Michigan University where I was working on a master's in human resources at Eastern, and that was in 2020. Wait a minute, I think that was in 2020.

Q. Okay. You mentioned a few there, I just want to sort of follow up. After the associates at Tallahassee Community College, you said you got a bachelor's. Was that also -- was that at the same college?

A. No, it was at Florida A&M University.

Q. Okay. And then you mentioned pursuing a master's, where was that?

A. That too was at Florida A&M University.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay. Did you -- you did get a master's degree?
A. Yes. I received -- I earned a master's in English secondary education.
Q. Okay. And I think -- I'm sorry, I lost track. You said another one after that, another degree.
A. I earned a doctorate of arts degree.
Q. Okay. From what institution?
A. From Clark Atlanta University.
Q. Okay. And then you said you were working on a master's again in 2020. Were there any other ones that I missed other than that?
A. Yes, I returned to college after I returned from the -- from Kuwait from a military deployment in 2016 and pursued a Ph.D. in Africana Women's Studies, Humanities, and I finished that degree in 2017. And when I returned back to Detroit, Michigan from the Atlanta area, I worked on a master's degree at Eastern Michigan University.
Q. Okay.
A. I didn't finish that degree.
Q. Okay. Are you currently pursuing it, or it's just on hold for now?
A. It's just on hold for now.
Q. Okay. Now, where was the Ph.D.?
A. It too was at Clark Atlanta University.
Q. Okay. Okay, and you mentioned a couple times



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

already, but what is your military background?
A. Human Resources. I finished the human resources specialist program back in 2011 with the United States Army, and I'm currently serving in the United States Army. I switched from active-duty component to reservist status, but right now, I'm in the reserve status.
Q. Okay. So, beginning in 2011, you were working in HR with the Army, is that right?
A. Yes.
Q. Okay.
A. From -- well, from the military aspect, but I had HR experience prior to the Army.
Q. Okay. Yeah, I just meant when did your military service start, and that was in 2011?
A. Yes.
Q. Okay. And is -- was there a rank involved in that? I'm not sure how that works, sorry.
A. Yes. I currently hold a staff sergeant rank promotable to sergeant first class.
Q. And you're a reservist now, is that what you said?
A. Yes.
Q. Okay. Okay, and then you said after active -- after you returned from active duty, you went on to pursue that Ph.D. which you completed in 2017, right?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Yes. I returned back to the states from Kuwait I want to say in 2016, and I learned that I could use my Montgomery GI Bill to pursue my -- another terminal degree. So, I reached out to someone in benefits with the VA and that person showed me how I can receive tuition assistance and also receive monies for my books.

Q. Okay. Did you have any other employment at that time? So, starting -- let's say when you came back from Kuwait in 2016, other than pursuing the Ph.D., did you have any employment?

A. I'm trying to think back. When I returned back in 2016, yes, I did. I'm sorry, I was teaching.

Q. Okay. Where was that?

A. That was at Herzing -- it was at Herzing University. I was a department chair.

Q. Can you spell that university for me?

A. It's H-E-R-Z-I-N-G. That's -- I'm spelling it to the best of my recollection.

Q. That's okay. And where was that?

A. Herzing University is located in Atlanta, Georgia.

Q. Okay. And you mentioned you were a department chair. What were you teaching??

A. I taught general education courses, English composition, research and writing, public speaking.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. To like undergraduate students?

A. Some of them -- it depend on which -- I would say a mixture of both -- both, but majority of the students were undergrad, but there were some graduate students who needed help with their public speaking and then their writing skills.

Q. Okay. And then when did you -- or how long did you do that job?

A. For about -- I started working at Herzing University maybe in 2016, and it -- I left Herzing University in 2017, so, maybe a little bit -- between 10 months to a year.

Q. Okay, and then what job did you do after that?

A. I continued to teach because I always kind of had like adjunct positions. So, I was at Strayer University. I taught at -- I'm having a brain freeze. Herzing University, DeVry University. Those are the two institutions of higher learning that I can remember for now.

Q. Okay. Did you say something like Strayer?

A. Yes, Strayer University. That's -- that was located in Marrow, Georgia, M-A-R-R-O-W. It's right --

Q. And then --

A. Sorry.

Q. How about the name -- spell the name of the



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

university?

A. S-T-R-A-Y-E-R.

Q. Okay, thank you very much.

A. You're welcome.

Q. And then what about you were -- after your adjunct positions, what -- what job did you have next?

A. I remained in academia for a while, and I still went to my reserve drills as required. But -- and that's basically about it, and I think I ended up going back on an active-duty mission and receive orders in -- on December the 1st, 2018 until December the 1st, 2019.

Q. Okay. And where were you deployed that time?

A. Fort Bliss, Texas, right outside of El Paso, Texas.

Q. Okay. And then how about when you ended that active-duty stint, is that when you started with the VA in Michigan?

A. Yes, I decided to return home to Detroit, and I started volunteer -- I ended -- my active-duty orders ended in December, and I commuted back to Detroit. And that's when I started volunteering at the hospital in January 2020 in the HR Department.

Q. Okay. How did you find out about that position, the -- when you started volunteering at the VA?

A. I want to say that I went to the VA -- well, I



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

started applying for positions online at USAJobs.gov, and then I had an in-person meeting with someone at the VA, and there was someone who was assigned to me as a mentor, and he stated to me perhaps you can probably end up getting a job at the VA if you volunteer until you can receive gainful employment.

Q. Okay. Do you remember who that was as the mentor?

A. Herbert Thompson.

Q. Okay. And as far as you knew, he was someone who worked at the VA already?

A. Yes.

Q. Okay. And then I understand you became an employee, left the volunteer position and became and employee sometime in around April 2020, is that right?

A. Well, yes.

Q. Please correct me if -- if you remember something differently. I'm just going off of what I've seen in the record.

A. I was offered a tentative position on April -- not April -- on March 31st, 2020, and then my effective date was April 1st, 2020.

Q. Okay. And then what job were you hired into?

A. At that time, the title was HR Assistant.

Q. Okay. And what did you understand that your job



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

was going to be? Like if you could just summarize the duties that you were going to have?

A. Based on what I saw one of the employee's job tasks and duties I assumed that I would probably be orient -- preparing orientation packets for new hires, because that's what I saw one of the permanent employees doing. And that's what I assumed HR functionalities entailed as it related to the Detroit VA MC. And also handling or preparing personnel paperwork or processing personnel paperwork.

Q. Okay. Now, I'm going to ask a lot more substantive questions about your time at the VA, but for right now, I just want to keep rolling with you -- the positions you've held. So, I understand that you left that VA position in February of 2021, is that right?

A. Yes.

Q. Okay. And then what job did you have after that, what was the next position you held after that?

A. I was placed on active duty orders immediately. Well, actually, I was placed on active duty -- I received my orders on February the 11th, but they didn't go into effect until later.

Q. Okay.

A. So, active duty.

Q. And do you mean the -- it was delayed for some



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

reason, or when you found on February 11th, it just wasn't supposed to start until later?

A. Could we backtrack for a moment?

Q. Of course.

A. You asked me -- you said that I left. I was terminated from the VA on February the 24th, 2021. So, I didn't leave, I was terminated.

Q. Okay. Thank you. I didn't mean to imply anything by the terminology, but I just -- but I appreciate the clarification.

A. Okay.

Q. Okay.

A. And -- sorry.

Q. And then okay, to circle back to the question, you said -- I'm just trying to recap what you said which is that you received active-duty orders on February 11th, but they didn't actually take effect until sometime later, right?

A. Yes.

Q. And so, that was around the end of February that you actually were in active duty?

A. No, I just received the orders, and you're not active duty until your -- you active duty order date goes into effect, so, I was on active duty, I want to say to the best of my recollect -- recollection June or July of



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

2020.

Q. Would that be 2021?

A. I'm sorry, 2021. I'm -- my apologies.

Q. That's okay. Okay, and then where was that deployment?

A. Fort Bliss, Texas.

Q. Okay. How long did it last?

A. One year.

Q. So, about June or July of 2022?

A. Yes. Yes, June 2022.

Q. Okay, and then what -- what job did you have after that, after that active duty stint?

A. I was hired at -- with the Department of Defense as a processor operator with -- under the Navy.

Q. Okay. Where is that located?

A. It's downtown, I want to say off of Michigan Avenue, but I worked in Ann Arbor, Michigan.

Q. Okay. So, when did you start that position?

A. I want to say I started in July of 2022.

Q. Okay.

A. To the best of my recollection.

Q. Okay. And then are you still in that position?

A. No, I resigned from the position -- well, actually, yes. I had to resign. Well, I didn't resign from the position; I transferred to another gov -- a



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

federal government agency.
Q. Okay. When was that transfer?
A. August 2022.
Q. Okay. So, you were there only about a month?
A. Or so, to the best of my recollection.
Q. Okay. And then where did you transfer?
A. To the Veteran's Affairs benefits office downtown, McNamara building.
Q. Okay. Okay, so, you currently work for the VA again?
A. Yes.
Q. Okay. And you're in the benefits office. What is -- what is the position title?
A. Rating veteran's service representative.
Q. Okay. And what are your responsibilities in this new position?
A. With this new position, I rate gov -- I rate claims for veterans.
Q. Okay. Is that like disability claims?
A. Yes.
Q. Okay. Is it full time?
A. Yes.
Q. Okay. So, for the rest of the day we're going to be discussing the EEO complaint that you filed with the VA in March of 2021. Before we get into the substance a



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

little bit more, have you filed any other EEO complaints with the VA?

A. To the best of my recollection, no.

Q. Okay. When I say other, I mean other than the one in March of 2021 concerning your -- your time at the VA between April 2020 and February of 2021. So none other than that that you can remember?

MR. MARTIN: Counsel, can you repeat the question? I'm sorry, I just stepped out.

MR. DOYLE: Oh, that's okay.

MR. MARTIN: I had to step out for one sec. Thank you.

MR. DOYLE: No problem. So, to -- to rephrase the question, I was just asking, we have an EEO complaint in this case that concerned your time at the VA from April of 2020 through February of 2021, and I was just asking, Ms. Miller, whether you're aware of having filed any other EEO complaints other than that one concerning that period of time?

MR. MARTIN: Thank you.

THE WITNESS: I filed an EEO complaint as it relates to the HR termination, and I filed an EEOC complaint, and I filed an HHP, harassment prevention complaint.

BY MR. DOYLE:



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay.
A. And there was a complaint with the Merit Board System. That was the first complaint.
Q. Okay, and all of those concern this same period of time, the --
A. Yes.
Q. -- April of 2020 through February of 2021?
A. Yes.
Q. Okay. I meant to ask you about that MSPB complaint, the merit systems one, how did that complaint resolve?
A. To the best of my recollection, it did not -- I didn't pursue it any further because I think it was denied due to something happened. I can't recall exactly what happened, but initially, I filed the -- file was received, it was processed, and I think there was something pertaining to a follow up, and as a result of me not following up or answering a question, it got dismissed. Now, that's all I can recall for right now, and I'm answering it to the best of recollection.
Q. Okay. All right, now, I want to talk about when you were hired, I think you said at the end of March 2020 and started in April of 2020 as an HR assistant.
A. Right.
Q. So, who hired you for that position?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Eric Osterbeck.

Q. Okay. And was he also supposed to be your first line supervisor?

A. That's what he shared with me that he would be my supervisor.

Q. Okay. And what location was that position again?

A. It was the John D. Dingell VA Medical Center in Detroit, Michigan.

Q. Okay. And then you said it was called HR assistant. Did you ever have any other title while you were at the HR -- or at the VA during that period?

A. Yes.

Q. Okay. What -- what did it change to or what was your other title?

A. It was changed to HR generalist.

Q. Okay. And is -- is it your understanding that those are the same position but they just -- the title changed?

A. I recall a conversation about re-modernization or something to that effect. So, I don't know if the job description changed because I didn't received a new job description, so, I can't answer that question.

Q. Okay, fair enough. Were you told at all that your responsibilities were going to change during -- after that sort of reorganization thing or anything like



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

that?

A. No. Not to my recollection, no.

Q. Okay. As far as you knew that job was supposed to be the same as the one you already held?

A. To the best of my recollection, I believe so, but there were duties that were given to me that were, I believe, outside of the scope of the job description.

Q. Okay. Do you mean after the reorganization?

A. After I was hired as an HR assistant, yes, and my title changed to HR generalist, yes.

Q. Okay. What were the additional duties that you -- that you were saying were outside of the job description?

A. I was responsible for completing and processing telework agreements throughout the entire high -- hospital. I was tasked with writing standard operating procedures. And there were a couple of other responsibilities that I cannot recall at this juncture. I would have to sit down and think.

Q. Okay. Okay, now, I want to move into talking about the particular acts that you allege were discriminatory during your time at the VA, and I'm going to do that based on your EEO affidavit that you -- that you referenced earlier. So, I want to move through these sort of point by point, but if at any point I'm phrasing



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

something in a way that is -- you think is not accurate, please just let me know how you would phrase it differently, okay?

A. Okay.

Q. Okay. So, the first point mentioned in that EEO affidavit is that between April 2020 and February of 2021, coworkers bullied, ashamed, embarrassed, and were hostile toward you. What do you recall about that particular allegation?

A. I recall going Saadia Graves Tatum and asking her about an HR functionality, and she addressed me as, "Listen, Linda". And at first, I really didn't know what was going on when she used that term, because I had never heard that before and I was thinking to myself well, maybe she might have me mixed up with another personnel, and then I was thinking -- I didn't know what was going on but I come to learn that "Listen, Linda" was a rude or derogatory phrase to reference someone in a not so pleasant manner.

Q. Okay.

A. So -- I'm sorry.

Q. Oh, go ahead. Please continue.

A. Okay. Also, as it relates to my interaction with Erica Bethany, there were times where we were tasked with HR functions or assignments and I needed her assistance,



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

and she responded to me in unpleasant manners such as being sarcastic or cruel, or raising her voice at me, or just kind of stopping me in mid-sentence when I was talking to her, using profane language, being belligerent, and I found it to be very uncomfortable, and I wasn't used to that type of environment.

And I -- I went to my supervisor on numerous occasions to bring those type of actions to his attention whether it was verbal or in written form and at one point in time, he said to me, "I'm not going to allow you to throw them under the bus," referring to Erica Bethany and another colleague, Angela Thompson, and this is not -- he said to me, "This is not a hostile environment," when I brought that to his attention, and he said, "You don't know what a hostile environment is." And as I mentioned before, he said, "I'm not going to allow you to throw them under the bus." And basically that was it.

And also, as it related to me encounter with Angela -- Angela Thompson. There was a situation that happened in July when she tried to create an impromptu meeting between myself and Erica Bethany, and it caught me by surprise because we were supposed to receive training from her as it relates to cyber awareness training and other PII Training, but when I went to this impromptu meeting, I discovered that we were not having a



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

meeting about training.

So, she asked me a couple of questions about talking to Erica. She said something to this effect, "I can sense in my spirit that there is something going on between you and Erica and you all need to talk about it," and she made a comment saying that something about people do not need to get the wrong impression outside of the office. And I -- she said, "Well, you call can sit here and talk with me present, or either you can all talk without me being present."

So, I said, "Give me a moment," and I excused myself and I went across the hall to the HR Department, the recruiters HR Department, and there was a recruiter there named Verian Walker. And I approached Verian, greeted here and said to her, "Verian, I have a situation that I'm uncomfortable with," and she said, "Well, what's going on?" I said that Angela Thompson has tried to create an impromptu meeting between myself and Erica Bethany. She said, "Do not participate. Go to your office and do your work. You do not need to be a part of that situation," and that's what I remember for the best -- to the best of my recollection.

And as it related to that encounter, it appears to me that I didn't inform my supervisor about the impromptu meeting between Erica and Angela Thompson;



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Angela Thompson did. So, Eric Osterbeck brought the topic to my attention when he called me in his office as a result Angela Thompson bringing to his attention that I performed some type of HR action incorrectly. And before I left his office, he said to me, "Angela brought to my attention that she tried to bring you and Erica together to talk about some of your differences." And I said, "Yes, she did." And he asked a question, "Why do you think she did that?" I said, "I do not know why she would do that." He said, "Well, I spoke to her about the matter."

