UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TARA D. MILLER,

Plaintiff,

vs. No. 22-12865

DENIS McDONOUGH, Secretary of the Department of Veterans Affairs,

Defendants.

---

DEPOSITION VIA ZOOM OF

ERIC J. OSTERBECK

Houston, Texas

August 22, 2024
11:40 a.m.

APPEARANCES:

FOR PLAINTIFF:

LAW OFFICES OF DEWEY RICK MARTIN
By: Dewey R. Martin (P42484)
13900 Woodward Avenue
Highland Park, Michigan 48203
(313) 963-1321
E-mail: drickmartin@glottaassociates.com

FOR DEFENDANTS:

DEPARTMENT OF JUSTICE
By: Christopher J. Doyle (P79376)
211 West Fort Street
Suite 2001
Detroit, Michigan 48226
(313) 670-5589
E-mail: christopher.doyle@usdoj.gov

REPORTER: Robin Darnbrook, CSR-2508, RPR

T A B L E  O F  C O N T E N T S

WITNESS: ERIC J. OSTERBECK


| BY MR. MARTIN: | Page |
|---|---|
| Cross Examination . . . . . . . . . | 6 |


- - -


| Exhibits | Identified |
|---|---|
| 1 - 12/19/2022 Department of Veteran Affairs Policy Statement | 16 |
| 2 - 7/23/2020 Memo from E. Osterbeck to to E. Bethany | 171 |

August 22, 2024

Houston, Texas

- - -

COURT REPORTER: I am not in the same location as the witness and this deposition is being conducted remotely. Is there any objection to my administering the oath remotely?

MR. MARTIN: None.

MR. DOYLE: None from me.

- - -

ERIC J. OSTERBECK,

Witness herein, having been first duly sworn to testify the truth, the whole truth and nothing but the truth, was examined and testified as follows:

- - -

MR. MARTIN: Please let the record reflect that this is the deposition being taken pursuant to Notice of Mr. Eric Osterbeck and it shall be used for all purposes under the Federal Court Rules.

Mr. Osterbeck, my name is Rick Martin. I represent the Plaintiff in this case, Tara Miller. I will be asking you a series of questions regarding your knowledge of things that

occurred during her employment and if you don't understand my question, just let me know and I'll rephrase the question or repeat the question. Once you've answered, then we will assume you understood and your answer is truthful. Fair enough?

**THE WITNESS: Yes.**

MR. MARTIN: Okay. And as I indicated earlier, Mr. Osterbeck, if you ever need a break, just let us know, let me know, you can take the break. If there's a question pending, then please answer the question and then you can take the break. Fair enough?

**THE WITNESS: I will do my best to do that, Mr. Martin. I do have ulcerative colitis and I'm having a flareup for the last week and when it hits my stomach, I do need to get to the restroom, but I will do my best to acquiesce to completing a question if I need to step out.**

MR. MARTIN: Yes. Thank you. Thank you. I appreciate that. And like I said, any time you need to take a break, you just let me know.

**THE WITNESS: Understood.**

MR. MARTIN: Okay.

- - -

CROSS EXAMINATION

BY MR. MARTIN:

Q Can you briefly go over your employment history, Mr. Osterbeck?

**A How far back would you like me to go, sir?**

Q Did you graduate from high school?

**A Yes, I did.**

Q Okay. Let's go over educational first. After high school --

**A I graduated from high school in 1988. I attended --**

Q I'm sorry, what high school was that and location?

**A Farmington Hills, Harrison High School.**

Q And that's located?

**A In Farmington Hills, Michigan.**

Q Okay. All right, continue.

**A After high school graduation, I attended Northern Michigan University in Marquette, Michigan for one year and then I attended Oakland Community College for one semester.**

Q And what did you study in that one year at Northern University?

**A It was --**

Q Generally.

**A -- general academics. There was no specialty as a freshman.**

Q And same thing in Oakland Community College?

**A Yes, sir.**

Q And then what did you do after then, Mr. Osterbeck?

**A In January of 1990, I joined the United States Marine Corps and enlisted.**

Q I appreciate it. Thank you for your service, Mr. Osterbeck.

**A Yes, sir.**

Q And did you get any additional educational training, take any courses while in the military?

**A There was several courses that were taken that were for -- you needed to do courses for promotions. I do not have a list of them but it wasn't -- it was only through the Marine Corps Institute, they called it, and you had to take different types of courses and receive credit for them and it helped towards like a promotions corps.**

Q And what was the -- did you do that from time to time?

**A Yes. I served for six and a half years, so from 1990 to 1996. It was a long time ago. I don't have records of courses. It was nothing that equated to what would be considered a collegiate transcript, so...**

Q I understand.
**A The only college classes I took were the ones that I've already indicated.**
Q And did it lead to you getting promoted? You mentioned about promotion as far as rank.
**A Yes.**
Q Okay. And what rank did you -- when you were discharged -- and I'm going to assume it was honorably, correct?
**A I was honorably discharged in August of 1996. I had by then obtained the rank of E5 sergeant.**
Q And after you completed your service, what did you do next, Mr. Osterbeck?
**A After I got out of the service, I worked for a metal fabrication company and also worked for a welding company. In August of nineteen ninety -- so excuse me, April of 1997, so approximately seven, eight months after I got out of the Armed Services, I began work at the United States Postal Service.**
Q In what capacity?
**A I was initially hired as a clerk which processed the mail. I became an acting supervisor. I supervised various types of operations within the Postal Service. For some years, I worked at several facilities within the greater Detroit, Michigan area**

as well.

I got into Human Resources in approximately 19 -- well, let me say 2001, roughly 2001 and I started in Labor Relations Department and from there, I was in human resources and/or labor relations for the majority of my postal career. I held various positions. I was an acting manager of the Labor Relations Department in two different districts, the Detroit District as well as the Greater Michigan District, and I should say one more as well, which was the Royal Oak or Southeast Michigan District which merged eventually with the Detroit District in about 2011.

I was also an officer in charge of several different mid level post offices and then I went back to labor relations at the next higher level, which was our regional area level, which was out of the Chicago, Illinois area and I did that until November of 2017 when I changed federal agencies from the Postal Service to the Department of Veteran Affairs.

I began my new career with the VA in November of '17 at the Ann Arbor VA Medical Center. In 2018, I was promoted to the Assistant Human Resources Officer at the Detroit VA Medical Center.

**I was then promoted to the position of Human Resource Officer at the Detroit VA Medical Center. And then in August of 2021, I transferred from the Detroit VA Medical Center into my current position at the Houston, Texas VA Medical Center.**

Q Thank you, Mr. Osterbeck. And that August transfer, same position, are you HR, Human Resource Officer?

**A The position changed titles in 2020, I believe. I don't know the approximate date but the position was the same but the title changed from Human Resource Officer to Senior Strategic Business Partner.**

Q Which is the title you hold now in Houston?

**A Yes, sir.**

Q Okay. Now, is that a G -- what level is that, a G-12, 13, 14?

**A It is a GS-14 level.**

Q And what does GS stand for, Mr. Osterbeck?

**A General Schedule. It's one of the pay tables that the federal government uses.**

Q Okay. And that was a GS -- I'm sorry?

**A 14.**

Q 14. And when you left Michigan from the Detroit VA, you were also a GS-14 or 13?

**A I was GS-14 when I left.**

Q Okay. And why did you leave Detroit to go to

Houston?

A I left Detroit to move to Houston for an opportunity. My wife is a letter carrier at the United States Postal Service, she didn't want to carry mail in the snow any longer and asked if we could relocate to a warmer climate. The position in Houston came up and I came down to Houston in May of 2021 on a detail, so I was here for May, June, and I believe the first two weeks of July, 2021 on a detail to see if I liked the facility, if the leadership and I were a good fit. Then I was offered the position here permanently and so we relocated to Houston, Texas. We actually moved in October of 2021.

Q And when you say detail, Mr. Osterbeck, what do you mean just so I understand?

A A detail, I was offered a detail because the position in Houston was vacant, they asked if I would come down to Houston again to see if the position was a fit for me, if I was a fit for the leadership at the facility and the leadership at our network for whom we report to. Kind of just a trial test to see if everybody fit good and if I wanted to make that change from Detroit to Houston. It's just an opportunity to kind of try out the position in

**Houston before accepting it on a permanent basis.**
Q And detail is just military parlance, correct? You call it detail. That's military? I don't think civilians would use that term, in other words, I went down there on a detail?
**A It's considered a temporary assignment.**
Q And again, that detail, that word detail, that's military use?
**A The government.**
MR. DOYLE: Form.
BY MR. MARTIN:
Q No, I'm just trying to understand. Go ahead, Mr. Osterbeck, that's -- civilian, like you know, you never really use detail for describing moving to a place or check in and out, that's just military parlance, correct, detail?
MR. DOYLE: Object to form.
**A Not military. It's the federal government term. It's by VA policy.**
BY MR. MARTIN:
Q Got it. Okay, thank you. And can you briefly go over where you were stationed, Mr. Osterbeck, during the six and a half years, to the best of your recollection, when you were in the military, in the Marines?

**A Yes, I did my boot camp in San Diego, California; I did combat training in Camp Pendleton, California; my job within the Marine Corps was that of a postal clerk; I did my training in Fort Benjamin, Harrison, Indiana; I was then stationed in Okinawa, Japan between 1991 and then I was stationed for the majority of my career at Camp Lejeune, North Carolina.**

Q And what did you do at Camp Lejeune, North Carolina primarily while you were there?

**A My military occupational skill, or MOS is the acronym, I was a postal clerk.**

Q So it's really easy for you to get a job with the United States Post Office once you got out, you had plenty of experience and qualifications?

**A Yes, sir.**

Q And you were promoted right away to an acting supervisor once you got there, not long after, fair to say?

**A Approximately -- I had been there one and a half to two years before I became the acting -- an acting supervisor.**

Q Okay. What made you decide to go into the area of HR, Mr. Osterbeck?

**A Well, I can say that, you know, from my time in the**

**Marine Corps of being a non-commissioned officer for half of my time in the Marine Corps, I was a leader and that is why I initially went into supervision. I was actually while I was in the Marine Corps, I did want to try to get into the legal field in some capacity but that didn't come to fruition. I was given the opportunity to fill a spot that was vacant within the labor relations department and I accepted that opportunity and found that human resources and working with people, assisting people and following rules and regulations through contractual manuals, which is obviously something instilled with my time in the Marine Corps, I found that it was a position or department that I enjoyed working in.**

Q So if my memory or my notes are correct, you began HR in around November of 2017 at the Ann Arbor Medical Center, that's when you went to the VA -- or maybe -- you didn't start in the HR office when you first got hired, or did you?

**A Are you asking about my time with the VA or the time with the Postal Service?**

Q I'm sorry, you're right. You first got into HR with the Postal Service, that's when you began getting your training, correct?

**A Yes.**

Q And even -- and I know you indicated that you attended college and things like that but you never got a degree in HR but you did take a lot of courses, is that fair to say, in HR once you developed an interest for that?

**A I took -- the courses that I took were in the Marine Corps that were for -- they were not -- those were not HR specific. As my time in human resources, 17 out of my 21 years in the Postal Service was spent in some facet of human resources and all of my time in the VA, so from 2017 to the present have been spent in human resources.**

Q Okay. So at the post office did you take any training courses? Like they didn't just throw you in there as an HR person, correct? Like what type of training did you receive or coursework once you decided you wanted to get into the HR area?

**A There -- within the federal government and human resources, there is a myriad of trainings, some are yearly, some are based upon occupation. I do not have a listing of my Postal Service training record that I can look at and ascertain but there are leadership courses, there's processing, personnel actions, time management, all different types of labor relations courses and trainings that I was**

**taking, all types of supervisory training courses, ethics, dealing with difficult employees, Hatch Act just to name some, but again I don't have a listing of everything that I've taken.**

Q No, that's fair and I appreciate that. That just gives us an idea you've taken a wealth, an abundance of courses in HR through the years. And that's kind of like an ongoing process, correct, you may sign up for a conference or a course here or there; is that fair to say?

**A Yes. There's yearly trainings that all employees in specific occupations but for me human resources that we need to take and then others are assigned at random for whatever reason that the VA decides that an occupational series like human resources need to take.**

Q And one of the jobs of a Human Resource Officer that you learned from your training is to enforce rules, regulations, policies, things of that nature?

**A Yes.**

Q And did you receive training on how to enforce rules, policies and regulations?

**A Yes.**

Q Now, I'm looking at a document from the Secretary of Veterans Affairs, it's dated December 19, 2022 and

the subject, it says to all employees and it says the employment -- the Equal Employment Opportunity, Diversity and Inclusion and then it says no fear and whistleblower rights and protection policy statement and it's signed by Denis McDonough. How do you pronounce his name?

**A McDonough.**

Q McDonough, okay, thank you. And it says -- do you recall receiving something like this before, like the policy statement regarding Equal Employment Opportunity, Diversity and Inclusion at some point in time?

**A Yes.**

MR. DOYLE: Just hold on. I'm just going to object to the extent we don't really know exactly what that document is. You can answer to the best of your ability, Mr. Osterbeck, if you know what document he's talking about.

MR. MARTIN: I understand. And let me do this to make it a little easier, Chris. Let me -- can I send this to you and then you could forward it to Mr. Osterbeck, this Exhibit 1?

MR. DOYLE: Yeah. Maybe move on to a different question in the meantime or something.

MR. MARTIN: Yeah. Yeah, let me send

it right now. I'll send it right now and we can take a five-minute break or whatever, Mr. Osterbeck, and you can take a five-minute break and I'm going to send this.

**THE WITNESS: That's fine.**

(A break was taken at 12:05 p.m.)

- - -

(Record resumed at 12:14 p.m.)

BY MR. MARTIN:

Q As a Human Resource Officer in particular where you're responsible for running the Human Resource Department or a particular department, I take it you take that job very seriously, Mr. Osterbeck, with your military training and with your commitment throughout the years with human resources, I take it you take it very seriously?

MR. DOYLE: Object to form.

**THE WITNESS: Yes.**

BY MR. MARTIN:

Q And when I say seriously, I mean enforcing the work rules, complying with policy, making sure the employees comply with policies and the work rules, you take that seriously; is that fair to say?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q Well, I'll ask you. Do you take that seriously, ensuring that employees comply with policies?

MR. DOYLE: Same objection, but go ahead if --

**THE WITNESS: I do take my job seriously, yes.**

BY MR. MARTIN:

Q And that includes enforcing policy and work rules, correct?

MR. DOYLE: Object to form.

MR. MARTIN: You can answer the question if you understand it.

**THE WITNESS: Can you repeat the question, please?**

BY MR. MARTIN:

Q Yeah. What is the job of a Human Resource Officer when you were working? Tell me your primary duties and responsibilities. Maybe we'll do it that way.

**A My duties --**

Q And we'll -- excuse me, I'm sorry. Because you've covered such a broad period, just to make it easier to focus, let's say when you got to Ann Arbor or Detroit, when you got with the VA, what was your primary job duties and responsibilities as the HR Officer or Assistant HR Officer?

A When I got to the Ann Arbor VA Medical Center, I was hired there as a GS-12 Employee Relation/Labor Relation Specialist. With the specific ER/LR duties, we are there to support the facility with rules and regulations, policy, working through in coordination with the union for that facility if grievances are filed, writing position papers and assisting with ER/LR, so employee relation, labor relation questions and functions.

Q Thank you. And what is the primary difference, what are the differences between labor relations duties and responsibilities as compared to an HR officer?

A So ER/LR duties are specific only to employee relation/labor relations. As a Human Resource Officer or my current title of Senior Strategic Business Partner, the HRO duties encompass all facets of human resources, so there is ER/LR, staffing, compensation, work life benefits, classification, Workers' Compensation, performance management, so anything that falls within the HR arena, the Human Resources Officer, you know, they're broken out into different teams but for the facility, the Human Resource Officer is responsible for all of the human resource activity within that facility.

Q Okay. And in your capacity as a GS-12 and employee -- is that relations, employee and labor relations?

**A Yes, sir.**

Q Did you have the authority, though, to hire, fire or discipline?

**A No, I did not have the authority to hire, fire or discipline as an ER/LR specialist. My role as the specialist did not have anything to do with hiring, however, in regards to employees wherein their service department requested for a piece of corrective action to be written, as an ER/LR specialist, we would review the case specifics of the request, review VA policy to see if it was violated and then draft the written document of the proposed action and then provide it to the requesting supervisor or manager for their review, and that supervisor or manager was the one who would be the issuer of that action.**

Q Did they have to follow your advice, and when I say your, I mean your department, whoever's the labor relations person, or did they have independence to -- or discretion, they could say I want to go through this anyway with this disciplinary action of three days or four days even though you may say

well, I think it should be a warning? Tell me that dynamics, how did that occur?

MR. DOYLE: Object to form, but go ahead if you understand.

**THE WITNESS: The Human Resource Department, we are advisors, we don't direct the supervisor or manager that they have to take an action or not take an action. We advise them. If they request an action, then we write the action to what fits appropriately for the case specific circumstances or infraction. We provide it to the requesting supervisor or manager and the decision of whether or not to issue that action lies with the requesting supervisor. All we do is provide advice as to this infraction, here's what is recommended.**

BY MR. MARTIN:

Q Understood. So you mentioned actually HR. Did you mean that as a labor relations or is it the same process?

**A I mean you were asking about the role of a Labor Relations Specialist.**

Q Yes.

**A So that's what the role of the Labor Relations Specialist was.**

Q And what about as an HR Officer, when it comes to

disciplinary action, what role does an HR Officer play within the department that you are over?

A **Within my specific department and my employees who specifically report to me?**

Q Yes.

A **So as the Human Resource Officer, if it's determined by myself that some type of action is warranted, then I would gather evidence, statements, what have you and then review it.  I would submit the action because I was the requester.  I would go ahead and submit that to the team that I would send an action to for review and then based upon their recommendation of support or non-support, it would come back and then I would make the final determination of whether or not to issue an action or not issue an action or -- I would say I'll leave it at that.**

Q Okay, understood.  So would the people in employee relations interact with the HR person at all, HR Officer?

A **Yes.**

Q Okay, in what ways?

A **It would depend on which team, you know, you're speaking of.  So when I -- and I'll try to clarify so that you understand.**

Q Okay, thank you.

A **When I was promoted to a GS-13 Assistant Human Resource Officer at the Detroit VA, so I left Ann Arbor and went to the Detroit VA, I had a ER/LR supervisor that reported to me and I had a staffing supervisor that reported to me. The rest of the employees within all of those sections of human resources that I spoke about a few minutes ago reported to each respective supervisor and then the supervisor reported to me. So I had the supervisors, they had specialists that reported to them as well as assistants that reported to them. So that was the hierarchy of the department.**

**If I as the supervisor of the entire department, if I was going to request an action on an employee, I would not do that -- I would say I would send that for review to the network specific ER/LR team.**

Q And who would that be when you were in Detroit?

A **Well, I have to kind of give you a little bit more clarity. So when we went through what we call a modernization process, the network as all -- they moved the reporting structure from reporting up through the facility to the facility Medical Center Director, who was the head of the entire facility.**

We then were moved to our modernization and many employees were reassigned under the network. So the Staffing Department, the Compensation Department, the Labor Relations Department, Work Life Benefits Department, Workers' Compensation Department, Performance Management Department, all of those employees were moved out from under what would be considered my jurisdiction as the Human Resource Officer and were moved to the network, and so my team in Detroit went from approximately 25 to 30 employees down to about I'll say roughly ten, I don't have an exact count, but ten to 12 and therefore I did not -- I no longer had any supervisors who reported to me. I was the only supervisor in the newly created strategic business unit model and therefore if I was going to take an action once that transition was completed, I would send it to the network Labor Relations Department. There were, you know, as a group and a team that it was sent to.

Q Thank you. So let's back up. Let's get some dates now. The modernization took place approximately when, Mr. Osterbeck?

A The modernization took place at the -- approximately the end of 2019.

Q Now, the VA Hospital in Detroit, are janitors employed there?

**A They're not called janitors but yes. There are people who clean at the facility, yes.**

Q Okay. So you have nurses, you have assistant, nurses or everything that's necessary for healthcare, correct?

**A Yes.**

Q Okay. As far as employees, you know, receptionists, things like that?

**A It's a healthcare facility just like any other private healthcare facility. There's --**

Q Approximately how many employees, approximately -- not including doctors, but approximately how many employees worked there in 2019, 2020 at that facility?

**A I don't know the breakdown of each position. There are hundreds of positions within the facility. I can tell you that the total number of full time equivalent employees in the Detroit VA Medical Center around the time of 2019 was approximately 2,100 employees.**

Q So if any one of those 2,100 employees violated a work rule and had to be disciplined or a supervisor decided to discipline them, did you play any role,

like did they contact HR for advice or were there 20 different HR departments? I'm trying to understand. I know when I was at Ford, we had an HR Department and that HR Department dealt with everybody in the coke and blast furnace plant at Local 600. I'm just trying to get an understanding of your involvement and communications with -- did they call you for advice?

**A I would say that if a consultation was needed, it would have been referred to the Employee Relation/Labor Relation Department section of Human Resources. I would not be consulted on every single action that has ever taken place within that facility. That's why we have the ER/LR Department.**

Q Got you. So now I got a better understanding. Discipline generally comes -- of those 2,100 employees, if discipline is needed, it comes from their supervisor that goes up to the ER Department?

**A Yes.**

Q And when you were involved in discipline, that was solely over the employees that reported to you, which as you indicated went from 25 to maybe ten to 12 where you were the initiator of the discipline?

**A Yes.**
Q But you make an inquiry from any one of the 2,100 employees regarding benefits or things of that nature?
**A Yes.**
MR. DOYLE: Object to form.
BY MR. MARTIN:
Q And give me an example of what you mean when you say you make inquiries from any one of the 2,100 employees.
**A If an employee reached out and said that they wanted to change their health benefit election, then it would come through my department because that's a benefit -- issuing benefits is part of Human Resources. If a section of the department wanted to know what they needed to do because they thought that they wanted to fill a vacant position, they would reach out to my department.**
Q Okay. Is it fair to say that your department was a pretty busy department in terms of workload?
MR. DOYLE: Object to form.
**THE WITNESS: I wouldn't say with Human Resources. It's ebb and flow. Sometimes it's extremely busy and sometimes it's not. It's just regular work that needs to be done and you were**

**there to support the facility.**

BY MR. MARTIN:

Q Okay. And the number of employees that you have working for you from time to time, was it sufficient; would you agree?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q In other words, did you ever tell your -- you know, let it be known hey, I need a couple more people here, we're short or, you know, we need some more help full time equivalent?

MR. DOYLE: Same objection.

**THE WITNESS: If I felt the need that more employees or a specific type of employee was needed, if somebody attrited from the department and I felt it necessary, then I would go to my manager and request for a position to be filled if it was needed.**

BY MR. MARTIN:

Q And who would you go to as a manager, as the manager in 2019, 2020?

**A Once modernization occurred at the end of fall, end of 2019, my manager became Eric Gonzales, who was the VISN 10 Chief Human Resource Officer.**

Q What was that first word? I got the Human Resource

Officer.
A **Chief.**
Q I got the chief part. Visiting?
A **VISN, V-I-S-N is an acronym for Veterans Integrated Service Network, so that is all the facilities that encompass each network. There's 20 or so different networks throughout the country. VISN 10 encompassed Michigan, Indiana and Ohio.**
Q Got it. And as you stated earlier, and I believe you took your job seriously as an HR Officer, and part of your job is to make sure that rules and regulations are being properly or appropriately enforced, correct?
MR. DOYLE: Object to form.
**THE WITNESS: Part of my duty is to support the facility, yes, with VA policy and rules and regulations, yes.**
BY MR. MARTIN:
Q Were there any rules or regulations or policies that you disagreed with that you can recall?
MR. DOYLE: Object to form.
**THE WITNESS: I am not the one who writes the policy. I adhere to them because that is what we are to do. I don't work for headquarters in VA Central Office, so I'm not a part of policy**

**making and it's not my job to object or not object to the policy.**

BY MR. MARTIN:

Q I understand. And I agree with you totally. I understand that. But we could have a policy that we don't agree with that we still enforce, right? That's true, right, you could have a -- a policy could come down that you don't agree with but your job is to enforce it and you enforce it, correct?

MR. DOYLE: Object to form.

**THE WITNESS: I don't have an opinion to policy. I read --**

BY MR. MARTIN:

Q Not that you would voice it. I'm just saying have you ever saw a work rule that you didn't agree with? Have you ever seen a work rule that you didn't agree with but yet you still had to enforce it?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q That you could recall?

**A Not at this time.**

Q Okay. And that could happen and you could just keep it to yourself. You know, I might see something and oh, I don't agree with that but we don't have to talk about it, right?

MR. DOYLE: Object to form.
BY MR. MARTIN:
Q You understand what I'm saying, Mr. Osterbeck? You might disagree with something but never say a word about it, true?
MR. DOYLE: Object to form.
**THE WITNESS: I'm not sure what you're asking of me.**
BY MR. MARTIN:
Q Let's say a work rule came down that says X, Y and Z and you think that that is unfair. As you stated, it's not your job to say whether it's fair or not. Just like you may give your opinion on discipline but when it comes to work rule, that's not your job but it doesn't mean you don't have as a human being an opinion and as an experienced person an opinion, true? You may have an opinion about a work rule; is that fair to say?
MR. DOYLE: Object to form and asked and answered.
BY MR. MARTIN:
Q Let me ask you this. Do you agree with Exhibit 1, the policy statements in Exhibit 1? Do you agree with them, what's in that policy statement?
MR. DOYLE: Object to form.

**THE WITNESS: I adhere to the policy because this is a policy of the company that I work for.**

BY MR. MARTIN:

Q Okay, let's go down to the second paragraph. "VA's leadership remains committed to advancing equity throughout the department and ensuring that our employees are provided opportunities to reach their full potential."

You agree with that -- you think that's a good idea? Let's put it that way. Do you think that's a good idea?

MR. DOYLE: Object to form.

**THE WITNESS: The policy is the policy.**

BY MR. MARTIN:

Q Do you agree it's a good idea? Do you agree with that statement?

**A I'm not giving an opinion. I'm to adhere to the policy. It doesn't -- it's irrelevant what my personal feelings are. I am an officer within the organization and --**

Q Mr. Osterbeck, I understand that but now I'm asking about your personal feelings. Let's go to this one. It says, "All employees, regardless of race, color,

religion, national origin, including gender identity, transgender status, sexual orientation, pregnancy, age 40 or older, disability, genetic information, marital status, parental status or political affiliation would have an equitable and inclusive workplace free from unlawful discrimination, harassment and retaliation."

Do you think that's a good idea? As a Human Resource Officer, do you think that's a good idea?

MR. DOYLE: Object to form.
Mr. Osterbeck, you can answer if you understand the question. I just want to put my objection to form on the record.

**THE WITNESS: Okay. Yes, I agree with that.**

BY MR. MARTIN:

Q Okay. Because you believe that unlawful discrimination is wrong, don't you?

**A I'm sorry, you broke up.**

MR. DOYLE: Same objection.

BY MR. MARTIN:

Q You agree that unlawful discrimination is wrong in a workplace, right, you agree with that?

MR. DOYLE: Object to form.

**THE WITNESS: Yes, I agree.**

BY MR. MARTIN:

Q Do you agree that unlawful harassment is wrong and should not be tolerated in a workplace? Do you agree with that?

**A Yes, I agree.**

Q I believe you do. I just need you -- I have to ask the questions. Do you believe that unlawful retaliation is wrong and should not be tolerated in a workplace?

**A Yes, I agree.**

Q Do you believe that all employees should be treated fairly?

**A Yes, I do.**

Q And is it fair to say you try to do that as a Human Resource Officer?

**A Yes, I do.**

Q And do you believe that violations of work rules should be -- well, let's put it this way. Do you believe it's important to enforce work rules in order to have a good department no matter where you work at? You believe it's important to enforce work rules?

MR. DOYLE: Object to form.

**THE WITNESS: Work rules are**

**necessary and they are applicable to protect everyone and yes, they should be enforced.**

BY MR. MARTIN:

Q And as a Human Resource Officer with all your training, you learned -- you've taken courses on bias and things of that nature, correct, bias and what's considered discriminatory or discrimination, you've taken courses and training on that, correct?

**A I have.**

Q Now, as a military person, I know you believe in timeliness, correct?

MR. DOYLE: Object to form.

**THE WITNESS: I'm not understanding what you mean by timeliness.**

BY MR. MARTIN:

Q You think it's important for employees to show up for work on time? Do you think that's important?

**A Yes.**

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q And from your experience, why do you think it's important for employees to show up at their work station on time?

**A In order for the department to run smoothly and to**

**be able to assist the customers, any department, company, agency needs folks to be on time.**

Q And you stressed that with your employees throughout your career, correct?

**A Correct.**

Q That it's important to be on time?

**A Yes.**

Q And because it can be unfair to the other people who show up on time in terms of workloads or just the policy should be adhered to, correct?

MR. DOYLE: Object to form.

**THE WITNESS: Employees should report as scheduled. They are required to do so by policy.**

BY MR. MARTIN:

Q And do you think that's a good policy?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q That employees should be on time?

**A Yes, I believe employees should be on time.**

Q When you -- you referred -- you used the word customers. Just so the record is clear, Mr. Osterbeck, explain to us who you're referring to or who is defined as a customer? What do you mean when you say customer?

**A Customers would be the employees of the facility in**

**which we operate. Also customers could also mean VA employees outside of the facility that we work within. The folks that need human resource assistance, those are considered our customers.**
Q Are patients considered customers, included in that, non-employee patients.
**A Patients and/or their families are customers of the hospital. There's really no reasons for patients or patients' families to really connect with Human Resources. They have patient advocates within the facility that work with patients and their families if they have questions or concerns about their care but it's not really a Human Resource thing to assist patients or families. They would go through the patient advocate because that's their job.**
Q And just looking over the policies here and looking at some papers, have you explained all the ways that you could think of how an employee not being on time can negatively impact your department and your responsibilities?
**A I don't believe I've explained every situation that could arise that would do that but in the general sense, if employees do not report to work on time, an operation cannot be fully successful.**
Q And when you have a situation where an employee does

not come to work on time or is absent, what authority do you have to try to correct that?

MR. DOYLE: Object to form.

**THE WITNESS: Can you repeat the question?**

BY MR. MARTIN:

Q Yeah. When you were in Ann Arbor, let's start with that, at the Ann Arbor location, did you ever have employees that you may have had to discipline because they just violated the work rule with respect to timeliness or absenteeism?

**A During my time in Ann Arbor, I was a Labor Relations Specialist, I was not a supervisor and I did not have employees who reported directly to me.**

Q Okay. But you may deal with employees in terms of recommending discipline for employees who violated the work rules with respect to timeliness or any other work rule, correct, as an employee relations?

**A Yes.**

Q And so what -- how would you enforce that policy as an employee relation? Let's say you had employees that just didn't come to work on time or was absent a lot.

**A Are you asking me what I would advise?**

Q Yeah, back when you were an employee relation in Ann Arbor.

A **Every case is fact circumstance based, there's no two cases that are alike, so based upon the fact circumstances, depending on what type of leave an employee was requesting, were they late to work, were they sick to work often, did they call in to work every Friday so they got a long weekend, if they were abusing what the leave policy was, if they were absent without official leave or they were a no call or no show, there could be different types of discussions or advice that a specialist would give to a requesting supervisor and it would also -- you would look at what type of an employee they were, were they in a probationary period, were they condition of employment, were they a career employee, had they received prior actions that would warrant something more, and then we would look at whatever policy was applicable to the situation and then also review the VA handbooks on actions in regards to the table of penalties and then make a recommendation to the supervisor and it would be up to the supervisor on what type of action they would do.**

Q As you explained earlier, correct?

A Yes.
Q Okay. Now, when you were at Ann Arbor -- well, let's just say Detroit, were you -- did your department have any guidelines and did you have guidelines as a manager or supervisor with respect to timeliness or the absenteeism policy, any guidelines, like if a person is absent once a month or late two or three times a week or any structure so to make sure the operation is running smoothly, like you said, did VA have a policy that says if this person is late two times or three times, here's what can happen?
A No, there was not a --
Q I'm sorry?
A There was not a policy in place like some private industries have with a specific designation of if you are late X amount of times, this is what you get. That's not what the policy was. The Detroit VA Medical Center had its own facility-specific policy on leave-related issues.
Q And leave-related issue because I'm sure they're concerned about employees coming to work on time, leave-related issues included being on time for work, correct?
A A leave-related concern, I don't think that you

**would be concerned with employees who didn't report on time. The concern would be employees who were tardy or absent.**

Q Okay, tardy. So were you given any guidance as to how to handle tardy employees? I guess that's what I want. Did the VA care about that or did they just let it go? I'm just trying to get an understanding.

You testified earlier the importance of people being on time for the operation to work smoothly and effectively, so any enforcement mechanism that was given to you or any other supervisor to make sure people are showing up on time and not absent?

MR. DOYLE: Object to form.

**THE WITNESS: The VA and specifically the Detroit VA Medical Center had its own policy on attendance that would work in conjunction with any policy that the VA overall had.**

BY MR. MARTIN:

Q What was your policy on tardiness or absence at the VA Detroit facility?

**A I do not have a copy of the Detroit VA leave policy in front of me in order to be able to quote specifically what it says.**

Q To the best of your -- I understand but to the best

of your recollection. I don't want to have to try and dig it up. What do you -- to the best of your recollection, what did the policy say and what was the enforcement mechanism to make sure people show up for work so the place can run efficiently?

MR. DOYLE: Object to form and foundation.

**THE WITNESS: I can't speak to the specifics of what the Detroit VA policy stated. I can tell you that leave is given or can be taken in 15-minute increments for VA employees and that employees are afforded leave different amounts based on their tenure of their career for annual leave. All employees receive, I believe, the same amount of sick leave. Employees are required to notify their direct supervisor if they are going to be late or going to be absent for the day.**

BY MR. MARTIN:

Q And if they fail to notify their supervisor that they're going to be late or going to be absent, what is the enforcement mechanism?

