STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

TARA D MILLER,

Plaintiff, Case No. 2024-207193-NO

Vs. Hon. F. Kay Behn

DENIS McDONOUGH, Secretary of

The Department of Veterans Affair,

Defendants.

___________________________________/

DEPOSITION OF ERICA BETHANY

taken on Thursday, the 27th day of February, 2025 at

11:07 a.m. Via Video Teleconference.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | DEWEY MARTIN<br>Law Offices of Dewey Rick Martin<br>13900 Woodward Avenue,<br>Highland Park, MI 48203<br>(313) 963-1321 |
| For the Defendant: | CHRIS DOYLE<br>Department of Justice<br>211 W Fort Street<br>Suite 2001<br>Detroit, MI 48226<br>(248) 476-6900 |
| Reported By: | DONALD HANDYSIDE<br>CER 1464<br>(248) 642-7708 |

I N D E X

WITNESS: PAGE

ERICA BETHANY

Direct Exam by Mr. Martin 4

EXHIBITS

(None)

---

COURT REPORTER: And we are now on the record. This is the deposition of Erica Bethany. It's being taken remotely today via Zoom. Today is February 27th, 2025. The time is approximately 11:07 a.m. Counsel, please state your appearances for the record.

MR. MARTIN: Yes. Dewey Rick Martin, appearing on behalf of the plaintiff, Tara Miller.

MR. DOYLE: Chris Doyle, appearing on behalf of the defendant, the Department of Veterans Affairs.

COURT REPORTER: Ms. Bethany, please raise your right hand. Do you solemnly swear or affirm the testimony you're about to give today will be the truth, the whole truth, and nothing but the truth so help you God?

**THE WITNESS: Yes, sir.**

COURT REPORTER: Please proceed.

(Witness sworn by Notary Public)

DIRECT EXAMINATION

BY MR. MARTIN:

Q Good morning, Ms. Bethany. How are you?

**A Morning, Mr. Rick. I'm good. How about yourself?**

Q I'm pretty good. Thank you. My name is Dewey Rick Martin and I'm the attorney for Tara Miller in this case that's been filed in federal court. I will be asking

you a series of questions. If you don't understand the question, let me know and I'll repeat it or rephrase it. But once you've answered, we'll assume that you understood the question and your answer is truthful; fair enough?
**A Fair enough. Yes.**
Q Now, during federal court litigation we are able to get discovery. And in this litigation we did get quite a bit of discovery. Discovery is getting information that's provided by the VA, which include emails, personnel, records, things of that nature --
**A Uh-huh.**
Q -- as far as information about the case.
**A Uh-huh.**
Q So, I have quite a bit. And a lot of the answers -- questions I may ask I may already know the answer to it because of the information that I have.
**A Uh-huh.**
Q But I have to ask you the question and any other witness the question to get the answer from that particular witness so it's admissible in court. In other words, I can't use this book, we have -- that's why we have -- take depositions from witnesses. So a lot of questions I already have the answer to, but you have to answer.
**A Okay.**

Q My first question, Ms. Bethany, is did you ever tape any conversations while you were at the VA? Record any conversations?
**A No.**
Q Okay. Did you know that Tara Miller did record conversation? Did you know that?
**A No.**
Q Okay. Well, she did record conversation and mainly because she was concerned as to what was going on and she felt that she was being mistreated. So, you understand that you're under oath. Mr. Coleman just read you the -- informed you that you were under oath. You raise your right hand. So we expect you to tell the truth, and I expect you to tell the truth, and I think you will tell the truth. So my question is this, isn't it true that you informed Angela Thompson that you had a child?
**A That I had a child?**
Q You have a child?
**A Yes.**
Q Okay.
**A Yeah.**
Q You discussed this child with Angela Thompson from time to time?
**A Yeah.**

Q Correct?
**A Yes.**
Q Okay. And it was at the workplace setting, correct?
**A Yes.**
Q Okay. And your child's nickname is Tutu?
**A Tutu, yes.**
Q Okay.
**A That's his nickname.**
Q You have a mother that's very, very caring and helpful. A great grandma, let's put it that way. Is that fair to say?
**A Yes.**
Q Okay. And you started working at the VA -- well, when I say at the VA what I mean is in May when you were hired at the hospital. During that time your mom lived out of state, correct?
**A No, I'm confused. Could you --**
Q Did your mom --
**A -- restate the question?**
Q Yeah.
**A Restate the question.**
Q In May of --
**A Working?**
Q Yeah, no problem. In May of 2020 --
**A Okay.**

Q -- did your mom live out of state?
**A Yes.**
Q Okay. And at that time you were not with Tutu's dad, correct?
**A Correct.**
Q Okay. And isn't it true that during that time your mom helped out with Tutu, in other words, caring for Tutu?
**A Yeah, but she wasn't there then.**
Q But she was out of state --
**A It was during lockdown of COVID. So, no, she wasn't present at that time.**
Q No. She was out of state, correct?
**A Correct.**
Q Okay. And what state was she living in? Was it Kentucky?
**A Correct.**
Q Okay. And during that time Tutu would be in Kentucky with your mom helping you out so you would be able to work, correct?
**A Yes and no. So, during that time, that was still the beginning, you know, of, you know, United States, you know, dealing with COVID, still investigating the disease and all that right there. So some of the time my son would be with his father, and then, you know, my mom would help. But I think around this time, my**

**mother, she -- again, she was not there. It was with his father.**
Q His father lived where?
A **In Detroit.**
Q Now, I know your mom wasn't there, she was in Kentucky. But isn't it true that you told Angela that you would take Tutu down to Kentucky and your mom would take care of him and you would visit while you were working? Isn't it true that you told her that Tutu would be in Kentucky and your mom was caring for Tutu? Babysitting --
A **Yeah.**
Q -- her grandson.
A **I mean --**
Q And that allowed you to be able to --
A **To work.**
Q -- work. Yes.
A **Yeah.**
Q Okay. There's nothing wrong with that, you get a great --
A **No, no it is. I'm just -- I'm -- I guess I'm just confused. I don't know. Okay.**
Q Okay. All right. Yeah, you got a great grandmother, so, a mother, you know, she loves her Tutu. And at time you would go down there when you got an opportunity to

visit and, you know, with Tutu while your mom was caring for?
A **Yes.**
Q Okay. That went on from about May, 2020 until around February, 2021.
A **No. That's what I'm saying. I'm -- that's what I'm like, I'm confused.**
Q No. That's okay.
A **I'm sorry for laughing. No.**
Q It went on from May, 2020 --
A **When the lockdown happened, okay, his father had him. I did not send my child -- no, nope, I don't even want to say that because his father had him for like a year and a half. I would get my son on the weekends. So that's why I'm like, I'm confused. I mean, and not to be like disrespectful or anything. I'm trying to see what's --**
Q No, I understand.
A **-- of this with Tara.**
Q No, I understand. So, weekends -- so from May, 2020 -- and just to give you a time reference, we're talking about when you started working at the VA with Tara Miller and Angela Thompson, okay?
A **Right.**
Q So just for a time reference, we're talking about that time period, okay?

