UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TARA D. MILLER
Plaintiff, Civil No. 22-12865
vs. Hon. F. Kay Behm
DENIS McDONOUGH, Mag. Judge Kimberly G. Altman
Secretary of the Department of
Veterans Affairs,
Defendants.
_____________________________/

The Deposition of SHAVON RENDER,
Taken Hanson Remote,
Commencing at 11:30 a.m.,
Thursday, January 16, 2025,
Before Susanne Ellen Gorman, CSR-9271, RPR.

APPEARANCES:

DEWEY R. MARTIN, ESQ. (P42484)
Law Offices of Dewey Rick Martin
13900 Woodward Avenue
Highland Park, Michigan 48203-3627
(313)963-1321
drickmartin@glottaassociates.com
Appearing on behalf of the Plaintiff.

CHRISTOPHER JAMES DOYLE, ESQ. (P79376)
Department of Justice
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3269
(313)226-9100
cjdoyle37@gmail.com
Appearing on behalf of the Defendant.

ASLO PRESENT:
LAUREN CIUCCI, Staff Attorney at Department of Veterans Affairs

TABLE OF CONTENTS


| SHAVON RENDER | PAGE |
|---|---|
| Examination<br>By Mr. Martin | 6 |


EXHIBITS


| EXHIBIT | PAGE |
|---|---|
| (Exhibits not offered.) | |

Remote deposition
Thursday, January 16, 2025
About 11:30 a.m.

COURT REPORTER: My name is Susanne Gorman, a Michigan State notary public and certified shorthand reporter, and this deposition is being held via videoconferencing equipment. The witness and reporter are not in the same room. The witness will be sworn in remotely pursuant to agreement of all parties. The parties stipulate that the testimony is being given as if the witness was sworn in person.

Do you solemnly swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

**THE WITNESS: Yes.**

**SHAVON RENDER,**

**having first been duly sworn, was examined and testified on her oath as follows:**

MR. MARTIN: Good morning, Ms. Render. How are you?

**THE WITNESS: Good morning. I'm good. How are you?**

MR. MARTIN: Good. Good. I'm fine. Thanks. I'm just glad it's not Monday next week that we're doing this deposition, below zero.

**THE WITNESS: Yeah.**

MR. MARTIN: You didn't have any trouble coming in?

**THE WITNESS: No, none at all.**

MR. MARTIN: Good. Okay. I represent Tara Miller in the case that she has against the VA. I will be asking you a series of questions regarding your employment and your knowledge of different things that may have happened or didn't happen during your employment. If you don't understand a question, just let me know, and I'll repeat the question, or I'll rephrase the question. Okay? Just let me know.

**THE WITNESS: Okay.**

MR. MARTIN: And if you answer, then we will assume that you understood the question and your answer is truthful. Fair enough?

**THE WITNESS: Yes.**

MR. MARTIN: Okay. And if you need a break anytime -- your deposition should not be long, but if you do need a break, just let me know, but you have to finish the answer to the question -- you have to answer the question, and then you can take a break. Let me know. We can take a five-minute break or whatever you need. Okay?

**THE WITNESS: Okay.**

MR. MARTIN: Can you please give us your -- now there are some questions I might be asking; it might be a little bit personal, and it's not to get into your personal business, and it's only a couple questions. It's only in case we need to subpoena you and you no longer are at the VA. Then I have to mail the subpoena, so that's why we need to know your home address -- your present home address okay?

**THE WITNESS: Okay.**

EXAMINATION

BY MR. MARTIN:

Q. All right. Can you please state your full name.

**A. Shavon Nicole Render.**

Q. And date of birth, please.

**A. January 31, 1981.**

Q. Just a little background. Did you graduate from high school?

**A. Yes.**

Q. Okay. What high school and what year?

**A. I graduated from Bitburg American High School in 1999.**

Q. And where is that located?

**A. Bitburg, Germany.**

Q. So I take it you speak more than one language?

**A. Actually, while I was in Germany, I learned Spanish.**

Q. Did you, really? Do you know German?

A. **The food was good, but I wasn't too fond of the language.**
Q. Okay. Can you briefly go over your educational history after high school. Anything else?
A. **Yes. I received my bachelor's degree.**
Q. From where and in what subject and what year?
A. **Baker College. I don't really remember the year. I would have go back to the --**
Q. That's okay.
A. **And it was in business administration.**
Q. Was it before you got hired with the VA or after?
A. **Yes --**
Q. Okay.
A. **-- it was before.**
Q. What was your first serious job after you graduated from college?
A. **Secretary with the Department of Defense.**
Q. And where were you located at that time?
A. **Selfridge Air National Guard Base, and that's in Michigan.**
Q. Okay. How long did you work in that position?
A. **In that position, I was there for eight years.**
Q. Do you recall what year you started, approximately?
A. **I started -- I actually started there in 2008, and while I was working there is when I received my**

degree, and I was in a secretary position after I received my degree.
Q. Okay. Were you ever in the service?
A. No, I was never in the service.
Q. And any other positions other than secretary during the years you were at the Department -- was it Department of --
A. It's the Department of Defense.
Q. -- Defense?
A. No.
Q. And what was your next job, Ms. Render?
A. My next job was HR assistant with the VA at John D. Dingell VA Medical Center.
Q. In what year, approximately, did you start that position? What month?
A. January of 2021.
Q. Can you briefly go over your job duties, your primary job duties.
A. My primary job duties were to instruct new employees with their benefits regarding their insurances -- health insurance, dental, vision, also their benefits regarding sick time, annual leave, making sure those employees -- their information was correctly input into the system. And that included personal information, making sure their payroll information was

**correctly submitted into the system so they wouldn't have any issues.**

Q. That's a lot of -- I'm sure you didn't go over everything, but those are the main duties; correct?

**A. Correct.**

Q. That's a lot of important duties and responsibilities. Did the VA provide you any training for that?

**A. During the time that I got there, the other two young ladies, Tara Miller and Erica Bethany, were human resource assistants, and the supervisor instructed them and let me know that they would be training me along with our leads, which were Angela Thompson and Sandra Barber.**

Q. And you said the supervisor told you they would be training you. Who was the supervisor at the time?

**A. Eric Osterbeck.**

Q. Did you interview with Mr. Osterbeck for the job?

**A. Yes, I did interview with Mr. Osterbeck.**

Q. So tell me the procedure, the process. What is the first thing you did to get that position at the VA? Was it a job opening that you applied -- just kind of take us through the process.

