**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**

| | | |
|---|---|---|
| **Tara Miller,** | ) | |
| | ) | |
| ***Complainant,*** | ) | |
| | ) | **VA Case No. 200J-VI10-2021102392** |
| ***v.*** | ) | |
| | ) | **EEOC Case No. 471-2021-00088X** |
| **Secretary,** | ) | |
| **Department of Veterans Affairs,** | ) | |
| | ) | |
| ***Agency,*** | ) | |

## FINAL AGENCY DECISION

## INTRODUCTION

In a formal EEO complaint dated April 2, 2021, Complainant alleged that officials at the Veterans in Partnership, Veterans Integrated Service Network (VISN) 10 in Ann Arbor, Michigan, discriminated against her as referenced below. The Department's Office of Resolution Management, Diversity, and Inclusion (ORMDI) accepted and appropriately investigated some of the claims raised in the complaint and properly notified Complainant of its determination to dismiss the remaining claims in accordance with the Commission's regulation governing partial dismissals at 29 C.F.R. Section 1614.107(b).[1]

At the conclusion of the investigation, the Department notified Complainant in writing of the right to request either a hearing and decision by an EEOC administrative judge, with a subsequent final action by the Department, or an immediate final decision by the Department without a hearing.

Complainant initially requested a hearing before an EEOC administrative judge but subsequently withdrew the request. Accordingly, the administrative judge remanded the complaint to the Department's Office of Employment Discrimination Complaint Adjudication for an immediate final agency decision based on the investigative record. OEDCA received the file from the judge on April 5, 2022.

---

[1] Upon review, we adopt ORMDI's Notice of Partial Acceptance, dated April 27, 2021, dismissing Complainant's claim regarding investigatory actions of the VA Police Service and police incident reports as failing to state a claim pursuant to 29 C.F.R. Part 1614.107(a)(1).

## CLAIMS[2]

Whether the Agency subjected Complainant to discrimination and a hostile work environment (sexual and non-sexual) based on Age (YOB: 1969), Sex, (Female), Race (African American), and Disability when:

1. From April 2020 to February 24, 2021, she did not receive proper training.

2. From April 2020 to February 24, 2021, coworkers bullied, shamed, embarrassed, and were hostile towards her.

3. In April 2020, the Senior Strategic Business Partner (S1) told Complainant that she could call him "Candy Man."

4. In October 2020, S1 belittled and yelled at Complainant.

5. In December 2020, S1 stated that he did not know she was a service-connected Veteran with regards to disability leave.

6. On January 21, 2021, S1 was demeaning to her and threatened her job.

7. On January 26, 2021, Complainant was told that she could not have a representative during a mediation.

8. On January 29, 2021, Complainant became aware that S1 was soliciting persons to write Reports of Contact against her.

9. On February 24, 2021, Complainant was accused of identity theft and unauthorized modification of an employee's personnel record.

10. On a daily basis (on unspecified dates), coworkers said the "N" word, used several curse words, S1 used sexual innuendos, and Complainant was blamed for events that she did not do.

11. On February 24, 2021, she was marked 7.75 hours Absent without Leave, and in February 2021, she was marked 7.75 hours Leave without Pay.

12. On February 24, 2021, Complainant was terminated from federal employment.

13. As of April 5, 2021, Complainant had not received her last paycheck.

14. As of April 5, 2021, Complainant had not received a COVID-19 monetary award.

---

[2] ORMDI accepted Events 1 and 11-14 as discrete claims of disparate treatment, as well as evidence in support of the overall harassment claim. Complainant's complaint was also amended to include a December 2020 statement by S1 as evidence in the overall harassment claim. We will adjudicate the complaint accordingly.

## SUMMARY OF FACTS

At the time of the events in question, Complainant was a Human Resources Generalist, GS-7, at the John D. Dingell VA Medical Center (VAMC) in Detroit, Michigan. (ROI, Tab 7-1, p. 103)

*Conflicts with Coworkers*

Complainant testified that her coworkers bullied, shamed, and embarrassed her. She stated that one coworker (CW1) referred to her as "Linda," instead of by her name, and that a second (CW2, African American, female, disabled, YOB: 1982) "disparaged" her and spoke in a loud voice. Complainant testified that another coworker (CW3, female, African American, YOB: 1971) pretended to meet with CW2 and Complainant to train them, but instead turned the meeting into a conversation about how she felt something was not right between Complainant and CW2 and asked them to discuss the matter. (ROI, Tab 7-1, p. 104)

Complainant reported her concerns to her first-line supervisor, the Senior Strategic Business Partner (S1), and testified that after doing so, CW1 apologized to Complainant. S1 also arranged a mediation between Complainant and CW2 after Complainant filed a report of contact regarding that incident. However, when Complainant reported "additional negative hostile behavior patterns" concerning CW3 and CW2, S1 responded to her that "this is not a hostile environment," telling Complainant that she did not know what a hostile environment was and was in fact making the environment hostile for her coworkers. (ROI, Tab 7-1, p. 104)

Complainant testified that CW2 once used "the n word" in the office, and that she generally cursed regularly, using "f-ck" in many sentences. Complainant stated that CW2 used the phrase "colored" twice to describe an African American man's actions. (ROI, Tab 7-1, p. 109)

Complainant testified that on one occasion, she wrote a quote from Sean Combs on the white board, and S1 wrote "Puffy," the stage name of Sean Combs, under it. Complainant erased that addition, stating that the quote had not been said in the context of Sean Combs as a musician, but rather as a graduation speaker. CW3 then wrote under the quote, "A.K.A. P-Diddy, A.K.A. Puff, A.K.A. P-Daddy," referencing the various stage names of Sean Combs. S1 then erased that text. (ROI, Tab 7-1, p. 117)