Q. Okay. I just want to break those down a little bit since you mentioned a few different sort of interactions. The first one you mentioned was an interaction with Ms. Tatum where she said -- where she referred to you as Linda, or she said, "Listen, Linda."

A. Yes.

Q. Now, did you regard that as discriminatory?

A. No.

Q. Okay. And then did you report that to your supervisor?

A. I did, yes.

Q. Okay. And was that Mr. Osterbeck?

A. Yes.

Q. Okay. Do you remember what he said about that?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. He said, "I'll talk to her."

Q. Okay. Did you ever have an issue with Ms. Tatum talking to you in a way that you didn't like after that?

A. I kind of tried -- well, in some regards, yes, but I kind of tried to stay my distance after that situation occurred and just tried to work in my office area space as positive and as calm and as precise as I could and remain professional.

Q. Okay. And when you say in some regards yes, what I'm really just trying to figure out is were there any other particular interactions with Ms. Tatum that you can remember, negative interactions?

A. Yes, but it -- it -- maybe just being a little short with me, but other than that, she did apologize to me, and we went from there, and then shortly thereafter she was transferred to another department with a promotion.

Q. Okay. And when you said you found out that that was like a particular phrase that you said people use in a rude or derogatory way, what did you find out about that?

A. It's kind of like in a belittling -- when you -- when a person says, "Listen, Linda," you being a little cynical, you kind of maybe talking to the person as though the person is not mentally up to par.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay. And what gave you that understanding or where did you find that out? What did -- what gives you that understanding?
A. I think I probably looked online at something, or saw some type of video where someone was using the phrase or the term and I said to myself, "Oh, that's -- that's what she meant when she said 'Listen, Linda.'" I had to go and look it up because I wasn't sure. And as I mentioned before, I thought maybe she had me mixed up with someone else. I didn't know what -- I didn't know what Saadia was trying to convey when she referenced me as listen Linda because I had never heard that -- that phrase before.
Q. Okay. Did you eventually see the video with the little kid who is saying listen, Linda?
A. Yes. I had to go and look it up.
Q. Okay. And then eventually you understood that's -- that's sort of where that was coming from from that video?
A. Yeah. Yes, and some verbiage that I saw too that meant it was used in a derogatory manner.
Q. Somewhat that you saw? I'm sorry.
A. Some verbiage that I looked up. It was used in a derogatory context.
Q. Okay. Was that from a particular website or



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

something that you saw that?
A. Yes.
Q. Okay. Do you remember what website said that?
A. No.
Q. Okay. Okay, then let's move onto the next -- the next thing that you talked about was that some of your interactions with Erica Bethany you said were -- I'm just trying to use the terms you -- you used which were you had unpleasant interactions and sometimes Ms. Bethany used profanity with you.
A. Yes. Yes.
Q. So, with regard to those interactions did you regard those as discriminatory?
A. No. Hostile.
Q. Okay. I guess what I'm asking is hostile based on any particular characteristic that you have, is that what you mean, or just generally hostile?
A. I want to say I think Erica -- could you repeat your statement? You said any characteristics that I have?
Q. Sure. So, any protect -- what I'm really getting at is whether you think those statements that were unpleasant or profane were based on any protected characteristics such as your age, your sex, your race, or any disability status?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. No.
Q. Okay. Okay, then I want to move on to the meeting you described that Angela Thompson set up. You said it was -- it was described to you as training but then when you got there, it was sort of a surprise like Angela Thompson was trying to hold some -- some type of like a mediation between you and Erica Bethany, is that what you were saying?
A. I wouldn’t necessarily say it was a mediation because Erica came to me and said, "Tara, it’s time for us to have the training meeting." So, I was thinking to myself if you came to me and told me it was time for us to have the training meeting, I saw Angela a couple of times that same day, she could have just, I guess, address me and say, "Hey, I notice that it seems like there is some type of conflict between Erica and yourself," instead of just surprising me, "Well, this is not -- we’re not going to do training, but we’re going to move to another place more private to have this training under" -- that’s what I was under the impression, but when we got to the area, it wasn’t training at all. It was a set up.
Q. Okay. Now, I want to break that down a little bit. What was the area that you guys moved to?
A. We -- I -- Eric Osterbeck had me sitting at the



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

front of the office area across from the reception desk, so Erica and Angela were sitting in the back of the office, and Erica sat at one of the cubicles. So she came from the back of the office all the way up to the front area and said to me, "Tara, it's time for us to have our training with Angela." So, I said, "Okay, give me a moment; let me just get my pad and my pen -- my pencil or pen." And when I followed her to the back, that's when Angela said, "Hey, we're going to train in a different area."

So we went into one of the office -- she said we need privacy, so we went into one of the vacant office kind of like in the middle where a door was located. And that's when she said -- started making the comment -- comment about, "It's in my spirit, something in my spirit is saying that there's something going on between you and Erica," and I didn't feel comfortable with it. Like I mentioned before, it was a set up, and as a result of that, I excused myself and I went across the hall, and I had to talk to someone who was more seasoned than me in the HR department and she told me, "Do not participate in that meeting. Go back to your office and do your work," and basically be quiet. And that's exactly -- I went back to the office area, and I said something to the effect of, to the best of my recollection, "I want -- I



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

would like to be excused and I don't want to be a part of this meeting."

Q. Okay. Was there anyone else present other than Ms. Thompson, Ms. Bethany, and yourself?

A. During that time?

Q. During the -- during the meeting that was supposed to be a training?

A. No.

Q. Okay.

A. But there were other people in the office but not in that area where we were.

Q. Okay. And -- okay, and then you don't know whether training was supposed to start after that or anything, do you, I mean --

A. It did not start at all.

Q. Right, but you -- I guess my question is you know, you left sort of at the beginning of, you know, before -- you left after Mrs. Thompson raised the issue with you and Mrs. Bethany, so, is it possible that training was supposed to start after that?

A. It didn't start because I asked her when are we going to go over the cyber awareness training, and she said we're going -- we need to get something -- some type of access and she didn't have it yet. So, training did not occur at all.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Oh, okay. Yeah, sorry, I did a bad job asking that question but that's what I was asking. And then so when did you have that conversation about following up about the cyber awareness training?

A. I sent a couple of email to her, and I told her that I needed to complete the cyber awareness training and send her the certificate, which I did, and I also ended up reporting to the office at six o'clock in the morning, two hours before my tour, to receive training from her when she complained about my HR task not being correct. So, I had -- after being called in the office with Mr. Osterbeck and Angela, I asked Angela Thompson in front of Mr. Osterbeck, or I asked Mr. Osterbeck, "Mr. Osterbeck, is it Postal Service-" -- no, I asked Angela. I said, "Is it possible that you can train me on the tasks that you feel as though are deficient?" And Angela made a comment, she said it's -- I think she -- something to the effect, "It's your call." And Mr. Osterbeck told her go ahead and work with Tara. And that was basically the gist of that.

Q. Okay. Do you remember when that particular meeting was?

A. I want to say to the best of my recollection between July and August 2020.

Q. Okay. And then after you, and Ms. Thompson, and



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Mr. Osterbeck had that discussion about training, did Ms. Thompson provide any additional training that you were seeking?

A. When I -- I think I must have went to work for maybe about a month or so, and maybe out of the month, maybe, to be honest, maybe about, maybe six to seven times I solicited help from her and I sent her an email and said, "Angela, I'm currently present in the office. I'm on my way to your office." She said, "No, I'll come to you." So, I just responded back in the email communication, "Okay." So, I had to, I guess, work around her schedule whenever she was available, but she and I were the only two people that were in the office before 8:00 a.m. that were on the HR team as far as the strategic business unit team is concerned.

Q. Okay. And I guess are you saying you were reaching out to her asking to come talk to her about something you wanted to be trained about?

A. Yes.

Q. Okay. And then you said she would say, "Don't come to me, I'll come to you"?

A. In one email communication she said that, yes.

Q. Okay. You said this happened about six times --

A. She --

Q. -- that you can remember.

A. One time in the email communication she said -- when I sent her an email saying that, "I'm present and I'm on my way to you, to your office," she said, "I'll come to you." That was one time with that instance.

But there were several other times that I solicited her help and needed help and she wasn't forthcoming with helping me. And I would say out of maybe a month or so, seven times, to the best of my recollection, she provided some form of training, but it wasn't thorough or detailed or precise.

Q. Okay. And then just to close out this topic, you know, talking about this meeting that was set up by Ms. Thompson, did you regard that as discriminatory, again, based on either age, or sex, or race, or any disability status?

A. No.

Q. Okay. Okay, so, now I want to move on to the next heading, or the next little topic in your EEO affidavit. This is B, and then this one is that and I'm quoting here, this is in April 2020:

"Eric Osterbeck, assistant human resources officer, told her she can call him quote/unquote, 'candy man.'"

Now, could you please describe what you recall about that event?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Okay. This is maybe about the second -- during this time, it was about the second week in April that I was working in the HR department, and Mr. Osterbeck, I think, called on the phone or communicated with me via email and said, "Tara, could you come into my office?" And I responded yes.

So, I reported to his office, and I think at that time he said, "I wanted to go over some of your job descriptions or requirements." So, I had my pen and pad headed to his office, and we went over some of the responsibilities that he wanted me to adhere to. And he made a comment about, "You can just come to my office; you don't have to knock. You can just come in and help yourself to anything that's in the office as far as Rice Krispy Treats and candy." And he asked me did I have any questions, and before I answered or responded to that, he said -- looked at me and had a smile on his face and said, "Because around here, they call me the candy man."

Q. Okay. What happened after that?

A. After that, I kind of paused for a moment and looked. He had a smile on his face, and I felt -- I felt uncomfortable, and I felt out of place and I was thinking to myself, "How do I respond to a comment such as this?" I felt very, very uncomfortable and I was -- I said, "Okay." "Do you have any" -- he asked me did I have any



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

questions for him, and I said no. And I said, "You know, is this all that I need to aware of as it relates to the job descriptions?" And he said yes. And I said, "Okay, thank you," and I left out of his office.

And there was a person in the office named Joe Franklin who I had a conversation with, and he -- and I told him what happened, and he just kind of said to himself -- well, he didn't say it to himself, but he said it to me, Tara, "You better be careful."

Q. When you say in the office, you mean generally like in the whole office, not in Mr. Osterbeck's office, that was -- you mean in the VA office?

A. Yeah, out -- when I left out of Mr. Osterbeck's office, I went down the hall and there were other cubicle areas out in the open.

Q. Okay. And what was Mr. Franklin's position?

A. He was -- he was ER/LR Assistant, employment labor, slash, labor relations assistant.

Q. Okay. Employee relations, labor relations, is EL -- ER/LR?

A. Yes, assistant, yes.

Q. Okay. Okay, and why did you tell Mr. Franklin about it?

A. Joe Franklin and I had a rapport and Joe Franklin was the person who Eric Osterbeck told to train me along



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

with Saadia Graves Tatum.

Q. And you said Mr. Franklin told you be careful. Is -- is that all he told you?

A. He said, well, yeah, in a sexual manner, yeah, sexual, he said -- to be -- he said, "Tara, be careful, watch yourself." That's what he said to me, "Be careful."

Q. Okay.

A. Sexual -- in a sexual connotation, sexual context, sexual acts. When he was talking to me, he was like, "Tara, be careful; watch yourself," because it was meant in a sexual context. That's how I took it, and when I told him that, that's how he -- he perceived it because he made the comment to me from my perspective.

Q. Okay. Now, did you regard Mr. Osterbeck's comment of saying he's -- they call him the candy man, did you regard that as being discriminatory on any basis age, sex, race, or disability?

A. Sexist.

Q. Okay. And then why did you regard that comment as being discriminatory based on sex?

A. Because I looked at it like this, I was his subordinate, he was a superior, and why would you even reference yourself as, "Around here they call me the candy man"? And I was thinking to myself, is he trying



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

to suggest my life experience as a candy man, satisfying people, are you trying to hint around by using that as a bait to see what type of person I was? I don't -- that's how I perceived it. It was -- I had never been -- I had -- in a professional environment from a civilian standpoint, no one, no male ever made that type of comment before.

Q. Okay. And I'm just trying to clarify a little bit more. What about the phrase candy man is suggested to you that it was a sexual comment?

A. It was kind of like street lingo. There's a song out there that's -- that referenced the candy man, a person who satisfied women. There are several songs that reference candy man from a sexist point of view.

Q. Okay. Just for the record, do you know what any of them are, who are -- who are the singers of those songs?

A. Yes.

Q. Please -- yeah, just go ahead and list whatever the songs are, who the singers are.

A. Rick James. Also, I can't remember this one person's name, but the song is about -- deals with candy licker. I don't know if he's a blues singer, or, I can't remember what type of genre of music it is, but it has something to do with the male reproductive part.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay. So, but Mr. Osterbeck was also literally talking to you about actual candy, right?

A. If someone is talking to someone about -- I mean, if -- if someone, in my opinion, according to my recollection, if you're offering someone some type of refreshment, you wouldn't need to go as far as saying, "Around here they call me the candy man," and you have a grin on your face, you pause for -- for emphasis. I personally speaking, if -- when being a supervisor, if I had refreshments, I didn't go as far as saying, "Hey, you can help yourself to x, y, and z, because around here they call me the candy woman." I nev -- I would have never phrased that. That's how I took it.

Q. Okay. And then I -- just to -- my particular question was that earlier in the conversation, he did offer you actual candy, right?

A. Yes, and then there was a pause, and then that's when he made the comment he made. So, I don't -- yeah.

Q. Okay.

A. With a smile. With a -- with a smile, a full-fledged grinning smile, so, I was thinking to myself, oh. I felt very uncomfortable, and I was saying to myself as a new hire, "What did I walk into?" I felt uncomfortable.

Q. Okay. And then have you heard the phrase candy



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

man used in a non-sexual context?

A. Usually when I hear candy man, it's affiliated with sexual connotation.

Q. Okay. But have you ever heard it used in a non-sexual context?

A. From Rick James and the other person, I can't remember that guy's name, no.

Q. Okay.

A. I can't remember his name.

Q. Have you heard the song in the Willy Wonka and the Chocolate Factory about the candy man?

A. No, because I'm not a Willy Wonka fan. So, maybe he probably came on the scene after I was an adult.

Q. Okay.

A. I am kind of older.

Q. I just mean as one other song I've heard about, you know --

A. Oh, no, I haven't.

Q. Okay. All right, and then other than talking to Mr. Franklin about that, did you talk to anyone else about that comment?

A. Yes, someone outside of the HR department. I told my parents, and I also told my best friend, and I also reported it when I started filing my claims about what occurred in the HR department. I also shared that



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

comment with Donald Scott who was -- who is or was an EEO representative in Pinellas, Florida. I mentioned that to him. I also shared it with Cindy Bukowsky who was an HHP representative with the EEO. I shared it with Zenia Berry, and I shared it with a couple of other.

Q. Okay. When you were saying someone outside of HR, was that someone whose name you didn't mention, or did you mention the name?

A. My parents.

Q. Oh, okay.

A. And my best friend.

Q. Okay. Was that by phone or by text?

A. That was in person.

Q. Okay, both of them?

A. Yeah, my parents and my best friend.

Q. Okay. And then what's your friend's name?

A. Makeba Cargile.

Q. Okay.

A. She -- she spells her first name M-A-K-E-B-A and her last name is spelled C-A-R-G-I-L-E.

Q. Okay, thank you.

A. You're welcome.

Q. Okay, now I want to move onto the next topic in the affidavit which is the heading number C which says in October 2020, Mr. Osterbeck belittled and yelled at you.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Yes.
Q. Now, what do you recall about that -- that event?
A. Well, I was called to his office again by something pertaining to work related, and he raised his voice at me, and to the best of my recollection, we were having a conversation, I mentioned something to him about a hostile environment and also something probably pertaining to work, and he raised his voice at me, and he was rude and discourteous, and he belittled me basically.
Q. Okay. Do you remember anything in particular that he said?
A. I want to say that -- I don't know if I had -- to the best of my recollection, again the hostile environment still ensued, nothing really was working as it relates to Erica -- my complaints regarding Erica Marie Bethany, Erica Bethany, and I want to say that I said it was still a hostile environment. And he raised his voice at me.
Also, there was an action pertaining to some type of educational debt reduction for the nurses and the doctors, and he got upset because he said something about no -- as a result of his absence, no one in the office could assist these employees, and he got upset, and he sent out an email communication that had all capital letters in it, and as a result of his comment, a couple



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

of people were offended. I was offended, but I didn't say anything because I was one of his new hires still. And one person did respond, and that was Joe Franklin, and Joe Franklin responded to Eric Osterbeck's email communication because he felt as though it was derogatory when he addressed a group of employees who were adults, even though he was our -- well, he was my supervisor, but he was one of the managers in the office.