**A The supervisor would have the right to charge the employee with AWOL, absent without leave, and they could take corrective action against an employee for infractions.**

Q Now, you said they could charge them with absent without leave. So there's no enforcement mechanism for tardiness, is that what you're saying, or not?

MR. DOYLE: Object to form.

**THE WITNESS: I don't understand the question. Can you rephrase it, please?**

BY MR. MARTIN:

Q Absent without leave, my understanding of that is when the person doesn't show up at all. Tardy, they show up but they're just tardy. You said they could be charged with absent without leave. Can they be charged with anything for being tardy?

**A So I guess maybe I'll try to give you an example --**

Q Okay.

**A -- of how a supervisor could determine things differently. If an employee's begin tour was at 8 a.m., okay, and at 7:50 a.m. an employee contacted the supervisor and said I'm not feeling well, I'm going to be approximately one hour late, they notified the supervisor and the supervisor would generally allow them to use their sick leave because they weren't feeling well for an hour for, you know, between 8 a.m. and 9 a.m.**

**If an employee called in the same situation where they start at 8 a.m. and they had a**

**flat tire and obviously couldn't report to work on time, that would not be something where sick leave would be warranted. They could request for annual leave to get their car towed and repaired, the tire so that they could get to work and the supervisor could allow them to take their annual leave.**

**However, if an employee's start time was 8 a.m. and there was no contact, then they failed to report to work and failed to notify a supervisor. And as an example, if the employee didn't show up until 9 a.m., then that manager or supervisor has the right to charge that employee with one hour of absent without leave because there was no request and no communication.**

Q Understood. And what if that policy continues to get abused, you just continue with the same disciplinary action or can it be increased, the punishment?

MR. DOYLE: Object to form.

**THE WITNESS: There are several different measures that a supervisor has in place and every case is specific to the fact circumstances of that case. There could be a verbal counseling, there could be a written counseling, there could be an admonishment, there could be a reprimand, there**

could be a suspension or it could lead up to and including removal from their position.

BY MR. MARTIN:

Q And has that ever happened before, Mr. Osterbeck, where you've had to discipline employees for being tardy?

A Yes.

Q And did that occur when you were in Ann Arbor or Detroit?

A Well, again in Ann Arbor, I did not have employees who reported directly, so I would not have issued any actions directly to a person. Yes, there would have been times when supervisors requested an action against their employee where the Employee Relation/Labor Relation Specialist and I was not the only one there, there were several of us, and if -- again fact circumstances, yes, we would write an action and it would be up to the supervisor to propose that action to the employee. In --

Q Okay. I'm sorry, go ahead.

A In Detroit for the Labor Relations Department, questions or cases that would come up from the facility, they would -- the specialists that were in Detroit would do the same thing that I just described for Ann Arbor. Myself as a

**supervisor/manager, there may have been times when attendance was an issue. I cannot recall specifically if I did or did not issue actions. I don't have any documentation on me for that and I've been gone for over three years now, so I may have but I do not recall specifically if I did or did not take action against an employee for any attendance concerns.**

Q Okay. What was your policy with respect to attendance concerns when you were in Detroit?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q When I say that, what I mean is this, what did you expect of your employees? And I'm sure you let them know what you expected of them when it comes to attendance and tardiness, correct?

**A Yes. With my employees, if they had a need for leave for whatever the reason, that they were to contact me and make a request for leave.**

Q I'm sure you let them know that you expected all the employees to show up on time, correct?

**A That's an expectation that I think any supervisor or manager would have, yes.**

Q It doesn't mean that they tell the employees -- and I'm asking you, I think you probably did but I need

you to tell me whether or not you told your employees when they got hired you expect them to be on time and if they're not going to be on time, to let you know and you let them know why it's important to be on time; is that fair to say?

**A Yes, I would expect that of any employee.**

Q Yeah. That's something you did as an orientation, correct?

**A When I -- when I would meet with any new employee, I would set expectations with them, yes.**

Q And it would include being on time, correct?

**A Yes.**

Q And you would make sure they understood the importance so they're not rolling their eyes, what do you mean? You make sure they knew why it's important to be on time in your department?

MR. DOYLE: Object to form.

**THE WITNESS: I believe I've answered your question several times, sir.**

BY MR. MARTIN:

Q So that's a yes and you wanted to make sure they understood the importance, correct, of being on time?

MR. DOYLE: Object to form, asked and answered. Mr. Osterbeck, you can just one last time

answer the question if you understand it.

BY MR. MARTIN:

Q Did you make it clear to them -- do you think you made it clear that you wanted them to be on time and you explained to them why it was important to be on time? Did you make that clear?

MR. DOYLE: Object to form.

**THE WITNESS: I would have set expectations for all of my employees for any facet of what their job duties were and what their expectations were and it would include attendance and procedures and being on time.**

BY MR. MARTIN:

Q And you also let them know so they couldn't say they didn't understand why it's important, you let them know why it's important to be on time, correct?

**A Yes, I would explain the importance of being on time.**

Q And did you also give them warning that if these rules are violated and these infractions occur, they can be disciplined? Did you give fair warning of that?

MR. DOYLE: Object to form.

**THE WITNESS: Can you repeat what the question is, please?**

BY MR. MARTIN:
Q I think you'd think as a Human Resource Officer with all your training, if you have work rules and policies, it's not fair to enforce that policy against someone if they're not aware of the policy; would you agree with that?
**A I'm sorry, I missed that last part.**
Q Would you agree that before you enforce a policy against an employee, they have a right to at least know what the policy is?
MR. DOYLE: Object to form.
BY MR. MARTIN:
Q We're talking about fairness, it's basic fairness, Mr. Osterbeck. You believe that before you discipline someone or enforce a policy, it's important for them to know what you expect in terms of that policy and for them to know about the policy, correct?
MR. DOYLE: Object to form.
**THE WITNESS: The VA has, and I don't have an exact number, hundreds and hundreds of policies. Ignorance to the law is no excuse. Employees are expected to follow policies that are governed by the Veterans Health Administration.**
**There are -- the people -- our**

**employees in orientation are given information about where to find policies and procedures throughout the medical facility that they work within and the VHA overall. Therefore, policies are put in place and employees are expected to follow the policy.**

BY MR. MARTIN:

Q So that's fair. They're told to look at the policies of the VA, read the policies, understand the policies and if you have a question, they could let someone know, correct?

MR. DOYLE: Object to form.

**THE WITNESS: Yes, employees are expected to read the policy, learn the policy, know the policy and if they have questions to reach out.**

BY MR. MARTIN:

Q And you tell your employees that, correct?

**A Yes, all employees are told that, yes.**

Q By you as a boss, you let them know that?

MR. DOYLE: Object to form.

**THE WITNESS: I don't tell every employee, the 21 or 2,200 employees about the policies.**

BY MR. MARTIN:

Q No, I'm talking about the ones that report directly to you, Mr. Osterbeck. Just the ones that report to

you, you want to run a good operation, you want to make sure that they feel like they're being treated fairly, so you let them know as a good boss, look, I expect you to follow these policies, if you have a question, just let me know? That's kind of generally how you run the operation; is that fair to say?

MR. DOYLE: Object to form.

**THE WITNESS: Mr. Martin, I'm not sure exactly what you're getting at or trying to ask of me, so I --**

BY MR. MARTIN:

Q Well, you know, it would be easier if you don't try to figure out what I'm trying to get at because I'm trying to give you a compliment as being a fair guy who in part of being fair is letting people know beforehand what you expect of them, give them a fair warning and if this policy is not followed or whatever, you can be subject to discipline. That's a fair employer, that's a fair boss and I'm assuming that you were a fair boss because you also were an employee one time and you know about unfairness, correct, as an employee, you know about what's fair and what's unfair, correct?

MR. DOYLE: I mean hold on a sec.

I'm going to put an objection.

MR. MARTIN: Let me rephrase the question.

MR. DOYLE: No, hold on. I'm going to put an objection. This is getting really argumentative. The questions have been extraordinarily vague and the witness is doing his best to understand the questions, so let's try to get to concrete questions. If the witness says he doesn't understand a question, he doesn't understand a question.

MR. MARTIN: Right, so then I'll rephrase the question.

BY MR. MARTIN:

Q So Mr. Osterbeck, these are not trick questions and like I said, I assume -- well, first of all, let me back up.

When you were employed, did you expect your boss to be fair, to treat you fairly?

MR. DOYLE: Object to form, relevance. You can answer if you understand.

**THE WITNESS: As an employee, I expect to be treated fairly, yes, and as a supervisor, I try to be fair and equitable with my employees.**

BY MR. MARTIN:
Q Okay. Thank you. In Exhibit 1, it talks about that bullying in the workplace should not be tolerated. Do you agree that employees should not bully other employees, Mr. Osterbeck?
**A Yes, I agree with the policy.**
Q And why do you agree that employees should not bully other employees? Tell me why you agree with that policy.
**A I agree with the policy because it's the policy that is given by the Secretary of the VA that all employees within the VA are expected to follow.**
Q Do you think an employee should be bullied?
**A Do I think an employee should be bullied?**
Q By another employee, yes.
**A No, I don't think an employee should be bullied.**
Q Why?
**A Mr. Martin, I think we are all taught from our parents hopefully at a young age that no one likes to have a bully or be bullied.**
Q I agree.
**A I don't understand --**
Q Do you think it's important for harassment, employee harassment not to occur in a workplace? Do you think that's important?

**A Can you say it again, please?**
Q Do you think -- do you agree that harassment, employee harassment should not occur in a workplace, it's not good for a workplace? Do you agree with that?
**A I agree that there should not be harassment in the workplace, yes.**
Q Do you believe that bullying and harassment can affect the bullied or harassed employee's ability to do their job effectively?
**A Potentially, yes.**
Q And when you say potentially, what do you mean? How could it negatively impact them? Just in your own words, how could it negatively impact an employee being bullied and harassed? How could it affect the operation?
**A As an example?**
Q Yes.
**A It could affect their work performance.**
Q And why do you say that?
**A You asked for -- I gave an example.**
Q Yeah, explain how it could affect their work performance. Tell me how bullying and harassment can affect the work performance.
**A That every individual is different and things affect**

**humans differently, so I don't know, you know, what specifically would be an example of drilling down further. I think that somebody could -- it could affect their work performance, it could affect their attendance, it could affect their interaction with co-workers. I mean there's several --**

Q It could lead to belligerent actions, it could lead to workplace violence possibly, correct?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q Do you believe that bullying and harassment could potentially lead to workplace violence?

MR. DOYLE: Object to form.

**THE WITNESS: I believe that it's possible, yes. I understand.**

BY MR. MARTIN:

Q Yeah. I mean that's on the news a lot, quite a bit, right, about workplace violence and it's a concern, it's a public concern about workplace violence throughout America, correct?

MR. DOYLE: Object to form.

**THE WITNESS: Mr. Martin, I will tell you that earlier you asked me about my Postal Service career. I came from the Royal Oak District. I worked in the building where fatal shootings**

**occur, so I understand what you're saying about harassment. I understand the effects, yes.**

BY MR. MARTIN:

Q And because of that, you can agree -- you wholeheartedly agree with a policy that says we're not going to tolerate bullying and harassment, you could agree with that policy easily, right?

**A I think that I've really asked and answered that question numerous times so far. I agree with the policy that's in place by Secretary McDonough that covers all VA employees.**

Q And for the reasons that you sort of talked about, it could lead to workplace violence. You were at a location where that occurred. For a myriad of reasons, you agree that bullying and harassment should not occur at the workplace?

**A Let me just clarify because I don't want you to be misconstrued. I wasn't there at the building when it happened but later on after it happened, I did work in that building, so let me just make that clear.**

Q I understand. I understand. So for all those reasons, you agree that anti-bullying, anti-harassment in the workplace are good policies, correct?

**A I agree with the policies, yes, sir.**
Q And you agree that they're good policies?
MR. DOYLE: Object to form. What?
BY MR. MARTIN:
Q I don't understand why you're afraid of the word it's a good policy. It's something that I think is important. Don't be afraid of that. I think the whole world would agree with that. I think every juror would agree with that. You believe that's a good policy to have for the reasons you mentioned. It could lead to death, right? You believe that anti-bully, anti-harassment policies are good policies to have?
MR. DOYLE: That question has been asked and answered several times. You can go ahead and answer if you have an answer.
**THE WITNESS: I think I've answered it on numerous occasions.**
BY MR. MARTIN:
Q The Secretary talks about retaliation. Do you understand what is meant by that policy against retaliation?
**A Yes, I understand.**
Q And what's your understanding? You tell us. What's your understanding? How do you interpret that as a

boss, as a supervisor, as a manager?
**A Is there a specific page that you're looking at that you want me to reference?**
Q No, just the policy against retaliation, Mr. Osterbeck. How would you define that? Because you got to enforce these policies. How would you define when the Secretary says the VA does not condone retaliation? You have to interpret that, so what's your understanding or what is meant by that?
**A If you give me a specific paragraph or page that the Secretary states. I'm not just going to interpret something -- I can't interpret something without reading something.**
Q Well, I think your years as ER and all the training you've went through, you understand what retaliation in the workplace is, right? The Secretary didn't have to tell you that. You had trainings about retaliation. What's your understanding of what's meant by retaliation in the workplace? What would you tell the jury your understanding is?
**A Well, I think the jury --**
Q About retaliation in the workplace, that a workplace should be free from retaliation.
**A I think retaliation isn't in a singular bubble. There could be different forms of it. I can't tell**

**you every form of retaliation of what an example would be. Retaliation would be changing the work environment or conditions potentially of an employee for exercising any employee's rights to make a complaint.**

Q You agree that employees should not be retaliated against for making complaints or exercising their right to make a complaint, right, you agree that they should not be retaliated against, including you? If you make a complaint, you agree that employees who make a complaint should not be retaliated against, correct?

**A I agree that employees should not be retaliated against, yes.**

Q Did you ever receive any training on hostile work environments at a workplace?

**A Yes.**

Q Just tell us generally what's your understanding, what's your training?

MR. DOYLE: Object to form.

**THE WITNESS: Can you repeat the question, please?**

BY MR. MARTIN:

Q Yeah. Tell me about your training on hostile work environments. You're a supervisor/manager, so I

take it you have to understand what a hostile work environment is, so just tell us about it. What's your training on hostile work environment, what does it mean to you?

A **Well, I received -- first trainings would have been with the Postal Service on how to -- an initial management inquiry process, when there is a complaint, it needs to be investigated by the supervisor, gather evidence, witness interviews, interview the person making the complaint, interview any witnesses thereto, have them write statements and then interview the party that the complaint is against and do a fact finding into the matter.**

Q When you were at the Detroit VA, Mr. Osterbeck, did you have hiring responsibilities for employees that worked for you?

A **Yes.**

Q And tell me the procedure that you would go through. Tell us how that works.

A **If it was a position for which I was the selecting official?**

Q Yes.

A **Okay. Well, positions can be posted on the USA Jobs website and applicants would apply, they would provide their documents and a staffing specialist**

would be assigned to work that recruitment action. Once the date closed, any qualified applicants, their resume would be forwarded to me as the selecting official and I would set -- well, first I would review all resumes and depending upon the number of resumes that I received, as an example, if I received more than five resumes, I would do a scoring grid, so to speak, and rate all of the resumes and probably interview. If it was less than five, I generally interviewed all five people. If it was more than five, I would rank them and potentially only interview the top three based upon the scoring.

Generally I would have some type of panel where I would engage two other people who would be subject matter experts of that position in order to have their input as well and they would do the same thing, they would independently rate all of the applications and then we would go to the interview process and we would interview the applicants that were selected and move on to the interview phase. Again, rank and rate the candidates based upon their interview, combine the score and the applicant that came out on top would generally be offered the position.

Q And who has the final say on that?

**A If I was the selecting official, I would have the say but we would need to get second-level approval for hiring from -- so for me, I would go to my manager and I would say I went through this process and I want to select this applicant and they would, you know, give the, as you state, final approval.**

Q And generally they would agree with you since you're the one that's going to have to be working with that individual?

**A I would say generally speaking, yes.**

Q Have you ever been overruled, to your recollection, on a selection?

**A I believe that I have but I cannot give facts.**

Q I understand. Okay. How is the pay -- I'm looking at the policies and looking at the G -- the schedule, the GS and the schedules and stuff and it looks like there could be a range, let's say, a G-7 can have a range, a G-12 can have a range of pay, a minimum and a maximum; are you familiar with that?

**A Yes, I'm familiar. It depends on the position. If it is a position in which it is a career ladder position where there are more than one grade for that position, those are career ladder positions, but some positions are only a set grade, there's**

only one grade. So there's different types of positions, so I would need you to be more specific of a position in order to fully answer your question.

Q Okay, fair enough. What about G-14, is there a range, a pay range that when you were promoted, is there a range that they could decide to pay you?

A Because I was a GS-13 prior to being G-14, there is a regulation in policy for promotions, that is called the two-step rule. So on the GS scale -- and do you have one in front of you by chance?

Q No, not right now.

A Okay. So there's different grades of GS employees, 3, 4, 5, 6 all the way up to 15.

Q Okay.

A Those are the grades. Each grade has ten steps, step 1 all the way through step 10, okay? So as an example, what the two-step rule is, if I was a GS-13 and I was promoted to a GS-14, if I was at the time a GS-13 step 6 that made X amount of dollars, you would take that X amount of dollars and go to the GS-14 scale because that's where I was being promoted to, where does it fall into the range of steps 1 through 10 on the GS-14 scale and then you go two steps from there. That's the two-step rule.

**So in that way it determined where I would personally be slotted into based upon where I was at at the GS-13 in order to get the GS-14 promotion. That's for the internal -- you're already an employee promotion. There are really a few different ways in order to -- how pay setting is done for employees.**

Q I understand. So let's say for you, when you went to -- from a 13 to a 14, what step did you go from in a 13 and what step did you arrive to in a 14?

**A I would have to look at my personnel record if you want an exact answer to -- for me to pull it up and tell you.**

Q It's okay. Best of your recollection.

**A I believe I went from a GS-13 step 6 to a GS-14 step 4 but I'm not exactly sure.**

Q Okay. Now, is there any discretion, in other words, could the person who hired you say you know what, I'm going to look at your background and your military career and your experience, da-da-da-da and I'm going to put you at a GS-14, 7 because you're qualified or does it have to go step by step?

**A When you are already an employee like I was and so it was a promotion and I was already an employee, within that, the two-step rule would be applicable.**

There's different pay setting rules and policies for initially when an employee is coming to the VA and I can use myself as an example and maybe you can understand a little further.
Q That was going to be the next question. Thank you. Go ahead.
A So when I was with the Postal Service, they do not use the GS pay scale, they have a different pay scale. So when I applied to the VA and was selected, they based upon my experience as well as the amount of money I was making with the Postal Service, I actually -- my salary with the Postal Service was higher than the GS-12 step 10 on the GS pay scale, therefore, they used my experience and my above minimum qualifications and my highest previous rank and when I was given the job offer, I was given the offer at a GS-12 step 10.
Q And who hired you and gave you the GS step 10?
A The supervisor who hired me in Ann Arbor was Susan Myers.
Q So now as the manager or supervisor at the Detroit VA, did you have the opportunity to hire employees?
A Yes.
Q And did you hire Angela Thompson?

**A Angela Thompson was an employee at the Detroit facility when I got there. She was in a different department but I did hire her and select her into my team in human resources.**

Q And to what position did you hire her into?

**A I believe the position that she was hired into was that of a staffing specialist. Mr. Martin and Mr. Doyle and Ms. Darnbrook, this has been about two hours. Can we take a recess?**

MR. MARTIN: Certainly, yes. What, about 15 minutes, is that good enough or do you need a little longer?

**THE WITNESS: No, that's more than enough, sir.**

MR. MARTIN: Okay, 15 minutes is fine? Thank you.

MR. DOYLE: Sounds good.

(A break was taken at 1:37 p.m.)

\- - -

(Record resumed at 2:00 p.m.)

MR. MARTIN: Can you read back the last question, please?

(The following was read back:

"Q And to what position did you hire her into?

A I believe the position that she was hired into was

that of a staffing specialist.")
BY MR. MARTIN:
Q Mr. Osterbeck, when you're hiring a new employee, what criteria do you use to determine or to recommend to your boss the GS level? Let's say it's a GS -- you're hiring someone to a GS-6 and there's a range, right, a minimum and maximum?
A **Yes.**
Q What criteria do you use to determine where to start that person?
A **Okay, let me just make one clarification on my previous answer. Angela Thompson had a few different positions within HR and I think she -- instead of a staffing specialist, I think she initially came over as an information specialist dealing with data, things of that nature. So I believe that was the first position that she had when she left the department that she was in before she came to HR. So I'm not sure if -- my recollection of which one she had first is I'm not sure. So hopefully -- and then to talk about the -- when somebody goes --**
Q Criteria, yeah, for G-6.
A **So let me try to give my answer that's more specific to the case at hand for familiarity. A Human**

Resources Assistant position is a GS-5 target 7. So when an applicant applies, the posting is generally for one of those three grades, the 5, 6 or 7. And then based upon their experience, education, background, what have you, the Staffing Department, not me specifically but the staffing specialist who was working that recruitment action would review the selectee's application, background, education, experience, things of that nature, and they would make a recommendation and state based upon VA qualification standards, this applicant meets the criteria to be a GS-5, a GS-6 or a GS-7. So the staffing specialist says they either meet the qualification standards of a specific grade.

Q Okay. And with respect to Tara Miller, who made that decision of a GS-7? What is the name of the staffing specialist that made that decision?

A I believe the staffing specialist was Janice Uselton, U-s-e-l-t-o-n.

Q She reports to you, though, correct?

A At one time she did report to me, yes.

Q At the time that she made this recommendation, she reported to you, correct?

A By that time, she did not report to me directly but I believe she was the staffing specialist who worked

**the hiring for Ms. Miller.**
Q I understand. But you have a department, correct, and you have 15 employees around that time, 15 to 20?
**A Ms. Miller came to us after modernization, I believe, so no, it would have been more that ten, 12 that I spoke of earlier, and the staffing recruitment actions were handled from the network or VISN, which I kind of explained earlier, but I believe Ms. Uselton was the specialist who worked the action.**
**So the staffing specialist would have reviewed the applicant's resume, background, experience, like I said, and they would make the determination this individual qualifies at in this case the GS-7.**
Q Right. But you have -- you as the manager and supervisor, you have final say so, correct, you either could agree or disagree?
MR. DOYLE: Object to form.
**THE WITNESS: No. If somebody qualifies at the GS-7 level, then they are hired at the GS-7 level. It's not something that I can override.**
BY MR. MARTIN:

Q Someone is making a decision whether it's going to be a G-5 or a G-7, right, that's a subjective/objective decision, right, someone is making that decision, correct?

MR. DOYLE: Object to form.

**THE WITNESS: The staffing specialist -- it's not objective or subjective or however you said. The qualification standards are clear, that is called a career ladder position, so they can based upon the individual's resume and experience weigh it against what the qualification standards are for that position. They would either qualify at the entry level grade of a 5, the mid level grade as a 6 or what we call the full performance level for that position, which is the GS-7.**

BY MR. MARTIN:

Q I understand. Mr. Osterbeck, what I'm saying is this, there is a subjective component whenever you look at someone's resume, there's a subjective component how much weight I want to put on this in the resume. Like you said, everyone may have different experiences and stuff. At some level, there is a subjective component as to what weight I'm going to put on this particular person's

experience, experience in what, what weight I'm going to put on this particular person's education, what is the education. There is a subjective component, correct?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q There's no one size fits all, right? Because one person might have been in the military and did this in the military, another person in the military did HR stuff in the military. You see what I'm saying?

**A Staffing specialists look at thousands and thousands of resumes and they look at what does that resume state and can it be found in the qualification standards to determine what level a person is hired into.**

Q Right. And then they make a decision whether it's going to be a G-5, G-6 or G-7, correct?

**A Correct.**

Q Okay. And Janice Uselton, who was her immediate supervisor?

**A I believe at that time, it would have been Amanda Rosas, R-o-s-a-s.**

Q Who trained Ms. Miller when she got hired?

**A Who trained her in what specific --**

Q Trained her, assisted?

A So let me kind of explain about the full performance level. There's a position description and what we call a statement of difference of -- so as a 5 you know this much, as a 6 you know more, at the 7 you're at the full performance level, you are considered an expert in that position and you know everything there is to know about that position because you accepted it at the GS-7 level in this case and you are supposed to be the one that helps the 5's and 6's because they don't know as much as the 7. So when you're at the full performance level, you are at the top performing level of that position.

Q Understood. But there's training involved in -- when you come to a place, different departments may operate differently, there may be different responsibilities; do you agree with me? Wherever she was before, it may be different responsibilities than where she's at now. When I say now, I mean working for you.

A Yes. So there was trainings that were put on from people within my department, there was also trainings that were put on by different departments at the VISN that were applicable to each person's occupation.

Q What training did Ms. Miller receive and who provided the training?

MR. DOYLE: Object to form and foundation, but go ahead.

THE WITNESS: I cannot state every single training that Ms. Miller had but I -- because specialists who are Grade 7, 9, 11, 12 would assist with training, the assistants who are the 5, 6, 7's. Also there was people who were benefit specialists at the VISN who would have trained all of my assistants that work benefit-type actions.

We also had within our department a gentleman by the name of Charles Sharkey, S-h-a-r-k-e-y, and he was also -- in his career, he was the supervisor over the processing and records department and that was a department that was before the modernization took effect, but he was one of the foremost experts in processing personnel actions, which was a mainstay task work assignment for the HR assistants, and I do know that Mr. Sharkey gave several trainings to Ms. Miller and other assistants that were within our department.

There were also trainings that were conducted, like I said before, by specialists with their certain area of expertise. But I don't have

**her training record or documents in front of me to speak specifically to each and every training that she had. But again, when an employee is at the full performance level, they're expected to know everything. That's why the positions have that career ladder grades of 5, 6, 7 because a 7 knows everything but a 5 or 6 would not know everything.**

BY MR. MARTIN:

Q And within that 7, there's what, seven through 12 steps?

**A No, sir. For every GS level, there are ten steps but the step is irrelevant to the knowledge base. The step is based upon time within that grade. So basically it's called a within-grade -- within-grade step increase, so throughout somebody's career, based upon the number of years that they have been at that grade, there are automatic step increases that happen, the 1 through the 10, but the grade doesn't change, only the amount of pay. Each step is a little bit more pay.**

Q I understand. But a person has to earn that, those step increases, right, it has to be -- it's merit, based on merit, it's not automatic, is it? A person has a poor performance record, comes in late all the time, they may not get that automatic step, correct,

step increase?

A No, the step increase is automatic but the supervisor can hold back a step increase if --

Q Performance.

A -- the person wasn't meeting the standards, yes.

Q Okay. And part of not meeting the standards could be being late, being absent, infractions like that, correct, excessive lateness or absenteeism, correct, that can hold someone back?

A No, attendance is not a factor in and of itself unless there was -- could be that, as an example, that disciplinary action was taken, they were demoted, you know, something to that effect to where no, they would not get the within-grade increase but there's several different factors that would go into it. The within-grade increase is based upon time, and each year an employee has a performance plan that is given to them and factors that are either critical or non-critical to be considered. If they meet the minimum standards for their performance plan, and attendance is not part of the performance plans that are issued to an employee, that determines whether or not they are considered for promotion or the within-grade increases.

Q Well, I don't know, Mr. Osterbeck. I've seen a lot

of reports about the VA and how it's been ran and a lot of complaints and congressional investigations and maybe that's part of it because it looks like -- if you're telling me they don't take into consideration a person coming late three days a week, that's okay, you're still going to get a merit increase? Is that what you're telling me? That's how that place is run where you were working at, a person could be late three days a week, five times a month, nah, you're still going to get a raise because that's what we do at this particular VA; is that what you're saying?

**A No, that's what you're saying.**

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q Well, you tell me where I'm wrong at.

MR. DOYLE: Object to form and foundation and argumentative.

MR. MARTIN: That's not argumentative, that's a question.

MR. DOYLE: It's argumentative.

MR. MARTIN: No, it's not. You may not like the question but it's a question.

BY MR. MARTIN:

Q You just said that you don't take in consideration

excessive tardiness, that that will not hold a person back from getting a merit increase. Is that true or not?

MR. DOYLE: Object to form.

**THE WITNESS: That is not what I said. I said attendance is not part of an employee's performance plan. It is not one of the categories that are in a performance plan.**

BY MR. MARTIN:

Q Which means if a person has bad attendance, they could still get a wage increase automatically at the VA? A person could have a bad attendance affecting the operation, as you stated earlier, that's very critical to be on time because it affects the operation, the delivery, the product you're delivering to customers. So what you're saying is that that's not a criteria, that's not part -- that's not something that we would consider in determining whether or not to promote a person from a step 4 to a step 5?

**A First off --**

Q If that's not true, just explain to me where am I wrong?

**A Mr. Martin, it's not a promotion, it's a step increase. It is not a promotion.**

Q Promotion in terms of more money. Would you agree money's important to employees, how much they're making could be important?

**A To some employees, sure.**

Q I don't know many unless they're Donald Trump billionaire. But would you agree that people are trying to make more money so they could take care of their families, put food on the table? That's something that people are -- that's natural, right, to try and get an increase in pay, correct?

**A Every person has their own reasons for why they want to work.**

Q Okay. And would you consider getting an increase in pay important to you?

**A For me personally?**

Q Yes.

**A Yes, I would like to do that, sure.**

Q And I think most people, most workers -- I know everybody in the plant that I worked at, they're always asking me Rick, how much are you going to give us a raise when I was president of the UAW Local 600 coke oven plant. That was the first question, even supervisors wanted to know, how much you going for, Rick, because they knew if I give the workers a raise, they're going to get a raise. So I

think we're on the same page.

So my question is this. Are you saying the VA in Detroit would give a pay increase automatically to an employee who had a terrible attendance record, a terrible record in terms of tardiness, that they would still get the pay because it's not part of what the VA looked at -- looks at?

**A I did not say that the VA didn't look at it. I said it's not part of an employee's yearly performance plan. I said --**

Q So they could get a pay increase then with a bad attendance or tardiness record, they could still get that pay increase because it's not looked at; is that your testimony?

**A No, my testimony is that if an employee has an attendance problem or issue or concern, it is addressed through other means, which could be counseling or corrective action.**

Q So they get corrective action, they get a suspension. They would still, though, get that automatic pay increase; is that true or not?

**A An employee potentially could, yes.**

Q You said potentially. Before you said it's automatic.

**A It's automatic in the system that we work within where it's already coded with the dates and when it will happen. Unless the advisor has a determination based upon individual facts, no two employees are always alike and therefore, the supervisor can withhold that for a period of time if they see necessary.**

**Additionally, I also stated that according to VA policy, if employees have leave, they have the right to use their leave. So it's different than what the UAW is. The leave policy for the VA is different than what -- when I worked at the Postal Service. Each agency or company has their own specific leave policy. So if an employee has leave on the book, so to speak, they have the right to use their leave accordingly.**

Q I understand. That's the same thing with the UAW and I think most companies do that. We're talking about somebody coming in late a lot. Not leave but just late, late three, four days a week, late, late. That's what we're talking about and I think all employers are concerned about that. From your experience, would you agree, from your experience?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q That most employers are concerned about excessive lateness?

MR. DOYLE: Object to form.

**THE WITNESS: I believe that employers care about what time their employees show to work.**

BY MR. MARTIN:

Q Okay, for the reasons stated earlier, right?

**A If I stated it, yes.**

Q Yeah, for the reasons you stated. You stated, I didn't, you stated that it could affect the operations. And you still agree to that statement, right?

**A Yes.**

Q Okay. Now, you mentioned something about, I guess, the primary duties of an HR assistant or HR generalist is processing personnel actions. Can you explain a little more, Mr. Osterbeck, what you mean by that?

**A Sure. We work within a database system called HR Smart and that is where all personnel information for every employee is stored. So if there are -- if an employee elects to change their health insurance, to change their beneficiary of who receives life insurance, beneficiary of their own 401(k) plan, if**

**they receive a promotion, if they receive a demotion, if they are on extended leave that would require an entry into the database, I mean there's hundreds of different ways of entries that need to be made in the database. If an entry needed to be made for one of those reasons I just stated, there are many more, the HR assistant would go into that database and code that action with an effective date and reason code for that.**

Q And all HR assistants are trained for doing that procedure?

**A Yes.**

Q And that training comes from the people you mentioned earlier?

**A Well, there's online trainings that happen that, you know, employees are subject to take. There was training from the network, the VISN that I stated earlier, there was training from specialists within the department and there's also a training from a true subject matter expert that I mentioned earlier, Charles Sharkey, who was a supervisor over the processing and records department within his career and he provided multiple trainings and sessions.**

Q All right. And can employees or customers feel that the VA has good security procedures to protect their

records, like, you know, from hackers or anything like that?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q In other words, are these stored in a secured manner?

**A So when an employee accesses a system, the system, they have their PIV card, Personal Identity Verification badge that has a chip in it. Any time they log into a computer, they have to place their PIV card into the card reader holder either in the computer or the keyboard, whichever system that particular computer device has, they have a six-digit numbered passcode that they have to enter every time just to get onto the computer. There are warnings about improper usage and things like that on the -- every time any employee logs into the computer and when they go into specific databases that house personal information, HR Smart is one of them, they have to repeat that process where they are putting in their six-digit code in order to get into each specific database system and HR Smart is only one of the systems that we have. So an employee has to repeatedly enter their code and their PIN code is only for them. They are the only**

**ones that should have that PIN code. So they have to enter that every time they go into one of these personnel databases.**

MR. MARTIN: I'm sorry, I have to take this call. Let's take five, a five-minute break. We're taking a five-minute break. This lawyer is getting ready to leave and I just got to tell him something.

MR. DOYLE: Yep.

MR. MARTIN: Okay, thanks.

(A break was taken at 2:30 p.m.)