A **Okay.**
Q So you got hired around May, 2020, correct?
A **I believe so. I would have to look at my SF-50, but yeah, I believe so. Yeah.**
Q All right.
A **Yeah, I had my son around that time. He was with his father.**
Q And you had him on the weekends?
A **And I would have him on the weekends. That was the arrangement that I made with his father.**
Q Okay. And he stood by that arrangement? He kept that arrangement?
A **For the most part, yeah.**
Q Okay. When was the time period that Tutu stayed with your mom in Kentucky?
A **That was probably like the following year, because I was by myself with my son during that timeframe when that lockdown and all of that stuff commenced, when they were issuing the ordinance of, you know, isolation, you know --**
Q I understand.
A **-- and, you know, monitoring the people you are around. So, no, me I took that very seriously because my son is at risk. He doesn't have asthma, however, when he catches a cold, he gets bronchiolitis and then he has to**

**have breathing treatments. I have to take him to the hospital because he has trouble breathing. And I know I was at risk as well for some medical conditions that I have. So I isolated us. I -- so that's why I'm like, I know around that timeframe I didn't go see my mom or my mom didn't come up until like the following year. And then that was like later on down the line. But his father had him.**

Q Okay. And the arrangements you made for his father to have him during the week and for you to have him on the weekends was for what reason? Because you were working?

**A To spend time with him. To spend time --**

Q No, no, no. The reason why you only had him on the weekends was because you were working during the week? Is that --

**A Correct.**

Q -- why you made that arrangement?

**A Correct. Because his father had a -- his own business. But during that timeframe, because March was when COVID hit Michigan.**

Q That's true.

**A So as the cases developed, they started giving ordinances about having people around. So I asked his father, you know, could you keep him? Because I have to report to work. I have to. I don't have a choice**

**because I was mission critical. So yeah.**
**So he would keep him during the weekday, I work Monday through Friday, and then I would get my son Saturday and spend time with him on Sunday. I would give him back to his father either Sunday night or early Monday morning he would meet me at the job before I clocked in. Well, not clocked in, we don't clock in. Before I went to work, he would pick him up early that morning.**
Q I see. And it was -- like you said, it was to trying to protect Tutu also?
**A Correct.**
Q Because you were working every day.
**A Correct.**
Q And you have to work and be exposed to a lot of people, correct? At the VA.
**A Correct.**
Q Okay. That makes sense. How's little Tutu doing now? I hope well.
**A He's good. Big seven years old.**
Q I was going to say, he's probably what? Seven now you said?
**A Yep. Big seven.**
Q Now, are you able to see -- keep him more often now, Ms. Bethany, that COVID has --
**A Yeah, I mean, custody never changed or anything. I'm**

**still the primary custodial parent. I have him the majority of the time.**

Q I see.

**A So nothing has changed regarding that. It was just it was a pandemic disease that nobody knew how to deal with nor treat so I made the best decision possible for my son.**

Q Understood. And you were fortunate that the father worked with you on that. A lot of times you don't get that.

**A Correct. He wasn't able to work. He wa -- he was -- he -- nobody could, you know, for -- except for hospitals primarily.**

Q Right.

**A Or for mission critical, you know, suppliers, you know, of medicines, goods, you know, stuff like that. But other than that, no. His father sold car ramps. That's what his father do. He was an authorized dealer of car ramps. So if there is no car shows or anything of the net -- nature he couldn't travel. So he was at home. So I would like get groceries and stuff like that for them and send it -- you know, drop it off at the front of his doorstep. Like, I just saw my son on the weekends.**

Q I understand. And everybody got through it,

fortunately.
**A Yeah. Through the grace of God, me and my son we've never contracted COVID since its existence.**
Q Good.
**A Knock on wood.**
Q True. Well, you all did a good job, let's put it that way.
**A Yeah.**
Q That arrangement worked out. So, I was looking at your personnel file and it appears that you received pretty good performance evaluations; is that correct?
**A Yes.**
Q Okay. It looks like the only problem you had as far as performance was a little timeliness problem. You came late.
**A Correct.**
Q Okay.
**A Correct.**
Q Now, what would you -- what reason -- you just -- are you a late night person and just kind of get up late? How is it that you were having trouble coming to work in a timely fashion?
**A Okay.**
Q In other words not being late.
MR. DOYLE: Object to form.

THE WITNESS: No, no, no. That's fine. So, the reason why I was coming late was because my son's father -- now, with my son's father, because of the dis -- because of the pandemic, this would've been his first time dealing with Caden on a full-time basis. Now, granted, our custody arrangement is joint custody. It's a week on and a week off. Okay?

However, my son's father did not live up to that arrangement. So I would keep Caden majority of the time, even on his time, I had him all the time. Okay?

I did not browbeat him into keeping his child prior to the disease hitting the United States and hitting Michigan, only when the disease hit, that's when I had to meet my son's father. I said, Hey, we have to come together. This is something different. You have to keep him.

BY MR. MARTIN:

Q Okay. So --

A So that was the arrangement --

Q I'm sorry, go ahead.

A -- we had. That was the arrangement that we had. So with that he's like -- you know, a father of that magnitude, you know, who hasn't dealt with the responsibility of having a full-time child, I was like, Hey, I have a new job. I can't be late. Okay? So I

need you to get here on time. Okay? And that's just it. Okay?

Or by me not being in the bargaining unit anymore, because my previous job I was an advanced medical support assistant. I had a chief who was aware of my circumstances. However, I did not let my circumstances defeat me. She would work with me when I needed her to work with me. Other than that, I would come to work, I'd do what I was supposed to do, I would work whatever she needed done, whatever the case may be. I was a stellar employee.

So, I said -- you know, and then I was in the union, so I was protected. However, when I transitioned over to HR, that's something totally different. I'm not protected under the bargain union anymore. So, you know, when it comes down to an action, you know, we're not as protected so it's easier for us to be fired than in the Bargaining Unit. It's a process. Granted -- in the non-bargaining unit is a process, but you're not as protected.

So by me knowing that, I'm like, Hey, you know, I need you to do what I -- you know, I need you to pick him up. So he said he understood but he made some errors with that. He did. A lot of times I would be sitting outside. I got to work on time. However, I am sitting

**outside looking at my supervisor as he takes smoke breaks before my shift. He would go up there, he would take smoke breaks all the time around that time, and I'm standing there looking at him. But I would --**

Q What's his name?

**A -- never say anything.**

Q What's the supervisor's name?

**A Our supervisor was Eric Osterbeck.**

Q Okay. Go ahead.

**A Yep. So I will be watching him take his smoke break and I'm sitting there waiting on my child's father to show up sometimes**

Q Show up where?

**A Show up to the job to retrieve -- so we can exchange the child and then I can go to work.**

Q You testified a few minutes ago that you would drop the child off at your -- at the father's -- you would drop the child off at your father's so that way you would be able to go to work. You recall that testimony under oath?