**A. Okay. There was a job posting on usajobs.gov, and I applied for that position. Several months later I received a phone call asking if I was still interested**

in the position, and there was an interview -- I don't recall how soon afterwards, but there was an interview for the position. I was told -- I'm not sure when -- how long after the interview that I got the job and was given a start date. I had to do a physical and fill out -- come in to fill out some paperwork prior to the start date as well.

Q. Okay. And who's the person that called you and told you and asked you if you were still interested?

A. Eric Osterbeck.

Q. And that was the first time you had any communication with Mr. Osterbeck?

A. Yes.

Q. And who were all involved in the interview that you had -- your first interview? Do you recall the names of the individuals involved?

A. I don't recall everyone, if there was more than one person. I recall Eric Osterbeck, but I really don't remember.

Q. Okay. You had never been a HR specialist, I take it, anywhere else. Correct?

A. Correct.

Q. But you had a wealth of secretary experience; correct?

A. Yes. And it wasn't a specialist. It was an HR assistant.

Q. I'm sorry. And you had a wealth of secretarial experience?

**A. Correct.**

Q. Just curious, any reason why you wanted to leave -- I know my mom was a secretary for 30 years with the City of Detroit, and she enjoyed it, but when a lot of the young people started coming in, it got a little bit too much. They didn't have the same kind of work ethic, so she's, like, okay. She got -- retired, got her 25 years and left; so -- and that could be very demanding, a secretary job. I understand that from my mom. Was it any reason why you left -- was it just that you got tired and wanted to make another move, do something else? Was it -- what reason -- was it money, or what reason was it?

**A. In the position that I held, there was no movement upward, and HR, they have a better chance of being able to promote, and that was pretty much the reasoning. Also, in the secretary position, I was a liaison with HR, so I received a lot of information and training with HR, and I actually enjoyed giving out the information as a secretary, so I wanted to see how, you know, much further I could go with that.**

Q. Especially when you could get promotions. My mom was able to get to executive secretary starting out at the

bottom. You didn't have that opportunity where you were; correct?
**A. Correct.**
Q. Okay. Presently, have you been promoted since you came to the VA? Have you had that opportunity to get any promotions yet?
**A. Yes.**
Q. Okay. Tell me about that.
**A. After being in HR for a year, I applied for a position as administrative officer with the police service in the VA at John D. Dingell VA Medical Center, and that was a promotion to a GS-7, and then after a year I was promoted to a GS-9 within that same department.**
Q. Same position, administrative officer, just a higher level?
**A. Correct.**
Q. Okay. And that was based upon performance; correct?
**A. Yes.**
Q. It has a lot to do with it.
**A. Yes.**
Q. Good performance, I should say.
**A. Yes.**
Q. Okay. When you first got hired, what was your -- you said you were assistant -- HR assistant; correct?
**A. Human resources assistant, yes.**

Q. Okay. What was it? G-5? G-6? G-7, Ms. Render? Do you recall?
**A. GS-6.**
Q. Okay. Were you on probation? Was there a probationary period for any amount of time?
**A. I don't believe there was a probationary period due to the fact that I was already a government employee. I was just a transfer --**
Q. I understand.
**A. -- from another agency.**
Q. Okay. Do you recall anyone else providing you with training? Did you -- strike that question.
Did you receive any orientation?
**A. Yes. I went through the same orientation class that I ended up teaching.**
Q. And who provided that orientation training or information?
**A. That information was provided by Erica Bethany and Tara Miller and Sandra Barber.**
Q. And did you receive any other training in that position?
**A. Can you be more specific?**
Q. Yeah. Any other training, like in-house training? Any other training from anyone else? Did you receive any other training from anyone else as to how to input

different things and stuff like that?
**A. Pertaining to the position?**
Q. Yes.
**A. Yes. I received training from Erica Bethany. I also received training from Sandra Barber as well as Angela Thompson.**
Q. Who is Sandra Barber? Where does she work at? What was her position, to your knowledge?
**A. Sandra Barber worked in HR also. She was an HR specialist.**
Q. I take it when you worked the eight years in the Department of Defense, in order to get -- well, how was your attendance record when you were at the Department of Defense? How would you characterize it? Pretty good?
**A. Yes, my attendance record was pretty good.**
Q. Was it important to be on time?
**A. Yes, very important.**
MR. DOYLE: Object to form.
BY MR. MARTIN:
Q. And why was that? While you were at the Department of Defense, why was it important to be on time?
**A. So I could perform my duties, and you would be in trouble if you weren't on time. I don't know what job allows you to be late, and it's just important to me.**

Q. Okay. Even if you didn't get in trouble, it was important. That's just how you were as a worker; correct?
**A. Correct.**
Q. You took being on time to be important to you?
**A. Yes, very important.**
Q. And who was your supervisor while you were at the Department of Defense?
**A. Christopher Ross.**
Q. And I take it that you were never disciplined for tardiness or absenteeism during that time?
**A. No, I did not have any type of discipline regarding tardiness or anything.**
Q. Okay. I didn't think so. So now we move to the VA. Was it impressed upon you while you were there that it's important to be on time?
MR. DOYLE: Object to form.
MR. MARTIN: Ms. Render?
**THE WITNESS: Can you repeat the question.**
BY MR. MARTIN:
Q. Yeah, yeah. From time to time your -- Mr. Doyle may make objections -- this is just for the record -- for whatever reason he may have, but after he makes his objection, then you have to answer the question unless he instructs you not to answer. Okay? I forgot to

tell you about that.

**A. Okay.**

Q. All right. So did anyone at the VA impress to you the importance of being on time, that they expect everybody to be on time because you have certain job duties and when you're not on time, it affects other -- your coworkers? Did anyone talk to you about that when you got hired?

MR. DOYLE: Same objection.

But, again, Shavon, like Rick said, if you understand. Okay?

**THE WITNESS: Okay.**

**I was told by Eric Osterbeck what time I was to report, what time my shift was to work. There was no in-depth discussion about being on time or not. I did not have a discussion regarding that. I was just told what time I was expected to be there and what time I was supposed to work till.**

BY MR. MARTIN:

Q. Did you take that responsibility seriously?

**A. Yes, I did.**

Q. Did Eric Osterbeck ever talk to you about times that you were late?

**A. No, I don't recall ever being late and not letting him know that I was gonna be late.**

Q. Were you late often?
**A. I was not late at all. If I was late, I would let him know.**
Q. And how many times do you think that you would have to let him know that you were late? That's what -- I'm just trying to get an idea.
**A. I don't recall, but -- I don't recall. I'm not a late person, so I don't recall ever, you know, having to have that conversation with him, but. . .**
Q. Now, I've seen some e-mails that -- where Mr. Osterbeck would send out letting people -- letting the staff know some people may be late or a person may be late. Have you seen those e-mails before?
**A. I vaguely recall them.**
Q. Okay. Letting you know if someone's gonna be late?
**A. Yes.**
Q. It's true, isn't it, Ms. Render, that Erica Bethany was late from time to time?
**A. Yes, I vaguely recall that she had some late times where she came in late.**
Q. And you worked in the department from January of 2020 until when, approximately?
**A. January of 2021 to January of 2022.**
Q. And Erica Bethany also worked during the time until you left -- correct? -- in the department?