*Candy Man Comment*

Complainant testified that at some point in April 2020, S1 told her that she could "help herself to any candy and Rice Krispy treats in his office at any time," stating that "around here, they call him the Candy Man." Complainant testified that S1 did not instruct her to call him Candy Man, but that she interpreted the phrase "candy man" to have sexual innuendo. (ROI, Tab 7-1, p. 104)

*Comments from S1*

Complainant testified that in October 2020, she was in S1's office when he yelled at her and "belittled" her. She testified that he also yelled at and belittled other employees, including sending an email to Complainant and others which "ridiculed some staff members who did not provide detailed information" for a project. One of the other staff members responded to the email to state that it was unprofessional. Complainant testified that S1 said things like, "you are skating on thin ice, and if this is not the place for you, then just let me know." Complainant provided examples of statements she found belittling, which included telling her that she did not have the authority to change the front desk schedule, or that he expected her to be at her desk unless she is on break. (ROI, Tab 7-1, pp. 105-106; 136)

Complainant also testified that S1 was upset at Complainant sending a reply-all email message on February 20, 2021. The record contains emails from S1 in January 2021, counseling Complainant about her use of reply-all to email messages sent to all staff, all HR Staff, or other large groups, as well as Complainant's response stating that she would continue to do so. (ROI, Tab 7-1, pp. 105-106; 134-136)

Complainant testified that S1 made comments to her such as asking if she was crazy, telling her that she had no common sense, and suggesting that she could not comprehend or complete simple tasks. Complainant interpreted this to be related to her psychological disability, testifying that she had been hired as a Schedule A employee which required that she had a service-connected disability, and therefore S1 would have been aware of her disability. (ROI, Tab 7-1, p. 115)

S1 denied this, testifying that he never asked if she was crazy or called her simple. He testified that Complainant was "a difficult employee who could not follow simple instructions," and that he did tell her that because he "constantly had to reiterate directions to her." (ROI, Tab 7-2, p. 256)

Complainant testified that S1 once told her she needed to change after she wore khaki camouflage pants to work, suggesting that she had come dressed in military uniform rather than the business casual dress code. However, she testified that she saw other employees wearing "Levi Jean material pants," and one wearing "Ugg Boots with Leggings." (ROI, Tab 7-1, pp. 118-119)

*Training*

Complainant testified that, between April 2020 and February 2021, she did not receive proper training for her position. She testified that S1 told her to seek training from other individuals, who trained her for several weeks, but one transferred out of the office, while another "abruptly stopped" training Complainant and CW2. Complainant testified that other employees trained her "when they could," but that some of the training was incorrect. Complainant described several instances where she would request training,

receive it for several weeks, and then have the training stop due to the employee changing roles. (ROI, Tab 7-1, pp. 110-111)

*Statement about Disability Status*

Complainant testified that S1 sent an email on December 18, 2020, which said, "I am unaware that you have a disability rating," noting that she had not requested leave for her VA medical appointment until the day before the appointment, and that she would need to use sick leave for her appointment. Complainant had requested Disabled Veterans Leave, which was 104 hours of special leave available for disabled veterans for their first year of employment. Complainant testified that after this conversation, S1 viewed her eOPF and found a Schedule A[3] letter; she testified that he should have known she was a disabled veteran based on that letter. (ROI, Tab 7-1, p. 151)

S1 testified that at the time Complainant requested disabled veteran leave, she had not completed the appropriate paperwork. He testified that he was aware that she was hired under Schedule A, and was aware that she was a veteran, but she had not yet shown she was qualified to use that leave or been approved to do so. He testified that after Complainant completed her paperwork through the payroll office, her leave request was adjusted to reflect the disabled veteran leave. (ROI, Tab 7-2, p. 251)

*Mediation*

On January 26, 2021, Complainant was scheduled to attend a mediation with S1 and was told by an EEO Specialist that she could not have her representative of choice at the mediation, as that individual worked for the human resources department and would therefore have a "conflict of interest" during the mediation. Complainant was given an opportunity to provide an alternate representative. However, when Complainant gave the alternate person's name to the mediator, the mediator told her that no one, including that representative, would be invited to the mediation except Complainant and the management officials. (ROI, Tab 7-1, p. 107)

The EEO Specialist testified that anyone staffed within the EEO Office, Office of General Counsel, or Human Resources does not serve as a representative for any aggrieved person or complainant due to the potential for a conflict of interest. She also testified that to the best of her knowledge, Complainant was not denied any other representative during mediation. (ROI, Tab 7-3, pp. 270-273)

The record includes an email to Complainant informing her that she could have an external representative. It also includes an email from Complainant thanking the EEO Specialist for the mediation and requesting on-going mediation once per month "to learn how to defuse conflict when it arises in the workplace." (ROI, Tab 7-3, pp. 274-275)

---

[3] Schedule A hiring authority is an optional hiring authority for federal employers to hire individuals with disabilities an exception to the traditional hiring process. Schedule A hiring authority does not require veteran status. www.usajobs.gov/help/working-in-government/unique-hiring-paths/individuals-with-disabilities.