Q. Okay. So, I'm picking up that there are two different things here. One was an email that was all caps that was -- you regarded as begin derogatory, and then there was also a meeting you had in Mr. Osterbeck's office in which he -- he said certain things that you regarded as belittling and derogatory?

A. Yes.

Q. Is that right?

A. Yes.

Q. Okay. So, starting with the email, did you regard the email as being discriminatory on the basis of age, or sex, or race, or disability?

A. Age, because of the fact that he sent out a mass email communication that was demeaning. We were all adults, and we were all professionals, and that email -- I would say age.

Q. Okay. Do you mean discriminatory based on old



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

age, or just the text of the email was inappropriate for your age, is that what you're saying?

A. I would say old age.

Q. Okay. Do you know the ages of everyone on the email?

A. Well, some people were in their 30s, and some people were in their 50s.

Q. Okay.

A. Maybe. I don't know. I'm -- I don't know.

Q. Okay. Yeah --

A. I know Erica was younger. She was in her 30s.

Q. Okay. And then I guess my question is just if the email had a lot of different people of different ages, what made you believe it was discriminatory based on age?

A. Well, no. No. I recant. No.

Q. Okay. All right, and then what about the particular comments that Mr. Osterbeck made to you in his office that you said he raised his voice, and he was rude, and belittled you, is it your testimony that those comments were discriminatory on any of those other basis that we talked about like age, sex, race --

A. Age as compared to Erica.

Q. Okay. Now, let's talk about that a little bit more. You said -- your response there was age as



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

compared to Erica, right?

A. Yes.

Q. Okay. So, is -- is what you're -- are you -- are you saying that Mr. Osterbeck made those comments to you but didn't make similar comments to Erica, is that what you're saying?

A. Yes.

Q. Okay. And Erica is younger than you?

A. Yes.

Q. Okay. Okay, now, do you know whether Erica did all the same things as you that Mr. Osterbeck was talking to you about?

A. Could you restate that please?

Q. Sure, yeah, pardon my, you know, phrasing. What I'm asking, I guess, is Mr. Osterbeck was having a meeting with you about particular things that he wanted -- that he wanted to talk to you about, like particular parts of your job performance that he wanted to talk to you about, right?

A. Well, yes. Yes.

Q. Okay. And then like what particular, you know, criticisms did he have?

A. He asked me, "Help me to understand your -- your way of thinking. You don't think like everybody else in the office. I have never met any," he said, "I have



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

supervised hundreds of people, but I have never supervised anyone like you."

Q. Okay. Was there -- was there something specific he was -- that caused him to -- that prompted him to make that comment? Like was he talking about something specific that you did that prompted that comment?

A. I'm try -- I don't think that anything I did warrant him to question my intellectual thinking process.

Q. Okay.

A. And he never reprimanded Erica about her job performance to my recollection.

Q. Okay. So, yeah, what I'm just trying to get down to is --

A. About her poor job performance, as a matter of fact.

Q. Okay, yeah, and what I'm just trying to get down to is whether it was warranted or not, do you know what prompted Mr. Osterbeck to say, you know, to make the criticisms that he was making?

A. No.

Q. Okay. So, he didn't mention anything in particular that he thought you did wrong?

A. Well, he did make the comment about an email being sent out.

Q. Okay, that you sent an email?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Yes, to Eric Gonzales.
Q. Okay.
A. That said thank you.
Q. Okay.
A. But it wasn't warranted.
Q. Okay. And was this an email -- I think I saw something about this in the file which is that this was an email that was response to a group email, like it was a reply-all email?
MR. MARTIN: Excuse me, I'm sorry, you can answer the question, then we're going to take a quick break, is that okay, Chris?
MR. DOYLE: Yeah, of course, go ahead.
MR. MARTIN: We'll take a quick restroom break. Okay, go ahead. You want to rephrase that just in case, 'cause I interrupted you?
MR. DOYLE: No problem.
BY MR. DOYLE:
Q. Okay, so then, yeah, Ms. Miller, what I was just asking is was that in the context of a reply-all email that you sent to Mr. Gonzales?
A. Yes.
Q. Okay.
MR. DOYLE: Now, let's take a break, and you know, we can take 10-minutes or whatever if that's okay.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

MR. MARTIN: Okay. 10 -- 10 is good. Thanks, Chris.

(Off the record from 1:33 to 1:52 p.m.)

BY MR. DOYLE:

Q. Okay. So, Mrs. Miller, when we left off we were talking about a meeting in which Mr. Osterbeck criticized you for sending an email, sending a reply-all email, is that -- is that right?

A. At -- yes. That was -- I want to say that was in 2021 when he criticized me for that and started to question my intellectual thinking process.

MR. MARTIN: 2021 you were no longer there.

THE WITNESS: January 2021.

MR. MARTIN: Oh okay. I'm sorry. Go ahead, I'm sorry.

BY MR. DOYLE:

Q. Okay. And the way we began talking about that is you said that Mr. Osterbeck criticized parts of your work performance but not of Ms. Bethany's performance, is that what you said?

A. Yes.

Q. Okay. Now, I have sort of two follow up questions about that and one is do you know whether Erica Bethany did the same type of thing, like a reply-all email, that Mr. Osterbeck criticized you for doing?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. I don’t know.

Q. Okay. And then how do you know that Mr. Osterbeck didn’t criticize Erica Bethany for her work performance?

A. Well, there was an email communication August -- I want to say August the 31st, 2022 -- I’m sorry, August 31st, 2020. We conduct a new employment orientation briefing with new hires, and there were some rude comments that were -- that were directed towards the new hires, and I want to say on September the 3rd, 2020 Eric Osterbeck sent an email communication to myself and Erica, and he said, "I received some comments from the new hires who," and I’m ad-libbing, "who were disgruntled about how they were communicated against, saying 'If you don’t get this document in, you ain’t going to get paid on time,'" and some other comments. And when Eric Osterbeck wrote the email communication, he included me as being one of the persons who was being rude to the new hires, and that wasn’t the case, and I sent a reply that the comments are accurate, but I -- it does not apply to me or something to that effect in the email communication.

So, when Erica was poor in her performance with communicating her portion of the NEO briefing to the new hires, I was also accused to the communication that she



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

shared with the listening audience at that particular time, and Mr. Osterbeck didn't distinguish between the both of us, and he never responded to that email that I sent him. So, I was blamed for poor performance.

Q. Okay.

A. And he --

Q. Oh, go ahead. Sorry.

A. Okay. And he also allowed Erica to be tardy without reprimanding her, which was -- or any type of disciplinary action despite the work violation rules.

Q. Okay. How do you know that he didn't reprimand her?

A. Well, when I -- she continued to be late, and he continued to send in -- send email communications -- well, mass email communications to the HR staff members to say, "Erica is late today; Erica is going to be a little bit late; Erica is late." It was emails it seems like every month about Erica being late to work.

Q. Okay. But you don't know whether Mr. Osterbeck and -- actually had any conversations with Ms. Bethany about being late?

A. I'm not sure because she never stopped.

Q. Okay.

A. She continued to be late. It wasn't effective if he did.

Q. Okay. And do you know that Ms. Bethany was tardy without a legitimate reason?
A. Well, he didn't share that with me.
Q. Do you think he had a -- had to?
A. Everyday just about -- well, we -- you asked a question do I think he should -- he had to?
Q. Yeah, if someone for example had to be late for a medical reason, the supervisor then probably shouldn't share the reason, right?
A. Say that one more time.
Q. Yeah, so, this might be silly, but just for example, you know, a supervisor might approve someone being tardy for a reason that that person doesn't want shared.
A. She was late -- well, she was late just about every day.
Q. Okay.
A. I'm sorry.
Q. That's okay. And my question was just if you -- if you know why or do you know that she didn't have a legitimate reason?
A. He didn't -- he didn't share that with me. Every day. No, he didn't give me reasons why she was at -- tardy just every day.
Q. Okay. Were you ever criticized for being tardy?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. I was tardy one time February 17 because it was an ice storm and a snowstorm where the snow was like 10 feet, it was a bad storm and I got into a car accident, and I phoned Mr. Osterbeck about seven something that morning, maybe to the best of my recollection between 7:30 and 7:40 something a.m., and left a message on his voicemail stating that I had been in a car accident and that I was going to be late. And I arrived to work at 8:10 a.m. that morning and banged up and all, and worked the full day and did not go to the emergency room until I -- until after I got off from work that day, and our tour ended I think at 4:30 p.m. I stayed until -- stayed to work until about five something. So, that was the only time I was late to work because of the -- the automobile accident due to the inclement weather.

Q. Okay. And were you criticized at all for being late that day?

A. I stopped at his office and said, "Mr. Osterbeck, did you receive my message?"

MR. MARTIN: Just answer the question. Were you criticized?

THE WITNESS: No. No.

BY MR. DOYLE:

Q. Okay. Okay, all right, now I'm going to move on to the next bullet point in the affidavit which is D, but



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

I think maybe we already talked about this, because this one says Mr. Osterbeck was demeaning and threatened your job, but the particular comments that's listed here is that you don't -- you don't think like everyone else, and I think you did discuss that conversation already, is that right?

A. Yes.

Q. Okay. And was this in response -- was this prompted by the reply-all email that we discussed before?

A. Yes, it was prompted by that email communication, and he went on to say, "Aren't you in the Army? Don't you know how to take orders? You disobeyed me."

Q. Okay.

A. "Don't you know how to follow orders? You can't follow simple instructions?"

Q. Okay. Was there anything else to that conversation?

A. He threatened my job and told me I was skating on thin ice and, "If this is not the place where you want to be, then just let me know and I'll send you where you -- you want to go," basically. That's the way he told me. That's what I remember and I was thinking to myself -- and he raised his voice to me and I had a splitting headache from my frontal lobe to the back of my head and I just couldn't believe it, and I just asked him, I said,



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

"Do you want me to leave your door open or closed?" And I was thinking to myself, "Disobey? That's what you tell an animal, dogs."

Q. Okay. So, and his precise, you know, criticism was that he told you not to do reply-all emails, and he said that was the thing you were disobeying?

A. He made a comment when I was in the office that, "If I tell you to do this, then you do that. You don't think like everybody else in the office. Help me to understand your -- your way of thinking." And I was thinking to myself -- I was just in disbelief.

And when I think about it now, it's a trigger for me because it seemed like I went through -- I went through a lot of humiliation, stress, pain, and it cost me my job, my livelihood. And it still affects me to this day, even if I have to apply for a position, they're asking questions, "Have you ever been terminated from your position within five years?" So, it's like it's a repeat -- it's a trigger. I have nightmares. I'm stressed. I'm stressed now even just regurgitating and just revisiting a lot of hurtful events that I encountered when he was my supervisor and just being in that office and knowing that that office had a high turnover. It's just stressful even to just talk to you about this, and for someone to even to question



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

somebody's intellectual thinking process, and I am a disabled vet, and he was aware of that with an intellectual disability.

Q. Okay. Okay. So, that gets into my next question which is similar to the ones I've sort of already asked about the other events, but as to this discussion that happened on January 21st, 2021, did you regard that discussion as being discriminatory on any basis?

A. Yes, I felt it was discriminatory to ask me and you -- to compare me to everybody in the office as it relates to my thinking process.

Q. Okay, so, the comment of that you think differently than other people in the office, you regarded --

A. Yes.

Q. -- that as being --

A. Yes.

Q. -- discriminatory?

A. Yes.

Q. Okay. And do you mean discriminatory on the basis of disability?

A. Yes.

Q. Okay. And you mentioned that you -- you had a disability, and that Mr. Osterbeck would have been aware of that, is that right?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Yes, because in December -- yes, he was aware because when I first got hired at the VA, I had to upload my Schedule A and my disability paperwork, and on one of those documents it states that the veteran has an intellectual disability, and when you have a Schedule A, it gives you a little bit more veteran preference to receive gainful employment as a federal employee, and it's called a Schedule A letter. So, yes, he was aware of that.

Q. Okay. Do you know whether it says anything in the Schedule A letter other than the term you used, intellectual disability, does it say anything else about what particular disability?

A. It does not. There is an intellectual disability or disability based off of my recollection, but it does not -- one of my documents does have something about my -- I think it may. I don't have the document in front of me at this moment. So, based off of my recollection, what I can recall from the document, it does say intellectual disability. That's one component of it.

Q. Okay. Do you have any other name for it, or do you call the disability that you have anything else other than just generally intellectual disability?

A. Am I allowed to disclose my medical? I have depression, manic depression/depression, anxiety, and



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

post-traumatic stress disorder. Those are the medical diagnoses that I have been diagnosed with from behavioral health.

Q. Okay. And then how did you know that Mr. Osterbeck had seen that Schedule A filing?

A. Because he said he orientated me, and if he orientated me, he would be familiar with my personnel documents. And also, in -- I don't know, am I allowed to give you an example?

Q. Of course, please.

A. In December 2020, I had a medical appointment which was with mental health, and I needed to take off for leave, and he said to me, "I wasn't aware that you were a disabled veteran." And I said, "My Schedule A letter and my disability letter was uploaded in eOPF upon my being hired, and Janice Yusiton was my HR recruiter, so, it was there." But when he said he looked into my eOPF file, he said, "Your disability letter is not there," but still the Schedule A letter was there which read that I had psychologic -- intellectual disability. And I also was hired under the Veterans 10-point preference as well, which means that I would --

Q. I'm sorry, were you finished with that response, or was that -- you were saying that was another reason that you think Mr. Osterbeck would know of that?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Yes.

Q. Okay. And then you might have explained this somewhat already, but just to make sure you have a full opportunity to respond here, what was it that made you think that -- that the comment of you don't think like everyone else was referring to an intellectual disability?

A. If someone -- if someone is telling you that you're not the majority, and you do not fit in the category of the majority, that means that you're on the -- you're -- you're on the outside. You're being marginalized and someone is challenging the way your thought process happens to be. So, I don't think like -- and they know. So, I don't -- I wasn't thinking like everybody in the office. So, why would you single me out and compare me to everybody in the entire office -- the office? Why would you do that? That was hurtful. Mentally.

Q. Okay. Now I want to move on to the next heading in the affidavit which is E, and it says on January 26th, 2021, that you were told you couldn't have a representative during a mediation. Could you please just summarize what you remember about that?

A. I communicated -- in January, I think January the 6th I was called into Eric Osterbeck's office again based



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

on a complaint that Angela Thompson had made, and Eric asked a question, "So, Tara, what do you think we can do in order to," and I'm adlibbing, "what do you think we can do in order for you to be able to receive the help you need," I guess, in so many words from Angela. And I said, "Well, Mr. Osterbeck, is it possible that Angela and I can have a mediation meeting to where we can communicate, learn how to communicate with each other in order to be productive in our HR tasks," and I'm adlibbing. And he said, "I will look into it."

So, as a result of me leaving to go away from military duty, I returned and I think I followed up with him in an email communication to the best of my recollection, maybe around January the 13th, 2021, and I asked him in the email communication a series of questions. I asked, "Mr. Osterbeck have you scheduled an appointment for a mediation between Angela Thompson and myself?" And right now, I can't remember his response.

But eventually an appointment was made. I spoke to Zenia Berry. She said to me that, "You can have a support person to accompany you to the mediation between you and Angela Thompson." So, I said to her -- she said, "Well, you have a deadline. Send me the name of the person who you want to attend." I sent her the name of Joe Franklin. Then she sent me back a response and said,



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

"You can't have Joe Franklin because he works in the HR department, and he would be a conflict of interest." So, I said okay.