\- - -

(Record resumed at 2:44 p.m.)

BY MR. MARTIN:

Q Now, directing your attention to Exhibit Number 1, Mr. Osterbeck, and you said -- and I assume you are familiar with Exhibit 1 and similar policies like that that you've received, correct?

**A Yes.**

Q And one of your responsibilities as a manager, the Secretary expects you to enforce the policy, correct?

MR. DOYLE: Object to form.

**THE WITNESS: I would say to adhere to the policies.**

BY MR. MARTIN:
Q Adhere and if the policies are violated to take action, correct?
MR. DOYLE: Object to form.
**THE WITNESS: Can you state the question again, please?**
BY MR. MARTIN:
Q Do you believe the Secretary expects you to take action if any of these policies are violated, for instance, if there's bullying going on in the workplace, are you expected to take some action to comply with the policy, which is anti-bullying?
**A It would be expected of any VA supervisor or manager to investigate a claim of things that are within this policy.**
Q And that means you, I'm talking about you right now.
**A Yes.**
Q As a supervisor and manager, correct?
**A Yes. It's an employee's -- the employee has the right to bring forth a claim that is within this and the supervisor would conduct an investigation.**
Q The supervisor has a duty to conduct investigation, correct?
**A The supervisor if it is brought to their attention would investigate or implore other entities to**

**conduct an investigation, yes.**
Q You don't have a problem with the word -- I'm sorry, you don't have a problem with the word duty. It's not a bad word. You have a duty, a responsibility as a supervisor, you and every other manager to adhere to this policy, which means to enforce violations of the policy, that's a duty, right?
MR. DOYLE: Object to form. It's vague.
**THE WITNESS: The duty is to adhere to the policy. If the policy called for X, then you do X. If it calls for Z, then you do Z.**
BY MR. MARTIN:
Q Okay. Now, I'd like to direct your attention to page 6 where it says Prohibited Personnel Practices. Let me know when you get there, Mr. Osterbeck, please.
**A Yes, I see it.**
Q Okay. The last sentence under prohibited workplace violence and bullying that we've already talked about, but the last sentence in that paragraph says, "If the bullying involves your direct supervisor, report the matter to the next level supervisor." You see that?
**A I do.**

Q And in your case, who would be the next level supervisor if you were accused of misconduct?

**A My supervisor at that time again would have been Eric Gonzales.**

**THE WITNESS: And Ms. Darnbrook, that's G-o-n-z-a-l-e-s.**

COURT REPORTER: Thank you.

**THE WITNESS: Eric, E-r-i-c.**

BY MR. MARTIN:

Q Now, during your time in Ann Arbor, did you ever have employees make complaints against other employees that had to be investigated?

**A I would suspect so but I don't have any specifics that come to my recollection.**

Q And during your time at Ann Arbor, did any employee make any complaints against you?

**A Not that I'm aware of.**

Q And what about at the VA in Detroit, any complaints made against you by an employee that you supervised?

**A When you say complaint, could you be more specific?**

Q Yeah. They complained to someone other than you about your conduct as a supervisor. Anyone at the Detroit VA ever do that, to your knowledge?

**A Well, I mean if a complaint was made, it would have**

**gone to my manager, so I wouldn't necessarily know about it unless I was contacted by my manager.**
Q I think one would expect to resolve a complaint, as you stated earlier, that there has to be an investigation and you talk to the parties involved, correct?
**A Yes.**
Q And has anyone ever talked to you about any complaints that were made by any employee against you?
**A I don't recall specifically my manager Eric Gonzales doing that.**
Q But about Labor Relations?
**A Again --**
Q Labor Relations.
**A I understand. If a complaint was made against me, though, it would not go to me and I'm saying that I don't recall being spoken to about a specific employee's complaint about myself. There was one employee who complained about being terminated but that was prior to modernization and that went to the associate director of the facility at that time, so that would have been in 2018 that was reported.**
Q And you terminated or recommended Ms. Miller's termination, correct, at some point in time?

A Yes, I was the recommending supervisor, Eric Gonzales was the approving official.

Q And prior to you recommending her termination, she never made any complaints against you, to your knowledge?

A Not to my knowledge, no.

Q Prior to terminating Ms. Miller, she was never subjected to any disciplinary action, right, you never disciplined her for any work rule violations or anything like that or any misconduct?

MR. DOYLE: Object to form.

THE WITNESS: Well, I can say that counselings, whether verbal or written, are not considered a form of discipline. I believe that she had counselings but again, I don't have the record in front of me for specifics. I do know that she received training and retraining several times and there were issues which led to her termination but again, she was a probationary employee. When an employee is in a probationary status, there is no policy that states you have to go through any type of progression of discipline. When they're a probationary employee, the supervisor/manager has the right to terminate them during their probationary period.

BY MR. MARTIN:
Q And you don't have to establish cause, right?
**A No, they're --**
Q In other words, you don't have to have a good reason?
MR. DOYLE: Object to form.
**THE WITNESS: No, you -- you have to have a reason for termination and again, I requested it, I submitted a packet to my supervisor, Mr. Gonzales, and he concurred with my recommendation and was the approving official for her probationary termination.**
BY MR. MARTIN:
Q You put emphasis on that probationary and just explain why do you put emphasis on the probationary termination?
**A I don't know that I put emphasis on it but probationary employee again is not subject to the full gamut of any type of repeated disciplinary action in order to get to a termination. If an employee has poor performance, poor whatever, they can be terminated within their probationary period.**
Q Now, during discovery, we're going to make a request for her personnel file and I just want to get from you or find out from you are you certain that you

put written counseling or written reprimands or anything like that in her personnel file or was it just you talked to her about that, about whatever -- about, you know, your displeasure or her work performance? Are you certain it's in her personnel file or is this something you just may have talked to her about?

**A First off, written counselings do not go into an employee's personnel file, which is the Electronic Official Personnel File, or EOPF. Those are not disciplinary action, they are between the supervisor and the employee and they are not made a part of the EOPF record.**

Q Can those EOPF records be modified by an employee?

**A Can they be modified?**

Q Yeah. We're talking security at the VA. Can they be modified or are they secure?

**A They are secure but HR personnel has the ability to modify them, look at them, modify them, they don't --**

Q Well, looking is one thing. I'm sorry, looking is one thing. Tell me how they can modify.

**A Any time a change is made, as I stated previously, if an employee opts to change their health insurance, that record is modified.**

Q Isn't that done through uploading, not typing modification, not modified, it's done through uploading, correct, the employee provides that information and then it's uploaded into their personnel records, isn't that the procedure?

**A It is -- some things are in upload, yes, and that is a constitution of a modified record. If an employee goes in and looks at a record and makes a change to that document, it will show modified in the EOPF system.**

Q How does an employee -- I know I look at records a lot and how does an employee make a change? Tell me what is the procedure for making a change on a record that's in the computer system? And I'm taking that they're in that computer system in a secured way, so tell me how an employee would modify it other than upload it?

**A If they go in and make a change of some sort to that record, it will show modified.**

Q Tell me the procedure to make the change, though. That's what I'm trying to get at. I'm trying to understand. Give me an example.

**A If an employee goes into the record and they make a change to an employee's address or name change, it will modify the record.**

Q They could type in that; is that what you're saying?

**A Yes.**

Q Not uploading?

**A Yes.**

Q So this written counseling, do you have copies of that yourself? Where do you maintain that when you do a written counseling of an employee? Where do you keep that? You said it doesn't go in their file, so where do you store that?

**A Any written counselings that are issued, any supervisor would keep that within their own locked office space.**

Q Is it in a paper form or is it in the computer, a written counseling?

**A A written counseling, I mean it could be either. It could be --**

Q Have you ever -- I'm sorry, go ahead.

**A It could be a document that is printed and wet signatured by the supervisor and the employee and therefore, it would just be a piece of paper in a folder in the supervisor's office. If an employee does not report on site because we have many employees that telework, it would have been done through like a PDF document and e-mailed to an**

**employee for, you know, signing back and forth. So it could be either way.**

Q Okay. And the importance of a written counseling is to try to improve behavior, correct?

**A It puts an employee on notice that something with their performance, conduct, work related, whatever the case may be, they're being put on notice that it needs to, you know, have changes or improvement to it, things need to change. It's not disciplinary but it's putting the employee on notice that, you know, if things do not change, then it could lead to disciplinary action.**

Q And the procedure -- first of all, is that procedure a procedure of the VA, what you're doing as a supervisor, this written counseling, is that in compliance with VA regulations and policies or is that something that you came up with?

**A No, that's a VA policy.**

Q So they have practices and procedures for doing that, correct?

**A Yes.**

Q So one of the things they require is for you to let the person know, that's the whole point of it, and then get them to sign the counseling, correct, so they can get an acknowledgement?

A If the -- I'm sorry, go ahead, Chris.

MR. DOYLE: Object to form. Sorry, go ahead.

THE WITNESS: I would say that any level of disciplinary or non-disciplinary action is case specific. If it's something that can be handled through a counseling and that suffices, then that's it. Not every conduct, performance, whatever, there is no regulation that you have to start out with a counseling. It's case specific to the fact circumstances of what is happening with that employee.

BY MR. MARTIN:

Q No, I understand it. Thank you. But you indicated when you took me through the procedure, you said you talk with the employee, you write everything down, it's a counseling, it's a written counseling, that's the difference, it's not oral, it's written?

A No, they're both.

Q I know, but we're talking written now. I just wanted that procedure. You mentioned that the person signs to acknowledge that they have received this counseling, correct, that's part of the procedure?

A Correct.

Q And then you take that, you give them a copy and then you put that in your file --
**A Correct.**
Q -- on that particular employee?
**A Correct.**
Q And that's in like a manila folder or something?
**A It could be, yeah.**
Q How did you keep yours, in a manila folder in your office or a binder?
**A I would have kept mine in some type of folder within a file cabinet, yes.**
Q Okay. And what do you do if that person is terminated, what do you do with that information?
**A Usually when an employee is terminated, all the information that you have for that employee would be placed into, you know, one folder and put in the file cabinet under that employee's name for future reference if needed.**
Q And in case you leave and go to Houston, Texas, the other -- your replacement would have that information, correct?
**A It would have been in the office of the manager, yes.**
Q And who replaced you?
**A I got to -- I'll have to think of it. Jerry -- I**

**got to think of his last name. You'll have to --**

Q Okay, no, if you come up with it, just let us know.

**A Yeah, there's been a few since me but I believe he was the first one to replace me.**

Q Okay. And you would agree that the VA take recordkeeping seriously, correct?

**A Yes. Give me one second and let me see if I still have his contact information. Rushing, Jerry Rushing.**

Q And you don't have the authority, when I say you, I mean no one, no supervisor, manager have the authority to destroy any records, any records involving employee personnel or anything like that, correct?

MR. DOYLE: Object to form.

**THE WITNESS: There are specific destruction dates for every different -- every type of record has its own specific destruction date. If it's a record that can be disposed of, there's time limits for each specific type of record. The Electronic Official Personnel File which I spoke of, that EOPF, when an employee is no longer in federal service, those get sent to the National Archives Center, I believe it's in Georgia.**

Q Yeah, it makes sense to keep these because you never

know when something might come up. It could be ten years later or whatever but the record is somewhere with the VA, correct?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q To your knowledge?

**A If it is within the limitations of the destruction stuff, yes. Normally records like that would be held onto, you know, for future reference.**

Q And the same goes for written counseling records, correct?

**A No, not necessarily.**

Q Well, you say not necessarily. So you tell me what the rule is.

**A Well, first off, again a written counseling is between the supervisor and the employee.**

Q Understood.

**A It generally is kind of kept in the drawer, so to speak, for six months to a year and if there's no further infractions, you know, the employee changes their ways, so to speak, and adheres to whatever the counseling was for, then that record would be destroyed at that point. The employee can ask for that to be, you know, gone away. That kind of conduct is not part of the official personnel file.**

Q It's destroyed pursuant to policy, correct?
MR. DOYLE: Object to form.
**THE WITNESS: Yes, I believe it's actually on the form of what it states specifically.**
BY MR. MARTIN:
Q When you say form, tell us what form you're referring to because we want to get copies of these forms.
**A The written counseling document, that's the form. It doesn't have a form number, if that's what you're asking for.**
Q But it is an actual form, a VA form?
**A No, that's what I'm saying, it's not a form, it's just a document. There's templates that ER/LR provides to supervisors for that. It doesn't have a VA form number.**
Q I got you. Okay. How many written counselings did Tara Miller receive from you before she was terminated, if any?
**A I am not sure.**
Q Are you certain she received any or it's just speculation?
**A I said I am not sure if she did or not. I cannot recall at this time.**
Q Okay.

A But not every action warrants a counseling.
Q I understand. So sitting here today, you cannot say under oath whether or not she received any written counselings from you prior to her termination; is that correct?
A Again, I don't recall either way. I can't be certain if she did or not. Again, this is over three years ago.
Q No, I understand. Okay.
A If I was still in Detroit, I could probably answer that question a little more specifically but I've been gone, you know, for over three years and so I don't have access to what my own files were.
Q That would be with someone else, correct?
A Yes, they would have been in the office that I had when Mr. Rushing took over, he took over the office that I had.
Q Would he have necessarily destroyed your file on written counselings of employees?
A I can't speak to what he would have done.
Q Mr. Osterbeck, it's true that Ms. Miller complained to you about Erica, specifically Erica Bethany about her conduct towards her, rudeness, bullying, things like that, she did make complaints to you about Erica Bethany, correct?

MR. DOYLE: Object to form.

**THE WITNESS: Tara Miller and Erica Bethany both brought complaints about the other person to me directly.**

BY MR. MARTIN:

Q What did Erica Bethany say? What complaints did she bring to you? What was the substance?

**A I'm going to paraphrase because again, I don't have any documents in front of me, but the both of them did not get along with each other, it gave the appearance that they did not like each other, they were not treating each other with the dignity and respect, and after receiving the complaints verbally from both of them, I believe I involved the Detroit VA Medical Center EEO manager and assistant manager and they took the complaints as part of what their job is and what they did for work within the facility and both employees had received training from the EEO Department.**

Q Who were the EEO people you're referring to who got involved in addressing the complaints you said were made by both individuals against each other?

**A Ms. Zenia, Z-e-n-i-a, last name Berry, B-e-r-r-y, and the manager was -- his first name was Fred and I don't recall his last name right away. I'd have to**

**try to find that out.**

Q Okay. Now tell me what document you were looking at.

**A I'm not looking at a document.**

Q I saw you looking up when you were getting Zenia Berry's, it looked like you were looking --

**A Oh, I'm sorry, I looked on Teams because I couldn't think of her last name.**

Q And so what documents did you review in preparation for your deposition today, Mr. Osterbeck? And it's fine to review documents. It's almost impossible for you not to do it after three years. But what documents did you review in preparation for your deposition?

**A I reviewed the complainant's termination letter along with a report -- the report from the Electronic Official Personnel File record in which the complainant accessed without authorization.**

Q Anything else?

**A I don't believe so today, no.**

MR. MARTIN: Okay. Chris, I would like you to forward the documents that you reviewed, e-mail them to your attorney and then he can e-mail them to me. Can you do that?

MR. DOYLE: Not today but...

MR. MARTIN: Well, I'd like to have it today so we don't have to come back.

MR. DOYLE: There's no basis to come back. I mean if there's a document request, there's a document request but these are records that were in the administrative file.

MR. MARTIN: I understand but I just want what he's looking at today. I think I'm entitled to that if he's --

**THE WITNESS: I didn't say I was looking at those right now. You asked me what did I do and I looked at my Teams so I could find Ms. Berry's name.**

MR. MARTIN: He reviewed the records in preparation for the deposition. So Chris, you know, it's not going to take a lot of time. I'm not going to take a lot of time on that. I just need to look at it. It's not going to extend this deposition that much longer. I mean he did look at it in preparation. I think you know that's kind of standard that I'm able to review the documents that he looked at in preparation.

MR. DOYLE: I don't know that that's standard. I'm not trying to be difficult on purpose.

MR. MARTIN: No, I understand.

MR. DOYLE: But this is taking an extraordinarily long time.

MR. MARTIN: All right, no problem. I'll send a document request, Chris, and we won't have to come back. It will just be a document request, how's that?

MR. DOYLE: Yeah, I think that would be the way it would normally be treated.

MR. MARTIN: Okay, that's fine.

BY MR. MARTIN:

Q Mr. Osterbeck, are you familiar with the head of the VA at the time you were employed there, Dr. Reeves? Are you familiar with her, Pamela Reeves?

**A I am.**

Q Did you ever have contact with her from time to time when you worked at the VA in Detroit?

**A Have I had contact with her in the time that I was there? Yes.**

Q And what would be the occasion why you may have to have contact with Dr. Reeves, the director?

**A Well, I would say that for the three years that I was in Detroit, I would say my contact with her was limited. I did not go to morning report. I would be called into any type of specific meetings.**

**Generally it was around recruitment and like the number of positions that we had, we called it a resource management board where the leaders of the hospital would request for positions that were vacant to be filled or new positions to be created in order to do the work of the hospital and as the Medical Center Director, Dr. Reeves was in charge of that, so she controlled that meeting. And just if she -- she usually delegated a lot to her subordinate leaders. So I would say that I met more with the leaders of the facility, the Chief of Staff, the Associate Director, the Associate --**

Q Give me some names. I'm sorry. Please give us names. Chief of staff?

**A Chief of Staff was Dr. Scott Gruber.**

Q Okay.

**A The Associate Director was Michelle Werner.**

Q Anyone else you would have direct contact with from time to time?

**A The Associate Director of Patient Care Services was Belinda Brown-Tezera.**

Q That's Belinda or Linda?

**A Belinda with a B.**

Q Thanks.

**A And the Deputy Director was Susan Yu, Y-u.**

Q Did you get along with these people okay?
**A Yes.**
Q Same thing with Dr. Reeves?
**A In the limited contact I had with her, yes.**
Q Did she appear to have an open door policy or was she one of those directors that I don't want you to ever bother me?
**A She did not have an open door policy. We were to work the chain of command and therefore, I would work more closely with Michelle Werner.**
Q Dr. Reeves had the authority if she wanted to to contact subordinates or supervisors directly if she wanted to, correct?
**A Of course.**
Q Did she ever contact you regarding Tara Miller?
**A Not to my recollection because Dr. Reeves was not in Tara Miller's chain of command.**
Q Well, I understand that. She's the boss, though. She's the head of the VA --
**A No.**
Q -- as you indicated.
**A No.**
Q So I want to know --
**A No. Let me clarify for you. From 2000 until -- 2018 to 2019, all HR personnel fell under the**

facility, which at that time would have been Dr. Reeves. In 2019 when we went through HR modernization, we were all -- all HR employees were taken out from under facility control and management and we reported to the VISN Chief Human Resources Officer, Eric Gonzales.

So we were a liaison after that to the facility, we worked with inside the Detroit facility but there was no reporting structure to the Detroit facility. So when Ms. Miller was hired, we were already into modernization and therefore, there was no reporting structure to Dr. Reeves. It was she reported to me and I reported to Eric Gonzales.

Q And Eric Gonzales ultimately reported to Dr. Reeves, correct? That's the head of VA?

A No. Dr. Reeves was the head of the Detroit VA Medical Center only. She was not the head of the VA.

Q Okay. So if an employee at the Detroit Medical Center where Dr. Reeves was the director contacted Dr. Reeves, she had the authority if that person made a complaint against a supervisor or manager, Dr. Reeves if she wanted to, she could contact you or she could contact your supervisor, correct?

**A I would say in theory, yes, but that was not the chain of command.**

Q I understand that. But if she gets a direct complaint, a serious complaint, nothing is stopping her from taking action, like trying to find out what's going on, like contact your boss, hey, what do you know about this, correct?

MR. DOYLE: I'm going to object to the foundation just to the extent it's her role, but go ahead.

**A I would say that if it was an employee of the Detroit VA Medical Center, which the HR employees were not of, then yes, it would be part of her duties to have someone work that issue or look into that matter. If it was an employee such as HR personnel who worked on site at that facility but did not report to her directly, that she would bring that up to the network because that's where HR employees reported to. We occupied space but there was no reporting structure to Dr. Reeves.**

Q So if she wanted to get a message to you or wanted something done because her hand may roam as far as the VA, Director of the VA because ultimately she is Director of the VA at the Detroit Center and if she's concerned about something that happens in HR,

then she would contact who?
**A Eric Gonzales.**
Q Okay. And did Eric Gonzales ever tell you that Dr. Reeves contacted him regarding a complaint that was made against you by Dr. Miller -- by Ms. Miller?
**A Not to my recollection. I would say not until the termination was issued.**
Q Then what happened when the termination was issued?
**A Well, during the process, I did have conversations with Eric Gonzales about Ms. Miller.**
Q Did he tell you that Dr. Reeves also talked to him about Ms. Miller?
**A Not to my knowledge.**
Q Well, either he did or he didn't. You're saying he didn't?
**A No, I'm saying not to my knowledge. I don't know -- I don't know of a conversation that took place between Eric Gonzales and Dr. Reeves about Tara Miller.**
Q I understand. So let's just -- let me clarify. I'm saying he never told you that he had a conversation with Dr. Reeves regarding complaints Tara Miller made against you, he never told you that, correct?
**A Not to my knowledge.**

Q No, no, you know whether he told you, Mr. Osterbeck.
A **I don't, Mr. Martin. It was three years ago.**
Q So you don't recall him ever telling you that, is that what you're saying?
A **Not to my knowledge, no. I don't recall whether he did or did not. I am not sure.**
Q Okay. Did Zenia Berry ever tell you that Tara Miller had made complaints against you?
A **I believe in the discussions of the need for both of the employees to receive training, it was discussed that both employees made complaints about each other, yes.**
Q No, the question is did Zenia Berry ever tell you that Tara Miller made complaints about you, not simply Erica but also about you, about your conduct?
A **Not that I recall right now.**
Q Did Cindy -- you've heard of -- have you ever heard of a person named Donald Scott, an EEO specialist?
A **Donald Scott?**
Q Yes.
A **Not -- I'm wondering if the gentleman's -- I wonder if it was Fred Scott but I don't know a Donald Scott. I can't think of the Fred gentleman's last name but I don't know a Donald Scott.**

Q What about Cindy Bukowsky?
**A That name does not sound familiar.**
Q So you don't recall her ever telling you that Tara Miller had made a complaint against you?
**A I don't know who Cindy Bukowsky is. I didn't have an employee by that name.**
Q Not an employee, she's with EEO.
**A Oh, I don't --**
Q She's an investigator of complaints pursuant to the policy.
**A I don't know who the investigator was that contacted me for Ms. Miller's complaint but the name does not sound familiar to me.**
Q I thought you told me that you never knew about Ms. Miller making a complaint against you.
**A Ms. Miller made a complaint against me, obviously, when she filed an EEO complaint against me for the termination, so that's when the complaint was made.**
Q Oh, I see.
**A I'm thinking that you're asking me in her time and tenure as an employee.**
Q I got it. Okay. So the only time you were aware of a complaint made against you by Ms. Miller was after her termination; is that correct?

A Yes.
Q And you don't recall Jerry Rushing ever talking to you about a complaint being made against you by Ms. Miller?
A **Not to my knowledge.**
Q You never had a problem with Ms. Miller being late; is that fair to say? She didn't have a tardiness problem, did she?
A **If it was, it probably was infrequent. I can't say that she was never tardy but if it was, it was not frequent.**
Q Okay. And what do you call frequent tardiness? Give me a range of what you would call frequent tardiness.
A **If somebody is tardy, you know, where they're -- I don't know what a range would be. If they're a couple times a week, couple times a month, you know, that's more frequent. I would say infrequent would be if they're late maybe once a month or, you know, something like that.**
Q Once every six months?
A **Something to that effect, sure.**
Q So Ms. Miller never got to the point where she was disciplined by you, correct?
A **Are you speaking for tardiness?**

Q Anything.

**A Well, she was terminated, so...**

Q Prior to that.

**A Get to the point.**

Q Yeah, prior to that, prior to being terminated, suddenly terminated, she was never disciplined for any infractions, correct, other than maybe counseling but you don't recall, she was never subjected to any written disciplinary action for any infractions or work rule violations, correct?

MR. DOYLE: Object to form, but go ahead if you know.

**THE WITNESS: No, I do not believe that I issued formal disciplinary action. I may have issued written counseling to her, I'm not sure if it was written or just verbal, but there was no admonishment, reprimand or suspension as that is not a requirement for a probationary employee. The manager has the right to terminate someone's probationary appointment. There is no need to have any other disciplinary action on record prior to termination. But I know that there was no discipline issued to Ms. Miller for attendance-related concerns that I'm aware of. I don't believe that happened.**

BY MR. MARTIN:
Q Were there any disciplinary actions ever taken against Erica, her co-worker, by you for anything?
A **I believe to the best of my recollection, that Erica Bethany received written counselings for conduct as well as attendance. I am not sure if there were formal disciplinary actions for that. It's possible but I'm not specifically sure.**
Q That would be in her personnel file if you wanted to find out, correct?
A **Again, if it was an admonishment, reprimand or suspension, it would be in her Electronic Official Personnel File. If it was a counseling of any kind, then it would not be in her official file.**
**And also, if it was an admonishment or reprimand, there are time limits for that and if the time limits pass, then an employee has the right to request that be removed from their file. So if there was one and the time limits have passed, it could no longer be in her file.**
MR. MARTIN: Okay. I'm going to send a document, an exhibit and we're going to -- we could take a five-minute break also, Mr. Osterbeck. If you need to take a little longer, you can let me know right now.

THE WITNESS: Five is good. Five's fine.

MR. MARTIN: All right, we'll take a five-minute break and Chris, I'm going to send you Exhibit 2.

MR. DOYLE: Okay.

MR. MARTIN: All right, thanks.

(A break was taken at 3:40 p.m.)

\- - -

(Record resumed at 3:49 p.m.)

BY MR. MARTIN:

Q Can you tell me the reasons that you terminated Ms. Miller or that you recommended her termination?

A Sure. There were the issue where she improperly accessed HR employees' EOPF records. There were, I believe, five HR employees where she improperly accessed their records and reviewed documents and modified documents in some way, shape or form.

And just to give you some context, the EOPF system is an electronic database of information that HR employees have access to, works in conjunction with the HR Smart system that I spoke about earlier. So in the Strategic Business Unit that I was in charge of and that Ms. Miller worked

**in, we were responsible for handling issues and concerns for Station 553 Detroit VA employees only and Ms. Miller had no business, reason or appropriate reason to look into the records of HR employees. That was not part -- any part of her job duty or job description. She should not have gone into anyone's employee personnel file.**

Q And when did you find out that she did this?

**A It was originally brought to my attention -- I don't know specific dates but I think it was first brought to my attention by Angela Thompson that she believed Ms. Miller had improperly accessed her EOPF record. Then as --**

Q When did she bring it to your attention, sir? I'm sorry, Mr. Osterbeck.

**A I don't have an exact date. It would have been, I believe, sometime in early 2021, if I'm not mistaken.**

Q So you think January or February -- she was terminated February 24th.

**A Yes. So you know, I believe that it would have been somewhere -- somewhere in there, in that January, you know, to the beginning of February time frame.**

Q Do you have any evidence showing the date that Angela Thompson brought this to your attention, any

e-mail or anything like that, any -- for a date that she brought this to your attention, that she brought it to your attention?

A **Again, this was over three years ago. I don't have specific documents. I'm at my home. I don't have the documents to that. Again, all of the records that I would have had would have been submitted to Eric Gonzales for review or submitted, you know, whenever a document was requested. So I don't have a specific date for you, sir.**

Q Okay. And you take it, as you testified earlier, very seriously someone going in accessing records that they have no authority to access, correct?

A **Correct.**

Q And Angela said she did a modification. How did she modify Angela Thompson's record?

A **I didn't state that she modified Angela Thompson's record. I said that she went into Angela Thompson's record. She also went into Gary Hollenquest's record, George London's record, Erica Bethany's record and my own record.**

Q And when you interviewed her, she told you what she was looking for, right, it was COVID awards, correct?

A **For some folks it was COVID awards but again, she**

had no business going into anyone's record.
Q And she complained to you repeatedly about she felt it was unfair that you did not recommend her to receive a COVID award, she had complained to you repeatedly about that, correct?
A I don't know about repeatedly. I do recall that she questioned why she was not given a COVID award. Not every employee was given an award for COVID.
Q Erica, her co-worker Erica was given an award for COVID, correct?
A I believe that Erica Bethany was given an award for COVID. That was based upon work that she had done above and beyond and outside of the HR Department for the facility.
So the facility recommended awards for employees who worked the -- when COVID was a big thing, the front desk screening stations where employees, patients, visitors entered the facility, they needed to be screened every time that they entered the facility and Erica Bethany repeatedly worked off her normal HR tour to do the screening and the facility which ran that program, they recommended folks for awards for that specific COVID purpose.
Q People were getting awards for different amounts but

they were getting awards because they were exposed
to COVID, correct?
**A Incorrect. They were not given an award because**
**they were exposed to COVID, they were given an award**
**for the people that worked the screening station.**
**And you're talking about Erica Bethany specifically,**
**her award was based upon her working the screening**
**station several, several times.**
Q Okay. And did you work the screening station
several, several times?
**A I did not work the screening stations at all.**
Q But you received a COVID award, correct, around
10,000?
**A Incorrect.**
Q What amount? What amount did you receive?
**A How is the amount that I received relevant to**
**anything?**
Q I understand that you may not think it's relevant
but it's a question that you have to answer if you
know. Was it 5,000?
MR. DOYLE: If you remember, Eric,
just whatever the amount was.
BY MR. MARTIN:
Q I'm looking at documentation. It looks like it was
around 5,000, is that correct, around that amount?

**A Yes, I received a COVID award for 5,000. My manager submitted me for the award.**

Q And that would be Eric Gonzales, correct?

**A Correct.**

Q And you did no screening, correct?

**A No, I did not do screening.**

Q And you had less contact with people who may have COVID than Ms. Miller, correct, working the front desk?

MR. DOYLE: Object to form and foundation.

BY MR. MARTIN:

Q Ms. Miller, she was at the front desk, so she was in a position where she may have contact with people who may have COVID, correct?

MR. DOYLE: Form and foundation again.

**THE WITNESS: Well, Ms. Miller worked the front desk in HR and I made the decision that the door would be locked so that foot traffic coming into HR -- and working the front desk in the HR is not the same as working the screening stations when entering the facility?**

BY MR. MARTIN:

Q Mr. Osterbeck, I understand that Erica did a lot

more and she was exposed to COVID a lot more, but your testimony is not that Ms. Miller was not exposed to COVID at all during the time where she had to be at the front desk; isn't that fair to say? She was exposed to COVID working the front desk even if you had the door locked, there were times when she had to be exposed to COVID, correct?

MR. DOYLE: Form and foundation.

**THE WITNESS: Any employee within the facility had a potential to be exposed to COVID, however, working the front desk screening station was the stop gap for people getting into the facility who potentially had COVID.**

BY MR. MARTIN:

Q I understand it reduces -- while we know it's not a hundred percent, it reduces the risk but Ms. --

**A She had no more or no less risk than any other HR employee. She was not the only HR employee who worked the front desk, other HR --**

Q I understand. And other people got COVID awards, correct? Other than Bethany, Angela Thompson received a COVID award, correct?

**A Any HR employee who worked the facility screening stations upon entry and worked them repeatedly, the facility put them in for an award. To the best of**

**my --**

Q I understand. Did Angela Thompson work the screening?

**A I believe she did.**

Q You're not certain?

**A I'm not certain. It wasn't a program ran by me. My employees were allowed to participate. It was done outside of their scheduled tour working hours.**

Q You made recommendation as to who should receive a COVID award, correct?

**A The facility provided me a list of names of HR employees who repeatedly worked the screening station and that request was submitted, I believe, to my manager and that they received awards if they repeatedly participated in helping out the facility because of the number of people that were needed to work the screening station.**

Q I understand, Mr. Osterbeck, but it sounds like you're trying to take yourself out of the equation, that your manager, but you're the one, your manager doesn't know, you're the one that's right there, you know who was working screening, you know who your employees -- what they were doing, right? You're the one -- you're the front line. You make the determination who you think should get a COVID award

from the list of people, correct?
A Incorrect. Again, I had nothing to do with the screening schedule of employees working before their tour or after their tour. That was ran by the facility. The facility provided me with the names of employees who did it repeatedly, several times.
Q I got you. Was Angela one of the people who repeatedly worked the screening station?
A I believe --
Q You would know, she worked for you.
A Again, it was off tour, so they were not my employee at the time that they were off tour because they were working for the facility, two separate entities.
The facility had a program where employees could volunteer to work the screening station. It wasn't during working hours. So for example, if my employees, just as an example, worked 8 a.m. to 4:30 p.m., they worked for me, they did not do screening, okay? But if they wanted to do screening between 6 a.m. and 8 a.m. before their tour started, I have nothing to do with it. If they worked screening from when their tour ended at 4:30 till 10:00 at night, that was between them and the facility.

Q Understood.

**A I had nothing to do with it.**

Q Understood. There's a list, you're saying a list was created with names of people, and Erica was one of them, who volunteered and did the screening repeatedly, correct?

**A Yes, I believe I had a few employees that did it, yes.**

Q You saw that list; is that correct?

**A At one time, yes, I'm sure I was provided a list of names of who worked, yes.**

Q And was Angela Thompson's name on that list that you saw?

**A Again, I stated I believe so. I do not have the list in front of me.**

Q Who would have that list? Where would that be maintained, these important records, where would that be maintained? If the judge wanted a copy, where would you recommend the judge make the request?

MR. DOYLE: Object to form and foundation, but if you know.

**THE WITNESS: The Detroit VA Medical Center would have -- if they have a copy still from something that took place that long ago, then the**

**Detroit facility would have that list. I do not have that list.**

BY MR. MARTIN:

Q Okay, thank you. So you recommended her termination for accessing five employees' files in which she looked at COVID awards and what other reason? You said she modified them.