**A No, I stated that the father, we would -- I would give the child to the father. You know, he had my son during COVID, but --**

Q Right. That's when you would drop him off in May. During COVID, when you got your new job, that's when you

told him, look, you got to start taking care of business. You would dro -- you got an arrangement. Let me just finish. You have to --

**A Okay.**

Q You have an arrangement where you would drop off your child -- this is your testimony under oath. You would drop your child off to the fathers and then you would go to work. He would keep them during the week, you would make the change on Fridays, and you would have your child, Tutu, the weekends. Do you recall that testimony under oath?

**A No.**

MR. MARTIN: Okay. Mr. Coleman, can you read back when I first asked about the arrangements that she made with her with -- Tutu's father we -- in May of 2020?

COURT REPORTER: Yeah, that'll take a minute. It -- so that was --

MR. MARTIN: I understand.

COURT REPORTER: Sure. Standby.

MR. MARTIN: Okay. Thank you. Take as much time as you need.

**THE WITNESS: Okay.**

COURT REPORTER: Okay. That's about seven minutes ago. No, that was before that. We'll get it, Counsel.

MR. MARTIN: I'm sorry?

COURT REPORTER: I said we'll get it. I'll get it for you.

MR. MARTIN: Oh, no problem. I know you will. Maybe picking --

COURT REPORTER: Say it again.

MR. MARTIN: -- I had my child over the weekends.

COURT REPORTER: Say it again, Mr. Wilson.

MR. MARTIN: Oh, Martin,

COURT REPORTER: I'm so sorry. Mr. Martin.

MR. MARTIN: Oh, that's okay. Picking my child over the weekends, I would have my child over the weekends.

COURT REPORTER: Okay.

MR. MARTIN: Maybe that might help.

COURT REPORTER: Okay.

**THE WITNESS: Right. I don't think I clarified of how he was dropped off, whether or how you know, the arrangement of it.**

MR. MARTIN: Well, that's what we're going to find out, Ms. Bethany. We're going to find that out.

COURT REPORTER: Standby.

MR. DOYLE: We'll just have the court reporter read back what you said earlier, Erica.

**THE WITNESS: Oh no, go ahead.**

MR. DOYLE: And then, you know, you can -- Rick

will ask you any follow up questions or anything like that, okay?

**THE WITNESS: Okay.**

COURT REPORTER: I went back too far.

COURT REPORTER: Okay. I am all set. Thank you.

MR. MARTIN: Okay.

BY MR. MARTIN:

Q Ms. Bethany, I'm going to go back. You've discussed two different arrangements of problems with Tutu's dad. You've said that you had a problem with him and you were late a lot because he wasn't doing the right thing as far as coming by or whatever. There was problems. And then you told him, look, I can't afford to lose this job. I got to be at work on time. When the COVID hit, he's not working, your testimony was that during that May time when you got at the VA, when you were hired, that you would drop off Tutu because he's not working -- the father's not working. You would drop him off and leave him with the dad for the week. And it was his responsibility, I guess, to take care of Tutu, if he had to go to school, whatever he had to do, and then you would have him on the weekends.

**A Okay.**

Q Can you recall the testimony?

**A Okay. So, in that, let me make a correction then.**

**Because you're -- when you have a child, yes, you can drop them off and then you can go up there and have them picked up. So, our drop off varied from time to time. Okay. So I would drop them off and then he would come and pick them up. So we had different things that we had to alternate.**

Q I understand.

**A So, I mean, life happens.**

Q I understand.

**A If you say, okay, well, Eric, I can't, you know, don't drop him at the house, can drop him off from here, then, you know, that's just what it was.**

Q Now, the records show that you were late about four or five, sometimes every day when you first started at the VA --

**A I wasn't late --**

Q May of 2020.

**A I wasn't late. No, I wasn't late every day. I was late sometimes. I was laid off.**

Q Okay. Three or four days a week. We got the records.

**A Yeah.**

Q Three or four days a week at times.

**A Okay.**

Q I'm not saying a half an hour, hour late, but you like --

A No, no, no. I get it. No. Eric used to give -- he gave a grace period. I think it was like 15 minutes. Then after that you were late.
Q Okay. So, three or four days a week, you would be maybe 15 up to 15 minutes late, correct? Within that grace period.
A Okay. Yeah.
Q Okay. And at times, Mr. Osterbeck sent out an email letting people know you might be late, correct?
A I take it so. I -- I'm trying to recall. I think so. I think he would send out an email, let people know who was off that day, who will be late, I think. I'm trying to recall. I think.
Q I understand. No, I understand. We have it. Okay. So, when you work for the VA prior to -- I'm sorry. When you worked -- well, let me ask you this way. Where did you work prior to coming to the VA in May of 2020?
A See, okay. So, I worked for the VA. I had been working for the VA since September of 2007.
Q 2007?
A Correct.
Q And where were you working in 2007, Ms. Bethany?
A For the VA.
Q Yeah. What location?
A Detroit. John D. Dingell VA Medical Center.

Q Okay. And that's where you were hired? The first job you had with the VA was at the medical center, Dingell?
A **Yes.**
Q Okay.
A **I came in at pre-registration. Came in the registration.**
Q And what job were you hired into in 2007? Your first job, Ms. Bethany.
A **Registration.**
Q And did you receive training for that position?
A **Yes. There was a part-time and it was a pilot. Got hired in registration for a job called pre-registration. So it was a pilot position in which we would reach out to veterans who had not been seen or hasn't had their means tests done in years. It was to reestablish ourselves with the veterans.**
Q I understand. Okay. Thank you. So you worked in that position until when? Approximately.
A **Until -- God. Whew. I worked there -- God. I worked there for probably like six, maybe seven months. And because that was a temp -- temporary position. They were trying to make that a full-time position. So my full-time position was when I worked as a telephone operator. That's when I became a permanent employee.**
Q Okay. Thank you. And how long did you work in that

position as a telephone operator? Approximately.
A **I'm trying to remember because that was when I was in my twenties. Maybe a year and a half, maybe two, I guess.**
Q What was your next position?
A **My next position, I worked as a program support assistant for the CWT program, which stands for compensated work therapy program. I did the time cards and whatever the vocational rehab counselors needed.**
Q And how long did you work in that position with CWT program?
A **I believe I worked in that position around five years. Yeah, I believe around five years, maybe four.**
Q And what was your next posi -- that's okay. What was your next position?
A **My next position was an advanced medical support assistant. I worked that for probably like around maybe five or six years**
Q And next position at the VA?
A **Then after that then I came into working into HR.**
Q Now, looking at the VA policies, and I reviewed quite a few, would you agree that they take being on time seriously? The VA.
MR. DOYLE: Object to form and foundation.
**THE WITNESS: Yeah.**
BY MR. MARTIN:

Q They expect workers to be on time through your career there, correct?
MR. DOYLE: Object to form.
**THE WITNESS: I'm sorry?**
BY MR. MARTIN:
Q Did any of your supervisors tell you and your team that they expect people to be on time?
**A In what? In my different various positions?**
Q Yes.
**A I mean, yeah. But they understood life happens.**
Q I understand that. And if you were a supervisor, you would expect people to be on time and if they have an explanation, life happens, but you would expect them to be on time, correct?
**A Correct.**
Q Okay. Being on time at any job is -- you believe is important, correct?
MR. DOYLE: Object to form.
**THE WITNESS: Yeah, it's essential.**
BY MR. MARTIN:
Q Okay. It's essential, correct?
**A Okay.**
Q Right?
**A I mean, yeah, it's -- yeah.**
Q Because there's things you're be -- there's things that

they expect you to do, correct? When I say you, I mean all employees to do, right?