**A. Yes. I don't know when she actually started, but yes, she was there during the time that I was there.**
Q. And is it fair to say that -- you-all work in close proximity -- correct? -- you, Erica Bethany, and Tara Miller -- when they all were there?
**A. Correct. We have cubicles in the same area.**
Q. And generally, you would know if Tara's late or if Erica's late, generally?
**A. Yes.**
Q. Okay. And is it fair to say that -- from your knowledge and your testimony -- that -- I'm looking at e-mails that Erica Bethany continued -- I just have to have your testimony, just like everyone else -- that Erica Bethany continued to come in late from time to time until you left there? Correct?
MR. DOYLE: Object to form.
**THE WITNESS: As I stated earlier, I vaguely remember the e-mails.**
BY MR. MARTIN:
Q. Not just e-mails. I'm just saying from time to time throughout the year that you were there, Erica Bethany would come in late from time to time?
MR. DOYLE: Same objection.
**THE WITNESS: Correct.**

BY MR. MARTIN:
Q. Now, did Erica Bethany ever tell you why she was late from time to time?
**A. I do not remember a conversation regarding specifics on why she was late, probably due to the fact that I wasn't her supervisor.**
Q. I understand. But just in talking with coworkers, she never really told you why; correct?
**A. No, she didn't.**
Q. Is it fair to say that you don't recall Tara Miller coming in late from time to time?
MR. DOYLE: Object to form.
**THE WITNESS: I know that Tara Miller had times where she was not at work. Regarding if she came in late, I don't really remember. I wasn't paying that much attention.**
BY MR. MARTIN:
Q. Is it fair to say -- I'm sorry. Is it fair to say --
MR. MARTIN: And please, Counsel, it seems like you're trying to prompt the witness, and that would be inappropriate. The witness is trying to be truthful, and I believe the witness, so when you make these objections -- and I think some of them are inappropriate, you know. It's almost kind of -- it can be intimidating, and I think it's unfair to the

witness.
BY MR. MARTIN:
Q. So my question to you, Ms. Render, is is it fair to say that Tara Miller was generally on time? Is that fair to say?
**A. I do not know. I was not her supervisor, and I did not pay attention to the times that she came in.**
Q. Did you ever complain to Mr. Osterbeck about Erica Bethany?
**A. I spoke with Eric Osterbeck about some concerns that I may have had, but it was just general workplace concerns.**
Q. I understand. And what were they? Were they about rudeness, or what were the concerns that you expressed to Eric Osterbeck about, that you had regarding Erica Bethany?
**A. I vaguely remember that there were some issues with -- if -- she was not there, but she scheduled some employees to come in to sit down and talk with regarding their benefits, and it was a day that she may have called off, so I would have to assist those employees along with the employees that I had scheduled for the day.**
Q. And why was that concerning for you, Ms. Render?
**A. It -- it increased my workload.**

Q. And from your experience -- eight years' experience as a secretary and just in the workplace, period -- is that one of the reasons why you try to be on time and be present and perform your duties in a timely way? Is that one of the reasons, because it can affect coworkers?
**A. Actually, no, it's not regarding my coworkers. It's just how I am and the way that I do things.**
Q. I understand. But if you're late, as you stated, it can put a burden on your coworkers; correct?
**A. I think it depends on the position.**
Q. Right. And in your position it did; correct?
**A. Not necessarily. I wouldn't agree with that because not all of my coworkers at that time would do the same thing that I would do.**
Q. I understand. But I'm saying, in the position you were in at the VA, Erica Bethany coming in late or failing to show up when she scheduled employees to be there affected you to the point that you expressed your concerns to your supervisor; correct?
**A. Correct.**
Q. What was Mr. Osterbeck's response?
**A. I honestly don't recall.**
Q. Any other concerns that you have with respect to Ms. Bethany or Ms. Miller that you expressed to

Mr. Osterbeck?
**A. The only issue that I expressed to Mr. Osterbeck regarding Ms. Miller was the amount of work that was not completed prior to her leaving.**
Q. Other than that, you didn't have a problem with Ms. Miller's work ethic; correct?
**A. I would not say that.**
Q. What was your problem that you had?
**A. I remember we had a training that was conducted by Angela Thompson, and myself -- it included myself, Erica Bethany, Tara Miller -- I believe Sandra Barber was in there also -- and we sat down for the training. It was an instructed training, and afterwards, Tara Miller came to me and asked me to show her how to do the information that was just given to us. So I felt like we got the same training. I didn't understand why she didn't get the training.**
Q. Were you sitting next to her during the training?
**A. I don't recall where everyone was sitting. I do, for a fact, know that she was in there, though.**
Q. Okay. And how many people were in there approximately?
**A. Like I said, it was Angela Thompson conducting the training, myself, Erica Bethany, as well as -- I believe Sandra Barber was in there also.**

Q. Now, you'd complained before about -- that you have witnessed Erica Bethany being very rude to employees, and employees have complained about that; isn't that true?

MR. DOYLE: Object to form.

**THE WITNESS: I didn't agree with some of the ways that she would speak to employees. It wasn't for me to say, but I did not agree with the way that she spoke to some employees.**

BY MR. MARTIN:

Q. And what made that you feel way? What was -- what didn't you agree with? As a professional, what didn't you agree with when you say "the way she spoke to certain employees"?

**A. I don't recall some of the conversations. I just know that it rubbed me the wrong way.**

Q. Why did it rub you the wrong way?

**A. Like I said, I don't recall what was actually said. It did seem like, though, sometimes she would just come off as not understanding, not being compassionate regarding to the customer.**

Q. Is it important, in your mind or in your opinion, to be compassionate to the customers?

**A. I believe it's important to listen and receive the information that's being given to you, but I don't**

believe there's a reason to turn people away for whatever reason or be mean to them.