*Report of Contact*

Complainant testified that on January 29, 2021, she was told by an individual who had walked into the human resources office to look for another office that "they tried to jam her up." The individual allegedly told Complainant that S1 had called his wife and asked her to submit a report of contact regarding an interaction with Complainant, and the wife refused. (ROI, Tab 7-1, p. 107)

*Leave Without Pay and AWOL*

Complainant testified that on February 24, 2021, she was marked as Absent Without Leave (AWOL). She discovered this by viewing her leave and earning statement in April 2021. Complainant used the terminology "AWOL" and "LWOP" interchangeably to describe this instance and testified that she believed S1 was responsible. (ROI, Tab 7-1, pp. 111-112)

*Identify Theft*

On February 23, 2021, S1 sent Complainant an email noting that she had discussed a coworker, CW3, by her first, middle, and last name; however, that employee in most VA systems was listed by a middle initial, not a full middle name. S1 asked Complainant how she knew CW3's middle name. Complainant responded that CW3 had told Complainant her middle name in 2020. In her response, she also noted that she was asked about whether she brought government documents home, a key to an office cabinet, and her involvement in an employee's forms. (ROI, Tab 7-1, pp. 126-127)

That day, S1 wrote a Report of Contact stating that he had "reason to believe" that Complainant "may have improperly and without authorization accessed personal records in the eOPF system for her fellow employees." He stated that a report run in the eOPF system showed that Complainant had accessed the records of five coworkers, including himself, and reviewed several records, as many as thirteen for one individual. For some coworkers, like CW2 and CW3, Complainant had accessed their files on multiple dates. (ROI, Tab 7-1, p. 129)

S1 wrote that there was no business reason for Complainant to access those files, and that Complainant had accessed the COVID-19 cash award records of her coworkers, transfer paperwork, individual case award files, security clearance investigation reports, beneficiary records, and other records. The report run by S1 also showed that Complainant had altered three of the individual's records without authorization. Those viewing record reports are included in the record and show Complainant accessing Cash Award and other documents for her coworkers. (ROI, Tab 7-1, pp. 129-130; 7-2, pp. 263-269)

On February 24, 2021, Complainant testified that she was accused of "identify theft and unauthorized access of an employee's personnel record." S1 told Complainant that he believed she had accessed several employee's records for unknown reasons and reported her to the police for possible identity theft or misappropriation of personally identifiable information. (ROI, Tab 7-1, p. 112)

Complainant admitted that she did look up a former employee's official personnel file but stated that she did so upon request from another human resources employee so that they could mail appropriate work forms to his home. That employee testified that he did ask Complainant if she had a forwarding address for the employee but did not specify that he needed her to access the former employee's personnel file. He also testified that he dropped W2s off to Complainant in a sealed envelope as requested by his supervisor. (ROI, Tab 7-1, p. 124; 7-10, p. 339)

S1 testified that he reported his suspicions to the VA Police Chief and a Special Investigator, who told him that improperly accessing eOPF records and modifying them could be a case of identity theft. S1 stated that he did not accuse Complainant of identity theft; he was investigating her for it. He also testified that as part of his investigation, he ran reports into employee access of eOPF files and found several other incidents of Complainant improperly accessing files as well. (ROI, Tab 7-2, p. 246)

S1 added that after Complainant was terminated, current employees had to go through her desk to resolve on-going issues. He stated that she had unfinished documents for employees that had not been properly processed, which coworkers had to work overtime to complete, and that they also found four pay stubs belonging to a deceased employee at her desk. S1 testified that the VA Police questioned Complainant regarding these paystubs, as "there is absolutely no reason why Complainant should have in her possession pay stubs for any other employee, period." (ROI, Tab 7-2, p. 250)

*Termination*

On February 24, 2021, Complainant was terminated from federal employment. Complainant testified that she was terminated because she refused to write a response to a report of contact that was submitted; however, Complainant denies refusing to do so. Instead, she states that she told S1 that she would need to consult with legal counsel prior to writing a response. (ROI, Tab 7-1, p. 112)

S1 testified that Complainant was terminated during her probationary period for failure to follow directions and failure to qualify during her probationary period, relating to the above identify theft issue. He testified that the request to terminate her came from him to the VISN 10 Human Resources Officer, S2, who concurred with S1's decision and signed the termination letter. (ROI, Tab 7-2, p. 248)

*Last Paycheck and Bonus*

Complainant testified that as of April 5, 2021, she had not received her last paycheck or a COVID-19 monetary award. She stated that she reported the issue with pay on March 24, 2021, but had not received a response. She also testified that when she asked about the COVID-19 monetary award, S1 told her that since she had not worked at a screening desk and was not exposed to COVID, she did not qualify for the monetary award. Complainant testified that she worked at a screening desk for eight hours in July 2020, and S1 responded that she still did not meet the criteria for an award. (ROI, Tab 7-1, p. 114)

## ANALYSIS

### 1. Statement of Applicable Law

### a. Statutes and Regulations

The law prohibiting employment discrimination based on race or sex is Title VII of the Civil Rights Act of 1964, as amended, Section 701 et seq., 42 U.S.C. 2000e et seq. ("Title VII"). The law prohibiting discrimination based on disability is the Rehabilitation Act of 1973, as amended, 29 U.S.C. Sections 706, 791 et seq. The law prohibiting discrimination against employees 40 years of age and over is the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. Section 633a, as amended. Federal sector equal employment opportunity regulations are set out in 29 C.F.R. Part 1614.

### b. Burden of Proof

**Disparate Treatment**

In the absence of direct evidence, disparate treatment claims are analyzed utilizing the same three-step evidentiary analysis as set forth for disparate treatment claims under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). That is first the complainant must demonstrate a *prima face* case by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination.

***Race and Gender***

In order to establish a *prima facie* case of disparate treatment on the bases of race or gender, the complainant must generally show: (1) the complainant is a member of a protected class; (2) the complainant suffered an adverse action; (3) a causal relationship existed between the complainant's membership in a protected class and the adverse action; and (4) other employees outside of the complainant's protected class were treated differently, or there exists some other evidence that the adverse action occurred under circumstances giving rise to an inference of discrimination. McDonnell Douglas, 411 U.S. at 802.