So, I sent her another name, Shadae Roberson, and I might be pronouncing her last name incorrectly, but she was supposed to be in attendance but over the phone, and when I got to the mediation meeting, to my dismay, Angela and Eric -- Angela Thompson and Eric Osterbeck walked up together, and when we went into the meeting. I asked a question to the independent mediators could I call the person who was supposed to be my support person to be a part of the meeting. One of the two ladies, the younger of the two said, "No. The only people who are going to be a part of this meeting are the three people sitting at this table."

So, I was denied my person, and I text Ms. Roberson, Shadae, and said to her, "I was told that you could not be a part of the meet -- I was told I could not have -- that only three people who were going to be a part of the meeting were the three people who were at the table, and I could not have a person of support." So, I text her after we got out of the meeting, and I was upset and I was thinking to myself now, "I asked Mr. Osterbeck if Angela Thompson and I could mediate, so why is Mr. Osterbeck coming to show his support for Angela



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Thompson?" We both are on the team, and I didn't think that was right and I didn't have any person to be of support to me during that meeting.

Q. Okay. As a follow-up to one thing you mentioned, what was it that led you to conclude that Mr. Osterbeck was there to support Mrs. Thompson?

A. Because of the questions he was asking and directing towards me. If Angela said something, then he added validity to what she was saying. If I said anything, he did not lend me support at all. And just by him showing up, I didn't even know he was supposed to be a part of the meeting. There was an email that was sent out by Zenia Berry that said Tara Miller, Eric Osterbeck, and Angela Thompson will be attending the meeting, but when I communicated with Zenia Berry initially, I said in the email -- I wrote in the email communication that I wanted to know if Mr. Osterbeck followed up with her with a meeting between Angela Thompson and myself. And also, the email communications that I sent to Mr. Osterbeck as well. So, I was upset, nervous, and frightened mentally and emotionally, that he would be in attendance.

Q. Okay. Now, as to this January 6th -- I'm sorry, January 26th interaction, did you regard that as being discriminatory on the basis of age, sex, race, or disability?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Unfair and retaliatory.
Q. Oh okay, so, retaliatory for what?
A. For me asking to have a meeting with Angela Thompson, and Eric Osterbeck going to the meeting to support her and not lend support or serving as a neutral person to say, "Hey, there is some type of situation or dilemma that exists on my team, and I want to make sure that I'm being fair with both employees so we can resolve this matter and be productive in the classroom."
Q. Okay. So, the underlying issue that you --
A. Retaliatory that was made against Erica Bethany. Against Erica.
Q. What was made against Erica?
A. The retaliatory that I made against Eric and Erica.
Q. You meant there --
A. Complaints.
Q. Oh, complaints against --
A. The complaint, yes.
Q. Okay.
A. The complaints that I made against Eric, the complaints I made against Erica, the complaints that I made against Angela to Zenia Berry to Cindy Bukowsky, to the other persons, they were retaliating against me. He attended the meeting to add support to Angela Thompson



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

as, in my mind, a united front. So, there was a social divide made through retaliation.

Q. Okay. Now, I want to break down those different complaints you mentioned. You mentioned you complained about Erica Bethany. What type of complaint was that?

A. Ang -- Erica Bethany was rude, belligerent in her communication towards me. She raised her voice towards -- well, at me. If I need assistance with different HR functions, she made excuses saying that, "I'm a -- I'm working on some very important deadlines or tasks and I'm not going to be able to help you; oh I thought I was going to help you -- be able to help you but I can't."

Erica used the N-I-G-G-E-R word in the office. She used profane harsh curse words, "I don't give an F, F-it." And she even was -- one time was cussing so loud to -- Ms. Diaz had to walk from her office around the corner and ask the question, "Who is cussing; who is cussing?" And Erica looked at her and said, "Oh, I'm sorry." And I think it was another person that was a psychologist that was in the office, it was a doctor, I can't remember her name but they both heard Erica's belligerent outburst and cussing as though she was outside in the city in a certain area in the city of Detroit; anywhere, for that matter. It wasn't -- her language wasn't conducive to the office environment, and



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

it was unprofessional, and it was demeaning, and disrespectful, and derogatory, and upsetting.

Q. Okay.

A. And then she started using -- and it violated the work rules.

And then there was another time where she was having a conversation with Yolanda May after returning from lunch, and she use the word -- she was referencing someone and she said, "He was just acting colored; just being colored, and you give a," and I don't like using the word, "You give an N a position and they abuse their power of authority," or something to the effect. That's what she said, and I said to myself, "Oh my God." It was offensive and I was embarrassed.

I was -- I just -- uh-uh. Like I said, my work and experience, I never worked in an environment as though we were outside. And there was just no decorum. That's not what I -- I mean I understand I'm in the military, that's separate, but I also have my civilian professional experience and background as well, but I wasn't used to that. It was -- it was upsetting. It was horrible. It was hostile.

Q. Okay. And then we got into this discussion because you said that the meeting you had was, you said, retaliatory for a complaint filed against Ms. Bethany.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

So, in what way did you complain about those things you were describing Ms. Bethany doing?

A. I sent complaints to Zenia Berry. I sent complaints to Cindy Bukowsky. I send complaints -- I spoke with Donald Scott over the phone about Erica. And I also went to Zenia Berry a couple of times to ask her does she have any literature that I could have on how to interact with disgruntled coworkers in the workplace. And there also was a one-on-one meeting that was scheduled by Mr. Osterbeck between Eric and myself when he spoke to us one-on-one, and Erica started raising her -- she started talking to me rough and rude, and he said to me because that -- at that time, after the meeting was over with, I got upset. I did not use belligerent language towards Erica. He said, "I saw what happened back there, and I'm going to schedule an appointment to where you all can meet with Fred Barry and Zenia" -- I'm sorry "Zenia Berry and Fred Harris." And I said okay. He said, "I'm going to talk to her about her communication." But to no avail. She continued to do it, and not just to me, but to veterans, employees, persons who called over the phone. Eric allowed it.

And there have been times when she also got into a verbal argument with Joe Franklin in the office. And Glen Belcher, one of the ER/LRs, he overheard a



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

conversation when a 70-some or 80-some plus year old man called in and said he needed help with something over the phone and Erica was just rude to the man, and my door was open, and I just could not believe how she was talking to this -- this veteran, this older gentleman: "I'm going to help you this time, but the next time you're going to have to," x, y, and z. But again, that was reported to Eric Osterbeck, but he allowed it because she still did not cease from her behavior. And it violated the work rules, and it was unprofessional. And it violated the rules of professionalism.

Q. Okay.

A. The VA rules rather.

Q. And then to circle back to the discussion we were having about the meeting, what made you conclude that not being allowed to have a representative was retaliatory for your prior complaints?

A. I talked to Zenia Berry on the -- over the phone and email communication, and she assured me that I could have a representative there. If the person could not be there in person, then that person can be called in. They violated my rights as an employee. So it was VA retaliation. You have a manager who is lending support to another subordinate. I'm a subordinate, too. But you have two people who are coming against one individual.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

That's unfair. It was unfair treatment.

Q. Okay. I just want to move on to the next bullet point which is --

A. And may I add one -- and I had complained about Eric.

Q. Okay.

A. So, okay, I'm sorry.

Q. Oh, that's okay. So, you mentioned a complaint about Eric to who?

A. Cindy Bukowsky, the harassment prevention specialist; Donald Scott, the EEO specialist. I want to say that I even talked to Fred Harris at one point in time as well. I had complained to several people, and also Glen Belcher told me, "Tara, report Eric to the EEO, and also in order to get him off of your head." And Joe Franklin and Reginald Guynes had even said report him to -- to congress -- Congresswoman Debbie Dingell, report him to Dr. Reeves, report him, Eric Osterbeck, to the EEO. And I also reached out to Dr. Reeves and sent her a grievance statement.

I also tried to contact Eric Osterbeck's immediate supervisor, which was Eric Gonzales, but Eric Gonzales didn't take my calls. So, I reported him to -- I even -- I reported him to anyone who could probably help me, and at that time, I did not know that I could



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

have joined the union and had someone to represent me. I didn't know because I wasn't orientated. And when I did conduct orientation, we were only allowed to present our 30-minute spiel and leave immediately because we had HR tasks and personnel actions to complete.

Q. Okay. Were all those complaints you were mentioning about the same thing or were those about different -- were they different complaints about different things?

A. They were about hostility, unfair treatment, discrimination, the candy man comment. They were about Eric Osterbeck lending support to Angela Thompson during the mediation on January the 26th, 2021. It was about Erica using the N word and or racial com -- slurs, profanity, being belligerent, not just to me but the nurses, the people she orientated who were not a part of the medical staff, the elderly gentleman calling in.

Q. Oh, okay.

A. Me.

Q. For now, sorry, I didn't mean to cut you off, but for now I was just talking about the ones about Mr. Osterbeck. Were all of those about the same -- the same subject matter or were they about different things is what I was asking?

A. They probably more than likely were about some --



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

I think it spilled over. Some of the same similar complaints, and then some new complaints as he continued to respond to me in certain manners.

Q. Okay. And then, just I'm going to do my best to break apart what you were saying. You said they were about hostility, discrimination, and the candy man comment. Those were three different things you mentioned.

A. Yes.

Q. What do you mean by -- what do you mean by hostility that you complained about?

A. If I complained to Eric about how I was being treated by Angela Thompson and Erica Bethany, Eric would raise his voice at me and tell me -- I would say this is a hostile environment, he would negate what I said. If I went and complained about an action that was performed incorrectly based on some advice that Angela gave me, he would blame the client instead of blame -- instead of receiving the onus that Angela made an error as it related to a HR function.

Also, there was a mass email that Angela Thompson sent out regarding a function that I performed improperly, but come to find out, I performed it, the function, correctly as it relates to getting in contact with the -- what is it, retirement service? I can't



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

remember the name of it, it's the RSSO.

Q. Okay. And then moving onto you said you complained about Eric Osterbeck being discriminatory, in what way?

A. He accused me of creating a hostile environment.

Q. Okay. Is that what you mean by you accused -- you complained about him being discriminatory?

A. Yes.

Q. Okay. And then -- okay, the candy man comment we have already sort of discussed.

A. Yes.

Q. Okay, so, anything else before we move on? I was going to move on and then you wanted to discuss that one last thing.

A. Oh, I was going to give you an example of discrimination, but I guess we haven't gotten there, so, I'll wait for you to pose the question.

Q. Oh, that's okay. I mean, an example of discrimination that you complained about by Mr. Osterbeck, is that what you're saying?

A. Yes.

Q. Okay, go ahead. What's -- what is the example?

A. Towards the end of my career in the HR department, Eric Osterbeck accused me of modifying documents that I had no training. He labeled me as a



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

cancer, incomp -- I lack competence, comprehension; I couldn't follow the simplest tasks, and I was a cancer on his team. He also said that I modified documents in the HR system. I had never received training on how to modify records in the HR system, but I did look into the system to verify some information when I sent my letter of grievance to the director of the hospital which was Pamela Reeves, Dr. Reeves. And as a result of that, I was -- the police was called on me on February the 23rd, 2021 about three -- three something in the afternoon, I can't remember the exact time, and I had no idea that the assistant deputy of the police department, Mr. Chester, George Chester, was going to apprehend me along with another police officer and take me downstairs to question me, and when he started to Mirandize me, I was so disturbed, and I didn't know what was going on, and I didn't know what Eric Osterbeck had told those police officers in order for them to meet me in the office at my cubicle area where I was working and say to me well, the assistant deputy chief said to me, "Hi, are you Tara Miller?" And I -- as I can recall, I said yes. He said, "May I speak to you outside?" And he said, "You can bring your items with you." And I was thinking to myself, okay, why does the assistant chief want to talk to me? I had no idea that Eric Osterbeck and Angela



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Thompson had collaborated and shared information with each other for this to -- to be implemented.

Also, on January the 29th, 2021 Reginald Guynes came to the office area and said to me, "Tara, I'm just checking to see if you're still here." And I said, "Well, Reggie, why are you checking to see if I'm still here?" He said, "Because Erica told Steven Griffen that you're going to be fired." This was on January the 29th. I went to the mediation on January the 26th. On January 25th, Eric Osterbeck had sent an email communication to Earl Lee to request my termination because he wanted this cancer to be off of his team because I was the common denominator who was creating conflict on the team which was not true.

And also, I had reached out to Cindy Bukowsky from my recollection between January 21st, 22nd, to report Eric Osterbeck. I had previously, the month of June 28th -- not June 28th, but December 28th, 2020, reached out to Donald Scott to report Eric's behavior towards me, and both Donald Scott and Cindy Bukowski were affiliated with the EEO. And I had already been reporting him to Zenia Berry who was also affiliated with the EEO as well.

Q. Okay. So, you mentioned a few dates there, and I want to break those activities out and talk about them a



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

little bit more.
A. Okay.
Q. So, I think the first one you mentioned that was something we hadn't covered yet was there was an email on January 25th from Mr. Osterbeck to Mr. Lee, did you say?
A. Yes, to Earl Lee. I found that email in my evidence file.
Q. Do you mean the --
A. I found it --
Q. -- the sort of report of information that was concluded or conducted with the EEO complaint?
A. Yes.
Q. Okay.
A. I believe, yeah.
Q. And as far as you know, this was an email where Mr. Osterbeck was saying he wanted to -- to terminate you?
A. Yes.
Q. Okay. And then the next thing you mentioned was on January 29th people started saying or you heard from somebody that --
A. Yes.
Q. -- somebody was -- they wanted to terminate you, is that right?
A. Yes. Reginald Guynes came to the HR department



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

on January the 29th and said he just checking to see if you still here, and I said, "Reggie, why are you saying that?" He said, "Because Erica told Steven Griffen that you're going to be fired."

Also, that same day, Mr. Michael Jenkins, the person who I helped with his benefits document, I want to say his SF-2809, if I can recall, stated to me the same day, he said, "Your supervisor tried to jam you up." And I said, "Well, what do you mean by that?" He said that, "Angela Thompson and Eric Osterbeck called my wife, Roberta Jenkins, and asked us to write a point of contact statement against you." And a point of contact is just a brief synopsis of a complaint based on something that someone has done within the VA hospital system or the VA Veteran Affairs system, not system but Veteran Affairs employment facility.

Q. Okay. So, yeah, that actually rolls right into this heading number F where, you know, I think that's the interaction that's discussed here where it says Mr. Osterbeck was soliciting persons to write report of contacts against you, and that's -- that's what you're saying this was, you heard about Mr. Jenkins saying that Mr. Osterbeck was trying to get Mrs. Jenkins to write a report of contact against you, is that right?

A. Yes. He told me that verbally, and also, I had



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

evidence where his wife responded to an email text saying they tried to get me to write a point of contact.

Q. Okay. And do you have any idea what the complaint they were trying to get Mrs. Jenkins to say, do you know what that was?

A. Yes. In December -- between December 23rd, 2020, Michael Jenkins and his wife were trying to drop insurance coverage. They missed the open enrollment season deadline. They reported to the HR department after December 14th, 2020. Mr. Jenkins even admitted in front of Angela, myself, and Charles Sharky at the time that he did discontinue his dental and some other, I think dental and maybe vision insurance, but he did not discontinue his medical coverage, which caused him to have to incur a debt and wait until the next open season period.

Angela and Eric stated that they both reported to the office in enough time, and I'm adlibbing, to drop their medical coverage. One day, Eric said that Michael either -- Roberta Jenkins reported to the office on December the 12th. Angela said that some -- they reported on December the 14th. But they didn't report until December 17th after the open enrollment period was over. So, they wanted them to write a statement. Ms. Jenkins said that she would not because Tara Miller was



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

professional when she interacted with me, and she did nothing wrong. And I even echoed that statement to Eric Osterbeck the day that he was terminating me which was February the 24th, around like 8:30-ish something in the morning. And he said that's not true, but it was true. And I think if -- well, it was true.