**A It wasn't just COVID awards that she looked at. She looked at Angela Thompson's transcripts or, you know, educational transcripts, other actions such as promotions, you know, that Angela had. She looked at George London's record, she -- you know, his promotion, his awards. So I'm saying she just didn't look at COVID awards.**

Q I understand. Okay. And what did she modify? What did she go in and actually modify? Whose records did she modify?

**A That would have been Gary Hollenquest's, a deceased individual.**

Q Now, did you know that his wife asked -- that she was told -- she was asked by someone to get the correct address, that that was a request being made of her to do that modification? Did you know that?

**A I don't know who would have made that request of her**

**but that should have come through me.**

Q Did you ever tell her that?

**A I'm sure I discussed it with her when we spoke about her improper access of employees' records.**

Q No, I'm talking about prior to. That's the thing, where you basically said you really didn't talk to them about training and what they could do or what they couldn't do?

**A No.**

Q I thought you said you expected them to know what to do.

**A No, I said that when an employee is hired at GS-7 full performance level, they are considered an expert in their position.**

Q Right. So you never talked to her, specifically you, about accessing records, correct, you just assumed she would know, right?

**A No, I don't assume that she would know.**

Q You never talked to her about it?

**A Does somebody have to be talked to?**

Q That's not the question, Mr. Osterbeck. That's not the question. You could just say no, I didn't and you can explain why to your lawyer or whatever. But you never talked to her about accessing records, correct?

MR. DOYLE: Object to form.

**THE WITNESS: No, that's not true. And additionally, each and every time somebody signs in to access their record, it specifically talks about in the popup block when they hit accept that they understand that they are not to use that information for personal use, that it's improper to access employees' records are not for a business reason. I don't need to tell her that every time. She should know it because if she knows how to read, she can see it.**

BY MR. MARTIN:

Q Right, I understand that and I know what you're saying, that you don't need to but that's not the question. The question is you never told her that, correct? It's yes or no.

**A I'm trying to understand your question.**

Q No, it's a pretty simple question, Mr. Osterbeck. You're battling with me. We don't need to do that. It just prolongs this deposition. That's okay, you gave an explanation.

**A Well, I'm trying to understand the question.**

Q No, you gave an explanation why you don't think you should have to and that's fair. I can understand it. The question is simple. You didn't tell her,

though, correct, directly, you didn't say Tara, you're not to do X, Y and Z, right, with respect to accessing records? You didn't say that to her, correct, yes or no?

**A So let me see, Mr. Martin, if I understand your diatribe question completely. If you are asking me --**

Q No, did you --

**A It's not --**

Q No, it is. Did you ever tell her not to access records? A judge would want to know yes or no. The judge would tell you that. Did you? It's a simple question, it's not complicated. Did you ever, you yourself personally ever say Tara, you're not to access employee records or customer records? Did you ever say that to her? That's all. Yes or no or you don't recall?

**A No.**

MR. DOYLE: He already asked for clarification and if he wants to ask for clarification --

MR. MARTIN: Counsel, I don't need a because of, counsel. Please tell him I don't need a because of. He can explain that to the jury. I just want to know yes or no.

MR. DOYLE: Absolutely. If you understand the question, Mr. Osterbeck, you can answer. If you don't understand the question, you can --

MR. MARTIN: And we'll just continue. I asked a simple question.

**THE WITNESS: I'm trying to ask the question so that I understand it because accessing records of course is a part of her job. She needs to do her job. However, improperly accessing records for employees that are co-workers and managers that is not in her purview for work is illegal.**

BY MR. MARTIN:

Q Got you. Now, the question, just like you looked at me and told me that, you never said that to her, yes or no?

**A Did I ever tell her that it's illegal to access people's records?**

Q Yes. Yes or no?

**A It's not a yes or no answer.**

Q It is a yes or no answer, sir, and we'll be here for another ten hours. You just told me. I could say yes, you told me that. Did you ever say to her -- and Counsel, maybe you want to talk to

Mr. Osterbeck. Did you ever say Ms. Miller, you're never to improperly access records for personal reasons? Did you ever say that to her, yes or no?

A **Every employee would have been taught in training --**

MR. MARTIN: Mr. Osterbeck, hold on. Let's go off the record for two minutes and you can talk to him because we're going to take all this time, I'm going to have to recharge and we're just going to be here a lot longer. So you need to talk to him about that one simple question. Maybe he doesn't understand it from me but you might be able to explain to him what this is about. It's just a yes or no response and I think a judge would get frustrated with these responses. So please talk to him. We'll take a five-minute break.

(A break was taken at 4:12 p.m.)

- - -

(Record resumed at 4:30 p.m.)

BY MR. MARTIN:

Q So just to make it pretty clear, Mr. Osterbeck --

MR. DOYLE: Let's go back on the record. Back on the record.

MR. MARTIN: Are we back on the record?

COURT REPORTER: Yes.

MR. MARTIN: Okay, thank you.
BY MR. MARTIN:
Q Mr. Osterbeck, just to make it clear, I know you may have an explanation, I know that and it's fair but in these kind of examinations, I have a right to get a yes or no and then you could explain if Mr. Doyle thinks it's necessary at this particular deposition for you to explain your answer as to why it's a no, then he'll do that. If he doesn't think it is necessary, then he won't and if it goes to trial, then definitely you would explain it at trial when he comes up after me.
But if I ask you for a yes or no answer and it's pretty obvious it's yes or no and you may have an explanation for the no, the explanation comes with your lawyer. Then he will give you a chance and you could speak for ten or 15 minutes explaining why your answer was no.
So again, my question is you told me exactly why employees are not allowed or it's against the rules to access files for non-business or personal reasons, right, you told me that, correct?
**A Correct.**
Q Okay. Even though you didn't think it was

necessary. And I can understand that because like you said, it's right there on the screen, but you never specifically face to face told Ms. Miller you're not allowed to access any employee files for personal or non-business reasons, you never told her that directly; is that fair to say?

**A No, that's not fair to say. Yes, I would have instructed her that she should only use it for business reasons.**

Q Now, you say I would have. That's not an answer to the question. It's not what you would have done. Your testimony is about what you did. And if you did, you tell me when you did it. So now are you saying yeah, I did instruct her?

**A I'm saying I don't have a specific date for you but yes, I would have told her that specifically you only access records for business purposes.**

Q You say you would have. The question is did you, Mr. Osterbeck?

**A I did. Yes, I did. I don't have an exact date, which I said four times.**

Q Yeah, you said that but you never said yes, you did. You kept saying I would have and I'm sure you know with your legal background a little bit there's a difference between I would and what I did. So now

you're saying yes, you did tell her that, you just don't have a specific date. Was it before she was terminated?

**A Yes.**

Q Okay. What other reason did you -- I'm sorry, you said she modified a record. Can you tell me whose record did she modify? Oh, I'm sorry. I'm sorry. Excuse me. I got lost in that. You did. You said it was Gary Hollenquest, correct, a deceased employee?

**A Correct.**

Q Okay. And what other reason did you terminate her employment, Ms. Miller's employment?

**A There were other failure to follow instructions situations, she was resistant to training. There was an incident wherein she was given specific training along with the other assistants, it was an approximate two-hour training that was given to them by an --**

MR. MARTIN: I'm sorry, Mr. Osterbeck. I just got interrupted. Two minutes. I got interrupted because a phone call came through while you were speaking, so let me get this phone call real quick and call you right back. I think it's the court on another case. Chris, I'll

call you right back.

(A break was taken at 4:35 p.m.)

- - -

(Record resumed at 4:38 p.m.)

BY MR. MARTIN:

Q Can you be a little more specific, Mr. Osterbeck, as far as the instructions that she failed to follow and what training was she resistant to?

**A Yes, sir. I was speaking about a training that was provided to the three assistants, which would have been Tara Miller, Erica Bethany and Shavon Render. Shavon Render was the newest member to the team at that time. Angela Thompson was providing training about entering certain types of actions and things of that nature related to the position of the assistant.**

Q Let me ask you a question. Let me ask you a question before you go any further. She did take part in that training, right?

**A She was there, she was present for the training. It was done at their work space. All of their work desks were right in the same area although she was not an active participant in the training and she was not taking notes, writing anything down, asking questions during the training, she just sat there.**

This was reported to me by Ms. Thompson who was giving the training as well as Shavon Render who was a participant in the training because after the training was completed and Ms. Thompson and Ms. Bethany had left for the day, Ms. Miller asked Shavon Render can you explain to me everything that Angela just went over? So she was there for the training, sir, but she was not an active participant in the training.
Q Understood. And when did that occur approximately?
A That probably would have been sometime at the, I would say -- this is a guess because obviously I don't have it in front of me but it would have been sometime at the end of 2020, December of 2020, beginning of January of 2021, somewhere around there. I can't recall specifically the date.
Q I understand, it's okay. And when was Ms. Render hired approximately?
A I believe that she was hired in the fall, summer, 2020, fall, 2020 but I don't know specifically.
Q Okay. That's fair enough. Anything else as far as failure to follow instructions?
A Yes. So I'm sure you can appreciate in our job we get a lot of e-mails, okay, a lot of e-mails. And

**there was -- I don't know if it was verbally or if**
**it was in writing to the team but what I asked them**
**not to do was to Reply All to e-mails because when**
**you Reply All, you may be only speaking specifically**
**to the sender but however many people are listed on**
**the original e-mail, if you hit Reply All, it goes**
**to everybody. And there was specific times when**
**people said, and we talked about it in our team**
**meetings, that we all get too many e-mails. So I**
**gave the instruction to all the employees that only**
**Reply All if it is a need to know, Reply All if**
**you're providing information that is beneficial to**
**the entire group that is on that e-mail.**
Q Understood. Okay. Let's move -- no, that's fine.
We can move on because I want to get you out of
here, too.
**A I wanted to -- you asked me about -- I'm trying to**
**give you a specific incident of what occurred.**
Q Okay.
**A I'm trying to give you some background. I'll be**
**brief.**
Q No, that's fine and I appreciate that. Because I
have documents, so you referred to that and I see
that in a document where you talked about that.
**A So our -- so I made the directive to the employees**

do not Reply All, and then our Chief Human Resources Officer, Eric Gonzales, received a message from our Network Director at the time, Rema Nelson. Ms. Nelson was the director over all of the facilities that encompass VISN 10, which is Ohio, Michigan and Indiana. Can you hear me? I'm getting some feedback.

MR. MARTIN: I'm sorry, go ahead.

MR. DOYLE: I think you came through okay.

MR. MARTIN: Yeah.

THE WITNESS: So Ms. Nelson, who was the Network Director over all VISN 10 employees, sent the Chief Human Resources Officer an e-mail just letting him know what a great job all of HR had done, thanking them for whatever the specific message was and Mr. Gonzales shared that e-mail with the 400 HR employees that were within the network. And Ms. Miller replied all and I can't remember specifically whether she said you're welcome or thank you but she replied all to the 400 people on a message that there was no absolute need to do any response and especially your response to the 400 people. She was saying you're welcome like the Network Director was speaking to her personally and

**the other 399 people weren't on the e-mail.**

BY MR. MARTIN:

Q Understood. Anything else?

**A Without the documents, I'm not sure I can think of anything at this time but the access of the EOPF was a very serious charge that warranted this.**

Q Okay. Anything else? Any other reason for her termination, for your recommendation that she be terminated?

**A Like I said, there was issues with not being able to follow simple instructions, simple tasks that were a part of a job and again, Ms. Miller was at the GS-7, the full performance level, and when you're at that level, it's working independently because you are a subject matter expert but she was struggling with doing the work that would be at the GS-5 or 6 level.**

Q Okay. When you hired -- you hired her, correct, she volunteered and then you subsequently hired her?

**A Correct, originally she was working in the department as a veteran transition back to work process and then at the time, I don't believe that we had a vacancy in our department and then eventually we had a vacancy to which she applied to.**

Q Okay, I'm looking at a document dated February 20, 2020. It says, "This letter serves as

certification -- and these documents were produced from the EEO from the VA. Your lawyer has some and we got these documents in the pretrial procedure, so to speak. We were trying to resolve the case.

But anyway, it says, "This letter serves as a certification that Tara Darnell Miller is an individual with a severe physical, intellectual or psychological disability that qualifies for consideration under 5 CFR 213.3102 (u), Schedule A hiring authority non-competitive appointment for persons with disabilities."

Are you familiar with that from your time in the service and at the VA of a Schedule A hiring authority?

**A Yes, I'm familiar with Schedule A hiring.**

Q Are you a Schedule A hiring authority person yourself?

**A Yes.**

Q So you also have a disability, correct?

**A Oh, are you asking if I was hired under Schedule A or am I a subject matter expert in the hiring of Schedule A applicants?**

Q Are you yourself a Schedule A applicant?

**A I am a disabled --**

Q Are you yourself a Schedule A employee, in other

words, do you have a military disability, duty-related disability?

**A I do have a VA compensable disability.**

Q Okay. And is that how you're familiar with 5 CFR Schedule A hiring authority?

**A I'm familiar with it because it's a part of my job in Human Resources.**

Q In what way?

**A Because there's many different facets that a person can get hired within to the VA and that is one of them, so for --**

Q What advantages does one get with a disability?

**A Sure. The advantage that a person with a disability --**

Q And let me just tell you I agree that you and everybody else with a disability who served the country, put your life on the line for the country should get some advantages. So if you could just tell me a little bit about that.

**A There's a difference between disabled veteran and there's a difference between Schedule A. There's many ways of hiring.**

**So a Schedule A authority, there's a form that an employee can complete and it's accompanied by a letter from their treating**

physician, so there's -- let's just say for example there's 25 different medical limitations that a person could have that qualify under Schedule A and if a person has -- they don't need to have one on the list, they can have more but one is -- if they have one, then their treating physician would provide a letter stating that they are employable and hirable under the Schedule A authority and what that does for an individual is they do not have to compete for the position, okay? So they can write directly to the hiring manager and say I would like to be considered for hire based upon my Schedule A and my known disability and here's my treating physician's letter and it goes --

Q And my qualifications?

A Yes, along with their resume. Yes, they still have to be qualified.

Q Exactly.

A You can't just become a pilot, you have to be qualified for the position through your resume and experience but it's a way to not go through the process of applying for a position, like I stated earlier, where it goes to -- jobs can compete against others for it. They can request to be hired outside of the regular hiring practice of posting a

position and competing against others, they can ask to be hired that way. A manager does not have to accept it, they can tell the person I appreciate it but you need to compete for this position or they can accept the person's claim of Schedule A with the documentation and they can review that and determine, you know, to hire them that way.

Q And I see a letter where you yourself recommended that Ms. Miller be hired as a Schedule A, correct?

A I know that Ms. Miller when she submitted her documentation, and again I said that was to Ms. Uselton, she would have provided that documentation along with her resume to Ms. Uselton. In turn, Ms. Uselton would inform me as a selecting official that an applicant qualifies under Schedule A. I wouldn't get the document from her treating physician but I would be told that she qualifies under that hiring authority. I would get her resume and I would be told that she qualifies under Schedule A and if I elect to do so, I could hire her through the Schedule A authority in lieu of the traditional hiring route where a person has to apply for and compete for a position.

Q But someone gets the doctor's letter to justify or to establish the disability, as you stated?

**A Correct.**

Q The treating doctor. Okay, it has to come to the VA?

**A Yes, it would come to the staffing specialist who worked the hire in this case, which would be Ms. Uselton.**

Q That's Janice?

**A Yes, sir.**

Q Okay. And what did she do with that letter, that doctor's letter? This all goes into the person's file?

**A It would go into the recruitment file for that position that staffing deems. It doesn't go into their electronic personnel file.**

Q Okay.

**A Only specific documents related to a person's personnel file go on the electronic form. All the hiring records, now that things are automated, all hiring records are electronic in a system called USA Staffing, which is another system that HR employees work in.**

Q Got you. Okay. So like you said, a recommendation is made but you as a supervisor do not have to accept the applicant as a Schedule A and you have the authority to say you're going to have to

compete, correct?

A Correct.

Q And in having that authority, what are some of the things you may look at to make that determination as to whether or not you're going to tell the Schedule A individual they have to compete? What are the things that you might look at?

A I think each hiring manager would be different and for me personally, I think it depends on what is the critical need for the position, is it one that is hard to recruit, hard to fill, like maybe in the past it's been posted a few times and we didn't get any qualified applicants. So in that regard, you know, it would be nice to have somebody apply and be eligible through Schedule A to at least take a look at because people aren't applying through the traditional route through the USA jobs posting.

You know, if it's -- you know, let's say there was internal applicants as well, you know, to the position. You know, like let's say it was a specialist position and I had assistants who have been under my charge for a period of time and, you know, they were waiting for this position to open up, so to speak. I might tell that applicant that they need to compete competitively because it's a

**sought-after position.**

Q Understood. Okay. So you also understand the laws regarding -- the ADA laws regarding accommodation of disabilities, correct?

**A Correct.**

Q You're very familiar with those laws because you have to adhere to them, right?

**A Correct.**

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q To the best of your ability, you try to adhere to those laws regarding ADA employees?

MR. DOYLE: Object to form.

**THE WITNESS: Yes, I'm aware.**

BY MR. MARTIN:

Q And that law requires you to -- and I'm not talking about Ms. Miller, just in general, it requires you to look at the disability and see if it could be accommodated without undue hardship, correct?

MR. DOYLE: Object to form.

**THE WITNESS: I would say yes, and the VA has a specific process for people requesting a reasonable accommodation.**

BY MR. MARTIN:

Q Okay. And so for you to make a decision whether or

not an employee could be accommodated, you would have to know what the disability is, correct?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q Common sense, you would have to know what the disability is in order to determine whether it can be accommodated without undue hardship?

**A Can I give you a non yes or no answer?**

Q Okay, how about if I do it this way. In order to accommodate a disability, you have to know what the disability is, is that fair to say, as a manager?

MR. DOYLE: Object to form.

BY MR. MARTIN:

**A As a manager, an employee would request for an accommodation based upon their disability and yes, there's a process to discuss it.**

Q Okay. To discuss what the disability is, correct?

**A And what the accommodation being requested is.**

Q Right. That's the interactive process that must take place?

**A Correct. That has nothing to do with Schedule A, though, just for the record.**

Q Okay, I understand. And if you wanted to, it's not illegal for you to ask Ms. Uselton I'd like to see what the disability is as I'm trying to decide who I

want to hire for this position, that's not illegal, right, you could get access to the disability note from the doctor, correct?

**A I don't ask for that. I don't believe I have the right to it. All I need to know is that they're eligible under Schedule A because that's not --**

Q So Ms. -- the person under you, the staffing person, they have a right to know what the disability is from the treating doctor and you're saying you do not have a right to know; is that what you're saying?

**A That is what I'm saying. The staffing specialist needs to know that the employee meets the qualifications to be hired under Schedule A. So they have to provide that documentation, the form which I stated along with the letter from their treating physician that states that they are eligible because this condition falls within the purview of Schedule A. So yes, the staffing specialist does need to know that the letter and the form meet the criteria for Schedule A. As the hiring manager, I only need to know that they qualify to be hired under Schedule A so that they can, for lack of a better term, skip the line, skip the competition.**

Q No, I understand. Let me ask it this way. Just like you said, that she -- you terminated her because she accessed files for personal -- in your opinion, personal and non-business reasons, correct?

**A Correct.**

Q She looked at a file, okay. So --

**A She looked at several files.**

Q Right.

**A Not a file.**

Q Okay, you're right, several files. So you're not saying that if you looked at her note, disability note, can you be terminated?

MR. DOYLE: Object to form.

**THE WITNESS: If I looked at her note.**

BY MR. MARTIN:

Q Yeah, her disability note from her doctor. Is that a terminable offense? Is that a violation of a work rule or VA policy if you as the hiring manager or as the hiring person, if you wanted to look and see what the disability is, is that a violation of any regulation or policy that you know of?

**A Well, first let me state that we're not similarly situated because she was in her probationary period**

**and I was not.**

Q No, I understand. No, the question is again, do you -- would you be violating a work rule, a regulation or a policy if you asked Janice, can I see her treating note? Or not just her, Ms. Miller, anybody, would you be violating a policy on a Schedule A person if you asked to see the disability note? To your knowledge, is that a violation of any policy or regulation?

**A I'm not sure. I don't know.**

Q You're not aware of any policy that would prohibit you from doing that, correct?

**A I'm not aware. I mean when -- let me just say that when people apply for positions, sometimes they write directly to the hiring manager, so that applicant would give the manager their documents, which could include Schedule A. So I can't say that I've never seen people's Schedule A requests before because people write directly to the hiring manager and ask for it. It was little bit different because Ms. Miller was already a volunteer in the department, so when she was told of the position, I instructed her to work with Janice Uselton.**

Q No, I understand. I just want to establish it wouldn't be illegal or a violation of the work rule

or the policy for a hiring manager like yourself to look at the Schedule A disability note from the doctor, that wouldn't be illegal, right?

A I don't know, sir.

Q Okay. And if they sent it to you, obviously you're seeing it, right?

A Correct. If by they --

Q Go ahead.

A If by they you mean an applicant sending it, yes. The staffing specialist would not just share that information with the hiring manager. Again, the hiring manager only needs to know that they qualify based upon that regulation.

Q I understand. But I just wanted -- so we understand what we're talking about here, the context, we're not talking about HIPAA, right, we're not talking about HIPAA, we know certain rules on HIPAA, right?

A Yes.

Q Okay, we're not talking about that kind of a situation. If you happen to know the Schedules A's disability, that's not something that you're not entitled to know, right?

A I'm not a HIPAA expert, so I'm not sure how to answer that.

Q I'm talking about Schedule A. If you know the disability -- if you know the doctor's treating note the doctor provided for the disability, that's not something that you're not entitled to know by law, to your knowledge, right?

**A Again, I'm not sure.**

Q Okay. Now, you know from time to time -- well, let me ask you this. You've learned as an HR person and specialist, an expert that under the ADA, certain accommodations may mean doctor's appointments, right, going to a doctor's appointment, that may be an accommodation that needs to be requested and granted, correct?

**A Well, I'm not -- I'm sorry, Chris, what did you say?**

MR. DOYLE: Object to form, but go ahead.

**THE WITNESS: I'm going to say that, you know, I don't know the ADA back and forth but an employee who requests leave for an appointment is predominantly granted, so I don't know that that is a part of a reasonable accommodation. A reasonable accommodation is generally that an employee has some type of a limitation, like a lifting restriction, sitting-standing restriction, like some people need a sit-stand desk to be able to change. I don't**

think that medical appointments are an
accommodation, that's a right for every employee.
BY MR. MARTIN:
Q Okay. And you honored that right, correct? If an
employee says they have a medical appointment, then
you don't stop them from that, do you?
A No, I typically wouldn't stop an employee from going
to a medical appointment. The only thing that I've
said anywhere that I've been as a manager is that --
and part of what the regulations state is when the
need for leave arises, you let your supervisor know.
So just as an example, if I went to
the doctor this morning and I have a follow-up visit
for September 30th, I tell my employees go into the
leave system and, you know, you have an appointment
scheduled for September 30th and make your request
now and then you can plan accordingly as a manager.
Obviously, if somebody's sick, you can't plan for
that ahead and if they say I need to go see my
doctor, then they would predominantly go see their
doctor.
Q And you wouldn't give employees a hard time for
medical appointments, correct?
A Would I give people a hard time for a medical
appointment?

Q Yes, if they had a doctor's appointment and you knew in advance or they put it in in advance, you wouldn't give them a hard time about that, would you?

**A I don't believe that I would, no.**

Q And it wouldn't be appropriate, correct?

MR. DOYLE: Object to form.

**THE WITNESS: I would think that that would not be appropriate if an employee needed to have a medical appointment.**

BY MR. MARTIN:

Q Did you also terminate Ms. Miller for identity theft?

**A I don't believe that that was part of the termination. I think that may have been after when an issue was raised to the VA police because she had unauthorized documents that were found in her work station that she should not have.**

Q Who found those documents?

**A I don't know specifically but it would have been Erica Bethany, Shavon Render or Angela Thompson because they were the ones that were tasked with going through Ms. Miller's work station after she failed to follow instructions after she received her termination letter.**

Q And what did they find? What did they tell you they found anyway?
**A Well, they told me and then they brought to me leave and earnings statements that belonged to a deceased individual, Gary Hollenquest.**
Q Where did they say they found these statements?
**A They found the statements in her locked file cabinet, I believe.**
Q If it's locked, how did they get in there?
**A We had to have the VA police come because Ms. Miller was not responding to anyone.**
Q No, I understand that but how did they -- you didn't have the police come until --
**A The police --**
Q -- they found the documents. How did they get into her locked -- okay, maybe I'm not understanding. Go ahead.
**A If police came to unlock the -- anything that was locked. There was several cabinets in a work station, desk drawers, things like that. So they came and unlocked it, the VA police.**
Q Why did they come? That's what I'm trying to get at. Who called the VA police to come unlock her drawers and lo and behold we find leaves and earnings statements, which I thought you said that

these individuals found them first and came to you.

A They -- I contacted the VA police because Ms. Miller after receiving her termination failed to follow instructions and left the facility without clearing the facility properly. Because they were locked, only Ms. Miller had the keys and she failed to turn in her keys to me after she cleared the facility and since she didn't clear the facility, she left without following the instructions once again, I had to contact the VA police because she retained her keys, which is VA equipment, after her termination.

The VA police came and opened the cabinet and then those three employees began to go through the office cubicle space of Ms. Miller and found documents that were older and should have been processed for employees that had requested benefits, changes, things of that nature. There was work that was shoved into these cabinets that wasn't completed by her that should have been completed. In addition to that, they did find the leave and earnings statements for Mr. Hollenquest and they brought them to my attention.

Q And what did you do?

A I contacted the VA police and I believe I completed a statement, a report of contact and that I felt

**that it was potentially an attempt at identity theft because also the reports of the improper access to the EOPF showed that Ms. Miller had modified Gary Hollenquest's, some of his documents within his EOPF. Therefore, I thought that it was -- it appeared to be an attempt at identity theft because there's no reason that she should have leave and earnings statements of a deceased employee. So I contacted the VA police on that matter.**

Q So you contacted them twice is what you're telling me?

**A Yes.**

Q The first time you contacted them was so they could unlock her cubicle or her cabinets?

**A Correct.**

Q Then you had the three employees who she complained about from time to time, they went through and found -- at least they claim that they found these documents, correct?

**A Well, first off, I don't recall Ms. Miller complaining about Shavon Render, so to lump her in that group, I think, would be incorrect as far as three people that she complained about.**

Q Two, okay. Two of the three?

**A Yes, sir.**

Q Okay.
**A I just want to be clear.**
Q And that's fair. That's fair. I thought she complained about Shavon but you've corrected me, that's fine. Thank you.
So you were not present and you didn't go through these files personally yourself, did you?
**A No, I was present in the office, I was not present at the cubicle. There was things that they brought to me to show me. I did not see every document that was found but in regards to forms that needed to be worked, that should have been worked that employees had requested different things, I did see some of them, not all of them and I had to prioritize the work of what needed to be done that was supposed to have been previously done by Ms. Miller.**
Q Where is your office in respect to Ms. Miller's cubicle?
**A From my office door to her cubicle was about maybe 12 steps, 12 to 15 steps.**
Q And you were in your office doing some work when the police came and unlocked the doors or unlocked the cabinets and you instructed the three people to go through her drawers, correct?

**A Correct. So she had several like personal items and we set those aside. I think we got a box and put her personal items in a box that wasn't --**

Q Hold on one second. I got you but I just want to be clear. You assigned that task to them, that's not something a manager, yourself did, right, you didn't go through the stuff, you assigned it to these three employees, correct?

**A Correct.**

Q Okay. You're back in your office doing your other work, right, you got a lot of work to do, it's fair to say?

**A Correct.**

Q Okay. And then at some point in time, how long was it that they came and said look, this is what we found?

**A I can't recall specifically. I believe it to be, you know, that day as they were going through it but I don't know how much time it was.**

Q I understand, but it's a lot of work to go through because they got to separate her personal stuff from VA materials, correct?

**A Correct. I mean just to give you a context about like the distance, the cubicles were, let's say, six feet high, so you know, I could see over them, so to**

speak, but not down into them from my office but they were right outside my office.
Q I understand.
A And then there was probably three or four top cabinets and then they have like a work desk this way. There would have been probably usually a two-file drawer cabinet underneath that had documents. Some of them had like bins with documents in it and -- because they're --
Q Excuse me, Mr. Osterbeck, I got you. Let's just say it's fair to say there's a lot of document to go through, a lot of work, fair to say?
A Yes.
Q And this is something that has to be done with respect to any employee who's terminated, correct, there's a procedure?
A Anybody that leaves or is terminated or takes another job, yes. There's a turnover that has to take place because you need to get that work space ready for the next person.
Q Right. And like you said, you find documents that should have been processed, you have to take care of that, correct?
A Correct.
Q Okay. But you cannot testify under oath that you

actually saw in her desk, Ms. Miller's desk the individuals pull out earnings of Gary Hollenquest or anything like that, you didn't see them pull it out and they said hey, look; that did not happen, correct?

**A I did not physically observe them pull those specific leave and earnings statements out of her cubicle. I was not physically standing there watching them from start to finish go through all the documents.**

Q I understand. Okay. And that's because you have other responsibilities, correct?

**A Yes.**

Q So identity theft, she was already terminated when the identity theft issue came up, correct?

**A Yes, I believe so.**

Q Well, you said that she had left and you said it was after her termination and that's why you had to call the police and go through everything.

**A Correct.**

Q Did you ever have any meetings with the police officers regarding Ms. Miller?

**A I did actually on the day of her termination. I recall that as well.**

Q So why were they there on the date of her

termination?
A Okay, I'll try to explain. When an employee is terminated or transfers, resigns or retires, if they're leaving the facility, there's a clearance process that the facility has in place. When a person is clearing the facility, they are given a clearance checklist, a piece of paper that has numerous tasks of different places within the facility that they need to go check out of, okay? Does that make sense? Are you with me?
Q Yeah.
A So on the morning of her termination, I issued her the termination, I gave her her rights to go along with it that are in the termination letter.
Q And the termination, excuse me, was for the reasons you testified to earlier, right, failure to follow instructions, resistant to training and accessing five employees' files and making a modification on Gary Hollenquest's?
MR. DOYLE: Asked and answered.
BY MR. MARTIN:
Q We're going through this thing again. I just want to make sure. That is what you --
A Yes, sir, the reasons that I previously stated were the reasons for the termination.

Q And she's in your office and you go over these reasons with her, is that fair to say, or you didn't?
**A I did. I read her the letter.**
Q Okay. At what point did you call the police so she could clear out, go through the clearance procedure?
**A Okay, I'm trying to explain it to you. After the termination was issued, I provided her with a clearance sheet and said you need to go to all of these different departments within the facility and clear. So what they do is when a person leaves, they present the clearance sheets to the manager or designee of that department, they check to make sure, you know, they turn in any equipment, they turn in their badge, they turn in anything, they get cleared from records, there's a bunch -- it's a whole process. It takes a couple hours to do, okay?**
Q Okay.
**A Her instruction was to go and clear and then I was the last stop on the clearance sheet. HR is one of the last stops.**
Q Okay.
**A So her instructions were to go and do this clearing, okay, go and clear at all these places and then come**

back to me. When you come back to me, I will sign your clearance sheet and then the very, very end stop after me was payroll, fiscal because of getting information about where to send the last check, things like that.

And then I said -- and then you know, once you clear and come back, you can gather all of your personal belongings from your cubicle and then, you know, leave the premises. So as I said, it takes a few hours to do clearing but it's not a -- I would say on average it would take a person about three hours, not a whole day event.

So I want to say about four hours after she was given the piece of paper and said go clear, I was starting to think where's Ms. Miller, okay? So I started to contact some of the departments that are in order of how you clear. Every department that I contacted said she has not been here. So basically she was given the instruction to go clear and hadn't completed a single task and it had already been four hours.

So I went down to the basement of the facility where the police offices are, where they're located and they said well, we'll try to contact her, we'll try to find her. I gave him her cell

phone, she was not answering her phone. I tried to call her as well, she didn't answer the phone. And the police actually started to look for her on the video surveillance. They could not find her for a period of time and if my memory serves, I think they saw her exiting a patient exit-entrance like a couple hours before this was happening and so that's how the police were involved.

Q What did they do? So tell me what happened next. So she doesn't -- they can't find her, she leaves, so what happens next?

A So written right on the clearance form says if you fail to clear properly, your last paycheck will be withheld. So I notified Cincinnati, which is where -- because again, we are network employees, not facility employees, so they do our payroll. It's not done locally out of the Detroit VA facility. I contacted them and I said here's an employee who was terminated, they failed to clear properly, you know, until they clear properly and check off every box on that form and, you know, they should not get their final paycheck.

The police finally got in touch with Ms. Miller, the police chief was Mohammed Kazan and the deputy, I believe his last name was Chester, and

**it was Chester who actually got Ms. Miller on the phone, spoke with her on a few occasions and agreed --**

Q Is this all the same day? Excuse me, is this all the same day?

A **No. I think he didn't get ahold of her for a day or two on the phone.**

Q So which police officer made the first contact, Mohammed, Police Chief Mohammed Kazan or Deputy Chester? Which one was the first one to contact her and when?

A **I'm not sure which one contacted her first but it would have been -- the first contact would have been made the day of the termination.**

Q Because you said before you tried to call her and they tried to call and no one could get ahold of her.

A **On the day of the termination, all three of us, I believe, tried to contact her.**

Q So at what point in time was she contacted by Deputy Chester?

A **On the day of termination we all tried. She did not pick up, I believe, on the day that the termination happened. I think it was the next day or maybe two days after where I wasn't with the two of them but**

**they had, I believe, contacted me and said we got in touch with Ms. Miller. By that time, the cubicle had been opened and her personal belongings were gathered, they were delivered to the VA police and they without me coordinated that exchange.**

Q What do you mean? Tell me what happened.