**A Yes.**

Q Okay. And there are times with you're not on time, not just you, anyone, it could affect other employees, correct? Their job, correct?

**A Not necessarily.**

Q But it can, correct?

**A It can, but not necessarily. It just depends.**

Q Right. I understand. Now, during the time you worked at these other positions, were you ever disciplined for any misconduct or for being late or for being absent?

**A One time with my -- what is this? With my program support assistant job. I was -- what is it? I got an admonishment, I believe. Yeah. That was my one time ever in my VA career getting one disciplinary. It was an admonishment --**

Q And what was it for?

**A Admonishment, something like that.**

Q Okay. And what was it for?

**A It was for -- excuse me. It was for my -- I believe it was for my leave. I think it was for my leave. What it was, the supervisor then said I was abusing my sick leave. How? Or did he put me on sick leave? I don't know. It was so long ago. He said I was abusing sick**

**leave. However, I really wasn't. I was sickly during that timeframe. I was having some medical conditions that was going on. I didn't know what was going on because I was getting -- at that particular time I was getting my treatment from VA. I didn't have -- I -- well, I did not choose to get outside VA insurance because I'm a veteran myself.**

**So I was going to VA to get my care and I wasn't getting the answers that I needed. So it caused me to be out of, you know, from time to time. So when I got my own outside VA insurance, that's when I found out what was going on with me. But, yeah.**

Q Okay. That was around 2012, correct?

**A I don't know.**

Q Okay. I understand.

**A It was a long time ago.**

Q That's true. The document shows around 2012. Absent without leave and failure to follow instruction. So, when you went to HR, first of all, what were your duties and responsibilities as an HR representative when you got hired?

**A So, as an HR generalist? Because that's what we were. We were generalists.**

Q Okay.

**A Generalists, we were told that we're primarily going to**

do benefits. We would do a bit of ERLR. Then we were to do a bit of -- what is this called? We were to do workman's comp. However, that workman's comp piece, that was taken away. You know, they didn't -- and that was VAY for HR generalists. So we would do primarily benefits and then we would transition over to doing ERLR work. That was one of the reasons --
Q Can you explain -- I'm sorry, ma'am. Can you explain what you mean?
A ERLR?
Q Yeah.
A ERLR, so, employee labor relations. So, we would learn about the laws and, you know, giving guidance to employees that would ask questions or work with the ERLR specialist. We would eventually work with the ERLR specialist and navigate with the stuff that they wanted us to do and research stuff for them. That was -- we was going to get cross-trained on that.
So -- but that was why I got picked because I already had a background in ERLR, because I was previously -- excuse me, AFG's first vice president and I was there at that particular time in my career. I had became --
Q What do you mean -- excuse me, when you say AFG, can you explain that.
A American Federation of Government Employees. That's the

**union. I was the union's first vice president.**
Q Okay.
**A And then I was the youngest in AFGE history to be the chief steward. I started off as the chief steward.**
Q And how old were you at that time?
**A Oh, I was 24, 25.**
Q Okay.
**A They had never had a chief steward that young.**
Q Congratulations. So that makes you familiar with collective bargaining to a degree and also policies where the company or the VA can discipline people. You're familiar with that if they violate certain work rules, correct?
**A Correct. For the most part. For what I've been experienced and exposed to.**
Q Right. I understand. And even today, the VA has policies that they expect to be adhered to, which include timeliness and showing up for work, right? There's policies about that, correct?
**A Correct.**
Q Okay. And if the policy is violated the person can be disciplined, correct?
**A Correct. It's at the discretion of the supervisor. It is a case by case basis.**
Q Right. Now, you testified that the only discipline you

recall receiving was the admonishment; is that correct?
A **Correct.**
Q Okay. Were you ever disciplined by Eric Osterbeck?
A **Yeah, I got a writeup for me being late.**
Q And when was that?
A **I don't know. It was so long ago. I ain't trying to be funny. I'm -- I just know I got a writeup. I don't know. That's so many years ago.**
Q But this only -- I'm sorry, go ahead if you have to get the copy.
A **No, no, no, go ahead.**
Q Okay. Was there only one writeup that you recall Eric Osterbeck giving you?
A **Yeah, I only got one.**
MR. MARTIN: Counsel, do you have a copy of that? Because I don't see that in the document that you recently gave to me.
MR. DOYLE: Rick, if you're -- yeah, I think maybe it was an exhibit to Eric Osterbeck's dep , but I -- it wasn't in Ms. Bethany's personnel file, so --
**THE WITNESS: Right. Write-ups don't go in personnel files. It doesn't. Only administrative actions, admonishment, reprimands, suspensions, removal.**
MR. DOYLE: That's what Mr. Osterbeck testified that the writeup wouldn't go in her personnel file. But

I thought it was an exhibit during his deposition.

MR. MARTIN: Yeah, I don't recall now.

MR. DOYLE: I actually do have it in front of me now, Rick. It's Exhibit 2 to --

MR. MARTIN: Thanks, Chris.

MR. DOYLE: -- Osterbeck's deposition.

MR. MARTIN: Thanks. What date do you have on that? Thanks, Chris.

MR. DOYLE: So, I'm just looking at, yeah, Exhibit 2. It's dated July 23rd, 2020.

MR. MARTIN: And that's the writeup with respect to Ms. Bethany, correct?

MR. DOYLE: It says written counseling, Erica Bethany.

MR. MARTIN: Off the record. Can you read that to me, Chris, because I don't have it in front of me. This is off the record. Mr. Coleman?

COURT REPORTER: Yes.

(Off the record)

MR. MARTIN: All set?

COURT REPORTER: Yeah, back on the record?

MR. MARTIN: Back on the record. Yes. Back on the record. Thank you.

COURT REPORTER: Very nice. Thank you.

MR. MARTIN: Thank you, Mr. Cole.