Q. And that's what rubbed you the wrong way from time to time; correct?

A. Yes.

Q. I want to take you to the time when -- were you present at the VA when Tara Miller experienced her last day of work?

A. Yes, I was there.

Q. And tell me what you witnessed.

A. I vaguely recall, but I do remember being scheduled to sit at the front of the human resources office to assist customers that were coming in with general questions. That particular day, Ms. Miller offered to sit at the front desk. I do believe -- I do remember asking her if she was sure. It wasn't really a position that most liked to do. That's why we were scheduled on our particular day to sit there. She reassured me that she was okay with doing that.

I don't recall exactly how much time went before I was instructed that I would need to go and relieve Tara -- Ms. Miller -- from the front desk. And the next thing I remember is while I was sitting at my desk, her coming over to her desk and being escorted by VA Police.

Q. Approximately how much time went by between the time that you relieved Ms. Miller and the time she was escorted? Approximately. I know it's a while ago.

**A. When she got escorted, I was still sitting at my desk. So I hadn't even made it up to the front desk, but I don't recall the time frame of what took place.**

Q. Okay. Who asked you, Ms. Render, to relieve Tara Miller from the front desk?

**A. The supervisor, Eric Osterbeck.**

Q. Okay. And you were saying that you didn't make it up there but Tara Miller went to Eric Osterbeck's office?

**A. No, that isn't what I said.**

Q. Oh, I'm sorry. That's what I want to get clear on.

**A. Okay. I was still sitting at my desk. Tara's desk was actually directly across from mine.**

Q. I see.

**A. And when I looked up and I saw her, it was her, with the VA Police, being told to grab her stuff and to come with them.**

Q. Okay. So just so we can understand it in the record, Tara Miller is at the front desk assisting people. She said that she'll do that job today?

**A. I honestly can't say she was even at the front desk because I vaguely remember -- she may not even have made it to the front desk 'cause I kind of remember**

her sitting at her desk while -- when the VA Police came to get her. But I know that she had volunteered to sit at the front desk on that particular day.
Q. Okay. So it was right after you started work. Is that fair to say? Soon after?
A. Soon after. It was fairly early in the morning.
Q. Okay. So when the -- how many -- do you recall how many police officers escorted Ms. Miller?
A. I believe it was no more than two.
Q. Had you ever seen these police officers before?
A. Yes. One of them would do a walk-through in our area -- in our department occasionally.
Q. I'm sorry. Can you repeat -- I'm sorry. Can you repeat the answer. I'm sorry.
A. One of the officers would occasionally do a walk-through of our area.
Q. And that was --
A. Patrolling.
Q. I see. That was officer who?
A. At the time, I don't believe he was a police officer, but he worked in the police department. He was a criminal investigator.
Q. What was his name?
A. George Chester.
Q. And was he a White or Black male?

A. **He was Black, yes.**
Q. And the other police officer, did you ever see him before?
A. **I don't even recall who it was. I just remember it was two people.**
Q. Okay. How often would Officer George Chester do walk-throughs, security checks through your area? How often?
A. **I vaguely remember. That's not something that I would even be paying attention to, honestly.**
Q. Okay. Just you recall him doing that, and that's how you recognize who was involved with escorting Ms. Miller?
A. **Yes.**
Q. So after Ms. Miller was escorted out, what did you do next?
A. **I logged off of my computer and went to the front desk.**
Q. Then what did you do?
A. **Completed my daily tasks.**
Q. And then what did you do?
A. **Can you be more specific?**
Q. Yeah. Anything else -- not as far as your tasks, but once you completed your tasks, then what did you do?
A. **Once my day was completed, I went home.**

Q. Did you meet with anybody regarding Tara Miller after she was escorted and after your day was complete?
**A. I don't recall meeting with anyone regarding that, no.**
Q. Did you go through anybody's desk -- your desk, or search for anything in Tara Miller's desk? Do you recall ever doing that?
**A. I don't recall ever doing that.**
Q. Did you ever see Tara Miller again after that day as you saw her being escorted out?
**A. No, I don't recall ever seeing her after that.**
Q. So what happened next? Did you have any other conversations with Mr. Osterbeck after Tara Miller left?
**A. I believe there was a conversation. I vaguely remember him stating that Tara Miller will not be in the department, but it was not in detail. It was very vague, and we were to proceed on.**
Q. And when he said that to you, who else was present? Your coworkers?
**A. I don't remember.**
Q. You just recall him saying she would no longer be in the department but did not say why?
**A. Correct.**
Q. Did he ever say she was being accused of wrongdoing?
**A. No.**

Q. Did anyone ever tell you that she was accused of wrongdoing after she was escorted out? When -- and when I say "anyone," I mean Angela Thompson or Erica Bethany.
**A. I vaguely recall having a conversation with Angela Thompson, but I don't remember the extent of the conversation.**
Q. So what jumps out to you? What was it basically about with respect to Tara Miller? What did she say?
**A. Personal information being retrieved on herself by Tara Miller.**
Q. And how long after Tara Miller was escorted out did she come to you and tell you that? How much time passed?
**A. I do not recall.**
Q. Did anybody else say to you anything about Tara Miller accessing personal information inappropriately?
**A. I vaguely remember a conversation with -- last name is Mr. Sharkey.**
Q. Okay. What did he say to you?
**A. I don't remember the conversation to specifics.**
Q. Just in general, he said something about Tara Miller had accessed personal information inappropriately?
**A. Correct.**
Q. You mentioned earlier about work not being completed.

When did that occur with respect to Tara Miller?
**A. After she had left, there were some items that should have been completed in a timely manner, prior to her even leaving, that we found out was not completed and had to be completed by myself and Erica Bethany.**
Q. And when did you find this --
**A. I do not recall.**
Q. Do you know the circumstances as to why the information may not have been completed?
**A. No, I do not know.**
Q. Is it fair to say that it's not unusual for you or anyone else maybe to have not completed information?
MR. DOYLE: Object to form.
BY MR. MARTIN:
Q. You can only do so much -- correct, Ms. Render? -- in a day? Is that fair to say?
**A. You have more than one day to complete information, so I don't see why information wouldn't be completed.**
Q. So what information had Tara Miller not completed that you recall as though should have been completed?
**A. As I stated, I don't recall the specifics, but I know -- I do remember that there was items that were not completed that she was responsible for and could have been completed prior to her leaving.**
Q. It's possible she may have completed it the day they

escorted her out that morning; correct?
**A. No. It was not in the system. Whatever it was, it was not in the system, and it had to be completed by myself or Erica Bethany.**
Q. Prior to your deposition today -- I'm sorry. Go ahead and get your drink. I'm sorry.
**A. Thanks.**
Q. You're welcome. Prior to your deposition today, did you have any conversations with Erica Bethany or Angela Thompson?
**A. Regarding?**
Q. Regarding Tara Miller or this case or anything like that.
**A. No.**
Q. When's the last time you spoke with Angela Thompson?
**A. Myself and Angela Thompson are still friends. We speak at least once a month.**
Q. And what about Erica Bethany?
**A. Myself and Erica Bethany, we are still friends. I speak to her maybe once every couple of months.**
MR. MARTIN: Counsel, let's take a five-minute break.
MR. DOYLE: Rick, I think we have Erica Bethany for 12:30, so I'll just tell her not to hop on yet, or Lauren can tell her just hold off for a little

bit.