In order for comparative employees to be considered similarly situated, all relevant aspects of the complainant's situation must be nearly identical to those of the comparative employees. O'Neal v. United States Postal Service, EEOC Request No. 05910490 (July 23, 1991).

***Disability***

In order to establish a *prima facie* case of disparate treatment under the Rehabilitation Act, the complainant must demonstrate that: (1) the complainant is an “individual with a disability”; (2) the complainant is “qualified” for the position held or desired; (3) the complainant was subjected to an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination. See Lawson v. CSX Transportation, Inc., 245 F.3d 916 (7th Cir. 2001).

The ultimate burden of showing that management intentionally discriminated against the complainant remains at all times with the complainant. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983).

***Age***

In order to prevail in an age-discrimination claim under the ADEA, the complainant must generally show membership in the group of persons protected under the ADEA (*i.e.*, persons who are age 40 or over); that the complainant was subjected to an adverse employment action; and that the complainant was disadvantaged in favor of a younger person because of his or her age. Simpson v. Midland-Ross Corp., 823 F.2d 937 (6th Cir. 1987); Polstorff v. Fletcher, 452 F.2d 17 (D. Alabama 1978) (citing Marshall v. Goodyear Tire & Rubber Co., 554 F.2d 730 (5th Cir. 1977).

Employers may make subjective judgments for any reason that is not unlawfully discriminatory. The ADEA is not intended as a vehicle for review of business decisions. Ackerman v. Diamond Shamrock Corp., 670 F.2d 66, 69 (6th Cir. 1982). The question is not whether the employee was treated fairly but, rather, whether he or she was discriminated against on the basis of age. Sahadi v. Reynolds Chemical, 636 F.2d 1116, 1118 n.3 (6th Cir. 1980).

**Hostile Work Environment**

Sexual Harassment

In order to establish a case of hostile environment sexual harassment, the complainant must show, by preponderance of the evidence, that: (1) the complainant belongs to a protected class; (2) that the complainant was subjected to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based on sex; (4) the harassment affected a term or condition of employment, either unreasonably interfering with the work environment or

creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. Margaret M. v. Department of Veterans Affairs, EEOC Appeal No. 0120151790 (January 23, 2018).

Non-Sexual Harassment

To establish a prima facie case of harassment based on disability, race, gender, or age, the complainant must show that: (1) the complainant is a member of the statutorily protected class; (2) the complainant was subjected to unwelcome verbal or physical conduct involving the protected class; (3) the harassment complained of was based on the statutorily protected class; and (4) the harassment had the purpose or effect of unreasonably interfering with work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) some basis exists to impute liability to the employer, i.e. supervisory employees knew or should have known of the conduct but failed to take corrective action. Pasquarelli v. Department of Homeland Security, EEOC Appeal No. 01A23696 (June 25, 2003).

*Prong 5: Agency Liability*

The complainant must establish that they were subjected to conduct that was either so severe or pervasive that a “reasonable person” in the complainant’s position would have found the conduct to be hostile or abusive, and that the conduct was taken because of the complainant’s protected classes. Only if the complainant establishes both elements, hostility and motive, will the question of Agency liability present itself. Eric K. v. Department of the Treasury, EEOC Appeal No. 0120152127 (October 3, 2017).

Harassment by a Coworker

An agency is responsible for acts of harassment in the workplace by the complainant's coworkers where the agency knew (or should have known) of the conduct and failed to take immediate and appropriate corrective action. Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, EEOC Notice No. 915.002 (June 18, 1999); see Policy Guidance on Current Issues of Sexual Harassment (March 19, 1990); Villanueva v. Department of Homeland Security, EEOC Appeal No. 01A34968 (August 10, 2006).

Harassment by a Supervisor

If the harasser is a supervisor, an employer is strictly liable if the supervisor’s harassment culminates in a tangible employment action (i.e., a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits). But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that: (1) the employer exercised reasonable care to prevent and correct any harassing behavior; and (2) the victim unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided. See Vance v.

Ball State University, 570 U.S. 421 (2013); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). An employee may be considered a supervisor for purposes of vicarious liability under Title VII only if he or she is empowered by the employer to take tangible employment actions against the victim. Vance, supra.

**2. Discussion**

**Qualified Individual with a Disability**

Complainant testified that she has a "psychiatric service-connected disability" that qualified her for Schedule A appointment authority and that her medical condition is expected to be life-long. (ROI, Tab 7-1, p. 103) Complainant did not provide evidence as to what major life activities she is substantially limited in, and the record does not contain that information. Nevertheless, we assume *arguendo* that Complainant is a qualified individual with a disability as required to assert a claim of disparate treatment or hostile work environment on the basis of disability under the Rehabilitation Act.

**Disparate Treatment**

Complainant alleged that she was discriminated against on the bases of age, sex, race, and disability when she did not receive proper training, was marked AWOL for 7.75 hours, was terminated from federal employment, did not receive her final paycheck in a timely manner, and did not receive a COVID-19 bonus.

Where the Agency articulates a legitimate, nondiscriminatory reason for its actions, the analysis can proceed directly to whether Complainant has shown by a preponderance of the evidence, that the actions were motivated by discrimination. See United States Postal States Board of Governors v. Aikens, 460 U.S. 711, 713-714 (1983).