Q. Okay. And just so I understand better, is the complaint that you understand they were trying to have the Jenkins write about you was that you didn't file something on time or like that they -- and I'm not asking whether it's true, I'm asking is it your understanding that they wanted the Jenkins to -- to complain that you didn't effectuate one of their requests in time, is that --

A. Yes.

Q. Was that the complaint?

A. Yes.

Q. Okay. And you're saying ultimately, that wasn't true. They didn't actually give it -- give the information to you by the deadline?

A. Right because I sent an email to Ms. Roberta Jenkins back in October 2020, and I have that email as evidence, but she never did respond because she did report to the HR department several times but when we provided her with the documents to complete to drop extra



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

coverage for open enrollment, she didn't do it. So, she missed her deadline. But they tried to say that she did report to the office on the 12th or either the 14th of December during open enrollment, and she could have dropped her coverage, but I did not do my job, which was not true.

Q. Okay. And then as a sort of wrap up question here as to all of this, the -- you know, the complaint seeking -- seeking the Jenkins to do a report of contact against you, is it your allegation that this was based on retaliation?

A. Yes.

Q. Okay. And then just very if -- if you can summarize very briefly, what is it that made you feel like getting -- trying to get this report of contact was an act of retaliation?

A. All the evidence leads to retaliation. I -- why would Mr. Osterbeck solicit employees to write a letter or a statement against someone he's supervising? It was done malicious. I complained against him, so, he was retaliating against me which that's how I perceived it.

Q. Okay. And then so, moving to the next bullet point, this is another thing that you mentioned is that there was an allegation of identity theft and/or unauthorized modification of personnel records. And you



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

were discussing this a little bit briefly, this is when somebody said you -- you looked at or changed OPF records, is that right?

A. Yes. Eric Osterbeck said that I went in the system and modified select people, he didn't say the word select but I'm saying select because I can't remember exactly which persons, but he said I modified records and I never received training on how to modify records, but I did view the records to see if the information was in the system so I could write the letter of grievance to Dr. Reeves who was the director over the VA Medical Center at that time, and I had been told to go and report Eric Osterbeck to Dr. Reeves by Glen Belcher, Joe Franklin, Reginald Guynes, and to report him not just to her but to the EEO and there was another agency that Glen Belcher told me to report Eric to in order to get him, as Glen phrased it, off of your head. And they saw the maltreatment that I was receiving in the office, and even what is his name, Jim Spear even attest and said that -- and he wrote a statement. He said that Eric doesn't hold the rest of his team to the same standard that he holds Tara to. It was obvious, and people were even sending me job announcements for me to apply as early as June. I received job announcements from Latasha Lloyd, Jeanette Mason, a couple of other people, there were -- I



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

interviewed for positions, but I never was able to get a position before he terminated me, and I wasn't able to get a position with the VA Medical Hospital even after he terminated me. I applied for several positions, and nobody would hire me, and I was even qualified for one position which was I want to say, what was it, public relations, public -- I can't remember the exact title, but I qualified. I had a degree in journalism. I had experience with publishing. I'm a publisher. I write for academia. I have written a children's book, and I also have a cartoon that I publish and created and produce.

So, I don't understand why I was not qualified for the position. I interviewed for the position, and I think I was in like the second interview phase, but I don't know if Mr. Browning reached out to Eric Osterbeck to ask him for a reference in reference to me, but I did not get that position. And the same day Eric terminated me, I had another interview but the day he terminated me, I couldn't even follow through with the interview. But there were other positions that I interviewed for that I did not get before it happened in which I was qualified.

Q. Okay. We'll discuss that a little bit later. To circle back to the accessing of records, you said, first thing you said you weren't trained on the system, so, I



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

want to talk a little bit more about that. What do you -- what system is it that we're talking about in the first place?

A. I went into eOPF to look up some information, and he said I was -- I modified information in the system. And I was thinking to myself, in order to modify someone's records, wouldn't you need training, because I don't know how to modify and switch around information. I knew how to upload documents, but I didn't know how to make changes in the system because I was never trained on that. And I think that would fall under, and I don't know, under the jurisdiction of a person who is an HR information system specialist. I was just an HR assistant, so I didn't know how to alter different people's information in the system because I wasn't trained on it. And then he said I looked into some of the files with dates that I never accessed those person's records, so, I don't know. And then there was a situation -- well, I'll just -- I'll -- I think I'm jumping ahead.

Q. Okay. So, just to close out the one thing you were saying, is it your testimony that you didn't modify records because you didn't know how, is that what you're saying?

A. Yeah, I didn't know how he was accusing me of



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

something that I didn't know how to do.
Q. Okay. But then as to accessing the records, you said you did access some records.
A. I did. I was trying --
Q. Okay. Your response was yes, you did? Okay. Now, maybe it'll be helpful. I have some -- this log that I found in the -- in the file, and I'm going to share my screen and maybe we can look at it together, it shows the eOPF access, okay.
A. Yes.
Q. So, I'm going to share my screen. Okay, is this popping up for you guys?
A. Yes.
MR. MARTIN: Yes, we -- yep, we see it, thanks.
BY MR. DOYLE:
Q. All right, so, I'm going up to the top. This is an eight-page document and it's the -- the words at the top of the first page are documents viewed. So, it looks like this is a system report that shows when certain records were accessed.
MR. MARTIN: Excuse me. Excuse me one -- excuse me one second, can we take a five-minute break? Let me -- I think I have a copy of those doc -- that.
MR. DOYLE: Sure. No problem.
MR. MARTIN: Okay, just a five-minute break.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

MR. DOYLE: Yeah, let's go off the record for a bit.

(Off the record from 2:50 to 3:10 p.m.)

MR. DOYLE: Okay, when we left off, I was sharing a document on the screen, and I think Counsel was going to see if maybe they had a copy of the document. Do you guys have a copy of that document?

THE WITNESS: Right.

MR. MARTIN: It appeared to be the same, yeah. It appears to be the same.

Hold on one sec.

THE WITNESS: Excuse me.

(At 3:11 p.m., brief pause to discuss scheduling.)

MR. DOYLE: All right, so, getting back into things, just for the record, the document I'm looking at has a sort of page number at the bottom or left side, depending on how you're looking at the document, and my page numbers read from 000262 through 000269. Are those -- are you guys looking at those pages as well?

MR. MARTIN: You mean like a Bates stamp number?

MR. DOYLE: Yeah.

MR. MARTIN: What we have are the -- Chris, I don't think -- I don't know -- this may be one of her documents because it's not Bates stamped, but it does say



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

one -- page one through 27 in the right-hand corner.

MR. DOYLE: Okay.

MR. MARTIN: Oh, wait a minute. I just saw -- Chris, I'm sorry. I just saw the Bates stamp number 000183, got it, on the left.

MR. DOYLE: Okay, I have a slightly different number, so, let me see if we can get to the same document.

MR. MARTIN: And ours states one through 27 in the right-hand corner.

MR. DOYLE: Okay. Just in case these are different, I'm going to put mine back up on the screen, and we can compare, if necessary, okay?

MR. MARTIN: Yeah, we'll just use yours. This is a different document.

MR. DOYLE: All right, so, I am sharing again, and you can tell me if these end up being exactly the same, but do you see where mine says 000262? I'm kind of highlighting it.

THE WITNESS: Right here, yes.

MR. MARTIN: Okay.

MR. DOYLE: Okay. So, if we're looking at different documents, then let's just try to focus on the one I have up, but if yours turns out to be exactly the same, that's fine.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

MR. MARTIN: That's fine.

MR. DOYLE: Okay.

MR. MARTIN: No, I think -- I think they're kind of different, and -- and I don't think I have all of the sequence or anything, so, we'll just go with yours.

MR. DOYLE: Okay. For the record, I'll mark this one as an exhibit.

Now, the affidavit we've been referring to, I want to mark that as Exhibit 1.

MR. MARTIN: Okay.

MR. DOYLE: So, I'm going to go back in time and mark that as Exhibit 1. This will be Exhibit number 2.

(Exhibit 1 and 2 marked.)

BY MR. DOYLE:

Q. Okay. So, let's move into talking about this, and Ms. Miller, if there's any point you can't see well enough, like I can zoom in or whatever, just let me know, okay?

A. Okay.

Q. All right. So, on mine there's some highlighted portions and the first sort of highlighted portion is a category that says Miller, and my understanding of this is these are records that -- that you, Tara Miller, have accessed, does that look correct as far as you can tell?

A. Yes.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay. So, like I see under that is your name Miller, Tara, and that seems to be the person who did the viewing of the documents, is that right?

A. My name is there, but I only viewed her documents one time and that was in January 2021. I didn't view her documents multiple times.

Q. Okay. Okay. So, I'll ask you I guess then about each of these, and you can tell me where you agree with the dates, and where you don't agree with the dates, okay?

A. Okay.

Q. Okay. So, the first one says there's a document viewed, and the document viewed was about Angela Thompson, and the date there says December 22nd, 2020. You're saying that date is incorrect, right?

A. That is incorrect. I only went in Angela files in January 2021 and Erica's, Eric's on those dates, January 2021, and that was to verify whether or not they received their COVID award, because again, I sent a letter, a grievance to Dr. Pamela Reeves -- okay. That's -- those dates are incorrect, sir.

Q. Okay. Yeah, for any -- for anything there, you just tell me whether you disagree with the date or whether you agree with the record as it's shown, okay?

A. Okay.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. All right, so, the first one said right, you disagreed with the date here, but then let's move on. It says you accessed and SF50B termination or appointment file. Is that a file of Angela Thompson's that you reviewed?

A. I did access that record, but not on that date.

Q. Okay. So, what's the SF50B?

A. It's a standard form, but I don't know what the 50B is, I don't know, but I know SF means Stand Form for the VA.

Q. Okay. And then you said you did access that record, but not on that date. So, why did you access that record?

A. I went through, I was looking to see information that I can use to include in my grievance statement to Dr. Reeves, and I was just clicking to see what I can find in reference to her COVID information.

Q. Okay. And would that be -- so, would you have accessed that in the January date you're talking about?

A. Yeah, I only went in her file one time. I went in three files in one day, and that was in January of 2021. I didn't go into her files on the other date. And when I looked, I looked in probably multiple areas to see what I could use in my grievance statement, but I never went in her file in December. And I never went in



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Erica's file other than January, and Eric Osterbeck's. And I notice that on this evidence document as it relates to accessing eOPF, that there was some information that suggests that I went into Erica's file in June. If I did access her files in June, that was probably something that Eric asked me to upload, but I don't recall going in Erica's files other than January 2021. Now, I will admit to that, but these others, no.

MR. MARTIN: Just answer the question.

THE WITNESS: I'm sorry, no. No.

BY MR. DOYLE:

Q. Okay. So now, maybe to make this more simple, there are like a few more entries here that look sort of similar to me, and they all have that same date of December 22nd, 2020, and you're saying, just for the record, you didn't access her, Angela Thompson's OPF on December 22nd, 2020?

A. No.

Q. Okay. But then there's a few more documents here, one is called transfer, one says employee something, do these look like the type of documents that you -- you said you were clicking around on a couple different ones, does this look like documents you might have accessed on that January date?

A. That says individual cash award? I can't -- is



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

that for COVID?
Q. I can zoom in a little bit.
A. Okay. If this is for COVID, I remember in January, yeah, COVID, but no, not on Jan -- December the 22nd, 2020. Angela was in the office, and I was in the office, so, no. No. No, sorry.
Q. Okay. But then the date is wrong, but this is the type of record you remember seeing?
A. I remember a COVID award, so, I don't know.
Q. Okay.
A. I don't -- that's -- I just remember COVID award. I don't know what that -- if you clicked on that what that would be. I don't know.
Q. Okay. I get that. And then okay, so, I'm scrolling down to the next page here and there are a couple other records that were accessed. Now, one is listed as being on January 21st, 2021.
A. That -- that -- I'm sorry. Sorry.
Q. Is that the date that you're talking about that you did -- that you do remember accessing Ms. Thompson's eOPF?
A. Yes.
Q. Okay. And here it says the record that was viewed was an individual cash award NRB. Would you understand that that's the COVID award document you were



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

looking for?

A. I would say if I accessed it on 1/21/2021 then I -- I clicked on that one. I don't know -- I would have to click on it to look on it to look at it to see if it said COVID award, but I did access that record on that day.

Q. Okay. And then just to sort of close -- close this topic out, is there -- there are like you know, one, two, three, four, five, six, seven, eight, nine different records that it says were accessed. Now, I know you -- you said the dates are wrong on some of these, but does nine seem like about the number of records that you did access on January 21st?

A. I clicked on several of her records on January 21st, but I can't tell you that it was nine different documents, but I only accessed it on January 21st.

Q. Okay.

A. Jan -- yeah, January 21st, 2021.

Q. Okay, now I'm going to scroll down to another page of the documents. This one is Bates stamped 000264 and that's really just the heading, it says Miller again.

A. Uh-huh.

Q. So, if I move down to 265 we have a few documents here where the owner is described as Erica Bethany.

A. Uh-huh.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay. So, now we have dates viewed, there are four records accessed it looks like, and there are two that are in June of 2020, and then two that are in January of 2021, do you see that?
A. Yes.
Q. Okay. And then you said if -- if you -- you might have accessed Ms. Bethany's OPF in June but it would have been for a reason that Mr. Osterbeck -- something specifically that Mr. Osterbeck asked you to do, is that what you were saying?
A. That's if I did, but I don't recall that.
Q. Okay.
A. And I was -- well.
Q. Okay. And then how about these two records that were accessed in January of 2021, does that look like --
A. Yes.
Q. -- records that you accessed on that date?
A. Yes.
Q. Okay. And again, what was the reason that you were looking for these records?
A. To verify information to go in my grievance statement.
Q. Okay. And I -- I should have asked this about Ms. Thompson's records too, but what was the information that you were looking for for the grievance statement?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. It was in reference to the COVID award and other information that I can infuse into the grievance statement to Dr. Reeves.
Q. Okay. What else other than the COVID award?
MR. MARTIN: He wants to know what else were you looking for?
THE WITNESS: Oh.
MR. MARTIN: If you don't recall, just say you don't.
THE WITNESS: I don't recall.
BY MR. DOYLE:
Q. Okay. All right, now, I moved down to the next page which is 00266. Again, I can zoom in on anything if you need me to. Now, this -- these are documents possessed by George London, and it says they were accessed on December 30th, 2020. Do you recall accessing Mr. London's OPF on that date?
A. Yes.
Q. Okay. And what for?
A. That was in reference to -- it was an HR personnel who came into the office and asked about his promotion and verification.
Q. Okay. Do you mean Mr. London asked you a question about his own file?
A. No, it was another HR personnel.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay. Who was it that asked you about that?
A. It was another personnel, but I can't recall right now.
Q. Okay.
A. But I know it was work related.
Q. Okay. And they just wanted to know when Mr. London had been promoted or something like that?
A. Something to that degree.
Q. Okay. Okay, I'm going to move on down to the next page, which is 000267, and these records, the owner is listed as Gary Hollenquest.
A. Yes.
Q. So, and the dates of access here are all February 12th, 2021, and it's -- so, there's several records accessed on that date. Do you recall accessing those records?
A. Yes, I did.
Q. Okay, what -- why did you access Mr. Hollenquest's records in February?
A. There was a payroll employee named Guerro -- what's her first name? Last name Guerro, she came down to the HR department and said that she received Gary Hollenquest's W-2 form. She also had Angela Thompson's and Gail Fredrick's W-2 forms in her possession. And she said she reached -- looked in the payroll system and did



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

not see an address to forward his wife -- to forward his W-2 form to his wife. So, she came down to the HR department and said -- and saw me sitting at the front desk and said, "Tara, do you have an address to where I can forward Gary Hollenquest's W-2 forms to his widow?" And I said, "No, I don't." But she said, "Can't you look in the system eOPF or Vista to get the address?" And I said, "I'll try to get into eOPF to see if I can find a forwarding address." And she stood at the front desk area as I accessed eOPF.

And then she said, "Well, I have these other two W-2 forms for Angela Thompson and Gail Fredrick." I said, "You can give me Gail Fredricks, but Angela is in the back so you can take her her W-2 forms." And I slid Gail Fredricks W-2 forms under the desk, and she took Angela Thompson's W-2 forms to the back to her, and I kept Gary Hollenquest's. And when she came back from the back area up to the front, I still -- I told her I didn't see the address, but I'll keep looking and it's hard for me to get into Vista, but I was able -- I said if I can't check Vista, I'll get someone to assist me. So, I used eOPF as a form of trying to track down Gary Hollenquest's widow because he died, I think, in August of 2020.