**A I wasn't there. All I know is we gave her personal belongings to the VA police and the VA police is where she picked them up at. I wasn't part of the exchange.**

Q And what did he tell you occurred? Did it go without incident? I'm sure you wanted to know what happened, so what did they tell you?

**A I don't recall specifically what they told me about whatever reason she gave for leaving without properly clearing.**

Q Well, why tell the VA police your suspicions of identity theft?

**A Yes, I've already responded to that, that I provided the statement to them about my suspicion of identity theft.**

Q Did they agree with you?

**A If I recall correctly, I think they said that they would -- you know, they obviously took my statement and would look into it. Nothing came of it as far**

**as any type of charges against her that I'm aware of.**

Q So she wasn't terminated for identify theft, she was terminated for the reasons you gave earlier. Now, why didn't you just -- first of all, you agree with me that to terminate an employee, especially a veteran, it's very serious to terminate their employment; you agree that's a serious act, right?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q Taking away someone's livelihood, that's a serious act, correct?

MR. DOYLE: Object to form.

**THE WITNESS: I believe termination of any employee, no matter what their background is, whether they're a veteran or not a veteran, I understand it's what we call an adverse action and it's a serious nature.**

BY MR. MARTIN:

Q It's the ultimate, right, as far as ultimate form of discipline? There's nothing else after termination, you're out of work, correct? That's what I mean by disciplinary action, it's the ultimate, it's the final step of a disciplinary action.

**A From --**

Q The most serious.
**A From employment, yes.**
Q Yeah. It's the most serious, correct?
**A No, I guess it's not. I mean people do things that they could be imprisoned for or fined when they work for the federal government, so I think that would be worse than termination.**
Q I agree, if it's justified. She didn't do anything that she should be imprisoned for, right?
MR. DOYLE: Object to form, foundation.
BY MR. MARTIN:
Q Correct, to your knowledge?
**A The VA isn't the ones that make that -- any type of determination like that. We don't -- that's not our call, that's up to the State's attorney.**
Q I understand. But you have no evidence that she did anything that warrants a State attorney looking at this as something of a criminal nature, right? You have nothing on that, correct?
MR. DOYLE: Object to form.
**THE WITNESS: Not to my knowledge.**
BY MR. MARTIN:
Q Okay. And you talked earlier about different forms of disciplinary action that could take place even

though you said that it wouldn't apply to her necessarily because she's probationary. But you could have suspended her for a period of time, correct?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q As a form of discipline?

**A As a form of discipline, could I have? Could I have suspended her in lieu of terminating her?**

Q Yes.

**A If she was a non-probationary employee, a suspension may have been warranted but she was not in that category, she was a probationary employee where termination was warranted.**

Q I understand, but that's your judgment, right, you're the boss, that's the judgment call. There's nothing that required you to terminate her, right, there's no policy or rule that says you must terminate her, correct?

**A Well, the VA has handbooks and policies on disciplinary action in a table of penalties and the infractions which she did warranted termination.**

Q Tell me -- point to the policy that says one should be terminated automatically, in other words, there's no discretion, it's automatic termination. Please

point me to that policy so we could look at it.
A I don't have anything in front of me at the moment and I --
Q You're not certain under oath that one exists that says that you were required to terminate her for what you accused her of?
A I don't believe that the policy says you are required to do it. A table of penalties shows vague, very broad types of infractions and what an appropriate penalty would be.
Q Right, and you decided to terminate?
A It was my decision to --
Q Recommend termination?
A -- recommend termination, yes.
Q Now, I gave you Exhibit Number 2. Now, did you hire Eric Bethany?
A Did I hire Erica Bethany?
Q Yes, I'm sorry, Erica.
A Yes, sir.
Q And what was her background when you hired her?
A I believe she had a lot of office and clerical duties. She may have been a medical support assistant. I know she was within the facility. To the best of my recollection, I believe that's what her position was.

Q And you hired her as a G-6, correct?
**A I believe she started as a GS-6, yes, not a -- yes, as a 6, I believe.**
Q And she started around May 1st?
**A Of what year are you speaking, sir?**
Q I'm sorry, 2020. With you in your department.
**A I'm not exactly sure of her start date.**
Q She started after Ms. Miller, correct?
**A Yes, I believe so.**
Q Now, Exhibit 2 shows that you issued a written counseling to Ms. Bethany, correct, on July 23rd, 2020, correct?
**THE WITNESS: Chris, is this what you -- did you send me this?**
MR. DOYLE: Right. So for the record, it was e-mailed over, it should say Ex 2 on the upper corner.
**THE WITNESS: Okay, let me -- okay, written counseling for Erica Bethany. Yes, I see it. My apologies.**
BY MR. MARTIN:
Q Okay. And so the dates -- well, you state, "I have reviewed your attendance and leave record for the period of 5/19/2020 through 7/20/2020. This review reflects the following about your use of unplanned,

unscheduled sick leave."
What does that mean right there, unplanned, unscheduled sick leave?
A **Again, like I said, if I have a doctor's appointment and it's for September 30th, then I would go into the leave request system and put in my leave request and my supervisor would then know on September 30th I'm going to be out of the office for however much time that I said I needed on that date.**
**Unplanned and unscheduled means there was no communication between the employee and the supervisor about the need for leave and so it was like, for lack of a better term, like on 5/19 the person said, in this case Bethany said I'm going to be late and again, as you can see by that, leave is done in 15-minute increments, so it's 30 minutes, 15 minutes or 45 minutes and then an hour with, you know, that as well.**
Q And the reason why you issued this counseling is because she violated the work rule with respect to unplanned, unscheduled sick leave and you're just applying it, correct?
A **Well, yes, obviously, you know, from me looking at this document, that was of a very repetitive nature.**
Q But this is the first counseling, correct?

**A That I am -- I'm not sure if it was the first or not. I can't say for certain.**
Q Okay. And I take it it's the first because I think she got hired around May, May 1. Ms. Miller started working, just to help refresh your recollection, April, around April 1st and she was hired after Ms. Miller. So if she was hired in May, May 1, then this probably is the first written counseling, correct?
**A Again, I don't have dates. It's possible. I'm not specifically sure.**
Q And the reason I say it's probably the first because the first date you have in here is 5/19, 30 minutes. And then you have 6/30 -- 6/03 -- let's just say you have one, two, three, four, five, six, seven, eight, so there's nine infractions of the policy, of attendance policy, correct?
**A Yes.**
Q And then you state in your letter number 2, "This letter of counseling is to inform you that this type of performance is unacceptable and will not be tolerated."
Were you serious about that?
**A What do you mean was I serious about it?**
Q Were you serious when you made that statement, it's

unacceptable and will not be tolerated?
A Of course. It's written there and I signed it.
Q Doesn't mean you're serious. I'm asking you now were you serious when you made that statement?
MR. DOYLE: Asked and answered.
BY MR. MARTIN:
Q You can make a statement and not be serious about it. My dad used to say he's going to punish me but he wasn't serious, he gave me a break. So I'm saying were you serious, did you really take this as a serious violation that needed to be corrected?
A Serious, I mean yes, it's a violation that -- in performance that needed to be changed. It also says that you're a valued employee and that we don't want these things to occur again, that we give the employee assistance program information.
If I took the time to create the document, then as a supervisor, yes, I would think that a counseling is serious and you can see at the bottom it says it may be retained for a period of one year or it could be withdrawn and destroyed after six months, depending on future conduct.
Q You also say that it can result in disciplinary action, right?
A Yes.

Q Were you serious about that, taking disciplinary action if the conduct continued?

**A I would say that every case is looked at on its own merit, but yes, if --**

Q Well, we're talking about this case. This is a letter that you wrote to her. We're talking about one person right now. You stated any future incidents involving this type of conduct may lead to disciplinary action being taken against you.

**A Yes, it may or may not. It says may lead to it.**

Q Right. And you make a decision whether disciplinary action will be taken if the conduct continues, right?

**A Correct.**

Q You make that decision. Now, isn't it fair to say when we get her records it will show that she continued to be late after this, after this warning of July 23, 2020? I have records showing October, November, December, she continued to have a tardiness problem, correct?

MR. DOYLE: Object to form and foundation.

**THE WITNESS: Without seeing her record, I can't answer yes or no.**

BY MR. MARTIN:

Q So you don't remember whether she continued to have a tardiness problem without seeing records? In general, Mr. Osterbeck, she had a problem being on time, isn't that true, for whatever reason?
**A Well, case fact circumstances for an employee are something that any manager would look at as well.**
Q I'm saying she had a problem being on time and people complained about it; isn't that true? She just had a problem, for whatever reason it was, she had a problem being on time?
**A I don't know that anyone complained about her attendance specifically. Quite frankly it's not the business of anyone's other than her direct supervisor.**
Q Yeah, that's a problem, isn't it, because you testified earlier -- that's a problem because you testified earlier that it does impact the operation, it's unfair to the other employees because they got to pick up and do work. You remember that testimony earlier about three or four hours ago where you said there's a reason, it impacts everybody when people come in late, you remember that?
**A I remember it clearly. What I'm saying is that it is the supervisor's responsibility to monitor attendance. It's not another employee's**

**responsibility to be checking when people walk in and walk out of an office.**

Q And you did monitor this attendance. How did you know she was 30 minutes, 45 minutes, one hour, 45 minutes, eight hours, eight hours, how did you know she was late the times she were late? How did you know that? You say you monitor. How did you do that?

**A Because employees were responsible for contacting me as the only supervisor if they were going to be late. That's why. See how it says call in? That means they call.**

Q Okay. So she called in to tell you she was going to be 30 minutes late. Did she ever tell you why she was going to be 30 minutes late?

**A I'm sure she provided reasons for being late, just like any employee would state why there was a need for leave.**

Q We can't make those assumptions. Some people may not state.

**A No.**

Q Again, don't try and put these people -- don't try and protect her --

**A I'm not protecting her.**

Q -- by saying what other people may do. It's obvious

that's what you're doing, but anyway, we can move on.
**A I didn't know you were going to. I thought you were just asking.**
Q So you're not going to say under oath that she was never -- you're not saying under oath that she did not have a tardiness problem after your July 23rd, 2020 letter, you're not going to say that under oath that she did not continue to be late? You're not going to say that, are you?
MR. DOYLE: Object to form.
**THE WITNESS: Well, you're talking four and a half years ago and I don't have an employee's leave record in front of me. As a reasonable person, do I think it just all of a sudden ceased? I've seen it happen. I don't know for her specifically because I'm not looking at her record. Unfortunately --**
BY MR. MARTIN:
Q I understand.
**A Unfortunately, she was a single mother with a toddler who had severe medical complications and she was trying to deal with being a single parent and a toddler with severe medical complications and it was difficult for her because the child needed breathing**

**treatments and care that the daycare could not do. So she was in a difficult predicament. So do I think it ended? No, she's probably still going through it today.**
Q And I appreciate that explanation. That's what she told you, correct?
**A Yeah.**
Q That's why I asked you.
**A Let's crucify her, sure.**
Q Well, you're just telling me this now, aren't you?
**A You just asked.**
Q Okay. So therefore, I did not know then, right? So don't say let's crucify her. I asked you specifically about this. You could have told me at any point in time. Mr. Martin, well, the reason why she had all these call-ins is because she had a kid that had severe problems. That's all you had to say but you didn't.
MR. DOYLE: Rick, I think he tried but you cut him off.
MR. MARTIN: No, I didn't hear anything like that. But anyway, let's move on.
MR. DOYLE: Rick, let's get to the next question. We're coming up on seven hours, too.
BY MR. MARTIN:

Q All right. So when you stated here any future incidents involving this type of conduct may lead to disciplinary action being taken against you, you never disciplined her for any of these infractions or any other infractions, correct, you never did that? For whatever reason, you never did?

A **Hold on, sir. First off, these infractions cannot be used for later discipline because they are used in this written counseling that put the employee on notice.**

**I do not recall whether or not I did give formal discipline to her or not. I do know that there was some things, like you stated earlier, about accommodating a request. I think that she did try a slight tour change so that she could have more accessibleness to daycare.**

**Generally because of employees and everybody has things outside of work, you know, there's business hours somewhere between 7 a.m. and 5 p.m. I had some employees start at 7 a.m., I had some employees start at 7:30 a.m. and I had some employees that started at 8 a.m. to try to work with any employees who requested one of those three tours that fit within their own personal needs. So additional --**

Q Did you do that with Ms. Bethany? I don't have a problem with that. Did you do that with her?

**A I just said that I believe that that was one of the things that was done. She also spoke to EAP, which is the reference there, which is like a counseling service program, and I think that she used some other type of facility resources that are outside of HR in order to find daycare that would be accessible for a child with her special needs.**

Q Now, you talk about crucifying her. That's not what I'm doing, but what I am concerned about is isn't it true that many employees and customers complained about her rudeness, her being belligerent; isn't that true? Now, maybe it was because of her kid because she got a lot of complaints from customers, didn't she, and employees? Some of them are documented.

**A Yes, there was complaints about Erica Bethany, there was complaints about Tara Miller, there was complaints about other employees within the department as well.**

Q There was specific complaints about Erica Bethany. Well, first of all, is profanity accepted in your workplace or at the VA pursuant to policy, use of profanity among employees?

A No. Profanity is not accepted and I believe that Ms. Miller had brought to my attention that Ms. Bethany had used profanity. She did not use profanity in front of me. I believe that Ms. Miller had reported that there was profanity and I know that I spoke to Ms. Bethany and stated that that was improper conduct and there's no room for that.
Q What was her response?
A I can paraphrase. I don't know what her exact response is, was at the time. Again, four years --
Q Just to be clear, let's not make it a Tara Miller versus Ms. Bethany thing. There are other people that talked about Ms. Bethany using profanity, correct?
A Not that I can recall at this time.
Q They talked about her being belligerent and rude, correct?
A I believe that I did receive some complaints about the way that she spoke and conducted herself.
Q Okay. Now, did she receive a written counseling or was that verbal?
A I believe -- or I know initially it would have been verbal and -- but I believe there may have been a written counseling for her conduct but I can't say specifically.

MR. MARTIN: Counsel, I don't know if I sent this over to you but it was a tape of Ms. Bethany using the N word at the workplace.

MR. DOYLE: That's never been disclosed to me.

MR. MARTIN: Okay. There was a problem getting it because it was a tape. So I'll send that over to you.

BY MR. MARTIN:

Q Did you ever hear of Ms. Bethany using the N word, that it was taped that she used the N word?

**A That it was taped?**

Q Yeah, her using the N word.

**A First and foremost, it's against VA policy to record anyone and if it would have been brought to my attention that somebody illegally recorded somebody, then that would have been cause for action as well. So no, a tape was never provided to me because that's against VA policy to record somebody. I never heard Ms. Bethany use that term and if I did hear her say it, then she would have been corrected on the spot because that's not acceptable.**

Q When you first hired Ms. Miller, you had a meeting with her in your office, or during that time when she was first hired, you had meetings with her kind

of explaining, you know, her duties and responsibilities, correct?

**A Yes. I meet with all new employees.**

Q Okay. And did you ask her at one of these meetings after she was hired, did you ask her if she was taping any meeting between you two? Did you ever ask her that?

**A I don't recall.**

Q Did you tape any meetings between you and Ms. Beth -- I'm sorry, and Ms. Miller?

**A Absolutely not. It's against VA policy.**

Q All right. So if she was to testify that you had said to her around here if you ever want any candy, just let me know, around here they call me the candyman, if she testified to that, you're not saying she's lying, are you?

**A She is absolutely lying.**

Q So you never said the word candyman?

**A I have never told her nor any other employee to call me the candyman.**

Q Did you ever say I'm known around here as the candyman?

**A No, I did not state that.**

Q So you never used the phrase candyman; is that what you're saying?

**A I am saying that I have never been called the candyman.**

Q I didn't say that. I'm not asking you that. Have you ever used the phrase in the employment setting candyman?

**A That is not a phrase that I would use, no, I would not use candyman. However, for the record, what I said to each and every employee when they come in is that I had a very nice office, my wife bought me three glass jars that had candy in them. I also had a refrigerator full of juice or soda. Additionally, my wife got me breakfast bars and/or candy bars and it was available to all employees that worked for me. Some employees liked to come in and get a piece of candy for the afternoon. I said this candy is available for everyone. At no time am I known as the candyman, did I tell anybody to call me the candyman or did I reference myself as the candyman. I hope I've been clear.**

MR. DOYLE: And we're right at seven hours now, Rick. I know we asked for one break, it was probably ten or 15 minutes but I think it's probably close to seven hours.

MR. MARTIN: Okay, I'm getting close to wrapping up now, Chris.

Q I didn't get this earlier, I'm sorry, Robin, when we first opened up. Can you give your business address and your date of birth, please, Mr. Osterbeck?

**A Sure. Are you talking about my business address now?**

Q Yes.

**A Okay. It is 2002 Holcombe, H-o-l-c-o-m-b-e Boulevard in Houston, Texas 77030.**

Q And date of birth, please?

**A Date of birth is June 30th, 1970. And additionally, when you had stepped away for a moment, I did just for clarification purposes, the name of the EEO manager in Detroit was Fred Harris, H-a-r-r-i-s.**

Q Thank you.

MR. MARTIN: Okay, Chris, let me just check my notes real quick.

MR. DOYLE: Yep.

MR. MARTIN: All right, thanks.

(A break was taken at 6:03 p.m.)

\- - -

(Record resumed at 6:03 p.m.)

BY MR. MARTIN:

Q One last question, Mr. Osterbeck. What is the difference -- I think you referred to it earlier but I didn't ask you to explain the difference between a

disabled veteran and a Schedule A disability veteran.

A Okay. So Schedule A, you don't have to be a veteran to be afforded hiring under Schedule A. Any individual seeking employment that has one of those conditions can be hired under Schedule A. So a veteran or a non-veteran, that makes no difference. It's whether or not you fit one of the criteria on the -- I think it's an SF-251, if I'm not mistaken, is the form for Schedule A -- or excuse me, 256, I think it is.

So it doesn't matter if you're a veteran or not. Anybody can use Schedule A disability to get hired. A veteran who is disabled, and that's a veteran who is 30 percent or more disability rated by the VA, that's a different schedule -- that's a different hiring authority. That's the disabled veteran hiring authority. Ms. Miller was hired under Schedule A.

Q Okay. You are aware that Ms. Miller sought promotional opportunities while employed before she was terminated, correct?

A I'm not sure what you mean by promotional opportunities.

Q Applied for other positions.

**A I'm not aware if she applied for other positions or not.**

Q Okay.

MR. MARTIN: All right, I have no further questions. Thank you very much, Mr. Osterbeck. I appreciate your time.

**THE WITNESS: Yes, sir.**

MR. DOYLE: Okay, nothing for me, so we should be done.

\- - -

(Deposition was concluded at 6:06 p.m.).

\- - -

COURT REPORTER: If I could just get the transcript orders, please.

MR. MARTIN: Yes, Robin, yes, I'm ordering and generally I get a hard copy and a mini, okay?

COURT REPORTER: So no electronic then?

MR. MARTIN: Oh, yeah, electronic, too, the works.

COURT REPORTER: And Mr. Doyle, do you need the transcript?

MR. DOYLE: Yes, please, just an electronic copy for us. Thanks.

STATE OF MICHIGAN)
) SS.
COUNTY OF OAKLAND)

CERTIFICATE OF NOTARY PUBLIC

I, Robin V. Darnbrook, Certified Shorthand Reporter, Notary Public, Oakland County, Michigan, certify the witness whose deposition was taken before me on August 22, 2024 was by me cautioned and sworn to testify the truth, that the testimony contained in the deposition was recorded by means of stenography, was reduced to a typewritten form and is a true and correct transcript.

I further certify I am not connected by blood or marriage to any of the parties, their agents or attorneys; that I am not an employee of any of them, nor interested directly or indirectly in the matter in controversy.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal in the County of Oakland, State of Michigan, this 3rd day of September, 2024.

Robin V. Darnbrook - CSR2508
Notary Public, Oakland County, MI
My Commission Expires 11/19/2024

## (

**(u)** 140:10

## 1

**1** 17:22 32:22,23 54:2 64:17, 24 75:18 85:15,17 174:4,7

**10** 29:24 30:7 64:17,24 66:13, 17,18 75:18 138:5,13

**10,000** 120:13

**10:00** 124:24

**11** 74:7

**12** 25:13 27:25 70:6 74:7 75:9 158:21

**12:05** 18:6

**12:14** 18:8

**13** 10:15,23 65:9,10

**14** 10:15,21,22 65:9,10

**15** 64:14 67:11,15 70:3 132:17 158:21 173:16 186:22

**15-minute** 43:11 173:16

**17** 9:23 15:8

**19** 9:3 16:25

**1970** 187:10

**1988** 6:10

**1990** 7:5,22

**1991** 13:6

**1996** 7:22 8:10

**1997** 8:17

**1:37** 67:18

**1st** 172:4 174:6

## 2

**2** 116:5 171:15 172:10,16 174:19

**2,100** 26:22,23 27:17 28:2,9

**2,200** 51:21

**20** 27:1 30:6 70:4 139:24

**2000** 107:24

**2001** 9:3,4

**2002** 187:7

**2011** 9:13

**2017** 9:19 14:16 15:11

**2018** 9:24 89:23 107:25

**2019** 25:25 26:15,21 29:21,23 107:25 108:2

**2020** 10:8 26:15 29:21 136:15, 21 139:25 172:6,12 176:18 179:8

**2021** 10:3 11:8,9,14 117:17 136:16

**2022** 16:25

**2024** 4:1

**21** 15:9 51:21

**213.3102** 140:9

**22** 4:1

**23** 176:18

**23rd** 172:11 179:7

**24th** 117:20

**25** 25:11 27:24 142:2

**256** 188:10

**2:00** 67:20

**2:30** 85:11

**2:44** 85:13

## 3

**3** 64:14

**30** 25:11 173:16 174:13 178:4, 14,15 188:15

**30th** 153:14,16 173:5,7 187:10

**399** 139:1

**3:40** 116:8

**3:49** 116:10

## 4

**4** 64:14 65:16 78:20

**40** 34:3

**400** 138:18,21,23

**401(k)** 82:25

**45** 173:17 178:4

**4:12** 131:16

**4:30** 124:19,23 131:18

**4:35** 135:2

**4:38** 135:4

## 5

**5** 64:14 69:3 71:13 73:3 74:8 75:6,7 78:20 140:9 141:4 181:20

**5's** 73:10

**5,000** 120:20,25 121:1

**5/19** 173:13 174:13

**5/19/2020** 172:24

**553** 117:2

## 6

**6** 64:14,20 65:15 69:3 71:14 73:4 74:8 75:6,7 87:15 124:21 139:16 172:3

**6's** 73:10

**6/03** 174:14

**6/30** 174:14

**600** 27:5 79:22

**6:03** 187:19,21

**6:06** 189:11

### 7

**7** 65:21 69:1,3 73:4,11 74:7 75:6,9 181:19,20

**7's** 74:8

**7/20/2020** 172:24

**77030** 187:8

**7:30** 181:21

**7:50** 44:17

### 8

**8** 44:17,23,25 45:8 124:19,21 181:22

### 9

**9** 44:23 45:11 74:7

### A

**A's** 151:21

**a.m.** 44:17,23,25 45:8,11 124:19,21 181:19,20,21,22

**ability** 17:17 55:9 92:18 146:11

**absence** 42:20

**absent** 39:1,23 40:10 41:7 42:3,13 43:17,20,23 44:1,8,11 45:13 76:7

**absenteeism** 39:11 41:6 76:8

**absolute** 138:22

**absolutely** 130:1 185:11,17

**abundance** 16:6

**abused** 45:16

**abusing** 40:9

**academics** 6:24

**accept** 128:5 143:3,5 144:24

**acceptable** 184:22

**accepted** 14:8 73:8 182:23 183:1

**accepting** 12:1

**access** 101:13 116:22 118:13 127:4 128:4,8 129:10,15 130:18 131:2 132:21 133:4,17 139:5 148:2 157:2

**accessed** 103:18 116:16,18 117:12 149:3

**accesses** 84:7

**accessible** 182:8

**accessibleness** 181:16

**accessing** 118:12 126:5 127:16,24 129:3 130:8,10 162:17

**accommodate** 147:10

**accommodated** 146:19 147:1, 7

**accommodating** 181:14

**accommodation** 146:3,23 147:15,18 152:12,21,22 153:2

**accommodations** 152:10

**accompanied** 141:25

**accused** 88:2 171:6

**acknowledge** 96:22

**acknowledgement** 95:25

**acquiesce** 5:17

**acronym** 13:12 30:4

**act** 16:2 168:8,12

**acting** 8:22 9:7 13:17,21

**action** 21:12,16,19,24 22:8,9, 13 23:1,7,9,11,15,16 24:15 25:17 27:13 40:23 43:24 45:17 46:13,18,19 47:7 62:1 69:7 70:11 76:12 80:19,20 83:8 86:3,9,11 90:8 91:20 92:11 95:12 96:5 101:1 109:5 114:9,14,21 168:17,23,24 169:25 170:21 175:24 176:2, 9,12 181:3 184:17

**actions** 15:24 40:17,20 46:12 47:3 56:7 70:8 74:11,18 82:17 115:2,7 126:10 135:14

**active** 135:23 136:8

**activity** 20:24

**actual** 100:12

**ADA** 146:3,12 152:9,18

**addition** 156:19

**additional** 7:10 181:25

**additionally** 81:8 128:3 186:11 187:10

**address** 93:24 126:22 187:2,4

**addressed** 80:18

**addressing** 102:21

**adhere** 30:23 33:1,19 85:24 86:2 87:6,10 146:7,11

**adhered** 37:10

**adheres** 99:21

**administering** 4:7

**Administration** 50:24

**administrative** 104:6

**admonishment** 45:25 114:17 115:11,15

**advance** 154:2

**advancing** 33:6

**advantage** 141:13

**advantages** 141:12,18

**adverse** 168:17

**advice** 21:20 22:14 27:1,8 40:12

**advise** 22:8 39:25

**advisor** 81:3

**advisors** 22:6

**advocate** 38:15

**advocates** 38:10

**Affairs** 9:21 16:25

**affect** 55:9,15,19,22,24,25 56:4,5 82:11

**affecting** 78:12

**affects** 78:14

**affiliation** 34:5

**afforded** 43:12 188:4

**afraid** 58:5,7

**afternoon** 186:15

**age** 34:3 54:19

**agencies** 9:20

**agency** 37:2 81:13

**agree** 29:5 31:4,6,8,15,16,24 32:22,23 33:10,17 34:15,23, 24 35:1,3,5,6,11 50:6,8 54:4, 6,7,8,10,21 55:2,4,6 57:4,5,7, 9,15,23 58:1,2,8,9 60:6,8,10, 13 63:8 70:19 73:17 79:1,6 81:23 82:12 98:5 141:15 167:22 168:5,8 169:8

**agreed** 166:3

**ahead** 12:12 19:4 22:4 23:10 46:20 58:15 66:6 74:4 94:18 96:1,3 109:10 114:12 138:8 151:8 152:16 153:19 155:17

**ahold** 166:6,16

**alike** 40:4 81:5

**allowed** 123:7 132:20 133:4

**Amanda** 72:21

**America** 56:20

**amount** 41:17 43:14 64:20,21 66:11 75:19 120:15,16,22,25

**amounts** 43:12 119:25

**and/or** 9:5 38:7 186:12

**Angela** 66:25 67:1 68:12 117:11,25 118:15,16,17,18 122:21 123:2 124:7 125:12 126:9,11 135:13 136:7 154:21

**Ann** 9:23 14:16 19:22 20:1 24:3 39:7,8,12 40:1 41:2 46:8, 10,25 66:19 88:10,15

**annual** 43:13 45:3,6

**answering** 165:1

**anti-bully** 58:12

**anti-bullying** 57:23 86:12

**anti-harassment** 57:24 58:12

**anyone's** 117:7 119:1 177:13

**apologies** 172:20

**appearance** 102:11

**appeared** 157:6

**applicable** 36:1 40:19 65:25 73:24

**applicant** 62:24 63:6 69:2,11 140:23 143:15 144:24 145:24 150:16 151:9

**applicant's** 70:13

**applicants** 61:24 62:2,21 140:22 145:13,19

**application** 69:8

**applications** 62:19

**applied** 66:9 139:23 188:25 189:1

**applies** 69:2

**apply** 61:24 143:22 145:14 150:14 170:1

**applying** 142:22 145:16 173:22

**appointment** 114:20 140:11 152:11,19 153:5,8,15,25 154:1,10 173:4

**appointments** 152:10 153:1, 23

**appropriately** 22:10 30:12

**approval** 63:3,7

**approving** 90:2 91:11

**approximate** 10:9 134:18

**approximately** 8:17 9:3 13:20 25:11,22,24 26:13,14,21 44:19 136:11,19

**April** 8:17 174:6

**Arbor** 9:23 14:16 19:22 20:1 24:4 39:7,8,12 40:2 41:2 46:8, 10,25 66:19 88:10,15

**Archives** 98:23

**area** 8:25 9:17,18 13:23 15:17 74:25 135:22

**arena** 20:21

**argumentative** 53:6 77:18,20, 21

**arise** 38:22

**arises** 153:11

**Armed** 8:18

**arrive** 65:10

**ascertain** 15:22

**assigned** 16:13 62:1 159:5,7

**assignment** 12:6 74:19

**assist** 37:1 38:13 74:7

**assistance** 38:4 175:16

**assistant** 9:24 19:25 24:2 26:5 69:1 82:16 83:7 102:15 135:16 171:23

**assistants** 24:12 74:8,11,20, 21 83:10 134:17 135:10 145:21

**assisted** 72:25

**assisting** 14:10 20:8

**associate** 89:22 106:12,17,20

**assume** 5:4 8:8 53:16 85:16 127:18

**assumed** 127:17

**assuming** 52:20

**assumptions** 178:19

**attempt** 157:1,6

**attendance** 42:17 47:2,7,10, 16 49:11 56:5 76:10,21 78:6, 10,12 80:5,13,17 115:6 172:23 174:17 177:12,25

178:3

**attendance-related** 114:24

**attended** 6:10,16,18 15:2

**attention** 85:15 86:24 87:14 117:9,11,14,25 118:2,3 156:22 183:2 184:16

**attorney** 103:23 169:16,18

**attrited** 29:15

**August** 4:1 8:10,16 10:3,6

**authority** 21:5,7 39:2 98:10,12 107:11 108:22 118:13 140:10, 14,16 141:5,23 142:8 143:18, 21 144:25 145:3 188:17,18

**authorization** 103:18

**automated** 144:18

**automatic** 75:17,23,25 76:2 80:22,25 81:1 170:25

**automatically** 78:11 80:4 170:24

**average** 164:11

**award** 119:4,7,8,9,11 120:3,4, 7,12 121:1,2 122:22,25 123:10,25

**awards** 118:23,25 119:15,23, 25 120:1 122:20 123:14 126:6,8,13,14

**aware** 50:5 88:17 112:23 114:24 146:14 150:11,13 168:1 188:20 189:1

**AWOL** 43:23

B

**B-E-R-R-Y** 102:23

**back** 6:5 9:16 23:14 25:21 40:1 53:17 67:21,23 76:3,9 78:2 95:1 104:2,4 105:6 131:21,22,23 134:24 135:1 139:20 152:18 159:10 164:1,7

**background** 65:19 69:5,8 70:13 133:24 137:20 168:15

171:20

**bad** 78:10,12 80:12 87:4

**badge** 84:9 163:16

**bars** 186:12

**base** 75:12

**based** 15:20 23:12 40:3,4 43:12 62:12,23 65:2 66:10 69:4,10 71:10 75:13,16,23 76:16 81:4 119:12 120:7 142:12 147:15 151:13

**basement** 164:22

**basic** 50:13

**basically** 75:14 127:6 164:19

**basis** 12:1 104:3

**battling** 128:19

**began** 8:19 9:22 14:15,23 156:13

**begin** 44:16

**beginning** 117:23 136:16

**behavior** 95:4

**behold** 155:24

**believed** 117:11

**Belinda** 106:21,22,23

**belligerent** 56:7 182:13 183:16

**belonged** 155:4

**belongings** 164:8 167:3,8

**beneficial** 137:12

**beneficiary** 82:24,25

**benefit** 28:12,14 74:9

**benefit-type** 74:11

**benefits** 20:18 25:5 28:3,14 156:16

**Benjamin** 13:4

**Berry** 102:23 111:7,13

**Berry's** 103:6 104:13

**Beth** 185:10

**Bethany** 101:22,25 102:3,6 115:5 119:11,20 120:6 122:21 135:11 136:5 154:21 171:16, 17 172:11,19 173:14 182:1, 18,22 183:3,6,12,13 184:3,10, 20

**Bethany's** 118:20

**bias** 36:6

**big** 119:16

**billionaire** 79:6

**binder** 97:9

**bins** 160:8

**birth** 187:3,9,10

**bit** 24:20 56:17 75:20 133:24 141:19 150:20

**blast** 27:5

**block** 128:5

**board** 106:3

**book** 81:15

**boot** 13:1

**boss** 51:18 52:3,20,21 53:19 59:1 68:5 107:18 109:6 170:16

**bother** 107:7

**bottom** 175:20

**bought** 186:9

**Boulevard** 187:8

**box** 159:2,3 165:21

**break** 5:9,10,12,21 18:2,3,6 67:18 85:6,11 115:23 116:4,8 131:15,16 135:2 175:9 186:21 187:19

**breakdown** 26:17

**breakfast** 186:12

**breathing** 179:25

**briefly** 6:3 12:21

**bring** 86:20 102:7 109:17 117:14

**broad** 19:21 171:9

**broke** 34:20

**broken** 20:22

**brought** 86:24 102:3 117:9,10, 25 118:2 155:3 156:21 158:10 183:2 184:15

**Brown-tezera** 106:21

**bubble** 59:24

**building** 56:25 57:18,20

**Bukowsky** 112:1,5

**bullied** 54:13,14,16,20 55:9,15

**bully** 54:4,7,20

**bullying** 54:3 55:8,23 56:11 57:6,15 86:10 87:20,22 101:23

**bunch** 163:17

**business** 10:11 20:16 25:15 116:24 117:3 119:1 128:8 133:9,17 177:13 181:19 187:2,4

**busy** 28:20,24

**C**

**cabinet** 97:11,17 155:8 156:13 160:7

**cabinets** 155:19 156:18 157:14 158:24 160:5

**California** 13:1,2

**call** 12:3 24:21 27:7 40:7,11 71:14 73:3 85:5 113:12,13 134:22,24 135:1 161:18 163:5 165:2 166:15,16 168:17 169:16 170:16 178:11,12 185:14,19 186:17