BY MR. MARTIN:
Q Ms. Bethany, it's not your testimony that after July you continued to be late from time to time, coming in maybe within that 15 minute grace period, correct? That continued from time to time, correct?
MR. DOYLE: Objection, form.
**THE WITNESS: July. I don't recall. I don't know.**
BY MR. MARTIN:
Q July, 2020, you continued to be late from time to time in August, in September, in October, in November?
MR. DOYLE: Object to form.
**THE WITNESS: I'm sorry?**
BY MR. MARTIN:
Q You continue to be late from time to time -- like you said, things happen, you continue to be late from time to time after July of 2020. Isn't that true?
**A I don't know. I don't -- it's not like I see a time card. I don't know. I don't recall four years ago.**
Q Okay. So when you say time card, what do you mean?
**A I don't know. I can't recall what I did four years ago.**
Q No, no, no, no. When you said -- you refer to a time card. Do you have to punch in? Is there a time card?
**A No, we don't have a time card. I mean, we don't punch in on -- it's on the merit base. So, I mean, I know after I got that writeup, I wasn't late.**

Q Is your testimony now that after that writeup -- I'm sorry, is it your testimony?
A **I wasn't late like that anymore because I didn't want to risk getting in trouble.**
Q I understand. But it's your testimony on the oath, under oath that you were never late again even within the grace period after July of 2020. Is that your testimony under oath?
A **No, that is not my testimony under oath. I stated after July, I guess when I got that, I know I slowed down with calling off because I did talk to the father and expressed to him, Hey, I got wrote up today. This cannot happen. I also talked to Eric Osterbeck about what was going on because I did not make him aware of my private issues.**
**So, we had a talk and I expressed to him what was going on. And so he said, okay, I will work with you, but it can't be -- you know, you can't be, you know, tardy like that. Because I had told him about the occurrences where I could prove where I was there on time but I was watching him but he didn't know that that was me.**
**I would be sitting in my truck watching him take his smoke breaks and I would tell him everything that he did. And he was like, you were here? And I said, yes. And he was like, well, why didn't you say something,**

**Erica? I said, because I didn't want to come to my new job laying my personal issues here.**

Q How many times did that happen where you were -- you had little Tutu with you at the workplace in the parking lot watching or waiting for the father? How many times did that happen?

**A I don't know. That was four years ago.**

Q Okay. Because your testimony is that you would drop him -- little Tutu off at the father. That was your testimony.

**A No, I didn't clarify that.**

MR. DOYLE: Object to form.

**THE WITNESS: The -- yeah.**

BY MR. MARTIN:

Q Go ahead.

MR. DOYLE: You can respond, Erica.

**THE WITNESS: Okay.**

MR. DOYLE: I just wanted to get the objection on the record.

**THE WITNESS: So, I stated that he will be dropped off. So I get -- I wanted to give clarification. It's a child, we -- I can drop him off or he can be picked up. We just had an arrangement in order to get the child picked up so I can go to work.**

BY MR. MARTIN:

Q I understand. Your testimony was, because you want to make sure -- you don't want to be sitting around waiting for the dad. You wanted to make sure that Tutu was where he should be so you could be at work on time. And you would drop your child off with the father and then go to work.

**A The child would be picked up outside --**

Q I'm sorry, wait.

**A -- on my outside of the job or the job or the child would be picked up -- okay.**

Q Primarily you would drop the child off because you want to take that responsibility to make sure, because this is your job, not your -- not the father's job, to be at work on time. You had to do that. That -- like you said, that was your responsibility. And that's why as a responsible person, you said, I'm going to drop him off at your place so I could go to work. Wasn't that the arrangement?

**A No.**

Q Okay. So you're going to change the testimony.

**A I --**

MR. DOYLE: Object. Argumentative. Rick, we said the transcript's going to say what it says. So just ask the new question. The transcript's going to say what it says.

MR. MARTIN: I understand.

BY MR. MARTIN:

Q Ms. Bethany, what was the arrangement starting May, 2020 when you got your new job at the VA with respect to little Tutu who you had on the weekends? So, we're only talking about Friday and Monday, right? Because little Tutu would be with the father during the week; is that correct?

**A Okay. I have my child Friday when I get off work, I'll have him sometimes on Sundays. So if I have the child on Sunday -- correction, yeah. If I still continue to have the child, then the child will be picked up on Monday from the job. So it varied.**

Q Okay.

**A It varied.**

Q So Tuesday, Wednesday -- for sure, Tuesday, Wednesday, Thursday, and Friday Tutu was with the father and then you would get him Friday after work and keep him the weekend, correct?

**A Correct.**

Q Okay. All right. We're going to move --

MR. MARTIN: Chris, I don't have that much more. Let's take a -- well -- okay. I will pass the witness. Please.

MR. DOYLE: Okay. Thanks Rick. I don't have any

questions for Ms. Bethany. So --

MR. MARTIN: Okay.

MR. DOYLE: That's all we got.

MR. MARTIN: Ms. Bethany thank you very much.

COURT REPORTER: Deposition concluded. We are off record 12:06 p.m.

(Deposition concluded at 12:06 p.m.)

STATE OF MICHIGAN )
COUNTY OF WAYNE )

RECORDER'S CERTIFICATE AND NOTARIZATION

I, Donald Handyside, Court Recorder, do hereby certify that on Thursday, February 27, 2025, at 11:07 a.m., there did personally appear before me, Joseph Coleman, a Notary Public, ERICA BETHANY, that he did swear said person to tell the truth and I did then electronically record her testimony, the same being later reduced to typewriting and that the foregoing is a true and accurate transcription of said electronic recording taken at such time and place.

I further certify that I am not related to or employed by any party of this cause or their respective counsel.