MR. MARTIN: Yeah. What time is it now, Chris?

MR. DOYLE: 12:27.

MR. MARTIN: Yeah. Just tell her to hold off.

(Off the record at 12:27 p.m.)

(Back on the record at 12:52 p.m.)

MR. MARTIN: Just a few more questions, Ms. Render.

**THE WITNESS: Okay.**

MR. MARTIN: We should be able to complete.

BY MR. MARTIN:

Q. Prior to the deposition, did you meet with the attorney? And it's okay to meet with the attorney. That's how we get information with our witnesses. You're a witness for the VA. But did you meet with the attorney prior to the deposition? When I say "meet," I mean have any conversations.

**A. Yes.**

Q. Okay. And was Erica Bethany or Angela Thompson present during any of those conversations?

**A. No.**

Q. When you testified earlier that you're still friends with Erica Bethany, do you-all socialize every now and

then?
A. No. She works for another VA, so we may come across each other with her bringing in her equipment or something or just reaching out, saying hello.
Q. When you say "bringing in equipment," what do you mean?
A. She still works for the VA, so she may stop by when she has to come in for an equipment swap or something, and she'll, you know, just come by to say hello, but it's through work.
Q. You said "friends" so when you talked about once -- once every couple of months, you talk?
A. Mm-hmm.
Q. Okay. You have her telephone number; right? You talk on the telephone in?
A. No. It's mostly through work. I don't even remember the last time I spoke with her on the phone -- personal cell phone.
Q. Does Erica Bethany have a child?
A. Yes.
Q. You ever met the child?
A. Yes. One time when she came in to have some work done on her laptop, she brought her son in.
Q. And how long ago was that?
A. I would say maybe some months ago, maybe six months.

**I don't remember.**

Q. It was after you left the VA -- I'm sorry. It was after you left the HR department, you were no longer working with her?

**A. Correct.**

Q. As friends, did she ever tell you that her child has special needs?

**A. No.**

Q. When you were at the VA working with her, did she tell you that her child lived with her mother?

**A. I think it was during -- for a brief time, her son, I vaguely recall, visiting with her mother.**

Q. How long?

**A. I don't know. I don't know.**

Q. This was after you got hired; correct?

**A. Correct. Yes.**

Q. Okay. So during that time is when she said her child may have visited her mother?

**A. Yes.**

Q. Did she ever tell you her child lived with her mother in the past?

**A. I don't recall being told that.**

Q. Did you know her mother lived out of state?

**A. Yes, I vaguely remember her mentioning that.**

Q. Okay. And earlier I had said that I needed some

personal information. The only personal information I need is, in case we have to subpoena you to come to court, your home address presently.
**A. My home address is 29993 Drager, D-r-a-g-e-r, Drive, and that's Roseville, Michigan 48066.**
Q. And we only need that just in case you get another job, like away from the VA and Mr. -- your attorney may not have the address. Then I'll be able to send the subpoena. Okay?
**A. Okay.**
Q. All right. Are you sure that the police officers did not appear -- and I'm talking about Officer Chester -- the day before --
**A. I don't recall.**
Q. I'm sorry.
-- the day before Ms. Miller was escorted out? Are you sure that they did not appear the day before also?
**A. I don't recall.**
Q. Okay.
MR. MARTIN: All right. I have no further questions, Ms. Render. Thank you very much for your time. I really appreciate it, and that's it.
I'll pass the witness to you.
MR. DOYLE: Okay. Thanks, Rick.

I don't have any questions for you, Ms. Render, so thank you for being here.

**THE WITNESS: Thank you.**

(The deposition was concluded at 12:59 p.m.)

CERTIFICATE OF NOTARY

STATE OF MICHIGAN )
) SS
COUNTY OF OAKLAND )

I, Susanne Ellen Gorman, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me via virtual technology; that the witness was by me first duly sworn to testify to the truth and nothing but the truth; that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full, and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party, nor interested in the event of this cause.

Susanne Ellen Gorman, CSR-9271, RPR
Notary Public,
Oakland County, Michigan.

My commission expires: September 14, 2029

### 1

**11:30** 4:3
**12:27** 32:4,7
**12:30** 31:24
**12:52** 32:8
**12:59** 36:5
**16** 4:2
**1981** 6:15
**1999** 6:20

### 2

**2008** 7:24
**2020** 17:21
**2021** 8:16 17:23
**2022** 17:23
**2025** 4:2
**25** 11:10
**29993** 35:4

### 3

**30** 11:5
**31** 6:15

### 4

**48066** 35:5

### A

**a.m.** 4:3
**absenteeism** 15:11
**accessed** 29:23
**accessing** 29:17
**accused** 28:24 29:1
**address** 6:8 35:3,4,8
**administration** 7:10
**administrative** 12:10,14
**affect** 21:5
**affected** 21:19
**affects** 16:6
**agency** 13:10
**agree** 21:13 23:6,8,12,13
**agreement** 4:9
**ahead** 31:5
**Air** 7:19
**American** 6:20
**amount** 13:5 22:3
**Angela** 9:12 14:5 22:10,23 29:3,5 31:10,15,16 32:21
**annual** 8:22
**anybody's** 28:4
**anytime** 5:19
**applied** 9:21,24 12:9
**approximately** 7:23 8:14 17:22 22:22 25:1,3
**area** 18:6 26:12,16 27:7
**assist** 20:21 24:13
**assistant** 8:12 10:25 12:24,25
**assistants** 9:10
**assisting** 25:21
**assume** 5:15
**attendance** 14:13,16
**attention** 19:16 20:7 27:10
**attorney** 32:15,18 35:7

### B

**bachelor's** 7:5
**back** 7:8 32:8
**background** 6:16
**Baker** 7:7
**Barber** 9:13 13:19 14:5,7,9 22:11,25
**Base** 7:19
**based** 12:17
**basically** 29:8
**benefits** 8:20,21 20:20
**Bethany** 9:9 13:18 14:4 17:17, 24 18:4,12,14,21 19:2 20:9,16 21:17,25 22:11,24 23:2 29:4 30:5 31:4,9,18,19,24 32:21,25 33:19
**birth** 6:14
**bit** 6:3 11:7 32:1
**Bitburg** 6:20,22
**Black** 26:25 27:1
**bottom** 12:1
**break** 5:18,20,22,23 31:22
**briefly** 7:3 8:17
**bringing** 33:3,5
**brought** 33:23
**burden** 21:10
**business** 6:4 7:10