Here, management has done so:

S1 testified that Complainant received all available training. He testified that Complainant was onboarded "shortly after the COVID-19 pandemic started," which caused the facility to have a modified schedule and a need to get employees onboarded quickly. He also testified that Complainant had been working as a volunteer in human resources and therefore was already aware of many aspects of the office. (ROI, Tab 7-2, p. 247)

S1 admitted that he marked Complainant AWOL. He testified that she failed to follow instructions and properly clear the facility following the Clearance Checklist and having left the premises without performing duties as instructed, he charged her AWOL. (ROI, Tab 7-2, p. 247)

The termination memo, which was dated February 19, 2021, stated that Complainant was terminated during her probationary period effective February 24, 2021, for failure to follow instructions. Complainant was terminated after system records showed that she had accessed several of her coworkers' and her boss' eOPF files in violation of Agency policy and without a work-related purpose. (ROI, Tab 7-16, p. 368)

S1 testified that Complainant was not given a COVID award because she did not meet the criteria to earn a COVID award. He testified that not every employee received one; only those employees in patient care, or those "who performed specific functions above and beyond their normal duties" received an award. He denies telling Complainant that she would get a COVID award. (ROI, Tab 7-2, pp. 248-249)

Email records show that on February 26, 2021, Complainant was told that her last check would be mailed to her, rather than direct deposited. However, Complainant reported that she did not receive the last check via mail. Email records show that management looked into the matter and had Complainant submit a form to request a replacement check on April 6, 2021. S1 also apologized to Complainant for the delay. (ROI, Tab 7-1, pp. 137-140)

Finally, S1 testified that Complainant's paycheck was withheld initially after she failed to properly follow the checklists for "clearing the facility," or turning in all equipment and paperwork upon termination or resignation. He testified that if she had followed proper procedure, her final paycheck would not have been delayed. However, he also admits that there were additional delays that were the fault of the payroll department, which he submitted a help ticket concerning. He testified that the issue has since been resolved and Complainant received her final paycheck. (ROI, Tab 7-2, p. 248)

We find these to be legitimate, nondiscriminatory reasons for the Agency's actions, and move to whether Complainant can prove those reasons to be mere pretext.

*Pretext*

The showing of pretext is, in effect, a requirement that the employee show, by a preponderance of the evidence, a connection between the alleged basis of discrimination and the action taken; namely, that the agency acted with discriminatory intent. Complainant's bare assertions, theories, and speculation are not sufficient, as a matter of law, to satisfy this standard. See Beatriz v. United States Postal Service, EEOC Appeal No. 2019002162 (September 29, 2020) ("the pretext inquiry is not concerned with bad judgment, dislike, or mistake"); see also Morin v. Department of Health and Human Services, EEOC Appeal No. 0120073357 (September 16, 2009) (stating that "the Commission is mindful that pretext requires more than disagreement with the agency's actions. Further, mere assertions are not enough to establish pretext.").

Our role as the decision maker in the adjudication process is not to "second-guess" management's decisions regarding personnel actions. See Homer S. v. Department of Transportation, EEOC Appeal No. 2019005337 (August 20, 2020) (citing Dewitt L. v. Department of the Navy, EEOC Appeal No. 0120160682 (May 3, 2016)); Vanek v. Department of Treasury, EEOC Appeal No. 05940906 (January 16, 1997). We are charged with reviewing the record to determine whether the burden of providing sufficient evidence of discriminatory motive in making the decisions was met. Here, Complainant has not met that burden.

Complainant did not establish that other employees outside of her protected classes hired in similar situations received more training than Complainant did; instead, the record contains several instances where Complainant attended training with another employee in the office.

While Complainant provided an explanation as to why she accessed the eOPF of one former employee, and testimony from a coworker confirmed that they requested a mailing address for that former employee, Complainant did not address or explain why she accessed a number of other employee records, including cash award and bonus information for her other coworkers. Complainant denied accessing records improperly, but the record clearly contained a report showing when she accessed the records and what records she accessed. Termination for such a serious breach in confidentiality and professionalism is not unreasonable and does not create an inference of discrimination; Complainant failed to provide other evidence as to why her termination was caused by the legitimate reason provided.

It is Complainant's burden to prove that unlawful discrimination occurred by a preponderance of the evidence. See Taunya P. v. United States Postal Service, EEOC Appeal No. 2019002894 (January 22, 2020). The Commission defines the preponderance of the evidence as that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. Thomas v. Department of Transportation, EEOC Appeal No. 01945798 (December 12, 1996). For each of the events in question, Complainant provided nothing more than conjecture to support her assertion that S1 or any other member of management was motivated by discriminatory animus in their actions.

We find that Complainant has failed to prove, by a preponderance of the evidence, that she was subjected to discrimination in the above-referenced claims.

**Hostile Work Environment**

***Sexual Harassment***

Complainant alleged that she was subjected to sexual harassment when S1 told her that she could call him "the candy man."

S1 testified that he "absolutely did not" tell Complainant to call him "candy man." He stated that he keeps water, granola bars, breakfast bars, and jars of candy in his office, and that those snacks are available to all employees. He testified that he tells all new employees about the snacks when they start, but that he never asks them to call him by anything other than his name or title. (ROI, Tab 7-2, p. 244)

Even if S1 did make the comment as alleged by Complainant, Complainant admits that the comment was made in reference to candy and other snacks being kept in S1's office for other employees. Nothing in the record or Complainant's testimony suggests an overtly sexual aspect to the comment, and S1's testimony is plausible.

In general, the harasser's conduct should be evaluated from the objective viewpoint of a reasonable person in the victim's circumstances. Enforcement Guidance on Harris v. Forklift Systems, Inc., EEOC Notice No. 915.003 (March 8, 1994). Here, an objective view of the comment in question would not lead a reasonable person in Complainant's circumstances to feel that they had been subjected to actionable sexual harassment.