Q. Okay.

A. And I reached out to his widow at that time



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

during the services and gave her our contact number at the HR department because I knew she was going to need it regarding his benefits and so on and so forth. But I did have his W-2 forms in my possession and that was work related, and I did look in different areas to see if I can find his address and I couldn't. So, I took his W-2 forms and locked them up in the cubicle where I worked until it could be -- until I came up or someone came up with a forwarding address. And I even tried to reach -- get the telephone number, but I don't even think there was a telephone number to contact her in the system.

Q. Okay. And just for the record, what was the name of the person who asked you to track down Mr. Hollenquest's address?

A. Carmen Guerro in the payroll department. Carmen Guerro.

Q. Okay. Do you have any take on spelling of the last name? I don't know if you can do it, but if -- if you remember at all.

A. I would have to look at my paperwork. It might be in here.

MR. MARTIN: The spelling for?

THE WITNESS: Guerro, Carmen. Give me one moment, please.

MR. DOYLE: Okay, sure.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

(Brief pause.)
MR. MARTIN: Just make your best --
THE WITNESS: Oh, okay.
MR. MARTIN: Do the best -- give it the best guess you can. They can find it. What's the name again?
THE WITNESS: I think it's Carmen Guerro, maybe G-
MR. MARTIN: Guermo?
THE WITNESS: Guerro, G-U-E-R-O (sic)? I know I miss --
MR. DOYLE: That's okay.
THE WITNESS: That's not the correct spelling.
MR. DOYLE: That's okay.
BY MR. DOYLE:
Q. And her first name is Carmen, you said?
A. Yes, with a C.
Q. Okay. Do you know like where in the building she worked or anything?
A. Payroll, down the hall from HR.
Q. Okay. Thank you.
A. You're welcome.
Q. So, let's move on to the next page here. This is 000269, it's the last page of mine, and this has a document viewed of Eric Osterbeck on January 21, 2021, and -- and does that seem familiar to you?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Yes.
Q. Okay. This is another one that you accessed?
A. Yes.
Q. And again, you were looking to see about whether certain people got a COVID award?
A. Yes.
Q. Okay. Okay, I'm going to stop sharing this. This was Exhibit two.
A. Okay.
Q. And I'm going to bring up another document that I want to mark as Exhibit three.
BY MR. DOYLE:
Q. Okay, and this may be a little bit small, but if you need me to zoom in, I can zoom in. The document I'm asking about at the top of it, it says, "Office of personnel management, eOPF," and what I understand this document to be is one of the screens that a person sees before they access the eOPF system. Could you confirm or deny that, Mrs. Miller, is this the doc -- is this a screen that you see before you access eOPF?
A. It's that screen that I see now as a new screen, but yes, to a certain degree, but it's a little different than what it was back in 2020, and '21.
Q. Okay. So, yeah, that's helpful. So, this is a type of screen that you would have seen around the time,



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

but it -- you see it being a little bit different than it was back then, is that right?

A. Yes, yes.

Q. Okay. How about the text in it, does that seem the same to you or is that different?

A. The text is very tiny.

Q. Okay. I'll zoom in. I -- I apologize or I appreciate you dealing with the Zoom hearing. I'm zooming in a little bit more and just let me know if you can read this or if you need anything else, okay?

A. Okay.

Q. Okay, so, I'll go ahead and read this into the record, and you can tell me whether or not that's the same as it was at the time, if you remember, okay?

MR. MARTIN: All right, that's a good idea, Chris, thanks.

MR. DOYLE: Okay.

BY MR. DOYLE:

Q. So this screen that I'm looking at which we'll mark as Exhibit 3, it starts off saying:

"This is an official United States Government computer system, which may be accessed and used only for official Government business by authorized personnel. Unauthorized



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

access or use of this computer system
may subject violators to criminal,
and/or administrative action."

Does that look right to you? Or I guess my question should have been is this text any different than it would have been when you were accessing the O -- OPF system in January 2021?

A. I can’t recall to be honest.

Q. Okay. Okay, so, we’ll just mark that as Exhibit three. I’m going to stop sharing.

(Exhibit 3 marked.)

THE WITNESS: Okay.

BY MR. DOYLE:

Q. Now, Mrs. Miller, the files that you accessed on January 21st, 2021, were you authorized to access those files?

A. When you say authorized, what, given permission by my supervisor?

Q. Or anyone. Were you given permission by anyone to access the files of Angela Thompson, Erica Bethany, and Eric Osterbeck?

A. No. No.

Q. Okay. Okay, now, let’s move on to the next heading in the affidavit which was number H, or letter H, I guess, sorry. And it seems like maybe we covered some



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

parts of this, so, if you want to review it and tell me whether there's any parts of this we haven't covered yet, that might be helpful.

MR. MARTIN: Fair enough. Thanks, Chris.

THE WITNESS: Yes.

MR. MARTIN: All right, give us a few minutes to read over. He just wants to know if anything that you haven't said that you would like to say. This is H.

THE WITNESS: Well, Eric did use a sexual innuendo when he was talking to Angela Thompson one time, and I want to say it was around December, either January -- around December 2020 or January of 2021 when he was telling her that the lady asked him can he do something, and he said something about don't let the grey hair fool you, or something to that effect, and she started laughing, but he said the comment very low, the part that she laughed at, and I couldn't really hear it, and I just said to myself in my mind that was inappropriate. But to me, based on what he was talking about, it was a sexual innuendo or some type of sexual word connotation that he was using.

BY MR. DOYLE:

Q. Okay. And this was a conversation between Angela Thompson and Eric Osterbeck you said?

A. Yes, and she -- Angela Thompson sat maybe two



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

feet or two feet away from me. She was in the back and my cubicle was right next to hers and he stood in the doorway and talked to her, and I could hear the conversation. And as it relates to the N word, again, Erica Bethany did use the N word out loud in the office, and the word colored when she was talking to Yolanda May, which was hostile in the textual form, verbal form. And then she would use the F word, I guess, to let me know that even if I was reporting her, she didn't give an F-U-C-K about no write up. And I think one time she was reading an email, and she made the comment about this is what the F it is, or something to that effect. She was upset about an email communication and just started using profanity out loud.

Q. Okay. Now, just to follow up on the use of the N word, where you were saying Ms. Bethany would sometimes use the N word --

A. She used it, I heard her --

MR. MARTIN: Wait, let him finish.

THE WITNESS: I'm sorry.

BY MR. DOYLE:

Q. Yeah, that's -- that's okay. What I was going to ask you is was that in reference to a specific person or how -- how would she use that, the N word?

A. It was in reference to an African American male



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

when she described and said when you give, oh God, when you give a N-I-G-G --

MR. MARTIN: Just say N word.

THE WITNESS: Okay. When he -- when you give an N word to a person, they tend to in so many words, just take their job for granted. And then she referred to that same person who she referenced with the n-word is that he was acting colored, just colored. And the other person said, "Well, what do you mean by the word colored?" "You know," according to Erica, "you know, just acting colored."

BY MR. DOYLE:

Q. Okay.

A. So.

Q. I don't know if we covered this yet, but do you know what race or ethnicity Erica Bethany is?

A. She may have variations of ethnicity, but from what I can, she look like she's African American to me, but.

Q. Okay. All right, and then, I think you elaborated on H a little bit, but is there anything else about this topic H that you wanted to discuss that we haven't discussed already?

A. That's all I can call -- recall right now.

Q. Okay. Okay, so, now the document moves into



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

numbering the claims, I think because EEO was treating these a little bit different, but I want to discuss them with the caveat that there might be a lot of overlap here. So, same way we just did for H, I want to discuss these one by one, but if -- I don't want to belabor any points, so, if there's anything where I'm asking about it and you feel just that we've already talked about it, you can just let me know, okay?

A. Okay.

Q. So, the first one says, this is -- this is heading number one now, and it says:

"From April 2020 through February 24th, 2021, she did not receive proper training."

And I don't know how much we've discussed about this yet, but if you could just summarize, you know, what this -- what you meant by not receive proper training.

A. When I was initially hired and started working HR functions, I was told to solicit assistance from Saadia Graves Tatum and Joe Franklin. Come to find out, when Angela Thompson joined the team, Angela informed Eric that I was being trained incorrectly by Joe Franklin and Saadia Graves Tatum. So, as a result of that, I was told to work with Angela. Angela too was performing HR functions incorrectly also.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Eric Osterbeck then solicited for me to receive training from Jacqueline -- Jac -- Jacqueline Pace that I can recall. She was an HR specialist who had about 20-plus years of experience under her belt, but she only assisted with training me for maybe about at the most three weeks based on what I can recall. Then he referred me to Ann Covel. Jacqueline Pace was in I think Cincinnati Ohio, some part of Ohio from what I can recollect, and then Ann Covel may have been in Cleveland Ohio from what I can recall, and she worked with me for maybe three weeks.

Also, we were trying to get help from Charles Sharky and Eric set that up, but that only lasted three days because we were waiting at the table for Erica to report, and she was late so he stopped helping us, stopped waiting in the conference room in the HR department to help us.

Q. Okay.

A. So, I was trying to -- sorry.

Q. Oh no, if you weren't finished, you can go ahead.

A. So, I tried to solicit help from anybody who Eric Osterbeck told me to coordinate with in order to learn my HR tasks and functionalities. And Jacqueline Pace was the best, but she ended up resigning from -- resigning or retiring from the HR department and she -- no, she



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

resigned I think, best of my recollection, and was offered a different job under -- with a different government agency.

Q. Okay. And then to kind of put the lack of training all under one heading, when we're referring to this lack of training, did you regard the lack of training as begin discriminatory on either age, sex, race, disability, or retaliation?

A. Age.

Q. Okay. What made you think that the lack of training was discriminatory based on your age?

A. Angela would train Erica with different information then she would exclude me, and also the new person who -- Chavon Render, who was also in her 30s at the time, she would go to Erica and Angela and train them and exclude me. And I had gone to Angela several times and she gave me pushback.

Q. Okay. So, you're saying Angela would do more training with Chavon Render and Erica Bethany than she did with you, that's what you're saying?

A. Yes, and I complained to Eric about it.

Q. To Mr. Osterbeck about that?

A. Yes, Eric Osterbeck.

Q. Okay. When do you recall complaining about that?

A. Oh goodness. I complained to him in August,



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

October, November, December. It seemed like every -- to be -- it seemed like I was in Mr. Osterbeck's office either every week or every other week. And I also had some email communications and written form where I wrote him, or I communicated with Angela where she gave me pushback. April, May, well -- Angela joined the team back in like July, so, she gave me pushback when she was helping me to train I -- as I can recall maybe in July, August, September, October, any time I needed help and especially in December when she humiliated me in front of Michael Jenkins as it relates to a standard form 2809 that I can recall when I was trying to cancel his benefits, and I was in the middle of a transaction and I was talking to the client and talking to Charles Sharky, and Angela zoomed out of her office and took over the conversation and humiliated me in front of the client, and then asked me to write on the form at the bottom administrative error, and there was no administrative error that was committed on my part. And as a result of that, I shared with her I cannot sign a document that has administrative error on it if I didn't commit the administrative error. And after that, she took Michael Jenkins form and went to Charles Sharky's office and Charles Sharky and Angela Thompson called Eric Osterbeck during his break, 'cause this was close to the Christmas



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

holiday, I can't remember if it was on the 23rd or the 22nd, and they called him, and then when Mr. Osterbeck returned from his Christmas and New Year break, he called me in his office again. I want to recall probably around about January the 6th, and that's when he and I got into -- January 6th, 2021, and that's when he and I got into the conversation what can we do in order to help you with your HR functions, and I said, "Could we have a mediation between Angela Thompson and myself?"

Q. Okay. What sort of training did Angela Thompson give to Ms. Render and Ms. Bethany that she refused to give to you?

A. The Dsub training. I'm trying -- what was it on, I have my information documented when I solicited help from her and I went to -- no, remedy tickets, remedy tickets. And I think that required a Dsub certificate, and also when we first received our headsets to start talking on Teams, that was the first time I had ever utilized that device and I wasn't really sure, so, she went to assist Chavon Render and Erica Bethany to make sure that they were on task with using the device, but she didn't assist me.

Also, I want to bring to your attention that you only have 15 minutes left on your battery.

MR. MARTIN: Okay.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

BY MR. DOYLE:

Q. Okay. All right, so --

MR. MARTIN: I got 15 minutes. I can -- I can recharge it, but -- so, we can go -- do you want me to just start recharging it now? Let me -- wait. Let me see if I can --

MR. DOYLE: Yeah, that works.

MR. MARTIN: No, we're all set. We're all set, Chris. I can reach it. I've got a cable here.

MR. DOYLE: Okay, sounds good. Thanks, Rick.

MR. MARTIN: All right, we're good.

BY MR. DOYLE:

Q. All right, thanks, Ms. Miller. So, let's move on then to the next topic which is -- it's listed together as number two and number three, and it says basically in February 2021 you were marked as 7.75 hours absent without leave. Do you see that one?

A. Yes, at the bottom of the document.

Q. Okay. Is that the -- are those two and three, are those the same thing?

A. He reported me as absent without leave, and then he reported me leave without pay. So, AWOL meaning that you don't have permission to leave the job, and then leave without pay, I didn't receive pay. I reported that morning at 7:00 a.m. after he called the police on me the



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

day before and he said just come on to work on tomorrow, which I did, and he had me just sit at the front desk to answer the phones, and then eventually he called me, Mr. Osterbeck, from the receptionist area to report to his office, and he wanted me to sign the termination letter at 8:35 a.m. and he wanted a statement before he terminated me. And I said -- he said Eric Gonzales wanted you to write a statement. I said I'm willing to write a statement, but I would like for my counsel to look over it, my legal counsel to look over it before I submit it. And he told me, "Well, I'm not an attorney, and I don't have time for that."

So, after he said that, he provided me with a clearance form and told me to read the instructions, and I think we had one more conversation when I said to him -- I brought up Roberta Jenkins and Michael Jenkins in reference to him, Mr. Osterbeck, calling or soliciting that they write a point of contact against me, and it was basically kind of like the last conversation and he said go ahead and read the instructions and start clearing the area, but on the form it said that you can turn in the clearance form before the final paycheck.

So, I was terminated on February the 24th, and I want to say I think we were supposed to be paid on March the 5th, so, I had a little time to clear the building,



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

but he reported me AWOL and leave without pay, but I did work that morning because he kept -- he had Chavon Render to move from the reception desk and put me up at the reception desk to answer the phones and to do what have you because he had work with -- well, I couldn't gain access to any HR systems that morning.

Q. Okay. And is it your testimony that you worked all day that day?

A. No, I did not work all day that day. I worked from seven in the morning until about 8:30 a.m. that morning when he called me into his office to sign the termination letter or to ask me to give a written statement per Eric Gonzales, and I never again told Eric Osterbeck that I refused to write a statement. I said I would write a statement, but I need my legal counsel to review the statement before I submit it. And again, he said, "I'm not an attorney, and I don't have that kind of time."

And I think he made a phone call to Eric Gonzales, and when he got -- told Eric Gonzales, he told him something 'cause yeah, and Eric, he said, "You're terminated, sign your name on the form," and I said that I can't sign my name on the form for false allegations that have been written on the termination letter.