**call-ins** 180:16

**called** 7:15 26:3 44:24 64:10 71:9 75:14 82:20 87:11 105:25 106:2 144:19 155:23 178:13 186:1

**calls** 87:12

**camp** 13:1,2,7,9

**candidates** 62:23

**candy** 185:13 186:10,12,15

**candyman** 185:15,18,20,22,24 186:2,5,7,17,18

**capacity** 8:20 14:6 21:1

**car** 45:4

**card** 84:8,11

**care** 38:12 42:6 79:7 82:5 106:20 160:22 180:1

**career** 9:6,22 13:7 37:4 40:16 43:13 56:24 63:22,24 65:20 71:9 74:14 75:6,15 83:22

**Carolina** 13:8,9

**carrier** 11:3

**carry** 11:5

**case** 4:23 21:13 22:10 40:3 45:22,23 68:25 70:16 73:9 88:1 95:7 96:6,10 97:19 134:25 140:4 144:5 173:14 176:3,5 177:5

**cases** 40:4 46:22

**categories** 78:8

**category** 170:13

**ceased** 179:16

**cell** 164:25

**Center** 9:23,25 10:2,4,5 14:17 20:1 24:24 26:21 41:19 42:16 98:24 102:15 106:7 108:18,21 109:12,24 125:24

**Central** 30:25

**certification** 140:1,6

**CFR** 140:9 141:4

**chain** 107:9,17 109:2

**chance** 64:11 132:17

**change** 11:24 28:12 75:19 82:23,24 92:23,24 93:8,12,13, 18,20,24 95:9,11 152:25 181:15

**changed** 9:19 10:8,10 175:13

**changing** 60:2

**charge** 9:14 43:22 44:1 45:12 106:7 116:25 139:6 145:22

**charged** 44:11,12

**charges** 168:1

**Charles** 74:13 83:21

**check** 12:15 162:9 163:14 164:4 165:21 187:16

**checking** 178:1

**checklist** 162:7

**Chester** 165:25 166:1,10,21

**Chicago** 9:18

**chief** 29:24 30:2,3 106:11,14, 15 108:5 138:1,14 165:24 166:9

**child** 179:25 182:9

**chip** 84:9

**Chris** 17:20 96:1 103:21 104:15 105:5 116:4 134:25 152:14 172:13 186:25 187:15

**Cincinnati** 165:14

**Cindy** 111:18 112:1,5

**circumstance** 40:3

**circumstances** 22:11 40:5 45:22 46:17 96:11 177:5

**civilian** 12:13

**civilians** 12:4

**claim** 86:14,20 143:5 157:18

**clarification** 68:11 129:20,21 187:12

**clarify** 23:24 57:17 107:24 110:21

**clarity** 24:21

**classes** 8:2

**classification** 20:19

**clean** 26:4

**clear** 37:21 49:3,4,6 57:21 71:9 131:20 132:3 156:8 158:2 159:5 163:6,12,20,25 164:7,15,17,20 165:13,19,20 183:11 186:19

**clearance** 162:4,7 163:6,10, 13,21 164:2 165:12

**cleared** 156:7 163:17

**clearing** 156:4 162:6 163:24 164:10 167:16

**clerical** 171:21

**clerk** 8:21 13:4,12

**climate** 11:6

**close** 186:23,24

**closed** 62:2

**closely** 107:10

**co-worker** 115:3 119:9

**co-workers** 56:6 130:11

**code** 83:8,9 84:21,24,25 85:1

**coded** 81:2

**coke** 27:5 79:22

**colitis** 5:14

**college** 6:18 7:1 8:2 15:2

**collegiate** 7:24

**color** 33:25

**combat** 13:2

**combine** 62:23

**command** 107:9,17 109:2

**commitment** 18:14

**committed** 33:6

**Common** 147:5

**communication** 45:14 173:11

**communications** 27:7

**Community** 6:18 7:1

**companies** 81:18

**company** 8:15,16 33:2 37:2 81:13

**compared** 20:12

**compensable** 141:3

**compensation** 20:18,19 25:4, 6

**compete** 142:10,23 143:4,23 145:1,6,25

**competing** 143:1

**competition** 148:25

**competitively** 145:25

**complainant** 103:18

**complainant's** 103:15

**complained** 88:22 89:20 101:21 119:2,4 157:16,23 158:4 177:8,11 182:12

**complaining** 157:21

**complaint** 60:5,8,10,11 61:8, 10,12 88:21,25 89:3,16,19 108:23 109:4 110:4 112:4,12, 15,16,17,18,24 113:3

**complaints** 60:7 77:2 88:11, 16,18 89:9 90:4 101:24 102:3, 6,13,16,21 110:23 111:8,11, 14 112:9 182:15,18,19,20,22 183:18

**complete** 141:24

**completed** 8:12 25:17 136:4 156:18,19,24 164:20

**completely** 129:6

**completing** 5:17

**compliance** 95:16

**complicated** 129:13

**complications** 179:22,24

**compliment** 52:15

**comply** 18:22 19:2 86:12

**complying** 18:21

**component** 71:19,21,24 72:4

**computer** 84:10,12,13,15,18 93:14,15 94:14

**concern** 41:25 42:2 56:18,19 80:17

**concerned** 41:22 42:1 81:22 82:1 109:25 182:11

**concerns** 38:12 47:8,10 114:24 117:2

**concluded** 189:11

**concrete** 53:9

**concurred** 91:10

**condition** 40:16 148:18

**conditions** 60:3 188:6

**condone** 59:8

**conduct** 86:21,22 87:1 88:23 95:6 96:8 99:25 101:23 111:16 115:5 175:22 176:2,8, 12 181:2 183:7,24

**conducted** 4:6 74:24 183:19

**conference** 16:9

**congressional** 77:2

**conjunction** 42:17 116:23

**connect** 38:9

**consideration** 77:5,25 140:9

**considered** 7:24 12:6 25:8 36:7 38:4,5 73:6 76:19,23 90:14 127:13 142:12

**constitution** 93:7

**consultation** 27:9

**consulted** 27:12

**contact** 27:1 45:8 47:19 98:8 105:16,18,21,23 106:18 107:4,12,15 108:24,25 109:6 110:1 121:7,14 156:10,25 164:16,24 166:8,10,13,19

**contacted** 44:17 89:2 108:21 110:4 112:11 156:2,24 157:9,

10,13 164:18 165:18 166:12, 20 167:1

**contacting** 178:9

**context** 116:20 151:15 159:23

**continue** 6:15 45:16 130:5 179:9

**continued** 176:2,17,19 177:1

**continues** 45:15 176:12

**contractual** 14:11

**control** 108:4

**controlled** 106:8

**conversation** 110:18,22

**conversations** 110:10

**coordinated** 167:5

**coordination** 20:6

**copies** 94:6 100:7

**copy** 42:22 97:1 125:18,24 189:16,25

**corner** 172:17

**corps** 7:6,15,18 13:3 14:1,2,4, 13 15:7

**correct** 8:9 12:2,16 14:15,24 15:15 16:8 19:9 26:7 30:13 31:9 36:6,9,12 37:4,5,10 39:2, 18 40:25 41:24 47:16,21 48:8, 11,22 49:16 50:18 51:10,16 52:23,24 56:8,20 57:25 60:12 69:20,23 70:2,18 71:4 72:4, 17,18 75:25 76:8 79:10 85:18, 22 86:3,18,23 89:6,25 93:3 95:4,20,24 96:23,25 97:3,5,21 98:6,14 99:3,11 100:1 101:5, 14,25 107:13 108:16,25 109:7 110:24 112:25 113:24 114:7, 10 115:10 118:13,14,24 119:5,10 120:2,12,25 121:3,4, 5,8,15 122:7,21,22 123:10 124:1 125:6,9 126:22 127:16, 25 128:16 129:1,4 132:23,24 134:9,11 139:17,19 140:19 143:9 144:1 145:1,2 146:4,5, 8,19 147:2,17,21 148:3 149:5, 6 150:12 151:7 152:13 153:4, 23 154:6 157:15,19 158:25 159:1,8,9,13,22,23 160:15,23, 24 161:5,12,15,20 168:12,22 169:3,13,20 170:4,19 172:1,8, 11,12 173:22,25 174:9,17 176:14,20 180:6 181:5 183:14,17 185:2 188:22

**corrected** 158:4 175:11 184:21

**corrective** 21:12 43:24 80:19, 20

**correctly** 167:23

**counsel** 129:22,23 130:25 184:1

**counseling** 45:23,24 80:19 92:1 94:6,8,15,16 95:3,15,24 96:7,10,17,23 99:10,15,22 100:9 101:1 114:8,15 115:13 172:11,19 173:19,25 174:8,20 175:19 181:9 182:5 183:20,24

**counselings** 90:13,15 92:8 94:11 100:17 101:4,19 115:5

**count** 25:12

**country** 30:7 141:17

**couple** 29:9 113:17 163:18 165:7

**courses** 7:11,12,13,16,23 15:4,6,14,23,25 16:1,7 36:5,8

**coursework** 15:16

**court** 4:4,21 88:7 131:25 134:25 189:13,18,22

**covered** 19:21

**covers** 57:11

**COVID** 118:23,25 119:4,7,8, 10,12,16,23 120:2,4,12 121:1, 8,15 122:1,3,5,7,10,13,20,22 123:10,25 126:6,8,14

**create** 175:17

**created** 25:15 106:5 125:4

**credit** 7:17

**criminal** 169:19

**criteria** 68:4,9,23 69:12 78:17 148:21 188:8

**critical** 76:19 78:14 145:10

**CROSS** 6:1

**crucify** 180:9,13

**crucifying** 182:10

**cubicle** 156:14 157:14 158:10, 19,20 161:8 164:8 167:2

**cubicles** 159:24

**current** 10:4 20:15

**customer** 37:23,24 129:15

**customers** 37:1,21,25 38:1,4, 5,7 78:16 83:24 182:12,15

**cut** 180:20

### D

**da-da-da-da** 65:20

**dad** 175:8

**Darnbrook** 67:8 88:5

**Darnell** 140:6

**data** 68:16

**database** 82:20 83:3,5,8 84:22 116:21

**databases** 84:18 85:3

**date** 10:9 62:2 83:8 98:18 117:16,24 118:1,10 133:15,20 134:2 136:17 161:25 172:7 173:9 174:13 187:3,9,10

**dated** 16:25 139:24

**dates** 25:21 81:2 98:17 117:10 172:22 174:10

**day** 43:17 136:5 159:18 161:23 164:12 166:4,5,6,14, 18,22,23,24

**daycare** 180:1 181:16 182:8

**days** 21:25 77:5,9 81:20 166:25

**deal** 39:15 179:23

**dealing** 16:2 68:16

**dealt** 27:4

**death** 58:11

**deceased** 126:18 134:9 155:4 157:8

**December** 16:25 136:15 176:19

**decide** 13:23 64:7 147:25

**decided** 15:17 26:25 171:11

**decides** 16:14

**decision** 22:12 69:16,17 71:1, 3,4 72:16 121:19 146:25 171:12 176:11,15

**deems** 144:13

**define** 59:5,7

**defined** 37:23

**degree** 15:3

**delegated** 106:9

**delivered** 167:4

**delivering** 78:16

**delivery** 78:15

**demoted** 76:13

**demotion** 83:2

**Denis** 17:5

**department** 9:4,8,20 14:8,14 18:12 21:11,21 22:6 23:2,3 24:13,15 25:3,4,5,6,7,18 27:3, 4,11,15,20 28:13,15,18,19,20 29:15 33:7 35:21 36:25 37:1 38:19 41:4 46:21 48:16 67:3 68:18 69:5 70:2 73:22 74:12, 16,22 83:19,22 102:19 119:13 139:20,22 150:22 163:14 164:18 172:6 182:21

**departments** 27:2 73:15,23 163:11 164:17

**depend** 23:23

**depending** 40:5 62:5 175:22

**depends** 63:21 145:9

**deposition** 4:5,18 103:10,14 104:15,19 128:20 132:7 189:11

**deputy** 106:25 165:25 166:9, 20

**describing** 12:14

**description** 73:2 117:6

**designation** 41:16

**designee** 163:14

**desk** 119:17 121:9,13,19,21 122:4,5,11,19 152:25 155:20 160:5 161:1

**desks** 135:22

**destroy** 98:12

**destroyed** 99:23 100:1 101:18 175:21

**destruction** 98:17,18 99:7

**detail** 11:8,10,15,17 12:2,3,5, 7,14,16

**determination** 23:15 70:15 81:3 123:25 145:4 169:15

**determine** 44:15 68:4,9 72:14 143:7 147:6

**determined** 23:6 65:1

**determines** 76:23

**determining** 78:19

**Detroit** 8:25 9:9,13,25 10:2,4, 22,25 11:2,24 19:23 24:3,4,19 25:10 26:1,20 41:3,18 42:16, 21,22 43:9 46:9,21,24 47:10 61:14 66:21 67:1 80:3 88:18, 24 101:10 102:14 105:17,23 108:8,10,17,20 109:12,24 117:2 125:23 126:1 165:17 187:13

**developed** 15:5

**device** 84:13

**diatribe** 129:6

**Diego** 13:1

**difference** 20:10 73:3 96:18 133:25 141:20,21 187:24,25 188:7

**differences** 20:11

**differently** 44:16 56:1 73:16

**difficult** 16:2 104:24 179:25 180:2

**dig** 43:2

**dignity** 102:12

**direct** 22:6 43:16 87:14,22 106:18 109:3 177:13

**directing** 85:15

**directive** 137:25

**directly** 39:14 46:11,12 51:24 69:24 102:4 107:12 109:17 129:1 133:6 142:11 150:15,19

**director** 24:25 89:22 105:21 106:7,12,17,20,25 108:21 109:23,24 138:3,4,13,25

**directors** 107:6

**disabilities** 140:11 146:4

**disability** 34:3 140:8,19 141:1, 2,3,12,14,16 142:13 143:25 146:18 147:2,6,10,11,15,17, 25 148:2,8 149:12,18,22 150:7 151:2,22 152:2,3 188:1, 14,16

**disabled** 140:24 141:20 188:1, 14,18

**disagree** 32:4 70:19

**disagreed** 30:20

**discharged** 8:8,10

**disciplinary** 21:24 23:1 45:17 76:12 90:8 91:19 92:11 95:9, 12 96:5 114:9,14,21 115:2,7 168:23,24 169:25 170:21 175:23 176:1,9,11 181:3

**discipline** 21:6,8 26:25 27:17,

18,22,25 32:13 39:9,16 46:5 50:15 52:19 90:14,22 114:23 168:21 170:7,8 181:8,12

**disciplined** 26:24 49:21 90:9 113:24 114:6 181:4

**disclosed** 184:5

**discovery** 91:23

**discretion** 21:23 65:17 170:25

**discrimination** 34:7,19,23 36:7

**discriminatory** 36:7

**discuss** 147:16,17

**discussed** 111:10 127:3

**discussions** 40:12 111:9

**displeasure** 92:4

**disposed** 98:19

**distance** 159:24

**District** 9:9,10,12,13 56:24

**districts** 9:9

**Diversity** 17:3,11

**doctor** 144:2 148:3,9 149:18 151:3 152:3 153:13,20,21

**doctor's** 143:24 144:10 152:2, 10,11 154:1 173:4

**doctors** 26:14

**document** 16:24 17:16,18 21:15 93:9 94:19,25 100:9,14 103:2,4 104:4,5 105:5,6 115:22 118:9 137:24 139:24 143:16 158:11 160:11 173:24 175:18

**documentation** 47:4 120:24 143:6,11,13 148:15

**documented** 182:17

**documents** 61:25 75:1 102:9 103:9,11,13,22 104:21 116:18,19 118:5,6 137:23 139:4 140:1,3 144:16 150:16 154:17,19 155:15 156:15 157:4,19 160:8,9,21 161:10

**dollars** 64:20,21

**Donald** 79:5 111:19,20,23,25

**door** 107:5,8 121:20 122:6 158:20

**doors** 158:23

**Doyle** 4:9 12:10,17 17:14,23 18:17,24 19:3,10 22:3 28:6,21 29:6,12 30:14,21 31:10,18 32:1,6,19,25 33:13 34:11,21, 25 35:24 36:13,20 37:11,16 39:3 42:14 43:6 44:4 45:19 47:11 48:17,24 49:7,23 50:11, 19 51:11,19 52:8,25 53:4,20 56:9,13,21 58:3,14 60:20 67:8,17 70:20 71:5 72:5 74:3 77:14,17,21 78:4 81:24 82:3 84:3 85:9,23 86:4 87:8 90:11 91:6 96:2 98:15 99:4 100:2 102:1 103:25 104:3,23 105:2, 8 109:8 114:11 116:6 120:21 121:10,16 122:8 125:21 128:1 129:19 130:1 131:21 132:6 138:9 146:9,13,20 147:3,12 149:14 152:15 154:7 162:20 168:9,13 169:10,21 170:5 172:15 175:5 176:21 179:11 180:19,23 184:4 186:20 187:17 189:8,22,24

**draft** 21:15

**drawer** 99:18 160:7

**drawers** 155:20,24 158:25

**drilling** 56:2

**duly** 4:12

**duties** 19:17,19,24 20:4,11,13, 16 49:10 82:16 109:14 171:22 185:1

**duty** 30:15 86:22 87:3,4,7,10 117:6

**duty-related** 141:2

**dynamics** 22:2

**E**

**e-mail** 103:23 118:1 137:6,13 138:14,17 139:1

**e-mailed** 94:25 172:16

**e-mails** 136:25 137:3,9

**E-R-I-C** 88:8

**E5** 8:11

**EAP** 182:4

**earlier** 5:8 30:9 40:25 42:8 56:23 70:7,9 78:13 82:8 83:14,18,20 89:4 116:24 118:11 142:23 162:16 168:4 169:24 177:16,17,20 181:13 187:1,24

**early** 117:17

**earn** 75:21

**earnings** 155:4,25 156:20 157:8 161:2,7

**easier** 17:20 19:21 52:13

**easily** 57:7

**easy** 13:13

**ebb** 28:23

**education** 69:4,8 72:2,3

**educational** 6:8 7:10 126:10

**EEO** 102:15,19,20 111:19 112:7,17 140:2 187:13

**effect** 74:17 76:13 113:22

**effective** 83:8

**effectively** 42:10 55:10

**effects** 57:2

**efficiently** 43:5

**elect** 143:20

**election** 28:12

**electronic** 92:9 98:21 103:17 115:12 116:21 144:14,17,19 189:18,20,25

**elects** 82:23

**eligible** 145:15 148:6,18

**emphasis** 91:14,15,17

**employable** 142:7

**employed** 26:2 53:18 105:13 188:21

**employee** 20:2,8,13 21:2 23:18 24:16 27:10 28:11 29:14 38:18,25 39:18,22 40:1,6,14,17 43:23,24 44:17,24 45:10,12 46:14,19 47:7 48:6,9 50:9 51:21 52:22,23 53:22 54:13,14,15,16,23 55:3,14 60:3 65:5,23,24 66:2 67:1 68:3 75:3 76:17,22 80:4,16,23 81:14 82:22,23 84:7,17,24 86:19 88:15,19 89:9,20 90:19,20,23 91:18,21 92:12,14,24 93:3,7,11,12,16,23 94:8,20,22 95:1,5,10 96:12,16 97:4,14,15 98:13,22 99:16,20,23 108:20 109:11,15 112:6,7,22 114:18 115:17 117:7 119:8 122:9,18,23 124:11 127:12 129:15 131:4 133:4 134:10 140:25 141:24 147:1,14 148:13 152:19,22 153:2,5,7 154:9 157:8 160:15 162:2 165:19 168:6,15 170:11,13 173:11 175:14,16 177:5 178:17 181:9 185:19 186:8

**employee's** 44:16 45:7 55:9 60:4 78:7 80:10 86:19 89:19 92:9 93:24 97:17 177:25 179:14

**employees** 16:2,11 17:1 18:22 19:2 21:10 23:3 24:7 25:2,7,11 26:9,13,15,20,22,23 27:18,23 28:3,10 29:3,14 33:8,25 35:12 36:17,23 37:3,12,18,19,25 38:2,23 39:9,14,15,16,22 41:22 42:1,2,5 43:11,12,14,15 46:5,10 47:14,17,21,24 48:2 49:9 50:23 51:1,5,12,16,17,21 53:25 54:4,5,7,8,12 57:11 60:6,11,13 61:15 64:13 65:7 66:23 70:3 79:2,4 81:4,9 82:5 83:16,24 88:11,12 94:24 101:19 102:18 108:3 109:12,19 111:10,11 116:17,22 117:2,5 119:16,18 123:7,12,23 124:3,6,16,18 125:7 130:11 132:20 137:10,25 138:13,18 144:20 146:12 153:14,22 156:13,16 157:16 158:13 159:8 165:15,16 177:18 178:9 181:17,20,21,22,23 182:12,16,20,25 185:3 186:13,14

**employees'** 116:16 126:5 127:4 128:8 162:18

**employer** 52:20

**employers** 81:22 82:1,5

**employment** 5:1 6:3 17:2,10 40:16 134:13 168:8 169:2 186:4 188:5

**encompass** 20:16 30:6 138:5

**encompassed** 30:8

**end** 25:25 29:22 136:15 164:2

**ended** 124:23 180:3

**enforce** 16:18,21 31:6,9,17 35:20,22 39:21 50:4,8,15 59:6 85:21 87:6

**enforced** 30:13 36:2

**enforcement** 42:10 43:4,21 44:2

**enforcing** 18:20 19:8

**engage** 62:15

**enjoyed** 14:14

**enlisted** 7:6

**ensuring** 19:2 33:7

**enter** 84:14,24 85:2

**entered** 119:18,20

**entering** 121:23 135:14

**entire** 24:14,25 137:13

**entities** 86:25 124:14

**entitled** 104:9 151:23 152:4

**entries** 83:4

**entry** 71:13 83:3,5 122:24

**environment** 60:3 61:2,3

**environments** 60:16,25

**EOPF** 92:10,13,14 93:9 98:22 116:16,21 117:12 139:5 157:3,5

**Equal** 17:2,10

**equated** 7:23

**equation** 123:19

**equipment** 156:11 163:15

**equitable** 34:5 53:24

**equity** 33:6

**equivalent** 26:20 29:11

**ER** 27:19 59:14

**ER/LR** 20:3,8,13,17 21:8,12 24:4,18 27:14 100:14

**Eric** 4:11,19 29:23 88:4,8 89:11 90:1 108:6,13,15 110:2,3,11,19 118:8 120:21 121:3 138:2 171:16

**Erica** 101:22,25 102:2,6 111:15 115:3,4 118:20 119:9,11,20 120:6 121:25 125:4 135:11 154:21 171:17,18 172:19 182:18,22

**establish** 91:2 143:25 150:24

**ethics** 16:2

**event** 164:12

**eventually** 9:12 139:23

**evidence** 23:8 61:9 117:24 169:17

**exact** 25:12 50:21 65:12 117:16 133:20 183:9

**EXAMINATION** 6:1

**examinations** 132:5

**examined** 4:14

**excessive** 76:8 78:1 82:1

**exchange** 167:5,10

**excuse** 8:16 19:20 50:22

134:8 160:10 162:15 166:4 188:10

**exercising** 60:4,7

**exhibit** 17:22 32:22,23 54:2 85:15,17 115:22 116:5 171:15 172:10

**exists** 171:4

**exit-entrance** 165:6

**exiting** 165:6

**expect** 47:14 48:2,6 50:16 52:4,17 53:19,23 89:3

**expectation** 47:22

**expectations** 48:10 49:9,11

**expected** 47:15,20 50:23 51:5, 13 54:12 75:4 86:11,13 127:10

**expects** 85:21 86:8

**experience** 13:15 36:22 65:20 66:10,14 69:4,9 70:14 71:11 72:1 81:23 142:21

**experienced** 32:16

**experiences** 71:23

**expert** 73:6 83:20 127:14 139:15 140:21 151:24 152:9

**expertise** 74:25

**experts** 62:16 74:18

**explain** 37:22 49:17 55:22 73:1 78:22 82:18 91:15 127:23 129:24 131:12 132:6, 8,11 136:6 162:2 163:8 187:25

**explained** 38:17,21 40:25 49:5 70:9

**explaining** 132:18 185:1

**explanation** 128:21,23 132:4, 15,16 180:5

**exposed** 120:1,4 122:1,3,5,7, 10

**extend** 104:18

**extended** 83:2

**extent** 17:15 109:9

**extraordinarily** 53:7 105:3

**extremely** 28:24

**eyes** 48:14

F

**fabrication** 8:15

**face** 133:3

**facet** 15:10 49:9

**facets** 20:17 141:9

**facilities** 8:25 30:5 138:5

**facility** 11:10,21 20:4,6,23,25 24:24,25 26:4,11,12,16,18 27:14 29:1 30:16 37:25 38:2, 11 42:21 46:23 51:3 67:2 89:22 102:18 106:11 108:1,4, 8,9,10 109:16 119:14,15,18, 20,22 121:23 122:10,13,23,25 123:11,15 124:5,13,15,25 126:1 156:4,5,7,8 162:4,5,6,9 163:11 164:23 165:16,18 171:23 182:7

**facility-specific** 41:19

**fact** 40:3,4 45:22 46:17 61:13 96:11 177:5

**factor** 76:10

**factors** 76:15,18

**facts** 63:14 81:4

**fail** 43:19 165:13

**failed** 45:9 135:7 154:24 156:3,6 165:19

**failure** 134:14 136:23 162:16

**fair** 5:5,12 13:18 15:4 16:5,10 18:23 28:19 32:12,18 35:15 48:5 49:21 50:4 51:7 52:6,15, 16,17,20,21,23 53:19,24 64:5 113:7 122:4 128:24 132:4 133:6,7 136:22 147:11 158:3 159:11 160:11,12 163:2 176:15

**fairly** 35:13 52:3 53:19,23

**fairness** 50:13

**fall** 29:22 64:23 136:20,21

**falls** 20:20 148:18

**familiar** 63:20,21 85:17 105:12,14 112:2,13 140:12,15 141:4,6 146:6

**familiarity** 68:25

**families** 38:7,9,11,14 79:8

**Farmington** 6:12,14

**fatal** 56:25

**fear** 17:3

**February** 117:19,20,23 139:24

**federal** 4:20 9:19 10:19 12:18 15:18 98:22 169:6

**feedback** 138:7

**feel** 52:2 83:24

**feeling** 44:18,22

**feelings** 33:21,24

**feet** 159:25

**fell** 107:25

**felt** 29:13,16 119:2 156:25

**field** 14:5

**figure** 52:14

**file** 91:24 92:2,6,9,10 94:10 97:2,11,17 98:21 99:25 101:18 103:17 104:6 115:9, 13,14,18,20 117:7 144:11,12, 14,17 149:7,10 155:7

**filed** 20:7 112:17

**files** 101:13 126:5 132:21 133:4 149:3,8,11 158:7 162:18

**fill** 14:7 28:17 145:11

**filled** 29:17 106:5

**final** 23:14 63:1,7 70:18

165:22 168:24

**finally** 165:23

**find** 51:2 91:25 103:1 104:12 109:5 115:10 117:8 155:1,24 156:20 160:21 164:25 165:4, 10 182:8

**finding** 61:13

**fine** 18:5 67:16 103:11 105:10 116:2 137:14,22 158:5

**fined** 169:5

**finish** 161:9

**fire** 21:5,7

**fiscal** 164:3

**fit** 11:11,20,23 181:24 188:8

**fits** 22:10 72:7

**Five's** 116:1

**five-minute** 18:2,3 85:5,6 115:23 116:4 131:15

**flareup** 5:15

**flat** 45:1

**flow** 28:23

**focus** 19:22

**folder** 94:22 97:6,8,10,16

**folks** 37:2 38:3 118:25 119:23

**follow** 21:20 50:23 51:5 52:4 54:12 134:14 135:7 136:23 139:11 154:24 156:3 162:16

**follow-up** 153:13

**food** 79:8

**foot** 121:20

**Ford** 27:3

**foremost** 74:18 184:14

**form** 12:10,17 18:17,24 19:10 22:3 28:6,21 29:6 30:14,21 31:10,18 32:1,6,19,25 33:13 34:11,13,25 35:24 36:13,20 37:11,16 39:3 42:14 43:6 44:4 45:19 47:11 48:17,24 49:7,23 50:11,19 51:11,19 52:8 53:20 56:9,13,21 58:3 60:1,20 70:20 71:5 72:5 74:3 77:14,17 78:4 81:24 82:3 84:3 85:23 86:4 87:8 90:11,14 91:6 94:14 96:2 98:15 99:4 100:2,4,6,9,10,12, 13,16 102:1 114:11 116:19 121:10,16 122:8 125:21 128:1 141:24 144:17 146:9,13,20 147:3,12 148:15,21 149:14 152:15 154:7 165:12,21 168:9,13,20 169:10,21 170:5, 7,8 176:21 179:11 188:10

**formal** 114:14 115:7 181:12

**forms** 59:25 100:8 158:12 169:24

**Fort** 13:4

**forward** 17:22 103:22

**forwarded** 62:3

**found** 14:9,13 72:13 154:17, 19 155:2,6,7,15 156:1,15 157:18 158:12 159:16

**foundation** 43:7 74:4 77:18 109:9 121:11,16 122:8 125:22 169:11 176:22

**frame** 117:23

**frankly** 177:12

**Fred** 102:24 111:23,24 187:13

**free** 34:6 59:23

**frequent** 113:11,12,13,18

**freshman** 6:25

**Friday** 40:8

**front** 42:23 64:11 75:1 90:16 102:9 119:17 121:8,13,19,21 122:4,5,11,19 123:24 125:15 136:14 171:2 179:14 183:4

**fruition** 14:6

**frustrated** 131:14

**full** 26:19 29:11 33:9 71:14 73:1,5,11 75:3 91:19 127:13 139:13 186:11

**fully** 38:24 64:3

**functions** 20:9

**furnace** 27:5

**future** 97:17 99:9 175:22 176:7 181:1

G

**G-12** 10:15 63:19

**G-14** 64:5,8

**G-5** 71:2 72:17

**G-6** 68:23 72:17 172:1

**G-7** 63:18 71:2 72:17

**G-O-N-Z-A-L-E-S** 88:6

**gamut** 91:19

**gap** 122:12

**Gary** 118:19 126:18 134:9 155:5 157:3 161:2 162:19

**gather** 23:8 61:9 164:7

**gathered** 167:4

**gave** 55:21 66:18 74:20 102:10 128:21,23 137:10 162:13 164:25 167:7,15 168:4 171:15 175:9

**gender** 34:1

**general** 6:24 10:18 38:22 146:17 177:3

**generalist** 82:17

**generally** 6:23 27:17 44:21 52:6 60:18 62:10,14,25 63:8, 11 69:2 99:18 106:1 152:22 181:17 189:16

**genetic** 34:3

**gentleman** 74:13

**gentleman's** 111:22,24

**George** 118:20 126:12

**Georgia** 98:24

**get along** 102:10 107:1

**give** 24:20 28:8 32:13 40:12 44:13 49:19,21 52:15,17 59:10 63:7,14 68:24 79:21,24 80:3 93:22 97:1 98:7 106:13 113:13 116:20 132:17 137:18, 20 147:8 150:16 153:22,24 154:3 159:23 175:15 181:12 187:2

**giving** 33:19 136:2

**glass** 186:10

**Gonzales** 29:23 88:4 89:11 90:2 91:10 108:6,14,15 110:2, 3,11,19 118:8 121:3 138:2,17

**good** 11:11,23 33:11,12,17 34:8,9 35:21 37:15 52:1,3 55:4 57:24 58:2,6,10,12 67:11,17 83:25 91:4 116:1

**governed** 50:24

**government** 10:19 12:9,18 15:18 169:6

**grade** 63:23,25 64:1,16 69:14 71:13,14 74:7 75:13,17,18

**grades** 64:13,16 69:3 75:6

**graduate** 6:6

**graduated** 6:10

**graduation** 6:16

**granted** 152:13,20

**great** 138:15

**greater** 8:25 9:10

**grid** 62:8

**grievances** 20:7

**group** 25:19 137:13 157:22

**Gruber** 106:15

**GS** 10:17,20 63:17 64:10,13 66:8,13,18 68:5,6 75:11

**GS-12** 20:2 21:1 66:13,17

**GS-13** 24:2 64:8,18,20 65:3,15

**GS-14** 10:16,23,24 64:19,22, 24 65:3,15,21

**GS-5** 69:1,12 139:16

**GS-6** 68:6 69:12 172:2

**GS-7** 69:12,16 70:16,22,23 71:16 73:8 127:12 139:12

**guess** 42:5 44:13 82:15 136:13 169:4

**guidance** 42:4

**guidelines** 41:4,5,7

**guy** 52:15

H

**H-A-R-R-I-S** 187:13

**H-O-L-C-O-M-B-E** 187:7

**hackers** 84:1

**half** 7:21 12:23 13:20 14:2 179:13

**hand** 68:25 109:22

**handbooks** 40:20 170:20

**handle** 42:5

**handled** 70:8 96:7

**handling** 117:1

**happen** 31:22 41:12 75:18 81:3 83:15 151:21 161:4 179:16

**happened** 46:4 57:19 110:9 114:25 165:9 166:24 167:6,13

**happening** 96:11 165:7

**harassed** 55:9,15

**harassment** 34:7 35:3 54:23, 24 55:2,3,6,8,23 56:11 57:2,6, 15

**hard** 145:11 153:22,24 154:3 189:16

**hardship** 146:19 147:7

**Harris** 187:13

**Harrison** 6:12 13:4

**Hatch** 16:2

**he'll** 132:9

**head** 24:25 105:12 107:19 108:16,17,18

**headquarters** 30:24

**health** 28:12 50:24 82:23 92:24

**healthcare** 26:7,11,12

**hear** 138:6 180:21 184:10,21

**heard** 111:18 184:20

**held** 9:7 99:9

**helped** 7:17

**helping** 123:15

**helps** 73:9

**hey** 29:9 109:6 161:4

**hierarchy** 24:13

**high** 6:6,8,10,11,12,16 159:25

**higher** 9:16 66:13

**highest** 66:15

**Hills** 6:12,14

**HIPAA** 151:16,17,24

**hirable** 142:8

**hire** 21:5,7 66:22,25 67:3,5,24 142:12 143:7,20 144:5 148:1 171:15,17

**hired** 8:21 14:19 20:2 48:2 65:18 66:18,19 67:6,25 70:22 72:14,23 108:10 127:12 136:19,20 139:17,18 140:20 141:10 142:24 143:2,9 148:14,23 171:20 172:1 174:4,6,7 184:23,25 185:5 188:6,14,19