DONALD HANDYSIDE (CER 1464)
Notary Public
My Commission Expires: 5/6/2027

## 1

**11:07** 4:5

**12:06** 38:6,8

**15** 23:2,5 33:4

## 2

**2** 32:4,10

**2007** 23:19,20,22 24:7

**2012** 28:13,17

**2020** 7:24 10:4,10,19 11:2 19:15 22:17 23:17 32:10 33:9, 16 34:7 37:3

**2021** 10:5

**2025** 4:5

**23rd** 32:10

**24** 30:6

**25** 30:6

**27th** 4:4

## A

**a.m.** 4:5

**absent** 27:12 28:17

**abusing** 27:23,25

**action** 17:16

**actions** 31:23

**adhered** 30:17

**administrative** 31:22

**admissible** 5:21

**admonishment** 27:15,17,19 31:1,23

**advanced** 17:4 25:15

**Affairs** 4:10

**affect** 27:5

**affirm** 4:12

**afford** 21:13

**AFG** 29:23

**AFG's** 29:21

**AFGE** 30:3

**agree** 25:21

**ahead** 16:20 18:9 20:24 31:9, 11 35:15

**allowed** 9:15

**alternate** 22:6

**American** 29:25

**Angela** 6:16,23 9:6 10:22

**answers** 5:15 28:9

**anymore** 17:3,15 34:3

**appearances** 4:6

**appearing** 4:7,9

**appears** 15:10

**approximately** 4:5 24:18 25:1

**Argumentative** 36:22

**arrangement** 11:10,11,12 12:17 15:9 16:6,9,19,21 19:2, 5 20:18 35:23 36:18 37:3

**arrangements** 12:9 19:14 21:9

**assistant** 17:5 25:6,16 27:14

**assume** 5:3

**asthma** 11:24

**attorney** 4:24

**August** 33:10

**authorized** 14:18

**aware** 17:5 34:14

## B

**Babysitting** 9:10

**back** 13:4 19:13 20:23 21:4,8 32:21,22

**background** 29:20

**bargain** 17:15

**bargaining** 17:3,18 30:10

**base** 33:24

**basis** 16:5 30:24

**beginning** 8:21

**behalf** 4:8,9

**benefits** 29:1,6

**Bethany** 4:3,11,21 6:1 13:24 20:20 21:8 23:22 24:8 32:12, 14 33:2 37:3 38:1,4

**Bethany's** 31:20

**Big** 13:19,22

**bit** 5:9,15 29:1,2

**book** 5:22

**break** 18:10

**breaks** 18:2,3 34:23

**breathing** 12:1,2

**bronchiolitis** 11:25

**browbeat** 16:11

**business** 12:18 19:2

## C

**Caden** 16:5,9

**called** 24:12 29:2

**calling** 34:11

**car** 14:17,18,19

**card** 33:18,19,22,23

**cards** 25:7

**care** 9:7 19:1 21:20 28:8

**career** 26:1 27:16 29:22

**caring** 7:9 8:7 9:10 10:1

**case** 4:24 5:13 17:10 30:24

**cases** 12:22

**catches** 11:25

**caused** 28:9

**center** 23:25 24:2

**change** 19:9 36:20

**changed** 13:25 14:4

**chief** 17:5 30:4,8

**child** 6:17,18,19,23 10:12 16:11,24 18:15,17,18,22 19:6,7,10 20:6,10,11 22:1 35:22,24 36:5,7,9,11 37:9,10,12

**child's** 7:5 18:11

**choice** 12:25

**choose** 28:6

**Chris** 4:9 32:5,8,16 37:22

**circumstances** 17:6

**clarification** 35:21

**clarified** 20:16

**clarify** 35:11

**clock** 13:7

**clocked** 13:6,7

**cold** 11:25

**Cole** 32:25

**Coleman** 6:11 19:13 32:17

**collective** 30:10

**commenced** 11:18

**comp** 29:3

**company** 30:11

**compensated** 25:7

**concerned** 6:9

**concluded** 38:5,8

**conditions** 12:4 28:2

**confused** 7:17 9:22 10:7,15

**Congratulations** 30:9

**continue** 33:14,15 37:11

**continued** 33:3,5,9

**contracted** 15:3

**conversation** 6:6,8

**conversations** 6:2,3

**copy** 31:10,15

**correct** 7:1,3,16 8:4,5,12,13,16,19 11:2 12:16,18 13:11,13,15,16 14:11 15:11,16,18 23:5,9,21 26:2,14,15,17,21 27:1,6,8 28:13 30:13,14,19,20,22,23 31:1,2 32:12 33:4,5 37:8,19,20

**correction** 21:25 37:11

**Counsel** 4:5 19:24 31:15

**counseling** 32:13

**counselors** 25:8

**court** 4:2,11,17,25 5:7,21 19:16,19,23 20:1,5,7,9,13,15,21,22 21:4,5 32:18,21,24 38:5

**COVID** 8:10,22 12:19 13:24 15:3 18:23,25 21:15

**critical** 13:1 14:15

**cross-trained** 29:18

**custodial** 14:1

**custody** 13:25 16:6

**CWT** 25:6,9

D

**dad** 8:3 21:9,19 36:3

**date** 32:7

**dated** 32:10

**day** 13:12 22:14,18 23:12

**days** 22:20,22 23:4

**deal** 14:5

**dealer** 14:18

**dealing** 8:22 16:5

**dealt** 16:23

**decision** 14:6

**defeat** 17:7

**defendant** 4:10

**degree** 30:10

**dep** 31:19

**Department** 4:10

**depends** 27:9

**deposition** 4:3 32:1,6 38:5,8

**depositions** 5:23

**Detroit** 9:4 23:25

**developed** 12:22

**Dewey** 4:7,23

**Dingell** 23:25 24:2

**DIRECT** 4:19

**dis** 16:3

**disciplinary** 27:16

**discipline** 30:11,25

**disciplined** 27:11 30:22 31:3

**discovery** 5:8,9

**discretion** 30:23

**discussed** 6:23 21:8

**disease** 8:23 14:5 16:12,13

**disrespectful** 10:16

**document** 28:17 31:16

**doorstep** 14:23

**Doyle** 4:9 15:25 20:22,25 25:23 26:3,18 31:18,24 32:3,6,9,13 33:6,11 35:12,16,18 36:22 37:25 38:3

**dro** 19:2

**drop** 14:22 18:16,17,24 19:5,7 21:17,19 22:2,3,4,11 35:8,22 36:5,11,16

**dropped** 20:17 35:20

**duties** 28:19

E

**earlier** 20:23

**early** 13:5,8

**easier** 17:17

**email** 23:8,11

**emails** 5:10

**employee** 17:11 24:24 29:12

**employees** 27:2,5 29:14,25

**Eric** 18:8 22:10 23:1 31:3,12, 19 34:13

**Erica** 4:3 20:23 32:13 35:1,16

**ERLR** 29:1,6,10,12,14,15,20

**errors** 17:23

**essential** 26:19,21

**evaluations** 15:11

**eventually** 29:15

**EXAMINATION** 4:19

**exchange** 18:14

**excuse** 27:21 29:21,23

**exhibit** 31:19 32:1,4,9

**existence** 15:3

**expect** 6:13,14 26:1,7,12,13 27:1 30:17

**experienced** 30:15

**explain** 29:8,24

**explanation** 26:13

**exposed** 13:14 30:15

**expressed** 34:12,16

F

**failure** 28:18

**fair** 5:5,6 7:10

**familiar** 30:9,12

**fashion** 15:22

**father** 8:24 9:2,3 10:11,13 11:7,10 12:8,9,18,24 13:5 14:8,17,18 16:2,3,8,14,22 18:11,21,22 19:15 34:11 35:5, 9 36:5 37:7,17