### C

**call** 9:25
**called** 10:8 20:21
**case** 5:6 6:5 31:12 35:2,6
**cell** 33:18
**Center** 8:13 12:11
**certified** 4:5
**chance** 11:17
**characterize** 14:14
**checks** 27:7
**Chester** 26:24 27:6 35:12
**child** 33:19,21 34:6,10,17,20
**Chris** 32:3

**Christopher** 15:9

**circumstances** 30:8

**City** 11:5

**class** 13:14

**clear** 25:13

**close** 18:3

**college** 7:7,16

**communication** 10:11

**compassionate** 23:20,23

**complain** 20:8

**complained** 23:1,3

**complete** 28:2 30:17 32:12

**completed** 22:4 27:20,24,25 29:25 30:3,4,5,9,12,18,19,20, 23,24,25 31:3

**computer** 27:17

**concerns** 20:10,12,14 21:20, 24

**concluded** 36:4

**conducted** 22:9

**conducting** 22:23

**continued** 18:12,14

**conversation** 17:9 19:4 28:14 29:5,7,18,21

**conversations** 23:15 28:12 31:9 32:19,22

**correct** 9:4,5 10:21,22,23 11:3 12:2,3,16,17,24 15:3,4 17:25 18:4,6,15,24 19:8 21:10,12, 20,21 22:6 24:4 28:23 29:24 30:15 31:1 34:5,15,16

**correctly** 8:23 9:1

**Counsel** 19:19 31:21

**couple** 6:4 31:20 33:12

**court** 4:4 35:3

**coworkers** 16:7 19:7 21:6,7, 10,14 28:19

**criminal** 26:22

**cubicles** 18:6

**curious** 11:4

**customer** 23:21

**customers** 23:23 24:13

D

**D-R-A-G-E-R** 35:4

**daily** 27:20

**date** 6:14 10:5,7

**day** 20:20,23 24:8,14,18 26:3 27:25 28:2,8 30:16,17,25 35:13,16,17

**Defense** 7:17 8:8,9 14:12,14, 22 15:8

**degree** 7:5 8:1,2

**demanding** 11:11

**dental** 8:21

**department** 7:17 8:6,7,8 12:13 14:12,14,21 15:8 17:21,25 26:12,21 28:16,22 34:3

**depends** 21:11

**deposition** 4:1,6,25 5:19 31:5, 8 32:14,18 36:4

**desk** 24:15,22,24 25:4,5,8,14, 21,23,25 26:1,3 27:18 28:4,5

**detail** 28:16

**Detroit** 11:6

**Dingell** 8:13 12:11

**directly** 25:15

**discipline** 15:12

**disciplined** 15:10

**discussion** 16:15,16

**Doyle** 14:19 15:17,21 16:9 18:16,23 19:12 23:5 30:13 31:23 32:4 35:25

**Drager** 35:4

**drink** 31:6

**Drive** 35:4

**due** 13:6 19:5

**duly** 4:17

**duties** 8:17,18,19 9:4,6 14:23 16:6 21:4

E

**e-mails** 17:10,13 18:12,18,20

**earlier** 18:17 29:25 32:24 34:25

**early** 26:6

**educational** 7:3

**employee** 13:7

**employees** 8:19,23 20:19,22 21:18 23:2,3,7,9,14

**employment** 5:8,10

**ended** 13:15

**enjoyed** 11:6,21

**equipment** 4:7 33:3,5,8

**Eric** 9:16 10:10,18 16:13,22 20:10,15 25:9,11

**Erica** 9:9 13:18 14:4 17:17,24 18:4,12,14,21 19:2 20:8,15 21:17 22:11,24 23:2 29:3 30:5 31:4,9,18,19,23 32:21,25 33:19