***Non-Sexual Harassment***

As an initial matter, we find that the claims analyzed above may not properly be considered as part of Complainant's harassment claim, given our determination that the actions were not motivated by discriminatory animus. See Kina v. Department of Veterans Affairs, EEOC Appeal No. 2019005041 (September 30, 2020).

We therefore proceed to address Complainant's remaining hostile work environment allegations, assuming that Complainant has established Prongs 1 and 2 of the prima facie case for workplace harassment—that she, a member of a protected class or classes, was subjected to behavior which she found subjectively unwelcome, and which, arguendo, a reasonable person, looking at the situation, objectively, would also find to be so. See Enforcement Guidance on Harris v. Forklift Systems, Inc., EEOC Notice No. 915.003 (March 8, 1994).

*Prong 3*

Harassing conduct, no matter how unjustified or egregious, cannot support a claim of harassment unless there exists some linkage between the conduct and membership in one or more of Complainant's protected classes. Felicidad S. v. Department of Veterans Affairs, EEOC Appeal No. 0120150141 (February 16, 2017); Complainant v. Department of Justice, EEOC Appeal No. 0120132442 (June 5, 2015); Stahl v Sun Microsystems, Inc. 19 F.3d 533 (10th Cir. 1994). Complainant fails to establish such a linkage where the agency has found no discrimination in reference to one or more incidents of alleged harassment analyzed as separately actionable claims. See Rudolf D. v. General Services Administration, EEOC Appeal No. 0120162402 (February 22, 2018) (noting that "a finding of a hostile work environment is precluded by our determination that Complainant failed to establish that any of the actions taken by the agency were motivated by discriminatory or retaliatory animus." (citing Oakley v. United States Postal Service, EEOC Appeal No.

01982923 (September 21, 2000); Denisse Y. v. United States Postal Service, EEOC Appeal No. 0120151303 (June 30, 2017); Staples v. Department of Veterans Affairs, EEOC Appeal No. 0120091013 (June 22, 2010).

Regarding the situation with her coworkers, S1 testified that in September 2020, he received reports about Complainant and CW2 being unable to "work cohesively together," and contacted the EEO department. In October 2020, Complainant and CW2 both received Professional and Ethical Behavior training from the EEO department. S1 testified that in December 2020, he against heard reports of Complainant having issues with another employee, this time with CW3. S1 scheduled a mediation between them to attempt to resolve the issues. S1 testified that Complainant never reported any employee using "the n word," curse words, or sexual innuendo to him. (ROI, Tab 7-1, p. 145; 7-2, pp. 243, 247)

In a September 2, 2020, memo, S1 wrote that he held a second meeting regarding Complainant and CW2's inability to work together, stating that he put them both on notice that "their feuding is getting out of control," and that their attitude and behavior need to change immediately. He writes that he informed both individuals that he "will not tolerate the creation of a hostile work environment within this department," and that they need to work together in a professional manner, or they will both be subject to proposed disciplinary action. (ROI, Tab 7-14, p. 361)

He testified that both Complainant and CW2 were at fault in the situation, and both "had words," which caused him to send both of them to the same training. He testified that he has counseled CW2 and CW3 "when they are out of line," and treated Complainant "no different than anyone else." He notes that several employees who were African American women were never counseled by him because they were "model employees." S1 also admitted to sending an email to staff which stated that they should have known information that led to a mistake; he denies that this email ridiculed staff. Finally, he testified that he felt Complainant was trying to create a hostile work environment for the other staff members. (ROI, Tab 7-2, pp. 253-254, 256)

CW3 testified that Complainant was "very defensive when it came to receiving information from her coworkers," and developed a hostility towards her and others. She testified that she suspected that Complainant had viewed her eOPF record after Complainant began referring to her by her full legal name, including her middle name, which CW3 did not use at the office. (ROI, Tab 7-6, p. 317)

CW2 testified that she "is human" and had "on occasion let a few curse words slip through," and that she heard Complainant do the same. She testified that Complainant was a bully, describing her as "VERY HOSTILE, MANIPULATIVE, & COMBATIVE" (emphasis in original). CW2 testified that she had a number of conflicts with Complainant related to work issues, and that when she confronted Complainant, Complainant called her an "Uncle Tom," and said that she wanted to "jump" on CW2, adding that they would have called a "code blue" medical emergency because Complainant was "ready to risk it all" to physically harm CW2 in that moment. CW2 testified that she apologized

immediately to diffuse the situation and attempted to leave Complainant "completely alone." (ROI, Tab 7-7, p. 330)

Regarding various comments from S1, one of the employees that Complainant testified was belittled by S1 testified that she did feel that the workplace was not "of a teamwork mentality," and that all staff were not friendly or supportive. She testified that S1 was not her supervisor, and that she did not tell Complainant that she felt S1 was racist or treated White employees better. Instead, she testified that she told Complainant that she did not feel like S1 valued her and was not friendly or joking; however, she testified that she did not know how he treated others. (ROI, Tab 7-11, pp. 342-343)

S1 testified that Complainant "had no business replying to all 400 HR VISN employees with you're welcome" to a message that the Human Resources Office forwarded along from the director. He also testified that Complainant, along with all other Detroit HR employees, had been counseled not to reply all to emails, and Complainant failed to follow that instruction. He stated that he told her that she was in the military and should know how to follow instructions. (ROI, Tab 7-2, p. 254)

S1 also testified that he did not belittle or demean Complainant, nor did he threaten her job, but that he did have conversations with her about her performance. He stated that she was making mistakes regarding employee benefits that he counseled her on and agreed that he told her that she was "on thin ice" regarding her mistakes. S1 added that Complainant "refused to acknowledge that she has ever made a mistake," would not take direction, and "refuses to listen to constructive criticism regarding her work." (ROI, Tab 7-2, pp. 244-245)