Q. Okay.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. And I'm willing to write a statement, but again, I need my legal counsel to look over the document before I submit it.
Q. Okay. So, at 8:30, did you leave the premises?
A. No, I was still in the building. I went downstairs and I think I went to -- what is it, the -- the something, the cashier, the cash something. I can't remember the name. There's an opening on the first floor in the yellow section of the VAMC, something cashier, and I also went into the chapel. And I think during that same day I saw Reginald Guynes and I ended up talking to him. Reginald Guynes worked in the PIB office which is down the hall from HR, and it kind of connected because that's where you go to get your -- your badge. So, I was still in the building.
Q. Okay.
A. I was in shock, but I was still in the building. And again, as I mentioned earlier, I had an interview, but I think I ended up going to Mr. Ken -- Kenneth Hill, and I canceled my interview in person, and that office was right down the hall from the HR department. He terminated -- well, he gave me the letter to clear the building. I went down the hall to cancel the interview because I was in no form of mental shape to go through an interview, and I tried desperately to apply for other



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

positions before he terminated me, and even after he terminated me. But to no avail, because I believe he retaliated and --

Q. Okay.

A. -- he was trying to get rid of me because of his biased favor towards Erica Bethany.

Q. Okay.

A. As it related to her age and non-disability. And retaliation for me complaining against him, Erica, and Angela.

Q. Okay. Did you say Erica -- Erica's non-disability, is that what you said?

A. Yes.

Q. Okay.

A. I know she's a veteran, but --

Q. Do you know whether she has a disability?

A. She never discussed that with me as far as -- yeah, she never discussed that with me as far as her intellectual disability. So, I can't answer that.

Q. Okay, yeah, so, my question was do you know one way or the other whether she has a disability. It sounds like no?

A. I -- no.

Q. Okay.

A. I don't believe she has one. Not mental



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

disability.

Q. Okay, why not?

A. She never discussed that with me.

Q. Okay. Any other reason?

A. Not that I can think of at this moment. She didn't disclose that information with me.

Q. Okay, so, the next number here is four and this kind of bleeds into what we were just discussing. It said on February 24th, 2021, she was terminated from federal employment. So, I know there's some overlap, but I guess you're saying -- is it your testimony that you were wrongfully terminated?

A. Yes.

Q. Okay. On the day of -- on that day, February 24th, did Mr. Osterbeck give you any explanation for why you were being terminated?

A. He said in front of Mr. -- the deputy -- the Assistant Deputy Chief of Police, George Chester, that, "You were taken down to the police department for the probability of the misappropriation of PII information and identity theft." That's what he told me in front of the assistant deputy police officer George Chester. He was there in the office because when he took me downstairs to question me, I guess an interrogation office area and Mirandized me, and started telling me



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

whatever you use in a court of law can be held against you, they were asking me questions about accessing electronic files. And when I said that, "I will answer your question if I have legal counsel present." Then they told me -- I asked a question, "So, if I don't answer your questions because I do not have legal counsel present," I asked the question, "so, what does this mean now? What is about to happen?" Because I thought they were getting ready to -- to handcuff me and call the city of Detroit police to transport me. I really did. And I was petrified. I didn't know what was going on like I said, Eric Osterbeck walked back and forth that -- well, I didn't ever say this, but the day, the 23rd, he walked back and forth, Earl Lee had reported to the Detroit VA Medical Center, and he was in the office cubicle area behind me. I didn't even know that Eric -- that Earl Lee was there. He did not come out of that office area the entire day until I heard someone clicking, and when he did finally come out at the end of the day, I was like, "Earl, how you doing? Long time no see. I'm surprised -- what brings you here?" He said, "I just had to do some work." And then Eric kept making a beeline from his office back there to the office area.

So, I was thinking to myself I don't know what was going on with that. I can't speculate but it just



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

seemed like it was out of character. But at any rate, I was apprehended, Mirandized, petrified mentally, and I was humiliated, embarrassed, frightened publicly because there were people that were watch -- oh my goodness. There were people that were watching in the hallway when I came back upstairs after George Chester escorted me back upstairs to Mr. Osterbeck's office area to let him know what transpired. I -- Eric -- I asked Eric the question verbally again in front of Mr. -- Chief Chester, "Why was I Mirandized and apprehended? Why did you call the police on me again for the possibility of PIP misappropriation and identity theft?"

And when he asked me to leave his office, Eric Osterbeck, to go back to my desk area, I saw Angela Thompson, Chavon Render, Gail Fredrick, I want to say Saadia Graves Tatum from what I can remember, and one other person congregating in a circle, and when they saw me, they all dispersed.

Also, I was inclined to think that Eric Osterbeck was informing Angela Denise Thompson and Erica Bethany about my termination status, and I couldn't understand why would a supervisor share that type of information with subordinates. And he even said to me, well, he didn't say to me, but he wrote in email communication I think to Earl Lee somewhere in January between January



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

28th or the 27th that, "Tara Miller does not follow my instruction, nor does she follow the instructions," and I'm adlibbing a little bit, "the instructions of her coworkers." And I sent an email communication to Eric Osterbeck January 2000 -- no, February 2021 asking him a question because he sent me an email saying, "Explain to me or tell me how did you know Angela Denise Thompson," or underlined the word Denise name or something. And I responded to him, I said, "Early on that year Angela -- when we worked overtime one time, Angela stated to me that her uncle named her Denise after Denise McNichols who was a celebrity who was from a native of Detroit, Michigan who played on the Heat of the Night, Baby I'm Back, Welcome -- and a couple of other shows." And I also said to him that she even told me she was from Ypsilanti, Michigan. And that's how I was aware that her middle name was Denise.

And I asked him, I said, "Am I in trouble for some reasons," and I'm adlibbing a little bit, and I said to him, "It seems to me that I'm the only person out of the six people out of the BSU team that you are subjecting to the aforementioned treatment," and I'm adlibbing a little bit because I don't have the information in front of me. And I said -- I have even written a quote on the board by Sean Combs as a form of



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

upliftment, and before, and this is honest, that before I even could leave the -- the office, and I had even worked overtime without pay, I saw on the board where Mr. Osterbeck wrote the word Puffy, Angela wrote P-Diddy, Puff-Daddy, and Diddy on the board, and that wasn't the context in which I wrote the quote. It was supposed to be positive and uplifting, and they defaced what I wrote. But when Erica wrote a quote on the board, it didn't get defaced.

And I spoke to Joe Franklin about it, I said, "Did you see those comments that were written on the board?" He said, "Yeah, when I came in," 'cause usually Joe Franklin comes in early, maybe about 7:00 a.m. and he said, "When I was sitting in my seat, I saw Mr. Osterbeck try to erase the marker, but he had to go next door and get a wet paper towel and erase -- erase the," I guess the writing residue off the board. And I communicated that information in email to Mr. Osterbeck, and he said, "I'm not going to allow you to," he said something about it's not true, and it was true. And I told him that I have been subjected to, and I'm adlibbing, mistreatment in the office, and he said that it's not true, and yes it was. Yeah, so.

Q. Okay. And then to circle back to where I started the question, I think your response was sort of that --



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

to summarize your response, on the day you were terminated or the day before, you were accused of wrongly accessing personnel files, PII, you said, right?

A. Yes, he said I -- I was referenced or sent to the police for investigation for the misappropriation of PII, and the possibility of the misappropriation of PII and identity theft, that's what he told me verbally.

Q. Okay.

A. Mr. Osterbeck.

Q. And then -- okay. And then he said do you want to write a statement about that, is that what you're saying? He gave you the opportunity to write a statement about that, right?

A. He said that Eric Gonzales wants me to write a statement in reference to that, and I said I will write a statement, but I need to share it with my legal counsel, and I will submit it.

Q. Okay.

A. And he -- and when I talked to Eric Gonzales later on, I think we were on a Zoom call, and I think it was -- we had a mediator and he said to me, "The reason why I went ahead and finalized your termination is because Eric Osterbeck told me that you refused to write a response," and that wasn't true. I said I would write a response, but I need to share it with my legal counsel.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay. And then ultimately after your -- after you, you know, didn't write a response, that's when Mr. Osterbeck told you you were terminated, is that how it worked?

A. Yes.

Q. Okay. All right, now, I'd like to move on to number five and number six. There's two different points there, but again, they're listed together. So, for the record, these two say that as of April 5th, 2021, she has not received her last paycheck, and then number six says as of April 5th, 2021, she has not received a COVID-19 monetary award.

A. Could you tell me what page that's on? I don't see it. Sorry.

Q. Oh, okay. So, it's paragraph -- starting at paragraph 61 and 62.

A. Oh, okay.

Q. Okay?

A. Yes, thank you. Yes, I --

Q. Okay, so, maybe start -- start with number five and just describe what's -- what's being -- what your complaint was about number five.

A. Okay. April 5th, 2021, I reached out to I think George Chester to let him know that I still had not received my last paycheck because he informed me --



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

George Chester, again, the Assistant Chief Deputy police department, he was the person who received the keys and any property that I had in my possession for the VA. At the time, I had to go on military duty out of town, I want to say in Georgia, and I also was in a car accident as I shared with you before, so my vehicle was in the repair shop. So during the time I got terminated, I didn't have transportation. I had to solicit transportation from a family member, and the day I got terminated, I ended up walking to a family member's residence and got a ride home.

Q. Okay.

A. So --

Q. So then, there was some delay, you're saying, in getting that last paycheck?

A. Yes. So, I turned in all the VA property on I want to say between March 12th, and March 13, or maybe between the 12th and the 14th, I want to say March 13th to the best of my recollection 2021, and then George Chester informed me that Mr. Osterbeck said that your check will be with the -- he said the aviation cashier, the agent, some type of cashier where I can go and pick up my check.

Q. Okay.

A. So, when I went to inquire about the check, maybe

a few days later, the person told me at the -- I can't remember, it starts with an A cashier, it wasn't there. So, I reached out to George Chester, and I think I started comm -- copying Eric Osterbeck or I either reached out to Eric Gonzales, and I mentioned to Eric Gonzales on I want to say March the 24th, 2021 that I still had not received my last paycheck. He said he would look into it, but he never followed up with me.

Then I saw an email communication from Eric Osterbeck and someone by the last name of Miller regarding the check. So, I still hadn't received my check by April the 5th, 2021.

So, I ended up receiving my last check probably towards the end of April and Eric Osterbeck informed me, and he -- and it's also on the clearance document that when you turn in the government property that you will receive your check thereafter. So, I felt, I believe, that Eric Osterbeck was still trying to retaliate against me by holding my final check without releasing it to me. And also, I should have been paid for my leave time as well, and that wasn't calculated either. And also, as it relates to April the 5th, I still had not received my COVID award monetary -- my COVID monetary award. I worked the COVID screening desk July 3rd, 2020, from 7:00 a.m. to 3:15 p.m., and I had to -- Eric sent out a mass



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

email saying that Eric Gonzales, his supervisor, the HRO, human resource officer, was soliciting people to volunteer to work the COVID screening desk, which is outside the scope of our regular duties within the HR department. So, I volunteered and he said to me, "Go over to the director's suite and coordinate with," I want to say Corey Stephen Smith, which I did, and she asked me what day do I want to work, and I let her know that I could work on July 3rd for the holiday, because I figured you know, I can get paid time and a half. So, I let her know that I was interested. She signed me up on this list. I also went back to Eric Osterbeck and said to him that I'll be working on July the 3rd. I think he had to get permission or let -- put our names on a list or something like that, and he had to get approval in order for me to receive overtime pay from his -- from the HRO which is Eric Gonzales. Sorry. Sorry.

Q. No, that's okay.

A. And I had to get approval from Eric Osterbeck, and then Eric Gonzales signed off in order for me to get paid, and I was paid sometime in July or maybe August of the overtime from my recollection, and I also didn't receive a COVID award because Eric Osterbeck said I didn't do anything to warrant one, and Erica Bethany too worked the COVID desk like Angela Thompson, and both of



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

them received -- Angela Thompson and Erica Ost -- I mean Erica Bethany received $1,000 COVID award and Eric Osterbeck received a $5,000 COVID award, and I didn't recall him ever working at the COVID screening desk. And according to Eric Osterbeck, you must perform duties outside of your job description that lends support to the COVID requirements.

Q. Okay.

A. If you will.

Q. I was going to ask, but I think you kind of already anticipated my question, which is how much were the COVID awards. You said Ms. Bethany and Ms. Thompson got one for 1,000?

A. Yes, a piece, yes. And Erica even came to me and had the conversation, this was in July, I recall this, July 2020, she said Eric said we would receive a COVID award for $1,000. This was in June 2020 I believe. So, I said to myself, let me -- I had already been sitting at the front desk, and he had me to write a point of contact for each -- for people who came into the office who had contracted COVID but they were trying to get a clearance form, so, I was being subjected to the COVID virus sitting at the front desk because I was the point of contact when they arrived to get them -- not -- I don't want to say reinstated, but cleared so they can go back



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

to work.

Q. Okay.

A. And that was a scary process too.

Q. Okay. And again, you might have covered this somewhat already, but just as a summary question here, is it your testimony that you didn't get a COVID-19 award based on some discriminatory reason like based on your age, sex, race, disability, or retaliation?

A. Age, retaliation, yes.

Q. Okay. And would that be for the same reasons you already discussed, or is there any other -- anything else that we haven't discussed that makes you think that decision was discriminatory?

A. Yes, from my disability standpoint too. Disability, age, and retaliation.

Q. Okay. And then --

MR. MARTIN: Chris, hold on one second. The FedEx man is here. Let me let him in. Hold on one second.

MR. DOYLE: Sure, no problem, Rick.

MR. MARTIN: All right, thanks.

(Off the record from 4:18 to 4:26 p.m.)

BY MR. DOYLE:

Q. Okay, Ms. Miller, I think I just have a couple more topics to discuss. Hopefully it won't be too much



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

longer. The first thing I wanted to ask you about is a piece of evidence that was transmitted in response to some requests for production that we sent your way, and this is a phone recording of a conversation between what I understand to be you and Mr. Osterbeck. Are you familiar with this phone recording?

A. Yes.

Q. Okay. Now, I just wanted to ask you some details about it. Obviously, what's contained on the phone recording will speak for itself, but I wanted to ask you some background about it, okay?

A. Okay.

Q. Okay. Do you know the date on which that phone recording was made?

A. I can't recall just yet. I would have to look in my document, but I did record.

Q. Okay. Did you make it on a cellphone?

A. Yeah -- no. No, I had a little mini cassette recorder that I can recall.

Q. Okay. And then how did it become the file that we have now? Did we have to upload that somehow?

A. I had to send -- trying to think. I think I had to -- from my recollection, I think I ended up recording some of the information on my phone and I created a link, and I ended up getting it transcribed from a court



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

reporter or some type of independent transcription company.

Q. Okay. So, yeah, that -- that makes things a little more clear. My -- my recording started with a cell phone video, I think. So, you're saying you played the tape into your cell phone?

A. I -- that I can -- that I can remember because I couldn't send the recording to the transcription. I had to have like my phone to record, or maybe I did -- I know I had -- they couldn't accept the recorder, so, I had to use my phone. And then I ended up sending it to my email as a link because I submitted it as evidence.

Q. Okay. And why did you make that recording?

A. Every allegation that I tried to make in reference to letting Eric Osterbeck know that I was working in a hostile environment, he put it on me as though I was causing problems. It seemed like nobody was believing me, and I needed to have something to substantiate the claims that I was making so someone would believe or see the truth. I had no other choice. I could -- he was a supervisor. I was a subordinate. Who was going to believe me? Nobody. They were depicting me as the worst incompetent employee that ever walked the face of the earth. So, I had to -- they accused me of a hostile environment, so, I needed some



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

type of evidence to show that I was telling the truth.

Q. Okay. And did you ask for the meeting with Mr. Osterbeck or was it something where he asked you to go to the meeting?

A. I think something Angela had said to him to accuse me, it seemed like I was in Mr. Osterbeck's office every other week, or every two weeks. I never rest. It was always something, and I was always filled with anxiety. It felt like I was walking on eggshells, or someone was going to do something to me. I was starting to have nightmares, and I was, bad nightmares, and I -- and to be honest, I was afraid of Erica Bethany. I really was. Her belligerent personality, I know I'm in the military, but I did not want her to bring any harm to me because when she talked to you, she was just so rude and -- and trying to provoke me into a verbal altercation or a physical altercation. I tried my -- to get me terminated. So, I tried my best to try to avoid her. I even talked to Joe Franklin. I even went to Zenia Berry. What can I do in order to try to deal with a combative employee? I even tried to solicit employment elsewhere and got turned down, got denied. I was trying my best to transfer out of the HR department. I talked to one of the chiefs in the resource department who was Sylvia, I can't think of her last name, well, she referred me to



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

her chief, and he asked me to submit my resume which I did. I even talked to the chief in the social work department to try to gain gainful employment.