**hiring** 21:9 61:15 63:4 68:3,6 70:1 140:10,14,15,16,21 141:5,22 142:11,25 143:18,22 144:18,19 145:8 148:22 149:20,21 150:15,19 151:1, 11,12 188:4,17,18

**history** 6:3

**hit** 128:5 137:6

**hits** 5:16

**Holcombe** 187:7

**hold** 10:12 17:14 52:25 53:4 76:3,9 78:1 131:5 159:4 181:7

**holder** 84:11

**Hollenquest** 134:9 155:5 156:21 161:2

**Hollenquest's** 118:19 126:18 157:4 162:19

**home** 118:5

**honorably** 8:9,10

**honored** 153:4

**hope** 186:19

**hospital** 26:1 38:8 106:4,6

**hostile** 60:15,24 61:1,3

**hour** 44:19,22 45:13 173:17 178:4

**hours** 67:9 123:8 124:17 130:23 163:18 164:10,12,13, 21 165:7 177:20 178:5 180:24 181:19 186:21,23

**house** 84:19

**Houston** 4:2 10:5,12 11:1,2,7, 13,18,19,24 12:1 97:19 187:8

**how's** 105:7

**HR** 10:7 13:24 14:16,18,22 15:3,4,8,15,17 16:7 19:24,25 20:12,20 22:17,25 23:1,19 27:1,2,3,4 30:10 68:13,19 72:10 74:19 82:16,20 83:7,10 84:19,22 92:18 107:25 108:2, 3 109:12,15,18,25 116:16,17, 22,23 117:4 119:13,21 121:19,21 122:17,18,19,23 123:11 138:15,18 144:20 152:8 163:21 182:8

**HRO** 20:16

**human** 9:2,5,24 10:1,7,10 14:9 15:8,10,12,18 16:12,15,17 18:10,11,15 19:16 20:14,17, 21,23,24 22:5 23:6 24:2,7 25:9 27:11 28:14,23 29:24,25 32:15 34:9 35:15 36:4 38:3,9, 13 50:2 67:4 68:25 108:5 138:1,14 141:7

**humans** 56:1

**hundred** 122:16

**hundreds** 26:18 50:21 83:4

## I

**idea** 16:6 33:11,12,17 34:8,10

**identify** 168:3

**identity** 34:2 84:8 154:12 157:1,6 161:14,15 167:18,20

**Ignorance** 50:22

**illegal** 130:13,18 147:24 148:1 150:25 151:3

**illegally** 184:16

**Illinois** 9:18

**impact** 38:19 55:13,14 177:17

**impacts** 177:21

**implore** 86:25

**importance** 42:8 48:14,22 49:17 95:3

**important** 35:20,22 36:17,18, 23 37:6 48:5,16 49:5,15,16 50:16 54:23,25 58:7 79:2,3,14 125:17

**impossible** 103:11

**imprisoned** 169:5,9

**improper** 84:16 127:4 128:7 157:2 183:7

**improperly** 116:15,17 117:12 130:10 131:2

**improve** 95:4

**improvement** 95:8

**incident** 134:16 137:18 167:12

**incidents** 176:8 181:2

**include** 48:11 49:11 150:17

**included** 38:5 41:23

**includes** 19:8

**including** 26:14 34:1 46:2 60:9

**Inclusion** 17:3,11

**inclusive** 34:6

**incorrect** 120:3,14 124:2 157:22

**increase** 75:15 76:1,2,3,14,16 77:7 78:2,11,25 79:10,13 80:3,12,14,22

**increased** 45:17

**increases** 75:17,22 76:24

**increments** 43:11 173:16

**independence** 21:22

**independently** 62:18 139:14

**Indiana** 13:5 30:8 138:6

**individual** 55:25 63:10 70:15 81:4 126:19 140:7 142:9 145:6 155:5 188:5

**individual's** 71:10

**individuals** 102:22 156:1 161:2

**industries** 41:16

**inform** 143:14 174:20

**information** 34:4 51:1 68:15 82:21 84:19 93:4 97:13,15,21 98:8 116:22 128:7 137:12 151:11 164:4 175:16

**infraction** 22:11,15

**infractions** 43:25 49:20 76:7 99:20 114:7,10 170:22 171:9 174:16 181:4,5,7

**infrequent** 113:9,18

**initial** 61:6

**initially** 8:21 14:3 66:2 68:15 183:22

**initiator** 27:25

**input** 62:17

**inquiries** 28:9

**inquiry** 28:2 61:7

**inside** 108:8

**instance** 86:10

**instilled** 14:12

**Institute** 7:15

**instruct** 133:14

**instructed** 133:8 150:23 158:24

**instruction** 137:10 163:20 164:20

**instructions** 134:14 135:7 136:23 139:11 154:24 156:4,9 162:17 163:24

**insurance** 82:23,25 92:25

**Integrated** 30:4

**intellectual** 140:8

**interact** 23:19

**interaction** 56:5

**interactive** 147:19

**interest** 15:5

**internal** 65:4 145:19

**interpret** 58:25 59:8,11,12

**interrupted** 134:21,22

**interview** 61:10,12 62:9,12,20, 22,23

**interviewed** 62:10 118:22

**interviews** 61:9

**investigate** 86:14,25

**investigated** 61:8 88:12

**investigation** 86:21,22 87:1 89:5

**investigations** 77:2

**investigator** 112:9,11

**involved** 27:22 73:14 89:5 102:14,21 165:8

**involvement** 27:6

**involves** 87:22

**involving** 98:13 176:8 181:2

**irrelevant** 33:20 75:12

**issue** 22:13 23:15,16 41:21 47:2,3 80:17 109:14 116:15 154:16 161:15

**issued** 46:11 76:22 94:11 110:8,9 114:14,15,23 162:12 163:9 172:10 173:19

**issuer** 21:19

**issues** 41:20,23 90:18 117:1 139:10

**issuing** 28:14

**items** 159:1,3

**J**

**Janice** 69:18 72:19 144:7 150:4,23

**janitors** 26:1,3

**January** 7:5 117:19,22 136:16

**Japan** 13:5

**jars** 186:10

**Jerry** 97:25 98:8 113:2

**job** 13:3,13 18:13 19:5,16,24 30:10,11 31:1,9 32:12,14 38:15 49:10 55:10 66:16 102:17 117:5,6 130:9,10 136:24 138:15 139:12 141:6 160:18

**jobs** 16:17 61:23 142:23 145:17

**joined** 7:5

**judge** 125:18,19 129:11,12 131:13

**judgment** 170:15,16

**juice** 186:11

**July** 11:9 172:11 176:18 179:7

**June** 11:8 187:10

**jurisdiction** 25:8

**juror** 58:9

**jury** 59:20,21 129:24

**justified** 169:8

**justify** 143:24

**K**

**Kazan** 165:24 166:9

**keyboard** 84:12

**keys** 156:6,7,11

**kid** 180:16 182:14

**kind** 11:22,25 16:7 24:20 52:5 70:9 73:1 99:18,24 104:20 115:13 132:5 151:20 184:25

**knew** 48:15 79:24 112:14 154:1

**knowledge** 4:25 75:12 88:24 90:5,6 99:6 110:14,17,25 111:5 113:5 150:8 152:5 169:13,22

**L**

**labor** 9:4,5,8,16 14:8 15:25 20:8,11 21:2,21 22:18,20,23 25:4,18 39:12 46:21 89:13,15

**lack** 148:24 173:13

**ladder** 63:22,24 71:9 75:6

**late** 40:6 41:8,11,17 43:16,20 44:19 75:24 76:7 77:5,9 81:19,20 113:6,19 173:15 176:17 177:22 178:6,11,14, 15,16 179:9

**lateness** 76:8 82:2

**law** 50:22 146:16 152:4

**laws** 146:2,3,6,12

**lawyer** 85:7 127:23 132:16 140:2

**lead** 8:4 46:1 56:7,12 57:13 58:11 95:11 176:8,10 181:2

**leader** 14:2

**leaders** 106:3,10,11

**leadership** 11:11,21 15:23 33:6

**learn** 51:13

**learned** 16:18 36:5 152:8

**leave** 10:25 23:16 40:5,9,10 42:22 43:10,12,13,15,23 44:2, 8,11,21 45:2,4,6,13 47:18,19 81:9,10,11,14,15,16,19 83:2 85:7 97:19 152:19 153:11,15 155:3 156:20 157:7 161:7 164:9 172:23 173:1,3,6,12,15, 21 178:18 179:14

**leave-related** 41:20,21,23,25

**leaves** 155:24 160:17 163:12 165:10

**leaving** 162:4 167:15

**led** 90:18

**left** 10:22,24 11:2 24:3 68:18 136:5 156:4,8 161:17

**legal** 14:5 133:24

**Lejeune** 13:7,9

**letter** 11:3 103:15 139:25 140:5 141:25 142:7,14 143:8, 24 144:9,10 148:16,20 154:25 162:14 163:4 174:19,20 176:6 179:8

**letting** 52:16 138:15

**level** 9:15,17 10:14,16 68:5 70:22,23 71:13,14,15,23 72:14 73:2,5,8,12 75:4,11 87:23 88:1 96:5 127:13 139:13,14,16

**liaison** 108:7

**lies** 22:13

**lieu** 143:21 170:9

**life** 20:18 25:5 82:24 141:17

**lifting** 152:23

**likes** 54:19

**limitation** 152:23

**limitations** 99:7 142:2

**limited** 105:24 107:4

**limits** 98:20 115:16,17,19

**Linda** 106:22

**list** 7:14 123:11 124:1 125:3,9, 10,12,15,16 126:1,2 142:5

**listed** 137:5

**listing** 15:21 16:3

**livelihood** 168:11

**lo** 155:24

**Local** 27:5 79:22

**locally** 165:17

**located** 6:13 164:24

**location** 4:5 6:11 39:8 57:14

**locked** 94:12 121:20 122:6 155:7,9,16,19 156:5

**log** 84:10

**logs** 84:17

**London's** 118:20 126:12

**long** 7:22 13:18 40:8 105:3 125:25 159:14

**longer** 11:5 25:13 67:12 98:22 104:19 115:20,24 131:9

**looked** 80:7,14 103:6,7 104:12,22 126:6,8,9,11 130:15 149:7,8,12,15 176:3

**lost** 134:8

**lot** 15:3 39:24 56:17 76:25 77:2 81:19 93:12 104:16,17 106:9 121:25 122:1 131:9 136:25 159:11,20 160:11,12 171:21 182:15

**lump** 157:21

**lying** 185:16,17

## M

**made** 13:23 49:4 64:20 69:15, 17,22 83:5,6 88:19,25 89:9,16 90:4 92:12,23 102:22 108:23 110:5,24 111:8,11,14 112:4, 16,19,24 113:3 121:19 123:9 126:22,25 137:25 144:23 166:8,14 174:25 175:4

**mail** 8:22 11:5

**mainstay** 74:19

**maintain** 94:7

**maintained** 125:17,18

**majority** 9:6 13:7

**make** 11:24 17:20 19:21 23:14 28:2,9 30:11 40:21 41:9 42:12 43:4 47:19 48:13,15,21 49:3,6 52:2 57:20 60:4,8,10,11 68:11 69:10 70:14 72:16 79:7 88:11, 16 91:23 93:12,18,20,23 101:24 123:24 125:19 131:20 132:3 145:4 146:25 153:16 162:10,23 163:14 169:14 175:7 176:11,15 178:19 183:11

**makes** 93:8 98:25 188:7

**making** 18:21 31:1 60:7 61:10 66:11 71:1,4 79:3 93:13 112:15 162:18

**management** 15:24 20:20 25:6 61:7 106:3 108:4

**manager** 9:7 21:17,18 22:7,12 29:16,20,23 41:5 45:11 47:23 59:1 63:5 66:21 70:17 85:20 86:13,18 87:5 89:1,2,11 97:22 98:11 102:15,24 108:23 114:19 121:1 123:14,20 142:11 143:2 145:8 147:11,14 148:22 149:20 150:15,16,19 151:1,11,12 153:9,17 159:6 163:13 177:6 187:13

**managers** 130:12

**manila** 97:6,8

**manner** 84:6

**manuals** 14:11

**Marine** 7:6,15 13:3 14:1,2,4,13 15:6

**Marines** 12:25

**marital** 34:4

**Marquette** 6:17

**Martin** 4:8,17,23 5:7,14,19,23 6:2 12:11,20 17:19,25 18:9, 19,25 19:7,11,15 22:16 28:7 29:2,7,19 30:18 31:3,13,19 32:2,9,21 33:4,16 34:17,22 35:2 36:3,16,21 37:14,17 39:6 42:19 43:18 44:7 46:3 47:12 48:20 49:2,13 50:1,12 51:6, 15,23 52:9,12 53:2,12,14 54:1,18 56:10,16,22 57:3 58:4,19 60:23 67:7,10,15,21 68:2 70:25 71:17 72:6 75:8 77:15,19,22,24 78:9,24 81:25 82:7 84:4 85:4,10,14 86:1,7 87:13 88:9 91:1,13 96:13 99:5 100:5 102:5 103:21 104:1,7, 14 105:1,4,10,11 111:2 115:1, 21 116:3,7,11 120:23 121:12, 24 122:14 126:3 128:12 129:5,22 130:5,14 131:5,19, 23 132:1,2 134:20 135:5 138:8,11 139:2 146:10,15,24 147:4,13 149:17 153:3 154:11 162:21 168:10,19 169:12,23 170:6 172:21 175:6 176:25 179:19 180:15,21,25 184:1,6, 9 186:24 187:15,18,22 189:4, 15,20

**materials** 159:22

**matter** 35:21 61:13 62:16 83:20 87:23 109:15 139:15 140:21 157:9 168:15 188:12

**maximum** 63:20 68:7

**Mcdonough** 17:5,7,8 57:10

**means** 78:10 80:18 86:16 87:6 173:10 178:12

**meant** 58:21 59:9,19

**meantime** 17:24

**measures** 45:21

**mechanism** 42:11 43:4,21 44:2

**medical** 9:23,25 10:2,4,5 14:17 20:1 24:24 26:20 41:19 42:16 51:3 102:15 106:7 108:18,20 109:12 125:23 142:2 153:1,5,8,23,24 154:10 171:22 179:22,24

**meet** 48:9 69:13 76:20 148:21 185:3

**meeting** 76:5,6 106:8 184:23 185:6

**meetings** 105:25 137:9 161:21 184:25 185:4,9

**meets** 69:11 148:13

**member** 135:12

**memory** 14:15 165:5

**mentioned** 8:5 22:17 58:10 82:15 83:14,20 96:21

**merged** 9:12

**merit** 75:22,23 77:6 78:2 176:4

**message** 109:21 138:2,17,22

**met** 106:10

**metal** 8:14

**Michelle** 106:17 107:10

**Michigan** 6:14,17 8:25 9:10,12 10:22 30:8 138:6

**mid** 9:15 71:13

**military** 7:11 12:2,3,8,15,18,24 13:11 18:14 36:11 65:20 72:8, 9,10 141:1

**Miller** 4:24 69:15 70:1,5 72:23 74:1,6,21 90:7 100:18 101:21 102:2 107:15 108:10 110:5,6, 11,13,20,23 111:8,14 112:4, 15,16,24 113:4,6,23 114:23 116:13,25 117:3,12 121:8,13, 18 122:2 131:1 133:3 135:11 136:5 138:19 139:12 140:6 143:9,10 146:17 150:5,21 154:12 155:10 156:2,6,14 157:3,20 158:17 161:22 164:15 165:24 166:1 167:2 172:8 174:4,7 182:19 183:2,4, 11 184:23 185:10 188:19,20

**Miller's** 89:24 107:17 112:12 134:13 154:23 158:18 161:1

**mine** 97:10

**mini** 189:16

**minimum** 63:20 66:15 68:7 76:20

**minutes** 24:8 67:11,15 131:6 132:18 134:22 173:16,17 174:13 178:4,5,14,15 186:22

**misconduct** 88:2 90:10

**misconstrued** 57:18

**missed** 50:7

**mistaken** 117:18 188:9

**model** 25:16

**modernization** 24:22 25:2,22, 24 29:22 70:5 74:17 89:21 108:3,11

**modification** 93:2 118:15 126:23 162:18

**modified** 92:14,15,17,25 93:2, 7,9,19 116:19 118:17 126:7 134:6 157:3

**modify** 92:19,22 93:16,25 118:16 126:15,16,17 134:7

**Mohammed** 165:24 166:9

**moment** 171:2 187:11

**money** 66:11 79:1,7

**money's** 79:2

**monitor** 177:24 178:3,7

**month** 41:7 77:10 113:17,19

**months** 8:18 99:19 113:21

175:22

**morning** 105:24 153:13 162:12

**MOS** 13:11

**mother** 179:21

**move** 11:2 17:23 62:21 137:14,15 179:1 180:22

**moved** 11:13 24:23 25:1,7,9

**moving** 12:14

**multiple** 83:23

**Myers** 66:20

**myriad** 15:19 57:14

**N**

**nah** 77:10

**named** 111:19

**names** 106:13,14 123:11 124:5 125:4,11

**national** 34:1 98:23

**natural** 79:9

**nature** 16:19 28:4 36:6 68:16 69:9 135:15 156:17 168:18 169:19 173:24

**necessarily** 89:1 99:12,13 101:18 170:2

**needed** 7:13 27:9,18 28:16 29:15,18 83:5 97:18 119:19 123:16 154:9 158:12,16 173:9 175:11,13 179:25

**negatively** 38:19 55:13,14

**Nelson** 138:3,4,12

**network** 11:22 24:17,22 25:3,10,18 30:5,6 70:8 83:17 109:18 138:3,13,18,25 165:15

**networks** 30:7

**newest** 135:12

**newly** 25:15

**news** 56:17

**nice** 145:14 186:9

**night** 124:24

**nineteen** 8:16

**ninety** 8:16

**non-business** 132:21 133:5 149:4

**non-commissioned** 14:1

**non-competitive** 140:10

**non-critical** 76:19

**non-disciplinary** 96:5

**non-employee** 38:6

**non-probationary** 170:11

**non-support** 23:13

**non-veteran** 188:7

**normal** 119:21

**North** 13:7,9

**Northern** 6:16,20

**note** 148:2 149:12,13,16,18 150:5,8 151:2 152:2

**notes** 14:15 135:24 187:16

**notice** 4:19 95:5,7,10 181:10

**notified** 44:20 165:14

**notify** 43:15,19 45:9

**November** 9:19,23 14:16 176:19

**number** 26:19 29:3 50:21 62:6 75:16 85:15 100:10,16 106:2 123:16 171:15 174:19

**numbered** 84:14

**numerous** 57:9 58:18 162:8

**nurses** 26:5,6

**O**

**Oak** 9:11 56:24

**Oakland** 6:18 7:1

**oath** 4:7 101:3 160:25 171:4 179:5,6,8

**object** 12:17 17:15 18:17,24 19:10 22:3 28:6,21 29:6 30:14,21 31:1,10,18 32:1,6,19,25 33:13 34:11,25 35:24 36:13,20 37:11,16 39:3 42:14 43:6 44:4 45:19 47:11 48:17,24 49:7,23 50:11,19 51:11,19 52:8 53:20 56:9,13,21 58:3 60:20 70:20 71:5 72:5 74:3 77:14,17 78:4 81:24 82:3 84:3 85:23 86:4 87:8 90:11 91:6 96:2 98:15 99:4 100:2 102:1 109:8 114:11 121:10 125:21 128:1 146:9,13,20 147:3,12 149:14 152:15 154:7 168:9,13 169:10,21 170:5 176:21 179:11

**objection** 4:6 19:3 29:12 34:13,21 53:1,5

**objective** 71:7

**observe** 161:6

**obtained** 8:11

**obvious** 132:14 178:25

**occasion** 105:20

**occasions** 58:18 166:2

**occupation** 15:20 73:25

**occupational** 13:11 16:15

**occupations** 16:12

**occupied** 109:19

**occur** 22:2 46:8 49:20 54:24 55:3 57:1,16 136:10 175:15

**occurred** 5:1 29:22 57:14 137:18 167:11

**October** 11:14 176:18

**offense** 149:19

**offer** 66:16,17

**offered** 11:12,17 62:25

**office** 13:14 14:18 15:13 30:25 94:13,22 97:9,22 101:15,16

156:14 158:9,18,20,22 159:10 160:1,2 163:1 171:21 173:8 178:2 184:24 186:9

**officer** 9:14,25 10:2,7,11 14:1 16:17 18:10 19:16,25 20:12, 15,21,23 22:25 23:1,6,20 24:3 25:9 29:24 30:1,10 33:21 34:9 35:16 36:4 50:2 108:6 138:2, 14 166:8

**officers** 161:22

**offices** 9:15 164:23

**official** 40:10 61:21 62:4 63:2 90:2 91:11 92:10 98:21 99:25 103:17 115:12,14 143:15

**Ohio** 30:8 138:5

**Okinawa** 13:5

**older** 34:3 156:15

**ongoing** 16:8

**online** 83:15

**open** 107:5,8 145:23

**opened** 156:12 167:3 187:2

**operate** 38:1 73:16

**operation** 38:24 41:9 42:9 52:1,6 55:16 78:13,15 177:17

**operations** 8:23 82:12

**opinion** 31:11 32:13,16,17 33:19 149:4

**opportunities** 33:8 188:21,24

**opportunity** 11:3,25 14:7,9 17:2,11 66:22

**opts** 92:24

**oral** 96:18

**order** 35:21 36:25 42:23 62:17 64:3 65:3,6 84:21 91:20 106:6 147:6,9 164:17 182:8

**ordering** 189:16

**orders** 189:14

**organization** 33:22

**orientation** 34:2 48:7 51:1

**origin** 34:1

**original** 137:6

**originally** 117:9 139:19

**Osterbeck** 4:11,19,22 5:8 6:4 7:4,8 8:13 10:6,17 11:15 12:13,22 13:24 17:17,22 18:2, 13 25:23 32:3 33:23 34:12 37:22 46:4 48:25 50:14 51:25 53:15 54:5 59:5 61:14 68:3 71:18 76:25 82:18 85:16 87:16 101:21 103:10 105:12 111:1 115:23 117:15 121:25 123:18 127:21 128:18 130:2 131:1,5,20 132:3 133:19 134:21 135:6 160:10 177:3 187:3,23 189:6

**oven** 79:22

**override** 70:24

**overruled** 63:12

**P**

**p.m** 189:11

**p.m.** 18:6,8 67:18,20 85:11,13 116:8,10 124:19 131:16,18 135:2,4 181:20 187:19,21

**packet** 91:9

**Pamela** 105:14

**panel** 62:15

**paper** 94:14,21 162:7 164:14

**papers** 20:7 38:17

**paragraph** 33:5 59:10 87:21

**paraphrase** 102:8 183:9

**parent** 179:23

**parental** 34:4

**parents** 54:19

**parlance** 12:2,16

**part** 28:14 30:3,11,15,25 50:7 52:16 76:6,21 77:3 78:6,17 80:7,10 92:12 96:23 99:25 102:16 109:13 117:5 130:9 135:19 139:12 141:6 152:21 153:10 154:14 167:9

**participant** 135:23 136:3,8

**participate** 123:7

**participated** 123:15

**parties** 89:5

**Partner** 10:11 20:16

**party** 61:12

**pass** 115:17

**passcode** 84:14

**passed** 115:19

**past** 145:12

**patient** 38:10,15 106:20 165:6

**patients** 38:5,6,7,8,11,14 119:18

**patients'** 38:9

**pay** 10:18 63:15,19 64:6,7 65:6 66:1,8,14 75:19,20 79:10,14 80:3,6,12,14,22

**paycheck** 165:13,22

**payroll** 164:3 165:16

**PDF** 94:25

**penalties** 40:21 170:21 171:8

**penalty** 171:10

**pending** 5:10

**Pendleton** 13:2

**people** 14:10 23:18 26:4 29:9 37:8 42:9,12 43:4 50:25 52:16 62:10,15 73:22 74:9 79:6,9,18 83:13 102:20 107:1 119:25 120:5 121:7,14 122:12,20 123:16 124:1,7 125:4 137:5,8 138:21,24 139:1 145:16 146:22 150:14,19 152:24 153:24 157:23 158:24 169:4 177:8,21 178:1,19,22,25 183:12

**people's** 130:19 150:18

**percent** 122:16 188:15

**performance** 20:19 25:6 55:19,23,24 56:4 71:15 73:1, 5,11 75:4,24 76:4,17,20,21 78:7,8 80:10 91:21 92:5 95:6 96:8 127:13 139:13 174:21 175:13

**performing** 73:12

**period** 19:21 40:15 81:6 90:25 91:22 145:22 149:25 165:5 170:3 172:24 175:20

**permanent** 12:1

**permanently** 11:12

**person** 15:15 21:22 23:19 32:16 36:11 41:7,11 44:9 46:12 61:10 65:18 68:10 72:8, 9,14 75:21,23 76:5 77:5,9 78:2,10,12,19 79:11 95:23 96:22 97:12 102:4 108:22 111:19 140:16 141:9,13 142:3,4 143:3,22 148:7 149:21 150:7 152:8 160:20 162:6 163:12 164:11 173:14 176:7 179:15

**person's** 71:25 72:2 73:24 143:5 144:10,16

**personal** 33:21,24 84:8,19 128:7 131:2 132:22 133:5 149:3,4 159:1,3,21 164:8 167:3,7 181:24

**personally** 65:2 79:15 129:14 138:25 145:9 158:7

**personnel** 15:23 65:11 74:18 82:17,21 85:3 87:15 91:24 92:2,5,9,10,18 93:5 98:13,21 99:25 103:17 107:25 109:16 115:9,13 117:7 144:14,17

**persons** 140:11

**phase** 62:22

**phone** 134:22,24 165:1,2 166:2,7

**phrase** 185:24 186:4,6

**physical** 140:7

**physically** 161:6,8

**physician** 142:1,6 143:17 148:17

**physician's** 142:14

**pick** 166:23 177:19

**picked** 167:9

**piece** 21:11 94:21 162:7 164:14 186:14

**pilot** 142:19

**PIN** 84:25 85:1

**PIV** 84:8,11

**place** 12:15 25:22,24 27:13 41:15 43:5 45:21 51:4 57:10 73:15 77:8 84:10 110:18 125:25 147:20 160:19 162:5 169:25

**places** 162:8 163:25

**Plaintiff** 4:23

**plan** 76:17,21 78:7,8 80:11 82:25 153:17,18

**plans** 76:22

**plant** 27:5 79:19,22

**play** 23:2 26:25

**plenty** 13:15

**point** 17:11 89:25 95:23 99:23 113:23 114:4 159:14 163:5 166:20 170:23 171:1 180:15

**police** 154:16 155:10,13,14, 18,21,23 156:2,10,12,24 157:9 158:23 161:19,21 163:5 164:23 165:3,8,23,24 166:8,9 167:4,8,17

**policies** 16:19,22 18:22 19:2 30:19 38:16 50:4,22,23 51:2, 4,8,9,22 52:4 57:24 58:1,2,12, 13 59:6 63:16 66:1 85:17,25 86:2,9 95:16 170:20

**policy** 12:19 17:4,10 18:21 19:8 20:5 21:14 30:16,23,25 31:2,5,7,12 32:23,24 33:1,2, 14,15,20 37:10,13,15 39:21 40:9,19 41:6,10,15,18,20 42:16,18,20,22 43:3,9 45:15 47:9 50:4,5,8,10,15,17,18 51:5,13,14 52:18 54:6,9,10 57:5,7,10 58:6,10,21 59:4 64:9 81:9,11,14 85:21 86:12, 15 87:6,7,11 90:21 95:18 100:1 107:5,8 112:10 149:20, 23 150:4,6,9,11 151:1 170:18, 23 171:1,7 174:16,17 182:24 184:14,19 185:11

**political** 34:5

**poor** 75:24 91:21

**popup** 128:5

**position** 10:1,4,7,8,9 11:6,12, 18,20,25 14:13 20:7 26:17 28:17 29:17 46:2 61:20 62:16, 25 63:21,22,23,24 64:3 67:5, 6,24,25 68:17 69:1 71:9,12,15 73:2,6,7,13 121:14 127:14 135:15 142:10,20,22 143:1,4, 23 144:13 145:10,20,21,23 146:1 148:1 150:22 171:25

**positions** 9:7 26:18 61:23 63:24,25 64:2 68:13 75:5 106:2,4,5 150:14 188:25 189:1

**possibly** 56:8

**post** 9:15 13:14 15:13

**postal** 8:19,23 9:6,20 11:4 13:3,12 14:21,23 15:9,21 56:23 61:6 66:7,11,12 81:13

**posted** 61:23 145:12

**posting** 69:2 142:25 145:17

**potential** 33:9 122:10

**potentially** 55:11,12 56:12 60:3 62:12 80:23,24 122:13 157:1

**practice** 142:25

**practices** 87:15 95:19

**predicament** 180:2

**predominantly** 152:20 153:20

**pregnancy** 34:3

**premises** 164:9

**preparation** 103:9,13 104:15, 20,22

**present** 15:11 135:20 158:6,9 163:13

**president** 79:21

**pretrial** 140:3

**pretty** 28:20 128:18 131:20 132:14

**previous** 66:15 68:12

**previously** 92:23 158:17 162:24

**primarily** 13:10

**primary** 19:17,24 20:10 82:16

**printed** 94:19

**prior** 40:17 64:8 89:21 90:3,7 101:4 114:3,5,21 127:5

**prioritize** 158:15

**private** 26:12 41:15

**probationary** 40:15 90:19,20, 23,25 91:12,14,15,18,22 114:18,20 149:25 170:2,13

**problem** 80:17 87:2,3 105:4 113:6,8 176:20 177:2,3,7,9, 10,15,16 179:7 182:2 184:7

**problems** 180:17

**procedure** 61:18 83:11 93:5, 13,20 95:13,14 96:15,21,24 140:3 160:16 163:7

**procedures** 49:12 51:2 83:25 95:19

**process** 16:8 22:19 24:22 61:7 62:20 63:5 84:20 110:10 139:21 142:22 146:22 147:16, 19 162:5 163:18

**processed** 8:21 156:16 160:22

**processing** 15:23 74:15,18 82:17 83:22

**produced** 140:1

**product** 78:15

**profanity** 182:23,25 183:1,3,4, 5,13

**program** 119:22 123:6 124:15 175:16 182:6

**progression** 90:22

**prohibit** 150:11

**prohibited** 87:15,19

**prolongs** 128:20

**promote** 78:19

**promoted** 8:4 9:24 10:1 13:17 24:2 64:6,19,23

**promotion** 8:5 65:4,5,24 76:24 78:24,25 79:1 83:1 126:13

**promotional** 188:21,23

**promotions** 7:13,18 64:9 126:11

**pronounce** 17:6

**properly** 30:12 156:5 165:13, 20 167:16

**propose** 46:19

**proposed** 21:16

**protect** 36:1 83:25 178:23

**protecting** 178:24

**protection** 17:4

**provide** 21:16 22:11,14 61:25 142:7 148:15

**provided** 33:8 74:2 83:23 123:11 124:5 125:10 135:10 143:12 152:3 163:9 167:19 178:16 184:18

**providing** 135:13 137:12

**psychological** 140:8

**public** 56:19

**pull** 65:12 161:2,3,6

**punish** 175:8

**punishment** 45:18

**purpose** 104:25 119:24

**purposes** 4:20 133:17 187:12

**pursuant** 4:19 100:1 112:9 182:24

**purview** 130:12 148:19

**put** 33:11 34:13 35:19 51:4 53:1,5 65:21 71:21,25 72:2 73:21,23 79:8 91:14,15,17 92:1 95:7 97:2,16 122:25 141:17 154:2 159:2 173:6 178:22 181:9

**puts** 95:5

**putting** 84:21 95:10

**Q**

**qualification** 69:11,14 71:8,11 72:13

**qualifications** 13:15 66:15 142:15 148:14

**qualified** 62:2 65:22 142:17,20 145:13

**qualifies** 70:15,22 140:9 143:15,17,19

**qualify** 71:13 142:3 148:23 151:12

**question** 5:2,3,10,11,18 17:24 19:12,14 34:13 39:5 44:6 48:19 49:1,25 51:9 52:5 53:3, 10,11,13 57:9 58:14 60:22 64:4 66:5 67:22 77:20,23 79:23 80:2 86:6 101:11 111:13 120:19 127:21,22 128:15,17,18,22,25 129:6,13 130:2,3,6,8,15 131:10 132:19 133:11,18 135:17,18 150:2 180:24 187:23