**father's** 18:17,18 21:18 36:13

**fathers** 19:7

**February** 4:4 10:5

**federal** 4:25 5:7

**Federation** 29:25

**felt** 6:10

**file** 15:10 31:20,25

**filed** 4:25

**files** 31:22

**find** 20:19,20

**fine** 16:1

**finish** 19:3

**fired** 17:17

**follow** 21:1 28:18

**form** 15:25 25:23 26:3,18 33:6,11 35:12

**fortunate** 14:8

**fortunately** 15:1

**found** 28:11

**foundation** 25:23

**Friday** 13:3 37:6,9,17,18

**Fridays** 19:9

**front** 14:22 32:3,16

**full-time** 16:5,24 24:22,23

**funny** 31:7

G

**gave** 23:2 31:17

**generalist** 28:22

**generalists** 28:23,25 29:5

**give** 4:13 10:20 13:4 18:21 23:1 35:21

**giving** 12:22 29:13 31:13

**God** 4:15 15:2 24:19

**good** 4:21,22,23 13:19 15:4,6, 11

**goods** 14:16

**Government** 29:25

**grace** 15:2 23:2,5 33:4 34:7

**grandma** 7:10

**grandmother** 9:23

**grandson** 9:13

**granted** 16:6 17:18

**great** 7:10 9:19,23

**groceries** 14:21

**guess** 9:21 21:20 25:3 34:10

**guidance** 29:13

H

**half** 10:14 22:24 25:3

**hand** 4:12 6:13

**happen** 33:15 34:13 35:3,6

**happened** 10:11

**helped** 8:7

**helpful** 7:9

**helping** 8:18

**Hey** 16:14,25 17:21 34:12

**hired** 7:14 11:2 21:17 24:1,7, 12 28:21

**history** 30:3

**hit** 12:20 16:13 21:15

**hitting** 16:12

**home** 14:20

**hope** 13:18

**hospital** 7:15 12:2

**hospitals** 14:12

**hour** 22:24

**house** 22:11

**How's** 13:17

**HR** 17:14 25:19 28:19,20,22 29:5

I

**important** 26:17

**include** 5:10 30:18

**information** 5:9,13,17

**informed** 6:12,16

**instruction** 28:18

**insurance** 28:6,11

**investigating** 8:22

**isolated** 12:4

**isolation** 11:19

**issues** 34:15 35:2

**issuing** 11:19

J

**job** 13:6 15:6 16:25 17:4 18:14,25 21:14 24:1,7,8,12 26:16 27:6,14 35:2 36:9,13 37:4,13

**John** 23:25

**joint** 16:6

**July** 32:10 33:2,7,9,16 34:7,10

K

**keeping** 16:11

**Kentucky** 8:15,17 9:5,7,10 11:15

**kind** 15:20

**knew** 14:5

**Knock** 15:5

**knowing** 17:21

L

**labor** 29:12

**laid** 22:19

**late** 15:15,20,24 16:2,25 21:11 22:13,16,18,24 23:3,5,9,12 27:12 31:4 33:3,9,14,15,25 34:3,6

**laughing** 10:9

**laws** 29:13

**laying** 35:2

**learn** 29:12

**leave** 21:19 27:22,24 28:1,18

**letting** 23:9

**life** 22:8 26:10,13

**litigation** 5:7,8

**live** 8:1 16:8

**lived** 7:15 9:3

**living** 8:14

**location** 23:24

**lockdown** 8:10 10:11 11:18

**long** 24:25 25:9 27:25 28:16 31:6

**lose** 21:13

**lot** 5:15,23 13:14 14:9 17:24 21:11 35:4

**loves** 9:24

M

**made** 11:10 12:9,17 14:6 17:23 19:14

**magnitude** 16:23

**majority** 14:2 16:9

**make** 19:9 21:25 24:22 34:14 36:2,3,12

**makes** 13:17 30:9

**March** 12:19

**Martin** 4:7,20,24 16:17 19:13, 18,20,25 20:3,6,8,9,10,14,19 21:6,7 25:25 26:5,20 31:15 32:2,5,7,11,15,20,22,25 33:1, 8,13 35:14,25 37:1,2,22 38:2, 4