**Erica's** 18:8

**escorted** 24:25 25:3,4 26:8 27:15 28:2,9 29:2,12 31:1 35:16

**escorting** 27:12

**ethic** 11:9 22:6

**EXAMINATION** 6:10

**examined** 4:17

**executive** 11:25

**expect** 16:4

**expected** 16:17

**experience** 10:23 11:2 21:1

**experienced** 24:7

**expressed** 20:14 21:19,25 22:2

**extent** 29:6

F

**fact** 13:7 19:5 22:20

**failing** 21:18

**fair** 5:16 18:3,10 19:10,18 20:3,5 26:5 30:11,16

**fairly** 26:6

**feel** 23:11

**felt** 22:15

**fill** 10:6

**find** 30:6

**fine** 4:23

**finish** 5:21

**five-minute** 5:23 31:22

**fond** 7:1

**food** 7:1

**forgot** 15:25

**form** 14:19 15:17 18:16 19:12 23:5 30:13

**found** 30:4

**frame** 25:6

**friends** 31:16,19 32:24 33:11 34:6

**front** 24:12,15,22 25:5,8,21, 23,25 26:3 27:17

**full** 6:12

G

**G-5** 13:1

**G-6** 13:1

**G-7** 13:1

**general** 20:11 24:13 29:22

**generally** 18:7,8 20:4

**George** 26:24 27:6

**German** 6:25

**Germany** 6:22,24

**give** 4:13 6:1

**giving** 11:21

**glad** 4:24

**good** 4:19,21,23 5:5 7:1 12:21 14:15,16

**Gorman** 4:4

**government** 13:7

**grab** 25:18

**graduate** 6:16

**graduated** 6:20 7:15

**GS-6** 13:3

**GS-7** 12:12

**GS-9** 12:13

**Guard** 7:19

H

**happen** 5:9

**happened** 5:9 28:11

**health** 8:21

**held** 4:6 11:16

**high** 6:16,19,20 7:4

**higher** 12:14

**hired** 7:11 12:23 16:8 34:15

**history** 7:4

**hold** 31:25 32:5

**home** 6:7,8 27:25 35:3,4

**honestly** 21:23 25:23 27:10

**hop** 31:24

**HR** 8:12 10:20,24 11:17,20,21 12:9,24 14:9 34:3

**human** 9:9 12:25 24:12

I

**idea** 17:6

**importance** 16:4

**important** 9:6 14:17,18,22,25 15:2,5,6,16 23:22,24

**impress** 16:3

**impressed** 15:15

**in-depth** 16:15

**in-house** 13:23

**inappropriate** 19:21,24

**inappropriately** 29:17,23

**included** 8:24 22:10

**increased** 20:25

**individuals** 10:16

**information** 8:23,25 11:20,22 13:17,18 22:15 23:25 29:10, 17,23 30:9,12,17,18,19 32:16 35:1

**input** 8:23 13:25

**instruct** 8:19

**instructed** 9:10 22:13 24:21

**instructs** 15:25

**insurance** 8:21

**insurances** 8:20

**interested** 9:25 10:9

**interview** 9:17,18 10:1,2,4,14, 15

**intimidating** 19:25

**investigator** 26:22

**involved** 10:14,16 27:12

**issue** 22:2

**issues** 9:2 20:17

**items** 30:2,22

J

**January** 4:2 6:15 8:16 17:21, 23

**job** 7:15 8:11,12,17,18,19 9:17,21,23 10:4 11:11 14:24 16:5 25:22 35:7

**John** 8:12 12:11

**jumps** 29:8

K

**kind** 9:21 11:8 19:24 25:25

**knowledge** 5:8 14:8 18:11

L

**ladies** 9:9

**language** 6:23 7:2

**laptop** 33:23

**late** 14:25 16:23,24,25 17:1,2, 5,7,12,13,15,18,19,20 18:7,8, 14,22 19:2,5,11,15 21:9,17

**Lauren** 31:25

**leads** 9:12

**learned** 6:24

**leave** 8:22 11:4

**leaving** 22:4 30:4,24

**left** 11:10,12 17:25 18:15 28:13 30:2 34:2,3

**letting** 16:24 17:11,15

**level** 12:15

**liaison** 11:20

**listen** 23:24

**lived** 34:10,20,23

**located** 6:21 7:18

**logged** 27:17

**long** 5:19 7:21 10:4 29:12 33:24 34:13

**longer** 6:6 28:21 34:3

**looked** 25:17

**lot** 9:3,6 11:6,20 12:19

M

**made** 23:11 25:5,25

**mail** 6:6

**main** 9:4

**make** 11:13 15:22 19:22 25:10

**makes** 15:23

**making** 8:22,25

**male** 26:25

**manner** 30:3

**MARTIN** 4:19,23 5:2,5,14,18 6:1,11 14:20 15:18,20 16:19 18:19 19:1,17,19 20:2 23:10 30:14 31:21 32:2,5,9,12,13 35:21

**Medical** 8:13 12:11

**meet** 28:1 32:14,15,17,19

**meeting** 28:3

**mentioned** 29:25

**mentioning** 34:24

**met** 33:21

**Michigan** 4:5 7:20 35:5

**Miller** 5:6 9:9 13:19 18:5 19:10,13 20:4 21:25 22:3,11, 14 24:7,14,22 25:2,8,11,21 26:8 27:13,15 28:1,8,12,15 29:9,11,12,16,22 30:1,19 31:12 35:16

**Miller's** 22:6 28:5

**mind** 23:22

**mine** 25:15

**Mm-hmm** 33:13

**mom** 11:5,12,24

**Monday** 4:24

**money** 11:15

**month** 8:15 31:17

**months** 9:24 31:20 33:12,25

**morning** 4:19,21 26:6 31:1

**mother** 34:10,12,18,20,23

**move** 11:13 15:14

**movement** 11:16

N

**names** 10:15

**National** 7:19

**necessarily** 21:13

**needed** 34:25

**Nicole** 6:13

**notary** 4:5

**number** 33:14

O

**oath** 4:18

**Object** 14:19 15:17 18:16 19:12 23:5 30:13

**objection** 15:24 16:9 18:23

**objections** 15:22 19:23

**occasionally** 26:12,15

**occur** 30:1

**offered** 24:14

**office** 24:12 25:11

**officer** 12:10,14 26:19,20 27:2,6 35:12

**officers** 26:8,10,15 35:11

**opening** 9:21

**opinion** 23:22

**opportunity** 12:1,5

**order** 14:12

**orientation** 13:13,14,16

**Osterbeck** 9:16,17,18 10:10, 12,18 16:13,22 17:11 20:8,10, 15 22:1,2 25:9 28:12

**Osterbeck's** 21:22 25:11

**P**

**p.m.** 32:7,8 36:5

**paperwork** 10:6

**parties** 4:9,10

**pass** 35:24

**passed** 29:14

**past** 34:21

**Patrolling** 26:18

**pay** 20:7

**paying** 19:16 27:10

**payroll** 8:25

**people** 11:7 17:11,12 22:21 24:1 25:21 27:5

**perform** 14:23 21:4

**performance** 12:17,21

**period** 13:5,6 21:2

**person** 4:11 10:8,18 17:8,12

**personal** 6:3,4 8:24 29:10,17, 23 33:18 35:1

**Pertaining** 14:2

**phone** 9:25 33:17,18

**physical** 10:5

**place** 25:6

**point** 21:19

**police** 12:10 24:25 25:18 26:1, 8,10,20,21 27:2 35:11

**position** 7:21,22 8:1,15 9:20, 24 10:1,3 11:16,19 12:9,14 13:21 14:2,8 21:11,12,16 24:17

**positions** 8:5

**posting** 9:23

**present** 6:8 21:4 24:7 28:18 32:22

**presently** 12:4 35:3

**pretty** 11:18 14:15,16

**primary** 8:17,19

**prior** 10:6 22:4 30:3,24 31:5,8 32:14,18

**probation** 13:4

**probationary** 13:5,6

**problem** 22:5,8

**procedure** 9:19

**proceed** 28:17

**process** 9:19,22

**professional** 23:12

**promote** 11:18

**promoted** 12:4,13

**promotion** 12:12

**promotions** 11:24 12:6

**prompt** 19:20

**provide** 9:7

**provided** 13:16,18

**providing** 13:11

**proximity** 18:4

**public** 4:5

**pursuant** 4:9

**put** 21:10

**Q**

**question** 5:10,11,12,15,21,22 13:12 15:19,24 20:3

**questions** 5:7 6:2,5 24:14 32:9 35:22 36:1

**R**

**reaching** 33:4

**reason** 11:4,12,14,15 15:23 24:1,2

**reasoning** 11:19

**reasons** 21:3,5

**reassured** 24:19

**recall** 7:23 10:2,15,17,18 13:2, 11 16:24 17:7,8,14,19 19:10 21:23 22:19 23:15,18 24:11, 20 25:6 26:7 27:4,11 28:3,6,7, 10,21 29:5,15 30:7,20,21 34:12,22 35:14,19