S1 testified that Complainant, CW2, and another employee were all provided with additional training due to mistakes made in employee benefits. He described Complainant as "refusing to participate in the training," which was provided by CW3. S1 stated that at the end of the day, Complainant asked one of the other employees in the training session who was "a brand-new employee at the time" to "show her everything" CW3 had covered in training. S1 testified that he asked each employee from the training session to provide him with reports of contact documenting their perspective on the incident so that he could investigate. S1 added that he also asked other individuals to document various mistakes that had been made, but that one declined. (ROI, Tab 7-2, p. 245)

CW3 provided an email, dated February 4, 2021, from her to S1 detailing the training which occurred on January 27, 2021. In her email, CW3 wrote that she discussed how to enter a remedy ticket with all employees present, and that two of the employees discovered during training that they did not have access to the appropriate system. CW3 then helped them get access to the system while sitting across from Complainant. She told S1 that Complainant did not state that she lacked access to the system at that time. (ROI, Tab 7-6, p. 325)

Complainant also provided unsworn statements from other former employees which suggested various conflicts with S1 but included individuals outside of Complainant's protected classes and stated various reasons for conflicts with S1, from calling him generally unprofessional to stating that he was "non-communicative." These statements were not provided as affidavit testimony and were instead submitted directly through Complainant through unknown circumstances. We note that not all management disagreements or even bad management is discriminatory; it remains Complainant's burden to establish a connection between the comments or actions in question and her protected classes. (ROI, Tab 1-1, pp. 25-29)

Outside of Complainant's own conjecture, the record lacks evidence tying her protected classes to the events in question. Even assuming the events and comments in question occurred as alleged—despite numerous evidentiary contradictions in the record—the events do not suggest that they occurred due to Complainant's race, sex, age, or disability. Many of the coworkers that Complainant had repeated conflicts with were also of her same race and sex, and one was of the same general age group as Complainant. Other testified that she, like Complainant, was disabled. Complainant described generally a challenging work environment where several employees, including Complainant, contributed to conflicts.

S1's testimony that he made several efforts to address the issues, including requiring training for both Complainant and one of the employees Complainant repeatedly had conflict with, as well as his attempts to address the issues with both Complainant and her coworkers, is supported by the evidence in the record. While Complainant may disagree with S1's management style, there is no evidence in the record to suggest that the reason she was treated in the manner that she was treated was due to her status as a member of any protected class.

*Prong 4*

Further, even if there were a nexus between Complainant's protected class and the events they described, and even if those instances occurred as alleged by Complainant, Complainant's allegation would still fail to satisfy Prong 4 of a *prima facie* case of harassment, as they are not sufficiently severe or pervasive.

Title VII does not set forth a general civility code for the American workplace and does not insulate employees from "personality conflicts at work that generate antipathy" or "snubbing by supervisors and coworkers." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). The statutes enforced by the EEOC are not to be used as a "general civility code;" they forbid "only behavior so objectively offensive as to alter the conditions of the victim's employment." Oncale v. Sundowner Offshore Services, Inc, 523 U.S. 75 (1998); see also Vore v. Indiana Bell Telephone Co., 32 F 3d 1167 (7th Cir. 1994). Title VII does not create a right to work in a pleasant environment; merely one that is free from discrimination. Consequently, offhand comments, petty slights, isolated incidents of workplace friction, and other ordinary workplace tribulations are generally insufficient to demonstrate harassment. See Philips v. Department of Veterans Affairs,

EEOC Request No. 05960030 (July 12, 1996); Banks v. Department of Health and Human Services, EEOC Request No. 05940481 (February 16, 1995).

The incidents described by Complainant, including various comments back and forth with coworkers, management, conflicts over who wrote what on a whiteboard, and so on, are best categorized as "personality conflicts," "petty slights, isolated incidents of workplace friction," and the routine exercise of supervisory responsibilities which, by definition, is neither severe nor pervasive so as to create a hostile work environment. See Broderick v. Department of Veterans Affairs, EEOC Appeal No. 0120150798 (June 2, 2017); Arlette W. v. Department of Justice, EEOC Appeal No. 012014091(October 20, 2016); Arellanes v. Department of Defense, EEOC No. 01A63349 (EEOC OFO 2006).

We therefore find that Complainant has not established that she was subjected to a hostile work environment—sexual or non-sexual—based on her race, age, sex, or disability.

## CONCLUSION

Complainant failed to establish that she was discriminated against or subjected to a hostile work environment, as alleged.

## RIGHT OF APPEAL

The Complainant may appeal this final agency decision within 30 calendar days of receipt to: **Equal Employment Opportunity Commission, Office of Federal Operations (EEOC-OFO)**. The appeal may be filed via the EEOC's Public Portal, U.S. Mail, or Hand-Delivery.

1. **EEOC-OFO recommends that all submissions and communications from complainants be electronic.**

   a. **Appeals submitted electronically should be completed via the EEOC Public Portal at https://publicportal.eeoc.gov/Portal/Login.aspx.** See warning below and detailed instructions attached.