I -- any position that I could apply for that I qualified for, I tried my best to interview, and it was denied. I never got a break, and I was sure that I would get the public -- what is it, I think it was the public relations with William Browning because I qualified for it. I was -- again, I was a disabled veteran. I had my higher learning education that could substitute for my time in service as it related to the position, and I had a second interview process, and I wasn't selected. I even put in an application for a peer specialist, Janice Yusiton, the person who hired me back in March 31st, 2020, she sent me an email communication I think in 2022, well, when I was hired, March 31st, 2020, she sent me an email communication in 2022 saying that -- for the peer specialist position that --

MR. MARTIN: '22 or '21?

THE WITNESS: '22, before I returned from active duty. To the best of my recollection, I think the statement said that because you had mental health treatment, that you're disqual -- you're disqualified or something to that effect. It just seemed like I just could not get my foot in the door with the VA until --



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

because of retaliation until June 2022 at the DVA, and then I was hired August the 15th, 2022 -- 2022, yes.

BY MR. DOYLE:

Q. Okay. That sort of leads into my next topic, the sort of last topic I want to talk about, so, let's break those down a little bit more particularly the other positions that you were seeking, okay?

A. Okay.

Q. Now, just as a starting question, are any of these other positions that you're talking about applying to, did you apply to them before February of 2021?

A. Yes, and after, yes.

Q. Okay. So yeah, let's break them apart that way. So, what are the ones that you applied for before February of 2021?

A. To the best of my recollection, it was an MBP position with the research department with Dr. Leavy. Also, I applied for a program analyst position under Ken Hill. I applied for a position with the public -- what is it, public relations, or public -- public something with William Browning. I applied for various positions with HR staffers with -- under Verian Walker and Latasha Lloyd, Jeanette Mason. I applied for several positions, and I didn't receive -- I was -- I wasn't selected as a candidate.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Q. Okay. Do you -- did you apply for those all at the same time?

A. Different -- different days maybe. To the best of my recollection, I applied for more than one position on a given day.

Q. Okay. Is there a range of time when were you applying for these positions like is there a month that you were applying for them, or do you remember?

A. I was looking for a position it seemed like every day. When I got off from work, I used my laptop to look and see what positions I could apply for. Also, Jeanette Mason, Latasha Lloyd, they were sending me job announcements. I was trying -- it seemed like I was trying to save myself mentally.

Q. Okay.

A. At one point I thought I was going to have a nervous breakdown.

Q. Okay.

A. I did, and -- and I thought Erica was going to do something to me, and I even said to Joe Franklin I don't trust -- I don't feel safe here. I -- I really didn't. Mentally, I was going through it seemed like haze -- haze every day.

Q. Okay. Of those positions you listed, were you told why you weren't selected for any of them?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. Just the one with Janice Yusiton with that peer specialist position when she said something to the effect you can't -- you're disqualified according to the law because you had received mental health treatment within the last year or something. That was the only excuse that I saw on the form for I guess denial.

Q. Okay. That one was in 2022 you were saying, right?

A. Yes.

Q. So that was -- that would be in the after category.

A. Yes.

Q. Okay.

A. But no, for 2021, I can't recall what their excuses were. Basically, they basically went with a different candidate.

Q. Okay. And then what makes you believe that you didn't get those positions based on a discriminatory reason?

A. Eric Osterbeck was I believe -- my theory is that William Browning probably contacted Eric Osterbeck as a point of reference to one of the positions I applied for which was the GS11 position for public relations, and I believe out of retaliatory, age, and discrimination, intellectual discrimination that he spoke with him in



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

order to prevent me from gaining gainful employment.

Q. Okay. And what --

A. And all of them.

Q. -- makes you have that theory?

A. Be -- because he -- he contacted my employer as a point of reference, and I believe that for all the positions it was -- I was on a list.

Q. Okay. You just think because it's normal to contact their references that's what would have happened, that's what you're saying?

A. Yes. Yes, and I believe that Eric probably more than likely said something derogatory as it relates to my character fitness to allow me not to be a candidate of selection.

Q. Okay. And then what about that position you said you had an interview for on the -- on February 24th, what one was that?

A. Oh, with Mr. -- I think he was assistant chief or the chief, Ken Hill. I think it was for a program analyst position.

Q. Okay.

A. I had two interviews under his leadership. I interviewed with one position, and they went with a different candidate, and then the day I was supposed to interview on the 24th of 2021, I couldn't because Eric



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

had terminated me, and I was done mentally.
Q. Okay. Was there ever an effort to reschedule that interview?
A. I think after I spoke with the young lady when I went down to the area, Mr. Hill wasn't there on that day, I'm not sure. Mentally, I -- I can't recall.
Q. Okay. Okay, now, let's -- I want to now ask you about the positions you applied for after February of 2021. So, what were those positions if you can remember?
A. One of the positions was the prog -- I'm sorry, the peer specialist was one of the positions. I applied for an HR position, and I applied for many more positions. I would have to look at my documents to be exact, but definitely HR peer specialist positions within the VA hospital.
Q. Okay. And then when -- what period of time were you applying to those positions?
A. Between -- after my termination. So, since we were talking about that. Are we -- are we being inclusive before and after, or just after?
Q. Yeah, yeah, for these ones that are after --
A. Okay.
Q. -- what period of time were you seeking -- seeking these other positions?
A. I would say after February 24th, 2021, onward



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

until I finally got hired with the Department of Defense with the Navy, and then I was still applying for positions, and I finally got the position with the DVA.

Q. Okay.

A. August the 15th, 2022.

Q. Okay. Now, were you applying for positions even while you were on that active-duty stint between June of 2021 and June of 2022?

A. Yes, because I was working the third shift. I was working from 7:00 p.m. to 7:00 a.m. --

Q. Okay.

A. -- while on active duty in the desert.

Q. Okay. So, it would have been -- are you saying it would have been possible to be working a different job during that time?

A. Yes, if I wasn't on active duty, yes. Because with the military, if I got hired or was in the position, they have to hold your position until you finish with your active-duty mission. If not, then USERRA would be involved.

Q. Okay. Maybe I didn't phrase my question that well, but I -- what I was asking is would it have been possible to be on active duty and then work another job at the same time?

A. I don't think I could have did -- done that but



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

maybe some people may have, but I don't think I would have did that, and plus they would have wanted me to be in the same city as it relates to gainful employment.

Q. Okay.

A. So, I guess --

Q. You were applying to jobs back in Michigan?

A. Yes, because I wanted to return home --

Q. Sure.

A. -- to help with my family.

Q. Okay. Okay, I think I just have a few more questions. These are also about damages, I'm trying to ask about what the damages you're alleging are, and so my next question is whether you have sought any medical or mental health treatment because of the discrimination you're alleging in this case?

A. Yes.

Q. Okay. Could you please, you know, do your best to sort of list, you know, what treaters you've been seeing that you allege are, you know, because of the discrimination you're alleging in the case?

A. I sought treatment with the Detroit John D. VA Medical Center, and the counselor who counseled me was, what's her name, Genevieve Johnson. I also sought mental health counseling with the Detroit -- no, the Dearborn Vet Center under the leader -- under the guidance of



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Shadae Roberson. I might be pronouncing her last name incorrectly. I also had a social worker named Carol -- I might be pronouncing her last name incorrectly too, Bostwick (phonetic). I might be pronouncing her last name incorrectly. I also, when I was on active duty, went to behavioral health and had to receive counseling as it relates to what happened to me with the wrongful termination. I also had to go to iCare America where I solicited help from a psychiatric nurse. And I also had to be placed on medication to reduce my anxiety, stress, and take, what is it, melatonin to calm myself down. So, I was on different types of medications, and I solicited mental health, and I'm still -- oh my God, as a matter of fact, I think I missed my phone call for my 3:00 appointment and that was my behavioral health telehealth person, now that I think of it. I forgot I had a 3:00 p.m. -- 3:00 p.m. mental health appointment today with the -- VAMC.

Q. Well, hopefully you can get that rescheduled, yeah, okay. Now, for any of those, were you seeing any of those providers before you were terminated in February 2021?

A. I was seeing Genevive Johnson, Carol Bostwick, I might be pronouncing her last name incorrectly, Shadae Roberson, and I also signed up or was referred outside of



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

the VA MC by Genevieve Johnson to the psychiatric nurse November 2020. So, yes.

Q. Okay. For any of those treaters where you were seeking treatment that you just listed, did you have out of pocket costs associated with those?

A. Yes, as far as prescription, mileage, gas, commuting, so yes. Because I had -- when they wrote a prescription, I had to pay out of pocket for some of them.

Q. Okay.

A. And then I had to commute to those locations to receive the treatment that I needed.

Q. Okay. As to the visits themselves, there were no out of pocket costs?

A. Not that I can recall right now. I would have to go back and look at some of my documentation.

Q. Okay. And then circling back to the prescriptions point, how much -- let's -- maybe the best way is to do it is like how much per month are you spending on those prescriptions?

A. It would range anywhere from maybe $9 to maybe 25, $30 based on the prescription and which place I went to, whether it was Walmart or CVS, or whether I picked up some of my prescriptions free of charge at the VA.

Q. Okay.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

A. So, it depended on which pharmacist location.
Q. Okay. And what were the pharmacies that you would go to?
A. I went to CVS. I also want to say that to the best of my recollection maybe Walmart, but definitely CVS when the psychiatric nurse prescribed me medications.
Q. Okay.
A. And then I also went to, when I was on active duty, I went to the pharmacist down in -- at the Fort Bliss Base area to pick up my medicines too.
Q. Okay. Okay, so that's -- I think I just have one last question which is whether there are any witnesses that you believe will testify in support of your claims that we haven't discussed yet today. Is there, you know, anyone who you think is going to testify on your behalf who we haven't already mentioned today?
A. Sylvia, I cannot think of Sylvia's last name. I'm drawing a blank. The name starts with an S. Sylvia, Jennifer -- Jennifer Fluker. Might be mispronouncing her name too.
Q. Okay. Who are Sylvia and Jennifer?
A. Sylvia was the person who referred me to her chief and Dr. Leavy. She used to work in the payroll department, and she witnessed Angela's behavior, and also Erica Bethany, and that's when she referred me to Dr.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

Leavy for possible employment in his office area. So, she worked in payroll, then she worked in the research department at the VA, but now she's retired.

Q. Okay. Who is Jennifer?

A. Jennifer Flu -- last name starts with an F, she is an HR recruiter, I want to say GS12, for the VA.

Q. And in what way would she be -- what way do you expect that she would testify on your behalf?

A. To say that she witnessed some of the conversations that occurred in the office when she called me to take care of an HR transaction and she heard voices in the background.

Also, knowing -- sending out job opportunities for me to gain access for other gainful employment within the VA MC because she realized that it was a hostile environment, and she too worked in the office at one point in time, and she worked with Eric Osterbeck and she witnessed how Eric Osterbeck was disparaging to Janet Simons, another African American female who was older than me who received the same type of treatment I received.

Q. Okay. Anybody else you can think of?

A. Yes, Jim Spear who stated in the written communication that -- and even told me verbally, "Tara, Eric does not hold the rest of the team to the same



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

standards that he holds you to. And if I were you, I would get a civil rights attorney in reference to how Eric is treating you and that Eric needs to be careful."

And he had -- Jim Spear also had a conversation with Glen Belcher about how I was wrongfully terminated, and Jim Spears end up communicating with me, telling me, "Tara, I'm so sorry for what happened to you."

Also, Roberta Jenkins and Michael Jenkins can attest to the fact that Eric Osterbeck solicited them to write statements, point of con -- point of contact statements against me that I did not complete their medical -- I'm sorry, I did not discontinue their benefits within the open enrollment season -- timeframe.

Q. Okay. We did discuss those -- those two already, okay.

A. So --

Q. Yeah, how about anybody else?

A. There were some people that were in that NEO class on August the 31st, 2020 that came up to me after the NEO class and said that, "We reported what happened in the NEO class to your supervisor and we can write statements about what took place in reference to how the other NEO briefer talked to us," but I didn't pursue it, but maybe the record for those persons who attend NEO can attest to what happened.



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

And also, I want to say -- I guess I'm kind of excited, getting a little anxious. Carmen -- oh Jacqueline Pace, the person who provided me training long distance in Cincinnati Ohio, can attest to what occurred. I also confided in Carmella Freeman and to let her know how I was being mistreated by Eric Osterbeck, and she was the person who reached out to Eric Gonzales to let him know that I was encountering problems in the HR department, and she told him that there's an employee who wants to speak to you named Tara Miller and he told her to send her my way, but when I called him twice, he didn't respond to me. So, she can attest to that, that I did try to solicit help.

Also, perhaps Reginald Guynes, but I think some of these people who are gainfully employed at the VA hospital may be apprehensive because they don't want to lose their jobs, and if I was retaliated against, what is going to make certain that they're going to have job security if they speak out on my behalf. They might end up in the same situation as myself.

Q. Okay. Anyone else you can think of who we haven't discussed already?

A. At this moment, I can't recall.

MR. DOYLE: Okay.

MR. MARTIN: That's all you can recall right now?



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

THE WITNESS: That's I recall right now. Oh, I'm sorry, Steven Busby.

MR. DOYLE: Okay.

THE WITNESS: Who -- who was also employed in the HR department. Janice Simon possibly who was also employed in the HR department.

MR. MARTIN: And Counsel, just for your information, these names are -- are in that affidavit. That's what she's looking at.

MR. DOYLE: Okay. That makes sense.

BY MR. DOYLE:

Q. So, I guess, aside from looking at the affidavit and looking at the names, are there any -- I guess what I'm asking is are there any other ones that you can remember outside of the affidavit?

A. I believe Cindy Bukowski would testify on my behalf because I was petrified when I was communicating with her over the phone and in written texts, and I even stated to her that I believe that my supervisor is trying to terminate me, and he also tried to have me apprehended by the VA police. So, I believe even though she is an EEO and harassment prevention representative, I believe she would speak the truth to my stress, strain, hostile work environment, the fear that I encountered. And Donald Scott, he warned me that --



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

MR. MARTIN: Before you start, tell who he is.
THE WITNESS: Donald Scott -- Donald Scott was an EE -- well, is -- well, was an EEO representative for the VA --
MR. MARTIN: Where?
THE WITNESS: In Pinellas, Florida. And Zenia Berry gave me a phone number to call as a point of redress, and she told me that I would have to solicit help outside of the VA, and when I called the number, I was connected to Donald Scott, and I told him what was going on and he stated --
MR. MARTIN: With the VA.
THE WITNESS: -- With the VA, the EEO, VA, and he stated to me that, "I don't know if you are aware or not, that if you file a complaint against your supervisor, you're not filing a complaint against him, you will be filing a complaint against the secretary of the VA and as such, since you are on a two year probationary period, you can be terminated if you file a complaint against your supervisor." And that left me in a state of paranoia and paralyzed -- paralyzation mentally. I was afraid. He sent me documents of how to follow through on my complaint and that, too, is also in the affidavit.
MR. DOYLE: Okay. Okay. That's all the questions I have, Mrs. Miller, so, I'll pass along to



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

your attorney in case he has any questions. That's how this works.

MR. MARTIN: No, I don't, Counsel.

THE WITNESS: Sorry.

MR. MARTIN: Wait a minute, stay still.

THE WITNESS: Sorry.

MR. MARTIN: That's okay, we're still here. No, nope, the deposition is over, and thank you so much for your patience this morning. I really appreciate it.

MR. DOYLE: Oh, no problem. We'll go off the record then.

(Whereupon, at 4:57 p.m., deposition concluded; off the record.)



Electronically signed by Kristen Shankleton (601-206-892-2623) e444893f-d4fe-4730-852c-fff87a97b539

C E R T I F I C A T E

I, Kristen Shankleton, an Electronic Reporter and a Notary Public, do hereby certify that the foregoing witness, Tara D. Miller, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my recordings and notes and is a true record of the testimony given by the foregoing witness.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 29th day of January, 2024.




Kristen Shankleton
Notary Public for the
State of Michigan

My commission expires: July 26, 2024

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947