**questioned** 119:7

**questions** 4:25 20:9 35:8

38:12 46:22 51:14 53:6,8,9,15 135:25 189:5

**quick** 134:24 187:16

**quote** 42:23

**R**

**R-O-S-A-S** 72:22

**race** 33:25

**raise** 77:10 79:21,25

**raised** 154:16

**ran** 77:1 119:22 123:6 124:4

**random** 16:14

**range** 63:18,19 64:6,7,23 68:7 113:13,16

**rank** 8:5,7,11 62:11,22 66:16

**rate** 62:8,18,22

**rated** 188:16

**reach** 28:18 33:8 51:14

**reached** 28:11

**read** 31:12 51:8,13 67:21,23 128:10 163:4

**reader** 84:11

**reading** 59:13

**ready** 85:7 160:20

**real** 134:24 187:16

**reason** 16:14 47:18 83:9 91:5, 8 117:3,4 126:6 128:9 134:5, 12 139:7 157:7 167:15 173:19 174:12 177:4,9,21 180:15 181:6

**reasonable** 146:23 152:21 179:15

**reasons** 38:8 57:12,15,23 58:10 79:11 82:8,10 83:6 116:12 131:3 132:22 133:5,9 149:4 162:15,24,25 163:2 168:4 178:16

**reassigned** 25:2

**recall** 17:9 30:20 31:20 47:2,6 89:11,18 100:24 101:6 102:25 111:3,5,17 112:3 113:2 114:8 119:6 129:17 136:17 157:20 159:17 161:24 167:14,23 181:11 183:15 185:8

**receive** 7:17 15:16 16:21 43:14 60:15 74:1 83:1 100:18 111:10 119:4 120:15 123:9 183:18,20

**received** 40:17 61:5 62:6,7 85:18 90:17 96:22 100:21 101:3 102:18 115:5 120:12,16 121:1 122:22 123:14 138:2 154:24

**receives** 82:24

**receiving** 17:9 102:13 156:3

**receptionists** 26:9

**recess** 67:9

**recharge** 131:8

**recollection** 12:24 43:1,3 63:12 65:14 68:20 88:14 107:16 110:7 115:4 171:24 174:5

**recommend** 68:5 119:3 125:19 171:13,14

**recommendation** 23:13 40:22 69:10,22 91:11 123:9 139:8 144:22

**recommended** 22:15 89:24 116:13 119:15,23 126:4 143:8

**recommending** 39:16 90:1,3

**record** 4:17 15:21 18:8 34:14 37:21 65:11 67:20 75:1,24 80:5,13 85:13 90:15 92:13,25 93:7,8,14,19,23,25 98:18,19, 20 99:2,22 103:17 114:21 116:10 117:12 118:16,18,19, 20,21 119:1 126:12 128:4 131:6,18,22,24 134:6,7 135:4 147:22 172:16,23 176:24 179:14,18 184:14,19 186:7 187:21

**recorded** 184:16

**recordkeeping** 98:6

**records** 7:23 74:15 83:22 84:1 92:14 93:5,11 98:12 99:8,10 104:5,14 116:16,18 117:4 118:6,12 125:17 126:16 127:4,16,24 128:8 129:3,11, 15 130:9,11,19 131:2 133:17 144:18,19 163:17 176:16,18 177:2

**recruit** 145:11

**recruitment** 62:1 69:7 70:8 106:1 144:12

**reduces** 122:15,16

**Reeves** 105:13,14,21 106:7 107:3,11,16 108:2,12,15,17, 21,22,24 109:20 110:4,12,19, 23

**reference** 59:3 97:18 99:9 182:5 186:18

**referred** 27:10 37:20 137:23 187:24

**referring** 37:22 100:7 102:20

**reflect** 4:18

**reflects** 172:25

**refresh** 174:5

**refrigerator** 186:11

**regard** 145:13

**regional** 9:17

**regular** 28:25 142:25

**regulation** 64:9 96:9 149:23 150:4,9 151:13

**regulations** 14:11 16:19,22 20:5 30:12,17,19 95:16 153:10

**related** 95:6 135:15 144:16

**relation** 20:3,8,9 27:11 39:22 40:1 46:15

**relation/labor** 20:2,14 27:11 46:15

**relations** 9:4,6,8,16 14:8 15:25 20:11,14 21:2,3,22 22:18,21,23 23:19 25:4,18 39:12,19 46:21 89:13,15

**relevance** 53:21

**relevant** 120:16,18

**religion** 34:1

**relocate** 11:6

**relocated** 11:13

**Rema** 138:3

**remains** 33:6

**remember** 120:21 138:19 177:1,19,22,23

**remotely** 4:6,7

**removal** 46:2

**removed** 115:18

**Render** 135:11,12 136:2,6,18 154:21 157:21

**repaired** 45:4

**repeat** 5:3 19:13 39:4 49:24 60:21 84:20

**repeated** 91:19

**repeatedly** 84:24 119:2,5,6,20 122:24 123:12,15 124:6,8 125:6

**repetitive** 173:24

**rephrase** 5:3 44:6 53:2,13

**replace** 98:4

**replaced** 97:24

**replacement** 97:20

**replied** 138:19,21

**Reply** 137:3,4,6,11 138:1

**report** 11:22 23:4 37:12 38:23 42:1 45:1,9 51:24,25 69:21,24 87:23 94:23 103:16 105:24 109:17 156:25

**reported** 24:5,6,9,10,11,12 25:14 27:23 39:14 46:11 69:23 89:23 108:5,13,15 109:19 136:1 183:5

**REPORTER** 4:4 88:7 131:25 189:13,18,22

**reporting** 24:23 108:9,12 109:20

**reports** 69:20 77:1 157:2

**represent** 4:23

**reprimand** 45:25 114:17 115:11,16

**reprimands** 92:1

**request** 21:14 22:9 24:15 29:17 45:3,14 47:19 91:23 104:4,5 105:5,7 106:4 115:18 123:13 125:20 126:22,25 142:24 147:14 153:16 173:6 181:14

**requested** 21:11 46:13 91:8 118:9 147:18 152:12 156:16 158:14 181:23

**requester** 23:10

**requesting** 21:17 22:12,14 40:6,13 146:22

**requests** 150:18 152:19

**require** 83:3 95:22

**required** 37:13 43:15 170:17 171:5,8

**requirement** 114:18

**requires** 146:16,17

**resigns** 162:3

**resistant** 134:15 135:8 162:17

**resolve** 89:3 140:4

**resource** 10:2,7,10 16:17 18:10,11 19:16 20:14,23,24 22:5 23:6 24:3 25:9 29:24,25 34:9 35:16 36:4 38:3,13 50:2 106:3

**resources** 9:2,5,25 14:9 15:8, 10,12,19 16:12,15 18:15 20:17,21 24:8 27:12 28:15,23 38:10 67:4 69:1 108:5 138:1, 14 141:7 182:7

**respect** 39:11,17 41:5 47:9 69:15 102:13 129:2 158:18 160:15 173:20

**respective** 24:9

**responded** 167:19

**responding** 155:11

**response** 131:13 138:23 183:8,10

**responses** 131:14

**responsibilities** 19:18,24 20:12 38:20 61:15 73:17,18 85:20 161:12 185:2

**responsibility** 87:4 177:24 178:1

**responsible** 18:11 20:23 117:1 178:9

**rest** 24:6

**restriction** 152:23,24

**restroom** 5:16

**result** 175:23

**resume** 62:3 70:13 71:10,20, 22 72:12 142:16,20 143:13,18

**resumed** 18:8 67:20 85:13 116:10 131:18 135:4 187:21

**resumes** 62:5,6,7,9 72:12

**retained** 156:10 175:20

**retaliated** 60:6,9,12,13

**retaliation** 34:7 35:9 58:20,22 59:4,8,15,18,19,22,23,24 60:1,2

**retires** 162:3

**retraining** 90:17

**review** 21:13,14,17 23:9,12 24:17 40:20 62:5 69:7 103:9, 11,13 104:21 118:8 143:6 172:24

**reviewed** 70:13 103:15,22 104:14 116:18 172:23

**Rick** 4:22 79:20,24 180:19,23 186:21

**rights** 17:4 60:4 162:13

**risk** 122:16,17

**roam** 109:22

**Robin** 187:1 189:15

**role** 21:8 22:20,23 23:1 26:25 109:9

**rolling** 48:14

**room** 183:7

**Rosas** 72:22

**roughly** 9:3 25:12

**route** 143:22 145:17

**Royal** 9:11 56:24

**rude** 183:16

**rudeness** 101:23 182:13

**rule** 26:24 31:15,16 32:10,14,17 39:10,18 64:10,18,25 65:25 90:9 99:14 114:10 149:20 150:3,25 170:18 173:20

**rules** 4:21 14:11 16:18,22 18:21,22 19:8 20:5 30:11,16,19 35:18,20,23,25 39:17 49:20 50:3 66:1 132:21 151:17

**run** 36:25 43:5 52:1,6 77:8

**running** 18:11 41:9

**Rushing** 98:8,9 101:16 113:2

**S**

**S-H-A-R-K-E-Y** 74:14

**salary** 66:12

**San** 13:1

**sat** 135:25

**scale** 64:10,22,24 66:8,9,14

**schedule** 10:18 63:17 124:3 140:10,13,15,16,20,22,23,25 141:5,21,23 142:3,8,12 143:5,9,15,20,21 144:24 145:5,15 147:21 148:6,14,19,21,23 150:7,17,18 151:2 152:1 188:1,3,4,6,10,13,17,19

**scheduled** 37:13 123:8 153:16

**schedules** 63:17 151:21

**school** 6:6,9,10,11,12,16

**score** 62:24

**scoring** 62:8,13

**Scott** 106:15 111:19,20,23,24,25

**screen** 133:2

**screened** 119:19

**screening** 119:17,21 120:5,7,9,11 121:5,6,22 122:11,23 123:3,12,17,22 124:3,8,16,20,21,23 125:5

**sec** 52:25

**second-level** 63:3

**Secretary** 16:24 54:11 57:10 58:20 59:7,11,16 85:21 86:8

**section** 27:11 28:15

**sections** 24:7

**secure** 92:17,18

**secured** 84:5 93:16

**security** 83:25 92:16

**seeking** 188:5

**select** 63:6 67:3

**selected** 62:21 66:10

**selectee's** 69:8

**selecting** 61:20 62:4 63:2 143:14

**selection** 63:13

**semester** 6:19

**send** 17:21,25 18:1,4 23:11 24:17 25:18 105:5 115:21 116:4 164:4 172:14 184:8

**sender** 137:5

**sending** 151:9

**Senior** 10:11 20:15

**sense** 38:23 98:25 147:5 162:10

**sentence** 87:19,21

**separate** 124:13 159:21

**September** 153:14,16 173:5,7

**sergeant** 8:11

**series** 4:24 16:15

**served** 7:21 141:16

**serves** 139:25 140:6 165:5

**service** 7:7 8:12,14,19,24 9:20 11:4 14:21,23 15:9,21 21:11 30:5 56:24 61:6 66:7,12,13 81:13 98:23 140:13 182:6

**Services** 8:18 106:20

**sessions** 83:23

**set** 48:10 49:8 62:4 63:25 159:2

**setting** 65:6 66:1 186:4

**severe** 140:7 179:22,24 180:17

**sexual** 34:2

**SF-251** 188:9

**shape** 116:19

**share** 151:10

**shared** 138:17

**Sharkey** 74:13,20 83:21

**Shavon** 135:11,12 136:2,6 154:21 157:21 158:4

**sheet** 163:10,21 164:2

**sheets** 163:13

**shootings** 56:25

**short** 29:10

**shoved** 156:18

**show** 36:17,23 37:9 40:11 43:4 44:9,10 45:11 47:21 82:5 93:9,19 158:11 176:16

**showed** 157:3

**showing** 42:12 117:24 176:18

**shows** 171:8 172:10

**sick** 40:7 43:15 44:21 45:2 153:18 173:1,3,21

**sign** 16:8 95:24 164:1

**signatured** 94:20

**signed** 17:5 175:2

**signing** 95:1

**signs** 96:22 128:3

**similar** 85:17

**similarly** 149:24

**simple** 128:18,25 129:12 130:6 131:10 139:11

**simply** 111:15

**single** 27:12 74:6 164:21 179:21,23

**singular** 59:24

**sir** 6:5 7:2,9 10:13 13:16 21:4 48:19 58:1 67:14 75:11 117:14 118:10 130:22 135:9 136:8 144:8 151:4 157:25 162:24 171:19 172:5 181:7 189:7

**sit-stand** 152:25

**site** 94:23 109:16

**sitting** 101:2

**sitting-standing** 152:24

**situated** 149:25

**situation** 38:21,25 40:19 44:25 151:21

**situations** 134:15

**six-digit** 84:14,21

**size** 72:7

**skill** 13:11

**skip** 148:24

**slight** 181:15

**slotted** 65:2

**Smart** 82:21 84:19,22 116:23

**smoothly** 36:25 41:9 42:10

**snow** 11:5

**soda** 186:11

**solely** 27:23

**somebody's** 75:15 153:18

**someone's** 71:20 114:19 168:11

**sort** 57:12 93:18

**sought** 188:20

**sought-after** 146:1

**sound** 112:2,13

**sounds** 67:17 123:18

**Southeast** 9:11

**space** 94:13 109:19 135:21 156:14 160:19

**speak** 43:8 62:8 75:2 81:15 99:19,21 101:20 132:17 140:4 145:24 160:1

**speaking** 23:24 63:11 113:25 134:23 135:9 137:4 138:25 172:5

**special** 182:9

**specialist** 20:3 21:8,9,13 22:21,24 39:13 40:12 46:15 61:25 67:7 68:1,14,15 69:6, 13,17,18,25 70:10,12 71:7 111:19 144:4 145:21 148:12, 20 151:10 152:9

**specialists** 24:11 46:23 72:11 74:7,9,24 83:18

**specialty** 6:24

**specific** 15:8 16:12 20:3,13 22:10 23:3 24:17 29:14 41:16 45:22 59:2,10 64:2 68:24 69:14 72:24 81:14 84:18,22 88:21 89:18 96:6,10 98:16,18, 20 105:25 117:10 118:5,10 119:23 133:15 134:2,16 135:6 137:7,18 138:16 144:16 146:22 161:7 182:22

**specifically** 23:4 42:15,24 47:3,6 56:2 69:6 75:2 89:11 100:4 101:11,22 115:8 120:6 127:15 128:4 133:3,16 136:17,21 137:4 138:20 154:20 159:17 167:14 174:11 177:12 179:17 180:14 183:25

**specifics** 21:13 43:9 88:13 90:16

**speculation** 100:22

**spent** 15:9,12

**spoke** 24:8 70:7 98:21 116:23 127:3 166:2 182:4 183:6,19

**spoken** 89:18

**spot** 14:7 184:22

**staff** 106:12,14,15

**staffing** 20:18 24:5 25:3 61:25 67:7 68:1,14 69:5,6,13,17,18, 25 70:7,12 71:6 72:11 144:4, 13,20 148:7,12,19 151:10

**stand** 10:17

**standard** 104:21,24

**standards** 69:11,14 71:8,12 72:14 76:5,6,20

**standing** 161:8

**start** 14:18 39:7 44:25 45:7 68:9 96:10 161:9 172:7 181:20,21

**started** 9:4 124:22 164:16 165:3 172:2,4,8 174:4 181:22

**starting** 164:15

**state** 63:7 69:10 72:13 74:5 86:5 118:17 149:24 153:10 169:18 172:22 174:19 178:17, 20 185:23

**State's** 169:16

**stated** 30:9 32:11 43:9 78:13 81:8 82:8,9,10,11 83:6,17 89:4 92:23 125:14 142:22 143:25 148:16 162:24 176:7 181:1,13 183:6

**statement** 17:4,10 32:24 33:18 73:3 82:12 156:25 167:20,24 174:25 175:4,7

**statements** 23:8 32:23 61:11 155:4,6,7,25 156:21 157:8 161:7

**states** 7:5 8:19 11:4 13:14 59:11 90:21 100:4 148:17

**stating** 142:7

**station** 36:24 117:2 120:5,8,9 122:11 123:13,17 124:8,17 154:18,23 155:20

**stationed** 12:22 13:5,6

**stations** 119:17 120:11 121:22 122:24

**status** 34:2,4 90:20

**step** 5:18 64:17,20 65:9,10,15, 22 66:13,17,18 75:12,13,15, 17,19,22,25 76:1,2,3 78:20,24 168:24

**stepped** 187:11

**steps** 64:16,24,25 75:10,11 158:21

**stomach** 5:16

**stop** 122:12 153:6,7 163:21 164:3

**stopping** 109:4

**stops** 163:22

**store** 94:10

**stored** 82:22 84:5

**strategic** 10:11 20:15 25:15 116:24

**stressed** 37:3

**structure** 24:23 41:8 108:9,12 109:20

**struggling** 139:15

**study** 6:20

**stuff** 63:17 71:23 72:10 99:8 159:7,21

**subject** 17:1 52:19 62:16 83:16,20 91:18 139:15 140:21

**subjected** 90:8 114:9

**subjective** 71:7,19,20,24 72:3

**subjective/objective** 71:3

**submit** 23:9,11

**submitted** 91:9 118:7,8 121:2 123:13 143:10

**subordinate** 106:10

**subordinates** 107:12

**subsequently** 139:18

**substance** 102:7

**successful** 38:24

**sudden** 179:16

**suddenly** 114:6

**suffices** 96:7

**sufficient** 29:5

**summer** 136:20

**supervised** 8:22 88:20

**supervision** 14:3

**supervisor** 8:22 13:18,22 21:17,18 22:7,12,14 24:5,6,9, 10,14 25:15 26:24 27:19 39:13 40:13,22,23 41:5 42:12 43:16,19,22 44:15,18,20 45:5, 10,12,21 46:18 47:22 53:24 59:1 61:9 66:19,21 70:18 72:20 74:15 76:3 81:5 83:21 86:13,18,21,22,24 87:5,22,23 88:2,3,23 90:1 91:9 92:11 94:12,20 95:15 98:11 99:16 108:23,25 144:23 153:11 173:7,12 175:18 177:14 178:10

**supervisor's** 94:22 177:24

**supervisor/manager** 47:1 60:25 90:23

**supervisors** 24:11 25:14 46:13 79:23 100:15 107:12

**supervisory** 16:1

**support** 20:4 23:13 29:1 30:16 171:22

**supposed** 73:9 158:16

**surveillance** 165:4

**Susan** 66:19 106:25

**suspect** 88:13

**suspended** 170:3,9

**suspension** 46:1 80:21 114:17 115:12 170:11

**suspicion** 167:20

**suspicions** 167:17

**sworn** 4:12

**system** 81:1 82:20 84:7,12,22 93:10,14,15 116:21,23 144:19,20 153:15 173:6

**systems** 84:23

**T**

**table** 40:21 79:8 170:21 171:8

**tables** 10:18

**takes** 160:17 163:18 164:10

**taking** 16:1 85:6 93:15 105:2 109:5 135:24 168:11 176:1

**talk** 31:25 68:21 89:5 96:16 127:6 130:25 131:7,9,14 182:10

**talked** 57:12 87:20 89:8 92:3,6 110:12 127:15,19,20,24 137:8,24 169:24 183:13,16

**talking** 17:18 50:13 51:24 81:18,21 86:16 92:16 96:20 113:2 120:6 127:5 146:16 151:15,16,20 152:1 176:5,6

179:12 187:4

**talks** 54:2 58:20 128:4

**tape** 184:2,7,18 185:9

**taped** 184:11,12

**taping** 185:6

**Tara** 4:24 69:15 100:18 102:2 107:15,17 110:19,23 111:8,14 112:3 129:1,14 135:11 140:6 182:19 183:11

**tardiness** 42:20 44:3 47:16 78:1 80:6,13 113:7,12,14,25 176:20 177:2 179:7

**tardy** 42:3,4,5 44:9,10,12 46:6 113:10,15

**target** 69:1

**task** 74:19 159:5 164:21

**tasked** 154:22

**tasks** 139:11 162:8

**taught** 54:18 131:4

**team** 23:11,23 24:18 25:10,19 67:4 135:12 137:2,8

**teams** 20:22 103:7 104:12

**telework** 94:24

**telling** 77:4,7 111:3 112:3 157:10 180:10

**templates** 100:14

**temporary** 12:6

**ten** 25:12,13 27:24 64:16 70:6 75:11 99:1 130:23 132:17 186:22

**tenure** 43:13 112:22

**term** 12:4,18 148:24 173:13 184:20

**terminable** 149:19

**terminate** 90:24 114:19 134:12 154:12 168:6,7 170:17,19 171:5,11

**terminated** 89:20,24 91:22 97:13,14 100:19 114:2,5,6 116:12 117:20 134:3 139:9 149:2,13 160:15,17 161:14 162:3 165:19 168:3,4 170:24 188:22

**terminating** 90:7 170:9

**termination** 89:25 90:3,18 91:8,12,16,20 101:4 103:15 110:8,9 112:18,25 114:22 116:14 126:4 139:8 154:15,25 156:3,11 161:18,23 162:1,12, 13,14,15,25 163:9 166:14,18, 22,23 168:14,21 169:7 170:14,22,25 171:13,14

**terms** 28:20 37:9 39:15 50:16 79:1 80:5

**terrible** 80:4,5

**test** 11:23

**testified** 4:14 42:8 118:11 162:16 177:16,17 185:15

**testify** 4:13 160:25 185:12

**testimony** 80:15,16 122:2 133:12 177:19

**Texas** 4:2 10:5 11:13 97:19 187:8

**thanking** 138:16

**theft** 154:13 157:1,6 161:14,15 167:18,21 168:3

**theory** 109:1

**thereto** 61:11

**thing** 7:1 38:13 46:24 62:18 81:17 92:21,22 107:3 119:17 127:5 153:8 162:22 183:12

**things** 4:25 15:2 16:19 26:10 28:3 36:6 44:15 55:25 68:16 69:9 84:16 86:14 93:6 95:9, 11,22 101:23 135:14 144:18 145:4,7 155:20 156:17 158:10,14 164:5 169:4 175:15 181:13,18 182:4

**thinking** 112:21

**thinks** 132:7

**Thompson** 66:25 67:1 68:12 117:11,25 122:21 123:2 135:13 136:1,4 154:21

**Thompson's** 118:16,17,18 125:12 126:9

**thought** 28:16 112:14 127:10 155:25 157:5 158:3 179:3

**thousands** 72:11

**throw** 15:14

**till** 124:24

**time** 5:20 7:19,20,22 13:25 14:2,12,20 15:8,10,24 17:12 26:19,21 29:4,11 31:21 36:18, 24 37:2,6,9,18,19 38:18,23 39:1,12,23 41:22,23 42:2,9,13 45:2,7 47:21 48:3,5,11,16,23, 25 49:4,6,12,16,18 52:22 64:19 69:21,22,24 70:3 72:21 75:13,25 76:16 78:14 81:6 82:5 84:9,15,17 85:2 88:3,10, 15 89:22,25 92:23 98:19 100:24 104:16,17 105:3,13, 16,18 106:19 108:1 112:21,23 115:16,17,19 117:23 119:19 122:3 124:12 125:10 128:3,9 131:8 135:13 138:3 139:5,21 140:13 145:22 152:7 153:22, 24 154:3 157:13,17 159:14,19 165:5 166:20 167:2 170:3 173:9 175:17 177:4,7,10 180:15 183:10,15 184:24 186:16 189:6

**timeliness** 36:12,15 39:11,17 41:6

**times** 41:8,11,17 46:13 47:1 48:19 57:9 58:15 77:9 90:17 113:17 120:8,10 122:6 124:6 133:21 137:7 145:12 178:6

**tire** 45:1,4

**title** 10:10,12 20:15

**titles** 10:8

**today** 101:2 103:10,20,25 104:2,8 180:4

**toddler** 179:22,24

**told** 48:1 51:7,17 110:22,24 111:1 112:14 118:22 126:21 128:15 130:16,23,24 132:19, 22 133:3,5,16 143:17,19 150:22 155:3 167:14 180:6,14 185:19

**tolerate** 57:6

**tolerated** 35:4,9 54:3 174:22 175:1

**top** 62:12,24 73:12 160:4

**total** 26:19

**totally** 31:4

**touch** 165:23 167:2

**tour** 44:16 119:21 123:8 124:4,11,12,22,23 181:15

**tours** 181:23

**towed** 45:4

**traditional** 143:22 145:17

**traffic** 121:20

**trained** 72:23,24,25 74:10 83:10

**training** 7:10 13:2,4 14:24 15:14,16,21 16:1,18,21 18:14 36:5,8 50:3 59:14 60:15,19,24 61:3 73:14 74:1,2,6,8 75:1,2 83:13,17,18,19 90:17 102:18 111:10 127:7 131:4 134:15, 17,18 135:8,9,13,19,20,23,25 136:2,3,4,8,9 162:17

**trainings** 15:19,25 16:11 59:17 61:5 73:21,23 74:21,23 83:15,23

**transcript** 7:24 189:14,23

**transcripts** 126:9,10

**transfer** 10:6

**transferred** 10:3

**transfers** 162:3

**transgender** 34:2

**transition** 25:17 139:20

**treat** 53:19

**treated** 35:12 52:2 53:23 105:9

**treating** 102:12 141:25 142:6, 13 143:16 144:2 148:9,17 150:5 152:2

**treatments** 180:1

**trial** 11:22 132:10,11

**trick** 53:15

**true** 31:7 32:5,17 78:3,22 80:22 83:20 101:21 128:2 177:4,8 182:12,14

**Trump** 79:5

**truth** 4:13,14

**truthful** 5:5

**turn** 143:14 156:6 163:15,16

**turnover** 160:18

**two-file** 160:7

**two-hour** 134:18

**two-step** 64:10,18,25 65:25

**type** 15:15 23:7 29:14 40:5,14, 23 62:14 90:21 91:19 94:1 97:10 98:17,20 105:25 152:23 168:1 169:14 174:20 176:8 181:2 182:7

**types** 7:16 8:23 15:24 16:1 40:11 64:1 135:14 171:9

**typically** 153:7

**typing** 93:1

**U**

**U-S-E-L-T-O-N** 69:19

**UAW** 79:21 81:11,17

**ulcerative** 5:14

**ultimate** 168:20,23

**ultimately** 108:15 109:23

**unacceptable** 174:21 175:1

**unauthorized** 154:17

**underneath** 160:7

**understand** 5:2 8:1 11:16 12:12 17:19 19:12 22:4 23:25 27:2 31:4,5 32:3 33:23 34:12 42:25 44:5 49:1,15 51:8 53:8, 10,21 54:22 56:15 57:1,2,22 58:5,21,23 59:15 61:1 63:15 65:8 66:4 70:2 71:18 75:21 81:17 89:16 93:22 96:14 101:2,9 104:7 105:1 107:18 109:3 110:21 120:18 121:25 122:15,20 123:2,18 126:15 128:6,13,17,22,24 129:5 130:2,3,8 131:11 133:1 136:18 146:2 147:23 149:1 150:2,24 151:14 155:12 159:20 160:3 161:11 168:17 169:17 170:15 179:20

**understanding** 27:6,16 36:14 42:7 44:8 58:24,25 59:9,18,20 60:18 155:16

**understood** 5:4,22 22:17 23:18 45:15 48:13,22 73:14 99:17 125:1,3 136:10 137:14 139:3 146:2

**undue** 146:19 147:7

**unfair** 32:11 37:8 52:24 119:3 177:18

**unfairness** 52:22

**union** 20:6

**unit** 25:16 116:24

**United** 7:5 8:19 11:4 13:14

**University** 6:17,21

**unlawful** 34:6,18,23 35:3,8

**unlock** 155:18,23 157:14

**unlocked** 155:21 158:23

**unplanned** 172:25 173:3,10, 21

**unscheduled** 173:1,3,10,21

**upload** 93:6,17

**uploaded** 93:4

**uploading** 93:1,3 94:4

**upper** 172:17

**USA** 61:23 144:19 145:17

**usage** 84:16

**Uselton** 69:19 70:10 72:19 143:12,13,14 144:6 147:24 150:23

V

**V-I-S-N** 30:4

**VA** 9:22,23,25 10:2,4,5,22 12:19 14:17,20 15:11 16:14 19:23 20:1 21:14 24:3,4 26:1, 20 30:16,25 38:1 40:20 41:10, 19 42:6,15,16,18,21,22 43:9, 11 50:20 51:8 54:11,12 57:11 59:7 61:14 66:2,9,22 69:10 77:1,11 78:12 80:3,7,9 81:9, 12 83:25 86:13 88:18,24 92:16 95:14,16,18 98:5 99:3 100:12,16 102:15 105:13,17 107:19 108:16,17,19 109:12, 23,24 117:2 125:23 140:2,13 141:3,10 144:3 146:22 149:20 154:16 155:10,21,23 156:2, 10,11,12,24 157:9 159:22 165:17 167:4,8,17 169:14 170:20 182:24 184:14,19 185:11 188:16

**VA's** 33:5

**vacancy** 139:22,23

**vacant** 11:18 14:7 28:17 106:5

**vague** 53:7 87:9 171:9

**valued** 175:14

**verbal** 45:23 90:13 114:16 183:21,23

**verbally** 102:13 137:1

**Verification** 84:9

**versus** 183:12

**veteran** 9:21 139:20 141:20 168:7,16 188:1,2,3,7,13,14, 15,18

**Veterans** 16:25 30:4 50:24

**VHA** 51:3

**video** 165:4

**violated** 21:15 26:23 39:10,16 49:20 86:2,9 173:20

**violating** 150:3,6

**violation** 149:19,22 150:8,25 175:11,12

**violations** 35:18 87:7 90:9 114:10

**violence** 56:8,12,18,19 57:13 87:20

**visit** 153:13

**Visiting** 30:3

**visitors** 119:18

**VISN** 29:24 30:4,7 70:9 73:24 74:10 83:17 108:5 138:5,13

**voice** 31:14

**volunteer** 124:16 150:21

**volunteered** 125:5 139:18

W

**wage** 78:11

**waiting** 145:23

**walk** 178:1,2

**wanted** 11:23 15:17 28:11,15, 17 48:21 49:4 79:23 96:21 107:11,13 108:24 109:21 115:9 124:20 125:18 137:17 147:23 149:21 151:14 167:12

**warmer** 11:6

**warning** 22:1 49:19,21 52:18 176:17

**warnings** 84:16

**warrant** 40:18

**warranted** 23:7 45:3 139:6 170:12,14,22

**warrants** 101:1 169:18

**watching** 161:9

**ways** 23:22 38:17 65:6 83:4 99:21 141:22

**wealth** 16:6

**website** 61:24

**week** 5:15 41:8 77:6,9 81:20 113:17

**weekend** 40:8

**weeks** 11:9

**weigh** 71:11

**weight** 71:21,24 72:1

**welding** 8:15

**Werner** 106:17 107:10

**wet** 94:19

**whichever** 84:12

**whistleblower** 17:4

**whoever's** 21:21

**wholeheartedly** 57:5

**wife** 11:3 126:20 186:9,12

**withdrawn** 175:21

**withheld** 165:14

**withhold** 81:6

**within-grade** 75:14 76:14,16, 24

**witnesses** 61:11

**wondering** 111:22

**word** 12:7 29:25 32:4 37:20 58:5 87:2,3,4 184:3,10,11,13 185:18

**words** 12:4 29:8 55:14 65:17 84:5 91:4 141:1 170:24

**work** 8:19 18:20,22 19:8 20:18 25:5 26:24 28:25 30:24 31:15, 16 32:10,14,17 33:2 35:18,20,

22,25 36:18,23 38:2,11,23 39:1,10,17,18,23 40:6,7,8 41:22,24 42:9,17 43:5 45:1,5, 9 50:3 51:3 55:19,22,24 56:4 57:20 60:2,15,24 61:1,3 62:1 74:11,19 79:12 81:1 82:6,20 90:9 92:4 95:6 102:17 106:6 107:9,10 109:14 114:10 119:12 120:9,11 123:2,17 124:16 130:12 135:21 139:16, 20 144:21 149:19 150:3,23,25 154:17,23 155:19 156:17 158:16,22 159:11,20 160:5, 12,19 168:22 169:5 173:20 177:19 181:18,22

**worked** 8:14,15,24 26:15 56:25 61:16 69:25 70:10 79:19 81:12 105:17 108:8 109:16 116:25 119:16,21 120:5 121:18 122:19,23,24 123:12 124:8,10,18,19,23 125:11 144:5 158:13 186:13

**workers** 79:18,25

**Workers'** 20:19 25:5

**working** 14:10,14 19:17 20:5 29:4 63:9 69:7 73:20 77:8 120:7 121:8,21,22 122:5,11 123:8,22 124:3,13,17 139:14, 19 174:5

**workload** 28:20

**workloads** 37:9

**workplace** 34:6,24 35:4,10 54:3,24 55:3,4,7 56:8,12,18, 19 57:13,16,24 59:16,19,22 60:16 86:11 87:19 182:24 184:3

**works** 61:19 116:22 189:21

**world** 58:8

**worse** 169:7

**wrapping** 186:25

**write** 22:9 46:17 61:11 96:16 142:10 150:15,19

**writes** 30:23

**writing** 20:7 135:24 137:2

**written** 21:12,15 45:24 90:13 92:1,8 94:6,8,11,15,16 95:3, 15 96:17,18,20 99:10,15 100:9,17 101:3,19 114:9,15, 16 115:5 165:12 172:10,19 174:8 175:2 181:9 183:20,24

**wrong** 34:19,23 35:3,9 77:16 78:23

**wrote** 176:6

**Y**

**Y-U** 106:25

**year** 6:18,20 76:17 99:19 172:5 175:21

**yearly** 15:20 16:11 80:10

**years** 7:21 8:24 12:23 13:21 15:9 16:7 18:15 47:5 59:14 75:16 99:2 101:8,12 103:12 105:22 111:2 118:4 179:13 183:10

**young** 54:19

**Yu** 106:25

**Z**

**Z-E-N-I-A** 102:23

**Zenia** 102:23 103:6 111:7,13