**means** 24:15

**medical** 12:3 17:4 23:25 24:2 25:15 28:2

**medicines** 14:16

**meet** 13:6 16:14

**merit** 33:24

**Michigan** 12:20 16:13

**Miller** 4:8,24 6:5 10:22

**minute** 19:16 33:4

**minutes** 18:16 19:23 23:2,5

**misconduct** 27:12

**mission** 13:1 14:15

**mistreated** 6:10

**mom** 7:15,18 8:1,6,18,25 9:5, 7,10 10:1 11:15 12:6

**Monday** 13:2,5 37:6,13

**monitoring** 11:22

**months** 24:20

**morning** 4:21,22 13:5,8

**mother** 7:9 9:1,24

**move** 37:21

N

**nature** 5:11 14:20

**navigate** 29:16

**necessarily** 27:7,9

**needed** 17:7,10 25:8 28:9

**net** 14:20

**nice** 32:24

**nickname** 7:5,8

**night** 13:5 15:20

**non-bargaining** 17:19

**Notary** 4:18

**November** 33:10

**O**

**oath** 6:11,12 18:20 19:6,11 34:5,6,8,9

**Object** 15:25 25:23 26:3,18 33:11 35:12 36:22

**objection** 33:6 35:18

**occurrences** 34:19

**October** 33:10

**operator** 24:24 25:1

**opportunity** 9:25

**order** 35:23

**ordinance** 11:19

**ordinances** 12:23

**Osterbeck** 18:8 23:8 31:3,13, 24 34:13

**Osterbeck's** 31:19 32:6

**P**

**p.m.** 38:6,8

**pandemic** 14:5 16:4

**parent** 14:1

**parking** 35:4

**part** 11:13 30:14

**part-time** 24:11

**pass** 37:23

**people** 11:22 12:23 13:14 23:9,11 26:7,12 30:11

**performance** 15:11,14

**period** 10:25 11:14 23:2,6 33:4 34:7

**permanent** 24:24

**person** 15:20 30:21 36:16

**personal** 35:2

**personnel** 5:11 15:10 31:20, 22,25

**pick** 13:8 17:22 22:5

**picked** 22:3 29:19 35:22,24 36:7,10 37:12

**picking** 20:4,10

**piece** 29:3

**pilot** 24:11,13

**place** 36:17

**plaintiff** 4:8

**policies** 25:20 30:10,17,19

**policy** 30:21

**posi** 25:13

**position** 24:10,13,18,21,22,23 25:1,4,5,9,11,14,15,18

**positions** 26:8 27:11

**pre-registration** 24:5,12

**present** 8:11

**president** 29:21 30:1

**pretty** 4:23 15:10

**previous** 17:4

**previously** 29:20

**primarily** 14:13 28:25 29:5 36:11

**primary** 14:1

**prior** 16:11 23:15,17

**private** 34:15

**problem** 7:24 15:13,14 20:3 21:10

**problems** 21:9,12

**proceed** 4:17

**process** 17:18,19

**program** 25:5,6,7,10 27:13

**protect** 13:10

**protected** 17:13,15,17,20

**prove** 34:20

**provided** 5:10

**Public** 4:18

**punch** 33:22,23

**put** 7:10 15:6 27:24

**Q**

**question** 5:2,4,19,20 6:1,15 7:19,21 36:24

**questions** 5:1,16,23 21:1 29:14 38:1

**R**

**raise** 4:11 6:13

**ramps** 14:17,19

**reach** 24:13

**read** 6:12 19:13 20:22 32:15

**reason** 12:11,13 15:19 16:2

**reasons** 29:7

**recall** 18:19 19:10 21:24 23:10,13 31:1,12 32:2 33:7, 18,20

**receive** 24:10

**received** 15:10

**receiving** 31:1

**recently** 31:17

**record** 4:2,6 6:2,5,8 32:15,17, 19,21,22,23 35:19 38:6

**records** 5:11 22:13,20

**reestablish** 24:15

**refer** 33:21

**reference** 10:20,24

**registration** 24:6,9,12

**rehab** 25:8

**relations** 29:12

**remember** 25:2

**remotely** 4:4

**removal** 31:23

**repeat** 5:2

**rephrase** 5:2

**report** 12:25

**reporter** 4:2,11,17 19:16,19,23 20:1,5,7,9,13,15,21,22 21:4,5 32:18,21,24 38:5

**representative** 28:20

**reprimands** 31:23

**research** 29:17

**respect** 32:11 37:4

**respond** 35:16

**responsibilities** 28:20

**responsibility** 16:24 21:20 36:12,15

**responsible** 36:16

**restate** 7:19,21

**retrieve** 18:14

**reviewed** 25:20

**Rick** 4:7,22,23 20:25 31:18 32:4 36:22 37:25

**risk** 11:24 12:3 34:4

**rules** 30:13

**S**

**Saturday** 13:3

**school** 21:21

**send** 10:12 14:22 23:11

**sense** 13:17

**September** 23:19 33:10

**series** 5:1

**set** 21:5 32:20

**setting** 7:3

**SF-50** 11:3

**shift** 18:2

**show** 18:11,13,14 22:13

**showing** 30:18

**shows** 14:19 28:17

**sick** 27:23,24,25

**sickly** 28:1

**sir** 4:16

**sitting** 17:24,25 18:11 34:22 36:2

**slowed** 34:10

**smoke** 18:1,3,10 34:23

**sold** 14:17

**solemnly** 4:12

**son** 8:24 10:14 11:6,17,23 13:3 14:7,23 15:2 18:22

**son's** 16:2,3,8,14

**specialist** 29:15,16

**spend** 12:12 13:4

**Standby** 19:19 20:21

**standing** 18:4

**stands** 25:6

**start** 19:1

**started** 7:13 10:21 12:22 22:14 30:4

**starting** 37:3

**state** 4:6 7:16 8:1,9,12,14

**stated** 18:21 34:9 35:20

**States** 8:21 16:12

**stayed** 11:14

**stellar** 17:11

**steward** 30:4,8

**stood** 11:11

**stuff** 11:18 14:16,21 29:16,17

**Sunday** 13:4,5 37:11

**Sundays** 37:10

**supervisor** 18:1,8 26:11 27:23 30:23

**supervisor's** 18:7

**supervisors** 26:6

**suppliers** 14:15

**support** 17:5 25:5,15 27:14

**supposed** 17:9

**suspensions** 31:23

**swear** 4:12

**sworn** 4:18

**T**

**takes** 18:1

**taking** 19:1

**talk** 34:11,16

**talked** 34:13

**talking** 10:20,24 37:6

**tape** 6:1

**Tara** 4:8,24 6:5 10:18,21

**tardy** 34:18

**team** 26:6

**telephone** 24:23 25:1

**temp** 24:21

**temporary** 24:21

**testified** 18:16 30:25 31:24

**testimony** 4:13 18:19 19:6,10 21:15,24 33:2 34:1,2,5,8,9 35:8,10 36:1,20

**tests** 24:15

**that'll** 19:16

**therapy** 25:7

**thing** 21:11

**things** 5:11 22:5 26:25 33:15

**Thompson** 6:16,23 10:22

**thought** 32:1

**Thursday** 37:17

**time** 4:5 6:23,24 7:15 8:3,6,11, 17,20,23,25 9:24 10:20,24,25 11:6,14 12:12 13:4 14:2 16:5, 10 17:1,25 18:3 19:20 21:14, 16 22:3 25:7,21 26:1,7,12,14, 16 27:4,10,13,15 28:4,10,16 29:22 30:5 33:3,5,9,14,15,16, 17,19,21,22,23 34:20 36:4,14

**timeframe** 11:17 12:5,19 28:2

**timeliness** 15:14 30:18

**timely** 15:22

**times** 14:9 17:24 22:22 23:8 27:4 35:3,5

**today** 4:4,13 30:16 34:12

**told** 9:6,9 19:1 21:13 28:25 34:19

**totally** 17:14

**training** 24:10

**transcript's** 36:23,24

**transition** 29:6

**transitioned** 17:13

**travel** 14:20

**treat** 14:6

**treatment** 28:5

**treatments** 12:1

**trouble** 12:2 15:21 34:4

**truck** 34:22

**true** 6:16 8:6 9:6,9 12:21 15:6 28:17 33:16

**truth** 4:13,14 6:14,15

**truthful** 5:4

**Tuesday** 37:16

**Tutu** 7:5,6 8:7,17 9:7,9,10,24 10:1 11:14 13:10,17 19:10 21:17,21 35:4,9 36:3 37:5,7, 17

**Tutu's** 8:3 19:15 21:9

**twenties** 25:3

### U

**Uh-huh** 5:12,14,18

**understand** 5:1 6:11 10:17,19 11:21 14:25 19:18 22:7,9 23:14 24:17 26:11 27:10 28:15 30:16 34:5 36:1 37:1

**understood** 5:4 14:8 17:23 26:10

**union** 17:12,15 30:1

**union's** 30:1

**unit** 17:3,18,19

**United** 8:21 16:12

### V

**VA** 5:10 6:2 7:13,14 10:21 13:15 21:16 22:15 23:15,17, 18,19,23,25 24:2 25:18,20,22 27:16 28:5,6,8,11 30:11,16 37:4

**varied** 22:3 37:13,15

**VAY** 29:5

**veteran** 28:7

**veterans** 4:10 24:14,16

**vice** 29:21 30:1

**violate** 30:12

**violated** 30:21

**visit** 9:8 10:1

**vocational** 25:8

### W

**wa** 14:11

**wait** 36:8

**waiting** 18:11 35:5 36:2

**wanted** 29:16 35:18,21 36:3

**watching** 18:10 34:21,22 35:5

**Wednesday** 37:16

**week** 12:10,14 16:7 19:8 21:19 22:20,22 23:4 37:7

**weekday** 13:2

**weekend** 37:19

**weekends** 10:14,19 11:8,9 12:11,14 14:24 19:10 20:6,11, 12 21:22 37:5

**Whew** 24:19

**Wilson** 20:7

**witnesses** 5:23

**wood** 15:5

**words** 5:21 8:7 15:24

**work** 8:19 9:16,17 12:25 13:2, 8,14 14:11 15:21 17:7,8,9,25 18:15,19 19:8 21:14 23:15,17 24:25 25:7,9 29:7,14,15 30:12,18 34:17 35:24 36:4,6, 14,17 37:9,18

**worked** 14:9 15:9 23:16,18 24:17,19,23 25:5,11,16 27:10

**workers** 26:1

**working** 7:13,23 9:8 10:21 12:11,14 13:12 21:15,18 23:18,22 25:19

**workman's** 29:3

**workplace** 7:3 35:4

**would've** 16:4

**Write-ups** 31:21

**writeup** 31:4,7,12,25 32:11 33:25 34:1

**written** 32:13

**wrong** 9:19

**wrote** 34:12

### Y

**year** 10:13 11:16 12:7 25:3

**years** 13:19 24:15 25:11,12,17

31:8 33:18,20 35:7

**young** 30:8

**youngest** 30:3

**Z**

**Zoom** 4:4