**receive** 13:13,20,24 23:24

**received** 7:5,25 8:2 9:25 11:20 14:4,5

**recognize** 27:12

**record** 14:13,16 15:22 25:20 32:7,8

**relieve** 24:22 25:7

**relieved** 25:2

**remember** 7:7 10:19 18:18 19:4,15 20:17 22:9 24:11,15, 23 25:24,25 27:4,9 28:15,20 29:6,18,21 30:22 33:16 34:1, 24

**Remote** 4:1

**remotely** 4:9

**Render** 4:16,19 6:13 8:11 13:1 15:18 17:17 20:3,24 25:7 30:15 32:10 35:22 36:2

**repeat** 5:11 15:19 26:13,14

**rephrase** 5:12

**report** 16:14

**reporter** 4:4,6,7

**represent** 5:5

**resource** 9:10

**resources** 12:25 24:12

**respect** 21:24 29:9 30:1

**response** 21:22

**responsibilities** 9:6

**responsibility** 16:20

**responsible** 30:23

**retired** 11:9

**retrieved** 29:10

**Rick** 16:10 31:23 35:25

**room** 4:8

**Roseville** 35:5

**Ross** 15:9

**rub** 23:17

**rubbed** 23:16 24:3

**rude** 23:2

**rudeness** 20:14

S

**Sandra** 9:13 13:19 14:5,7,9 22:11,25

**sat** 22:12

**scheduled** 20:18,23 21:18 24:11,18

**school** 6:17,19,20 7:4

**search** 28:5

**secretarial** 11:1

**secretary** 7:17 8:1,5 10:23 11:5,11,19,22,25 21:2

**security** 27:7

**Selfridge** 7:19

**send** 17:11 35:8

**series** 5:7

**service** 8:3,4 12:10

**Sharkey** 29:19

**Shavon** 4:16 6:13 16:10 19:6 20:6 21:20 25:9

**she'll** 25:22 33:9

**shift** 16:14

**shorthand** 4:5

**show** 21:18 22:14

**sick** 8:22

**sit** 20:19 24:12,15,18 26:3

**sitting** 22:18,19 24:23 25:4,14 26:1

**socialize** 32:25

**solemnly** 4:12

**someone's** 17:15

**son** 33:23 34:11

**Spanish** 6:24

**speak** 6:23 23:7 31:17,20

**special** 34:7

**specialist** 10:20,24 14:10

**specific** 13:22 27:22

**specifics** 19:4 29:21 30:21

**spoke** 20:10 23:9,13 31:15 33:17

**staff** 17:12

**start** 8:14 10:5,7

**started** 7:23,24 11:7 18:1 26:4

**starting** 11:25

**state** 4:5 6:12 34:23

**stated** 18:17 21:9 30:21

**stating** 28:15

**stipulate** 4:10

**stop** 33:7

**strike** 13:12

**stuff** 14:1 25:18

**subject** 7:6

**submitted** 9:1

**subpoena** 6:5,7 35:2,9

**supervisor** 9:10,14,15 15:7

**supposed** 16:18

**Susanne** 4:4

**swap** 33:8

**swear** 4:12

**sworn** 4:8,11,17

**system** 8:24 9:1 31:2,3

T

**talk** 16:7,22 20:19 33:12,14

**talked** 33:11

**talking** 19:7 35:12

**Tara** 5:5 9:9 13:19 18:4 19:10,13 20:4 22:11,13 24:7,22 25:7,11,21 28:1,5,8,12,15 29:9,11,12,16,22 30:1,19 31:12

**Tara's** 18:7 25:14

**tardiness** 15:11,13

**tasks** 27:20,23,24

**teaching** 13:15

**telephone** 33:14,15

**testified** 4:18 32:24

**testimony** 4:10,12 18:11,13

**thing** 9:20 21:15 24:23

**things** 5:8 14:1 21:8

**Thompson** 9:12 14:6 22:10,23 29:3,6 31:10,15,16 32:21

**Thursday** 4:2

**till** 16:18

**time** 7:18 8:22 9:8,15 10:11 13:5 14:17,22,24 15:5,11,16,21 16:4,5,6,13,14,15,17,18 17:18,24 18:2,14,15,20,22 19:3,11 20:4 21:3,14 24:3,4,6,20 25:1,2,6 26:20 29:14 31:15 32:2 33:17,22 34:11,17 35:23

**timely** 21:4 30:3

**times** 16:22 17:4,19 19:14 20:7

**tired** 11:13

**today** 25:22 31:5,8

**told** 9:14 10:3,8 16:13,17 19:8 25:18 34:22

**training** 9:7,11,15 11:21 13:12,16,20,23,24,25 14:4,5 22:9,12,13,16,17,18,24

**transfer** 13:8

**trouble** 5:2 14:24 15:1

**true** 17:17 23:4

**truth** 4:13,14

**truthful** 5:16 19:22

**turn** 24:1

**type** 15:12

U

**understand** 5:10 11:11 13:9 16:11 19:7 20:13 21:9,16 22:16 25:20

**understanding** 23:20

**understood** 5:15

**unfair** 19:25

**unusual** 30:11

**upward** 11:17

**usajobs.gov** 9:23

V

**VA** 5:6 6:6 7:11 8:12,13 9:7,20 12:5,11 15:14 16:3 21:17 24:7,25 25:18 26:1 32:17 33:2,7 34:2,9 35:7

**vague** 28:17

**vaguely** 17:14,19 18:18 20:17 24:11 25:24 27:9 28:14 29:5, 18 34:12,24

**videoconferencing** 4:7

**vision** 8:21

**visited** 34:18

**visiting** 34:12

**volunteered** 26:2

W

**walk-through** 26:11,16

**walk-throughs** 27:7

**wanted** 11:4,13,22

**ways** 23:7

**wealth** 10:23 11:1

**week** 4:24

**When's** 31:15

**White** 26:25

**witnessed** 23:2 24:10

**witnesses** 32:16

**work** 7:21 11:8 14:7 16:14,18 18:3 19:14 22:3,6 24:8 26:4 29:25 33:10,16,22

**worked** 14:9,11 17:21,24 26:21

**worker** 15:2

**working** 7:25 34:4,9

**workload** 20:25

**workplace** 20:11 21:2

**works** 33:2,7

**wrong** 23:16,17 24:3

**wrongdoing** 28:24 29:2

Y

**year** 6:19 7:6,7,23 8:14 12:9, 12 18:21

**years** 7:22 8:6 11:5,10 14:11

**years'** 21:1

**you-all** 18:3 32:25

**young** 9:8 11:7