**WARNING!**

**Attorneys and non-legal representatives MUST NOT use the EEOC Public Portal to file appeals on behalf of their clients as the portal will incorrectly list the representative as the complainant. Therefore, COMPLAINANTS MUST file electronic appeals themselves through the EEOC Public Portal regardless of whether they are represented.**

b. **Appeals submitted by mail should be completed by using EEOC Form 573.** A copy of EEOC Form 573 is attached. Appeals submitted by mail should be sent to:

Director
U.S. Equal Employment Opportunity Commission
Office of Federal Operations
P.O. Box 77960
Washington, D.C. 20013

c. **As an alternative to mailing the appeal, the appeal may be hand-delivered to**:

Equal Employment Opportunity Commission
Office of Federal Operations
131 M Street N.E., Suite 5SW12G
Washington, D.C. 20507-0004

**2. If mailing or hand-delivering the appeal to the EEOC-OFO, a copy of the appeal must also be sent to the VA Office of General Counsel at the following address:**

Department of Veterans Affairs
Office of General Counsel (024)
810 Vermont Avenue, N.W.
Washington, D.C. 20420

3. Statements or briefs in support of the appeal must be submitted to the EEOC-OFO within 30 calendar days of the filing of the appeal. The EEOC-OFO will accept statements or briefs in support of an appeal by facsimile transmittal at (202) 663-7022. If statements or briefs are submitted by mail or hand delivery, a copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement," must also be sent to the VA's Office of General Counsel at the above address.

4. If an appeal is filed with the EEOC-OFO by mail or hand delivery, the appeal, and any subsequently filed statement or brief, must contain a statement certifying the date and method by which copies of these documents were served on the VA's Office of General Counsel.

5. If the Complainant files an appeal with the EEOC-OFO beyond the above-noted time limit, the Complainant should provide the EEOC-OFO with an explanation as to why the appeal should be accepted despite its untimeliness. If the Complainant cannot explain why timeliness should be excused, the EEOC-OFO may dismiss the appeal as untimely.

## RIGHT TO FILE A CIVIL ACTION

The Complainant also has the right to file a civil action in an appropriate United States District Court. The Complainant may file a civil action:

(1) Within 90 days of receipt of this final decision if no appeal to the EEOC-OFO has been filed; OR

(2) Within 90 days after receipt of the EEOC-OFO's final decision on appeal; OR

(3) After 180 days from the date of filing an appeal with the EEOC-OFO if there has been no final decision by the Commission.

The Complainant must name the official head of the Department of Veterans Affairs, **Denis McDonough**, as the defendant. The Complainant may not name just the Department. The Complainant must also state the official title of the Department head, which is the **Secretary of Veterans Affairs**. Failure to provide the name or official title of the head of the Department may result in dismissal of the case. **Please consult your District Court's website for procedures to file a civil action and any COVID-19 related changes in procedures.**

If the Complainant decides to file a civil action under Title VII (discrimination due to race, color, religion, sex, national origin, or reprisal) or under the Rehabilitation Act of 1973, as amended, (discrimination due to disability), and if the Complainant does not have or cannot afford the services of an attorney, the Complainant may request that the Court appoint an attorney to represent the Complainant and that the Court permit the Complainant to file the action without payment of fees, costs, or other security. **The grant or denial of the request is within the sole discretion of the Court**. Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS of the date that Complainant receives the final agency decision from the Department or the Commission.

TERRIE BRODIE
Digitally signed by TERRIE BRODIE
Date: 2022.08.23 13:26:23 -07'00'

8/23/2022

For MARY LYNNE POPIDEN
Director, Office of
Employment Discrimination
Complaint Adjudication

Date

Enclosures: EEOC Public Portal Instructions
EEOC Form 573

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**

## CERTIFICATION OF SERVICE

| | |
|---|---|
| Complainant's Name: | Tara Miller |
| Agency Case No.: | 200J-VI10-2021102392 |
| EEOC Case No.: | 471-2021-00088X |

I certify that on this date, the Final Agency Decision was sent via electronic mail to the individuals and parties shown below. For timeliness purposes, it shall be presumed that the parties received the Final Agency Decision within five (5) calendar days after it was sent via electronic mail.

**Complainant:**

Tara Miller

taramiller2005@yahoo.com

**Complainant's Representative:**

Dewey Martin

drickmartin@glottassociates.com

**EEO Manager:**

Karen Johnson

karen.johnson16@va.gov

**ORMDI Field Office:**

Office of Resolution Management, and Inclusion (08O)

ORMMDFrontOffice@va.gov

**Agency Representative:**

Lauren Ciucci

lauren.ciucci@va.gov

TAYLOR BANKS Digitally signed by TAYLOR BANKS Date: 2022.08.23 16:21:46 -04'00'

8/23/2022

(*Signature of Dispatcher*) *(Date of Dispatch)*

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**

**TRANSMITTAL OF FINAL AGENCY DECISION**

| | |
|---|---|
| **TO:** | The Parties<br>Representatives of the Parties<br>ORMDI Field Office |
| **SUBJ:** | Final Agency Decision |

| | |
|---|---|
| Complainant's Name: | Tara Miller |
| Agency Case No.: | 200J-VI10-2021102392 |
| EEOC Case No.: | 471-2021-00088X |

Enclosed is the Department's Final Agency Decision concerning the above-referenced complaint of employment discrimination.

The Final Agency Decision includes a statement explaining the complainant's right of appeal and right to file a civil action.

The transmittal to the complainant and, if applicable, the complainant's representative, includes EEOC Form 573 (MSPB Form 185, if the subject complaint is a "mixed case") for use should the complainant wish to appeal the enclosed Final Agency Decision.

If the complainant requested a hearing before an EEOC administrative judge, the transmittal to the ORMDI field office also encloses the hearing record, including the EEOC administrative judge's decision, and/or other miscellaneous correspondence/documents provided to this office by the judge.

TERRIE BRODIE Digitally signed by TERRIE BRODIE Date: 2022.08.23 13:27:20 -07'00'

For Mary Lynne Popiden
Director

Enclosures