UNITED STATES DISTRICT COURT
EASTERN DISCTRICT OF MICHIGAN

TARA D. MILLER,

Plaintiff,

vs.

DENIS MCDONOUGH,
Secretary
U.S. Department of Veteran Affairs
Agency

Defendants

Case No. 22-cv-12865

Hon. F. Kay Behm
Mag. Judge Kimberly G. Altman

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Table of Contents

INDEX OF AUTHORITIES.............................................................3

STATEMENT OF QUESTIONS PRESENTED............................................5

I. INTRODUCTION.....................................................................6

II. SUMMARY OF ARGUMENT......................................................10

III. STATEMENT OF MATERIAL FACTS.............................................10

IV. STANDARD GOVERNING SUMMARY JUDGMENT MOTIONS.................26

V. ARGUMENTS ........................................................................ 28

**I. Where Defendant terminated Plaintiff for a *single* reason of "failure to follow direction," Defendant's Motion for Summary Judgment must be denied when relying on after-acquired evidence which can only be used as a defense to damages, not as a defense to liability in employment discrimination cases..........................................28**

**II. Defendant's shifting reasons for terminating Plaintiff's employment creates a genuine issue of material fact on the question of pretext, thereby, precluding summary judgement, as a matter of law...................................32**

**III. Defendant's failure to cite to the Court the current and applicable law for Title VII hostile work environment claims precludes summary judgment, as a matter of law...........36**

CONCLUSION.........................................................................43

RELIEF REQUESTED................................................................44

CERTIFICATE OF SERVICE.........................................................45

# INDEX OF AUTHORITIES

**Cases**

*Alexander v. CareSource,* 576 F.3d 551, 557-58 (6th Cir. 2009)..................28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)....................27

*Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002)...........33

*Edwards v. U.S. Postal Serv.*, 909 F.2d 320, 324 (8th Cir. 1990)................33

*Gaglioti v. Levin Group, Inc.*, No. 11-3744 (6th Cir. 2012).........................35

*Mckennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995)...6, 9, 10, 29, 30, 31, 32

*McNeal v. City of Blue Ash,* 117 F.4th 887 (6th Cir. 2024)..........................37

*Peck v. Elyria Foundry Co.*, 2009 WL 2868831 (6th Cir. Sept. 8, 2009).........34

*Pierson v. Quad-Graphics Printing Corp et. al.*, 749 F.3d 530 (6th Cir. 2014)...33

*Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018).......27
*Schmitz v. St. Regis Paper Co.*, 811 F.2d 131, 132-33 (2d Cir. 1987)............32

*Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996)...............32
*Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997)................33
*Wyatt v. Nissan N. Am. Inc.*, 999 F.3d 400 (6th Cir. 2021)..........................35

**Court Rules**

Fed. R. Civ. P. 56(a)..........................................................27

Fed. R. Civ. P. 56(c)..........................................................27
Fed.R.Civ.P. Rule 56(h).....................................................10

**Statutes**

Title VII..........................................................................9

ADEA..............................................................................9

The Rehabilitation Act........................................................9

**CONTROLLING AUTHORITIES**

*Mckennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995)............6

*McNeal v. City of Blue Ash,* 117 F.4th 887 (6th Cir. 2024)..........................37

*Muldrow v. City of St. Louis,* 600 U.S.______ (2024)..............................39

## STATEMENT OF QUESTIONS PRESENTED

**I. Where the decision to terminate Plaintiff Defendant terminated Plaintiff for a *single* reason of "Failure to follow Direction" was made on February 19, 2021, must Defendant's motion for summary judgment impermissibly based on after-acquired evidence discovered on February 23, 2021 be denied?**

**II. Where Defendant's shifting reasons for terminating Plaintiff's employment creates a genuine issue of material fact on the question of pretext, is summary judgement precluded, as a matter of law?**

**III. Where Defendant failed to cite to the Court the current and applicable legal framework for Title VII hostile work environment claims, must summary judgment be denied, as a matter of law?**

# I. INTRODUCTION

The Defendant's motion for summary judgment necessarily must be dismissed because it is impermissibly based upon alleged misconduct *not known at the time* Defendant made its decision to terminate Plaintiff's employment. In an attempt to avoid the consequences of its acts of sex, age and disability based discrimination, Defendant fails to cite or discuss the law set forth in *Mckennon v. Nashville Banner Publishing Co*., 513 U.S. 352 (1995). That landmark decision makes clear that information discovered after the employer made the decision to terminate an employee can only be used to as a defense to damages, not as a defense to liability.

The Defendant's motion for summary judgment necessarily must be dismissed or denied because Defendant fails to cite or discuss the applicable and governing legal standard for the issues in this case. While the Defendant is purposefully vague, the material fact that must be addressed and claimed not to be disputed, is the reason for Plaintiff's termination on February 19, 2021. The applicable document specifically states the reason for the discharge:

> 2. <u>Your supervisor, Eric Osterbeck, has recommended that you be terminated from your position for failure to qualify during your trial period</u>. **<u>Your termination is due to failure to follow direction</u>**. (Ex. 1, Defendant's February 19, 2021 Notice of Termination Letter) (Emphasis added)

Said attached document is dated February 19, 2021. February 19, 2021, Tara Miller was terminated by HR Manager, Eric Gonzalez with a digital signature and said document was sent directly to Tara Miller telling her that the effective date of termination was February 24, 2021. By that date, she must "properly clear the facility." Tara Miller is ordered to "turn in any government property." And without any specificity, she was ordered to "clear any indebtedness prior to release of [her] final paycheck." Then Tara Miller was given the procedure "to seek review of this action."

The reason for termination was extremely vague. There was no documentation of what "direction" Tara Miller failed to follow. Nor was there any indication that remedial actions were possible. Her termination by letter dated February 19, 2021, was final and uncompromising.

Defendant's motion presents a much different picture to the Court. In a disingenuous attempt to escape the impact of *Mckennon, supra,* Defendant pretends that the February 19, 2021 letter informing Plaintiff that she had been terminated does not exist.

However, the Defendant's supporting brief, on page 8, paragraph 36 to paragraph 40 paints a series of events that turns the chronology upside down. Paragraph 36 states that: "Osterbeck began the process of seeking to terminate

Miller's probationary employment by sending a request to Earl Lee in VA's employee-relations department. (Def. Brief, p. 8)

Paragraph 37 states: "Then, **or around February 19, 2021**, that **request** was forwarded to Osterbeck's supervisor (and Miller's second-line supervisor), Eric Gonzalez." (Emphasis added) Contrary, to Defendant's assertions, it was not a "request." **February 19, 2021 is the actual date that Gonzalez "terminated" Tara Miller**. Again, the February 19, 2021 letter entitled "Termination during Trial Period" speaks for itself.

Paragraph 38 states: While that request was pending, Angela Thompson told Osterbeck she was concerned that Miller might have accessed her personnel file because Miller addressed Thompson as "Angela Denise Thompson," (i.e. including her middle name)

However, the "request" to terminate Plaintiff was not "pending." On the contrary, Tara Miller was fired on February 19, 2021. The position in Defendant's motion for summary judgment is to say to this Court that there was an ongoing investigation. That position is untrue and intentionally misleading.

Paragraphs 39-40 read as follows:

> 39. Osterbeck then obtained an access log from the personnel-file system, which confirmed that Miller accessed her coworkers' files. (Exhibit 19, OPF Access Report)

> 40. The next day, Eric Gonzales approved Miller's termination based on her failure to follow directions and unauthorized access of coworkers' personnel files. (Exhibit 17, Declaration of Gonzales.)

The Defendant's used the phrase "the next day" specifically to mislead the Court into finding that Gonzalez's decision to fire Tara Miller was made *after* Osterbeck claimed she "accessed her co-workers' files" on February 23, 2021, instead of *before* that date. That position has absolutely no factual support, and is directly contradicted by Gonzalez's *own* termination letter to Tara Miller dated February 19, 2021.

There is a reason the Defendant seeks to mislead the Court. Defendant seeks to avoid the legal consequences of *McKennon, supra,* which explicitly precludes the use of "after-acquired evidence" as a liability defense to civil rights claims.

The Defendant intentionally attempted to mislead the Court both by misstating the facts, and ignoring the applicable law. The information Defendant claimed to have obtained after Tara Miller was terminated cannot be used to as a defense to liability, because it was not known at the time Defendant made the decision to terminate her "probationary" employment on February 19, 2021.

As *McKennon supra,* makes clear, after-acquired evidence is relevant **<u>only</u>** on the question of "damages". It cannot be asserted as to absolve Defendant of liability for its alleged violations of Title VII, ADEA and the Rehabilitation Act.

Because Defendant's motion for summary judgment is impermissibly based upon after-acquired evidence, it conflicts with the law set forth in *McKennon, supra*, and therefore, must be denied.

## II. SUMMARY ARGUMENT

The Defendant's motion for summary judgment necessarily must be denied because the Defendant motion for summary judgment fails to cite or discuss the applicable legal standard for this case. In addition, the motion is impermissibly supported by (1) after-acquired evidence; (2) inadmissible hearsay documentary evidence; and (3) an affidavit containing false and misleading statements in violation of Fed.R.Civ.P. Rule 56(h).

## III. STATEMENT OF MATERIAL FACTS

Plaintiff, Tara Miller was born July 8, 1969. She joined the United States Army on May 9, 2011 and continues to serve the country as a Sargent First Class in the U.S. Army Reserves Unit. (Ex. 2, Plaintiff's Declaration, ¶ 1) Plaintiff re-enlisted in the Army Reserves twice: in 2017, and the second time in June 2024. (Id.; Ex. 3, Re-enlistment Certificates)

Unfortunately, during Tara Miller's service, she was violently physically sexually assaulted by male soldiers twice. (Ex. 2, Plaintiff's Declaration, ¶ 1) The first sexual assault occurred in 2014 at Fort Gillem, Georgia, and the second one occurred in 2015 while she was on duty in Kuwait. (Id. ¶ 2)

In a *Military Mental Health* article entitled: **"Sexual Assault in the Military"** (Ex. 4, 2015 Military Mental Health Article) the authors state in part:

> Sexual assault remains a persistent problem in the military, with an estimated **20,000 active duty service members experiencing unwanted sexual contact in 2014 [1•], and sexual assaults even occurring in combat environments [2]. Estimates of sexual assaults that occur during military service range from 9.5 to 43% among women and 1–12 % among men** [3]. (Emphasis added)
>
> * * *
>
> The impact of sexual assaults on victims can be devastating, affecting their psychological and physical health, military career, and success once leaving the military. **Sexual assaults are a major contributing cause to post-traumatic stress disorder (PTSD) in female service members and veterans [13, 14]. Depression, substance abuse, and eating disorders likewise have been linked to sexual assault in military and civilian populations** [15–19]. A wide range of medically unexplained physical symptoms have also been associated with sexual assault [17, 19–21]. **Sexual assaults are a major reason that some female service members leave the military [22, 23]. As a result of military-related sexual trauma, many female veterans struggle transitioning back into civilian life, with some ending up homeless**. (Id.) (Emphasis added)

As a result of the "two" sexual assaults suffered by Tara Miller she was awarded a "70%" service-connected psychiatric disability for PTSD with a history of MST [Military Sexual Trauma]." (Ex. 2, Plaintiff's Declaration, ¶ 4; Ex. 5, Schedule A-Disabled Veteran)

Plaintiff specifically sought government employment to keep from being terminated during the times of deployment overseas or for training missions in the states. (Id) Plaintiff had been told by others that doing volunteer work for the VA would increase her chances of being offered a full-time position. (Id.)

So, on February 4, 2020, Plaintiff began working at the VA in Detroit as a "volunteer" in the Human Resources Department as a receptionist, despite her resume, which included "two" doctorate degrees and former position of Human Resources Specialist in the U.S. Army. (Id. ¶ 6; Ex. 6, Plaintiff's Resume)

On March 31, 2020, Eric Osterbeck a supervisor in the Human Resources department hired Plaintiff as a full-time Human Resources Assistant at a G-7 pay scale to start on April 1, 2020. (Ex. 2, Plaintiff's Declaration ¶ 7) At the time she was hired, Osterbeck knew from Tara Miller's application that she was a Scheduled "A" hiring with a "severe physical, intellectual or psychiatric disability." (Id.) Osterbeck told Plaintiff she was would be under a "two year probationary period and could be terminated at his discretion." (Id.) However, during her orientation with Osterbeck he purposely did not tell Plaintiff that she had the right to join the union. (Id.) In fact, Plaintiff was told the opposite by several HR administrators. (Id.)

Despite Supervisor Osterbeck's knowledge that Tara Miller had a severe psychiatric disability, he immediately subjected her to *unwelcomed* sexual

advances and sexual innuendos, causing her to immediately relive the two violent sexual assaults for which she was undergoing psychiatric treatment for PTSD and MST. (Id. ¶ 8)

On April 15, 2020, just 14 days after being hired, Osterbeck called Tara Miller into his office. (Id. ¶ 9) At the conclusion of the meeting regarding his expectations, Osterbeck stated: "You may help yourself to any candy, and Rice Krispy treats in my office at any time." (Id.) He then said with a flirtatious smile: "Because around here they call me the Candy Man." (Id.) In an instant, Tara Miller's brain retriggered to the sexual assaults; she he did not see Osterbeck, she saw the two soldiers who sexually assaulted her. (Id.)

Plaintiff was extremely uncomfortable with his comment because she knew that the expression "Candy Man" has a sexual connotation in that "Candy" refers to a man's "penis." (Id.; Ex. 7, Candy Man (Christina Aguilera Song)) That is why Osterbeck's statement immediately retriggered the trauma of the two sexual assaults she encountered in the Army. (Id.)

However, Tara Miller masked her emotions and anger because she knew she needed a government job. (Id.) Federal agencies are one of few employers who will allow military reservists to return to the position they would have had they not been deployment or on training missions. (Id. ¶ 11) Not wanting to risk losing her newly acquired VA job, Plaintiff remained silent, disgusted, and shocked as she

thought to herself: “Here I go again with same uncouth sexual innuendos.” (Id. ¶ 12)

Undeterred by Tara Miller’s silence at his unwelcomed “Candy Man” comment, Osterbeck thought he would give it another try. (Id. ¶ 13) On April 21, 2020 as Osterbeck and Plaintiff were walking past each other in the office hallway, Osterbeck began ogling her body from her hips to her breast. (Id. ¶ 14) And when he reached Plaintiff he stated with a flirtatious grin: “You look nice!” (Id.) The way Osterbeck was staring at her body made she feel as though he was looking through her cloths. (Id. ¶ 15) Tara Miller thought to herself: “Here we go again with female body objectification,” which again, immediately sent her mind back to Fort Gordon, Georgia and Camp Arifjan, Kuwait. (Id.)

Plaintiff decided to take the risk of making a stronger non-verbal resistance to Osterbeck’s *second* unwelcomed sexual advance. (Id. ¶ 16) She made sure this time, he saw a look of disgust and shock on her face, she loudly sighed, and rushed away from him. (Id.)

As a result, of Plaintiff’s strong expression of opposition to Osterbeck’s unwelcomed sexual advances, decided that Plaintiff had to be fired. (Id. ¶ 17) He, therefore, decided surreptitiously to retaliate against Plaintiff by structuring a hostile work environment that was designed and intended to cause Plaintiff to either quit, or lead to her unlawful firing. (Id.)

The first step was to hire someone who Osteerbeck believed would "play his sexual games." (Id. ¶ 18) That individual was Erica Bethany, a substantially younger woman in her 30's with a turbulent VA work history. (Id.) Osterbeck faced a difficult roadblock. (Id.)

To hire Bethany, protocol required that a panel would review Bethany's work history, as compared to the other possible candidates. (Id. ¶ 19; Ex. 8, Osterbeck Dep. pp. 171-172) A member of the HR department hiring panel, Glen Belcher told Plaintiff the panel would have never approved Bethany's hiring. (Ex. 2, Plaintiff's Declaration, ¶ 20; Ex. 8, Osterbeck Dep. pp. 61-63) Therefore, Osterbeck violated protocol, a serious infraction of regulations in order to hire someone who would "play his sexual games." (Ex. 2, Plaintiff's Declaration, ¶ 20) He was successful in implementing his plan. (Id.) Bethany was hired and was to report to work on May 19, 2020 as a Human Resource Generalist G-6. She reported late the first day of work, and continued to be late virtually every day thereafter. (Id.; Ex. 9, Osterbeck Warning of Disciplinary Action to Bethany)

As Osterbeck expected, Bethany immediately acceded to his sexual advances, sexual banter and sexual innuendos by engaging in flirtatious behavior along with Osterbeck's assistant, Angela Thompson. (Id. ¶ 21) They would often continue their flirtatious behavior while following Osterbeck into his office and closing the door. (Id.) Osterbeck would claim they were having a "office" meeting,

but Plaintiff was always excluded. (Id.) Another way they "played" Osterbeck's sexual games was by spewing the "F" word and by wearing extremely tight fitting sexually provocative clothing. (Id.) On one occasion in June 2020, Bethany stated: "Tara, just play the game." (Id.)

Osterbeck rewarded Bethany for being willing to "play the game" by giving her favorable treatment, that included: (1) being allowed to report late for work 3-4 times a week, resulting in an unfair increase in Plaintiff's workload without compensation; (2) being provided the proper and complete training required to successfully perform the HR job duties, while Plaintiff's request for the same training given her co-worker was repeatedly denied; (3) allowing Bethany and Angela Denise Thompson to wear inappropriate sexually provocative clothing in violation of the dress code; (4) giving Bethany and Thompson a $1,000.00 COVID award for working the COVID Screening Desk, while refusing to award Plaintiff for the work she performed at the COVID Screening Desk on July 3, 2020 from 7:00 a.m. to 3:30 p.m.; (5) allowing Bethany to be hostile, belligerent, and disrespectful to Plaintiff; (6) allowing Bethany to be hostile, belligerent, and disrespectful to VA patients, customers and VA employees; (7) allowing Bethany to use vulgar and profane language in the office including the F word and N word. (Id. ¶ 22)

Bethany's and Plaintiff's job duties as Human Resource Generalist assigned to them by supervisor Osterbeck, included the following:

> To write Employee Verification Letters, for VA personnel, and Standard Operation Procedures, edited memorandums, write advertisement slogans for VA "Open Season" Health Care Marketing pitches, conduct research to assist all potential new hires with employment at the VA, host New Employee Orientation Workshops to onboard new hires, arrange "Open Season" Health Care Fairs, for VA Employees, provide direct coverage to HR Department front desk office, consulted with new hires about selected Health Care coverage, and benefits, prepare New Employee Orientation folders, for medical and non-clinical personnel, assisted retirees and those who resigned with their clearance requirements, prepare Transmittal Forms, for Employee Drug Testing, and Employee Health Physical appointments, assist all Detroit VA Medical Center personnel internally, and externally with Thrift Saving Plan inquiries, provide guidance to VA Employees on how to complete Family Medical Leave Act Plans, and Loan Forgiveness Forms, Verified VA Employment Status, assist with Death Gratuities and Physician Bonuses, track and input Detroit VA Employees' service-time on an Excel Spread-sheet to track their years of service, distribute all in-coming mail to Human Resource Managers and HR personnel, receive data and update the VA Transit Subsidy Excel spread sheets, for employees who utilized public transportation, research and extract personnel information in HR Smart, USA Staffing, Electronic Office Personnel Manager (eOPF), and Veterans Health Information Systems and Technology Architecture (VISTA) to assist VA Employees with benefits information, or other miscellaneous requests, code personnel

> Actions in the HR Smart System based on the Guide to Process Personnel Actions, and process close to 2,700 Telework Agreements throughout the John D. Dingell VA facility between August 5, 2020 through February 24, 2021. (Id. ¶ 23)

Osterbeck knew from the HR Generalists job description that allowing Bethany to be consistently late for work virtually every day come to work late nearly every day, would result in an unfair increase in Plaintiff's workload, thereby creating stress and anxiety that significantly worsen her the terms and conditions of Plaintiff's employment. (Id. ¶ 24)

Osterbeck lied as to the reason he allowed the obvious mistreatment of Plaintiff by Bethany's excessive lateness. (Id. ¶ 25) He testified that the reason he allowed such a self-evident work rule violation was because Bethany was a *single* parent who was caring for a severely disabled child. (Ex. 8, Osterbeck, Dep. pp. 172-183) However, Bethany testified at her deposition that her child eas in the custody of his father during the workweek, and in her custody on Saturdays and Sundays. (Ex. 10, Bethany, Dep. pp. 12-13, 37) In other words, Osterbeck's reason for allowing Bethany to be consistently late for work was untrue.

Osterbeck also personally participated in the hostile and toxic work environment designed to force Plaintiff to quit, by (1) failing to inform Plaintiff of her right to join the union; (2) failing to provide Plaintiff with the proper training required to successfully perform her job duties and responsibilities that he had his

assistant Angela Thompson provide Bethany, and refusing to allow Plaintiff to seek training from others; (3) allowing Bethany to be consistently late for work on a near daily basis in order to increase Plaintiff's work load; (4) falsely accusing Plaintiff of wrongdoing and of mistreatment of customers; (5) yelling, berating, and belittling of Plaintiff for minor errors that were also committed by Bethany and others, and threatening to terminate her employment; (6) mocking, demeaning and ridiculing Plaintiff's psychiatric disability by referring to her as "crazy," and repeatedly telling Plaintiff she has "no common sense;" that she lacked the "mental" ability to "complete simple" tasks, "follow simple" directions, that he had "never supervised a person like her," and repeatedly telling her she "skating on thin ice," constantly reminding Plaintiff that she was a 2-year probationary employee who could be terminated at his discretion, and punished me for exercising my rights as a disabled veteran to medical treatment; and (7) soliciting customers to file false complaints against me. ((Ex. 2, Plaintiff's Declaration, ¶ 27; Ex. 11, Plaintiff's EEO Affidavit)

The unbearable hostile work environment placed Tara Miller in a perilous contradiction. Because she needed government employment, she could not simply quit, which is what Osterbeck intended. (Ex. 2, Plaintiff's Declaration, ¶ 27) That left Plaintiff with no other choice then to file complaints against her co-workers and Osterbeck to try to end the harassment. (Id.)

In August 2020, Plaintiff's first complaint was filed against her co-workers. The complaint was assigned to VA harassment and hostile work environment investigator, Zenia Berry who informed Osterbeck about the complaint. (Id.) Osterbeck retaliated by continuing to allow Bethany to report to work, and continuing to falsely accuse Plaintiff of minor errors. (Id. ¶ 28)

On December 17, 2020, *just two months* before Osterbeck recommended Plaintiff's termination on February 19, 2021, he demonstrated animus towards her known service-connected psychological disability. (Id. ¶ 29; Ex. 12, Disability Leave Emails) Osterbeck knowingly lied in claiming he did not know that Plaintiff had a service-connected severe disability in order to require Plaintiff to use up her "sick time." (Ex. 2, Plaintiff's Declaration, ¶ 29) Osterbeck admitted to the EEO Agency that he has known Plaintiff was a Schedule A Disabled Veteran since the day she was hired. (Ex. 23, Osterbeck EEO Investigation Affidavit) In other words, Osterbeck lied in order to penalize and harass Plaintiff in retaliation for rebuffing his sexual advances and refusing to play his sexual games. (Id. ¶ 30) As a result, Plaintiff was wrongfully denied the 104 hours she was entitled to use a disabled veteran. (Id.) Instead of quitting, on December 28, 2020, Plaintiff contacted VA's Equal Employment Opportunity Specialist, Donald Scott to seek help against Director Osterbeck's sex, age and disability based harassment. (Id. ¶ 31; Ex. 13, Scott Email) Plaintiff specifically informed Scott of Osterbeck's sexual

advances, including, the "Candy Man" comment. (Id.) Scott told Plaintiff that because she was a probationary employee that her supervisor may fire her in retaliation. (Id.)

January 21, 2021, Director Ostebeck yelled at Plaintiff, mocked and ridiculed Plaintiff about her psychological disability, and then threatened to fire Plaintiff. Osterbeck falsely accused Plaintiff of intentionally failing to comply with his instruction about "mass-email" communications. (Id.)

On January 21, 2021, Plaintiff emailed Dr. Pamela Reeves, the Director of the John D. Dingell VAMC pleading for help. In a very lengthy email, Plaintiff informed Director Reeves about the severe and pervasive hostile work environment created by her supervisor, Eric Osterbeck. (Id. ¶ 33)

On January 21, 2021, VA Harassment Prevention Program Specialist, Cindy Bukowsky responded to Plaintiff's continued complaints of severe and unrelenting harassment, and of Osterbeck's retaliation for making the sexual harassment complaint against him. (Id. ¶ 34) Bukowsky told Plaintiff that she needed to take my complaints against Osterbeck to the VA Office of Accountability and Whistleblower Protection Office, which Plaintiff immediately did, but never received a response. (Id.; Ex. 14, Bukowsky Email Chain)

On January 22, 2021, Plaintiff informed Cindy Bukowsky, a Harassment Prevention Program Specialist, once again of the severe and pervasive harassment

Plaintiff continued to be subjected to, not only, from Plaintiff's co-workers, but also, from her supervisor, Eric Osterbeck. (Id ¶ 35; Ex. 14) Plaintiff also expressed her concern of being terminated in retaliation for her complaints. Plaintiff told Bukowsky that Osterbeck's harassment included sexual advances, and the "Candy Man" comment. (Id.)

On January 25 and January 26, 2021, Jerald Rushing, a VA Employee and Labor Relations Investigator left a voice-message for Plaintiff to call him to discuss the harassment complaint Plaintiff lodged against Osterbeck. (Id.) Rushing also stated he had received the complaint from Harassment Specialist Cindy Bukowsky. (Id. ¶ 36)

On January 25, 2021, Dr. Reeves, the head of VA Detroit Medical Center brushed off Plaintiff's supervisor harassment and hostile work environment complaint by stating in an email: "You should not try to have areas of conflict with your boss…You can only change your actions, **not theirs**." (Id. ¶ 37; Ex. 15, VA Director Reeves Email Chain) (Emphasis added) Not surprisingly, the head of the VA was involved in a VA scandal and fired. (Ex. 16, Newspaper Reports)

On January 25, 2021, Osterbeck sent e-mail communication to Earl Lee of the ER/LR department in Cleveland, Ohio, informing him of his desire to terminate Plaintiff for not being a "satisfactory" fit in the department. (Ex. 2, Plaintiff's Declaration, ¶ 38)

On January 26, 2021, Plaintiff, along with Angela Thompson and Director Osterbeck attended the hostile work environment mediation meeting. (Id. ¶ 39) Thompson is one of Plaintiff's co-workers who along with Bethany and supervisor Osterbeck created a severe and pervasive hostile work environment. (Id.) Osterbeck was not neutral. Instead, he completely supported Thompson's position during the mediation, by falsely accusing Plaintiff of harassing her co-workers, insubordination, and the person creating the hostile work environment. (Id.)

On January 27, 2021, Plaintiff complained to Harassment Specialist Cindy Bukowsky about how Osterbeck unfairly represented Angela Thompson in mediation meeting. (Id. ¶ 40) Plaintiff told Bukowsky that her request to have a representative was denied by the 2 Mediation panel members. (Id.)

On January 28, 202, Director Osterbeck sent an e-mail to Employee and Labor Relations Manager, Earl Lee expressing his desire to terminate me because he was not satisfied with my performance. (Id. ¶ 41)

On January 29, 2021, a VA customer Michael Jenkins informed Plaintiff that Director Osterbeck and Angela Thompson asked him and his wife Roberta Jenkins to make a false complaint against me and they refused to do so. (Id. ¶ 42; Ex. 17, Jenkins Text)

On February 2, 2021, Labor Management representative Jerold Rushing sent Osterbeck an email stating he wanted to meet and discuss the harassment

complaint Plaintiff had made against him. (Id. ¶ 43; Ex. 18, Rushing Investigation of Osterbeck Memorandum) Rushing testified that such complaints could result in the supervisor being terminated. (Ex. 19, Rushing Dep. pp. 13-17)

On February 19, 2021, just 17 days after Osterbeck was informed that he was being investigated for alleged harassment that could result in his termination, Eric Gonzalez made the decision to approve Osterbeck's recommendation that Plaintiff be terminated. (Id. ¶ 44; Ex. 1, February 19, 2021 Termination Letter) The sole reason given was "failure to follow direction." (Id.) Nowhere in the letter does it state what specific direction Plaintiff "failed to follow." (Id.) The reason is because there is no lawful "direction" that Tara Miller, a 10-year Army veteran with the rank of Staff Sargent, would refuse to follow. (Id.)

On February 22, 2021, Plaintiff called Osterbeck's immediate supervisor, Eric Gonzalez to tell complain about Osterbeck's harassment but he did not answer. Plaintiff left a message for Gonzalez to call her back, but he never did. (Id. ¶ 45)

In the early morning of February 23, 2021, Plaintiff received an email from Ostebeck asking how did she did know that Angela Thompson's middle name is "Denise." (Id. ¶ 46)

On February 23, 2021, Director Ostebeck called the VA Police Chief to apprehend plaintiff for suspected "identity theft" and stealing checks. (Id. ¶ 47)

Plaintiff was taken to the VA police department located in the basement and questioned. When Plaintiff was released she was told by Osterbeck to go home, and the police never charged Plaintiff with "identity theft" and stealing checks because Osterbeck knew both accusations were false. This was done in retaliation of my harassment complaints made against Osterbeck to the EEO personnel. (Id.)

On February 24, 2021, Plaintiff informed HR Harassment Specialist Bukowsky that Osterbeck continued to harass Plaintiff by having her taken from her desk by the VA police to be interrogated on the knowingly false charge of "identity theft." (Id. ¶ 48) A few hours later, Osterbeck called Plaintiff to his office and told Plaintiff to leave the building, which she did. (Id.)

Osterbeck immediately promoted Erica Bethany to Plaintiff's former G-7 pay scale. (Id. ¶ 49)

On March 31, Plaintiff filed a formal complaint of employment discrimination with the Department of Veteran Affairs. (Id. ¶ 50; Ex. 20, Plaintiff's VA Discrimination Complaint) In a letter to Plaintiff dated April 27, 2021, the EEO Counselor stated:

> 5. We have determined your claim of harassment passes the **severe or pervasive requirement for further processing.** The above-identified events establish a pattern of conduct that could create a hostile work environment and/or that could interfere with the job performance of a reasonable person. (Id.) (Emphasis added)

This EEO finding is supported by Plaintiff's EEO affidavit (Ex. 11, Plaintiff's EEO Affidavit), and Plaintiff's medical records showing the worsening of Plaintiff's PTSD, MST, panic disorders, extreme anxiety and depression (Ex. 21, Progress Notes) and the need for ongoing psychiatric treatment. (Ex. 22, Psychiatric Disability Letters; Ex. 2, Plaintiff's Declaration, ¶ 51)

## IV. STANDARD GOVERNING SUMMARY JUDGMENT MOTIONS

The law for analyzing a motion for summary disposition is mandatory and precise. However, unfortunately, a culture has developed where the application of the law as applied to motion for summary dispositions, particularly motions claiming there is no genuine issue of material fact, rarely follows either the mandatory or precise requirements of the rule.

The reason that the law of motion for summary disposition is both mandatory and precise is because granting a motion for summary disposition destroys a serious right in this country—a litigant's constitutional right to a trial by jury. That is why the law, as written, imposes a heavy burden on the moving party. The burden requires the moving party to "specifically identify the issue" on which it claims there are no genuine issues of material fact. In other words, the movant *must* first identify the material fact on which is "undisputed."

At the summary judgment stage, the court determines whether there are genuine disputes of material fact that should go to a jury; it does not find facts. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). There is a genuine dispute of material fact if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. The party moving for summary judgment carries the burden of showing the absence of a genuine dispute of material fact; if it satisfies that burden, the nonmoving party must show "specific facts that reveal a genuine issue for trial." Laster, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); see also Fed. R. Civ. P. 56(c).

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson, supra* at 250. The party bringing the motion first must explain why the record is so settled that no genuine issues of material fact exist by "identify[ing] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-

24 (1986)). Notably, ***"[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party***, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource,* 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52) (Emphasis added)

## V. ARGUMENT

### I. Where Defendant terminated Plaintiff for a *single* reason of "failure to follow direction," Defendant's Motion for Summary Judgment must be denied when relying on after-acquired evidence which can only be used as a defense to damages, not as a defense to liability in employment discrimination cases

Even though Defendant had already terminated Plaintiff on February 19, 2021, requiring Plaintiff to clear-out her belongings and return all government property by February 24, 2021, Defendant's nevertheless argues in its motion for summary judgment that its decision to terminate Plaintiff was made on February 24, 2021. Defendant not only changes the date it decided to terminate Plaintiff, but also, changes the reason for the termination. Defendant then contends that the reason for termination was "accessing personnel files." It is important that the Defendant was searching for other reasons for termination. That is the very reason

that Defendant's motion for summary judgment must be denied as a matter of law. (Defendant's Brief, p. 20).

Discovery has revealed that the actual date Defendant decided to terminate Plaintiff was on February 19, 2021 "due to failure to follow direction." Because the record shows that Defendant's motion for summary judgment is impermissibly based upon after-acquired evidence, it must be denied as a matter of law.

In *Mckennon, supra,* the U.S. Supreme Court *unanimously* held, that in cases arising under the ADEA and similar employment discrimination statutes, courts should not consider evidence acquired by the employer after the "decision" to discharge an employee. Since the primary issue for purposes of liability in employment discrimination cases is the employer's "motive" for the discharge, and the employer could not be motivated by information not in its possession *at the time* of its decision. The *McKennon* Court reasoned that after-acquired evidence could not be relevant for the purposes of establishing liability. In reversing summary judgment granted to the defendant on the question of liability, the *McKennon* Court stated:

> We do question the legal conclusion reached by those courts that **after acquired evidence of wrongdoing which would have resulted in discharge bars employees from any relief under the ADEA. That ruling is incorrect**. *Id.* at 356
>
> *　　　*　　　*

> McKennon's misconduct was not discovered until after she had been fired. **The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason**. Mixed-motive cases are inapposite here, except to the important extent they underscore the necessity of **determining the employer's motives in ordering the discharge, an essential element in determining whether the employer violated the federal antidiscrimination law**. (Citations omitted) *Id.* at 359-360. (Emphasis added)

In the case at bar, Defendant's decision to terminate Plaintiff "due to failure to follow direction," was made on February 19, 2021, and Plaintiff's alleged misconduct of accessing personnel files was not discovered until February 23, 2021. Therefore, Defendant could not have been "motivated" to terminate Plaintiff by knowledge it did not have on February 19, 2021. The reason for the *McKennon* Court decision is to protect the enforcement of the federal anti-employment discrimination statutes.

The *Mckennon, supra,* decision explicitly limited the use of after-acquired evidence to the remedial stage of litigation for the purpose of ensuring that the federal and state anti-discrimination statutes continue to function as effective devices for eradicating discrimination in employment. In providing guidance as how properly to apply after-acquired evidence in the remedial phase of the litigation, the *McKennon,* Court declared as a general rule that the after-acquired

evidence could only be used to limit damages, not to absolve the employer of liability. That is because employment discrimination litigation seeks to determine the employer's "intent" *at the time* of its decision to terminate the employee. Evidence learned after the adverse decision was made could not have "motivated" the actual decision, and is therefore, not relevant to the issue of liability. Consistent with the *McKennon*, decision such after-acquired evidence may be considered in determining the amount of damages—not to absolve the employer of all liability for a Title VII violation.

Importantly, *McKennon*, *supra,* has restored the focus in employment discrimination claims involving after-acquired evidence to the employer's "motive" at the time it decided to terminate the employee, and explicitly limited the after-acquired evidence to the remedial phase of the litigation. To allow an employer to use after-acquired evidence as a defense to liability, after being proven to have discriminated against an employee directly contradicts and undermines federal anti-discrimination statutes' goal of eradicating discrimination in employment.

Given the law above outlined, the question to be submitted to the jury on the issue of liability is whether Defendant's decision to terminate Plaintiff on February 19, 2021 was "motivated" by Plaintiff's alleged "failure to follow direction," or by unlawful discrimination and retaliation.

Defendant's motion for summary judgment impermissibly based upon after-acquired evidence learned on February 23, 2021, it is not relevant as to Defendant's motive for its decision made on February 19, 2021. Because Defendant's motion for summary judgment conflicts with the Supreme Court's decision in *McKennon, supra,* it must be denied, as a matter of law.

**II. Defendant's shifting reasons for terminating Plaintiff's employment creates a genuine issue of material fact on the question of pretext, thereby, precluding summary judgement, as a matter of law**

The law in the Sixth Circuit precludes summary judgment where as in the case at bar, the employer provides "shifting reasons" to justify its termination of the employee. *See, Pierson v. Quad-Graphics Printing Corp et. al.,* 749 F.3d 530 (6th Cir. 2014). "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996) *am. on other grounds*, 97 F.3d 833 (6th Cir. 1997); *see also Edwards v. U.S. Postal Serv.*, 909 F.2d 320, 324 (8th Cir. 1990); *Schmitz v. St. Regis Paper Co.*, 811 F.2d 131, 132-33 (2d Cir. 1987).

In the case of *Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) the Sixth Circuit explained:

> Shifting justifications over time calls the credibility of those justifications into question. **By showing that the defendants' justification for firing him changed over time, [the plaintiff] shows a**

> **genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination**. (Emphasis added)

*See also Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) (finding that inconsistencies regarding which of two managers made the decision to fire an employee and which of the two offered justifications was the real reason for the decision create a genuine issue of material fact regarding pretext).

In finding that the trial court reversibly erred in granting summary judgment where the record showed shifting reasons for termination, the Court stated:

> Although it is possible that Lentz had Pierson's allegedly poor teamwork in mind when he initially selected him for termination, and that **both reasons played a role in Pierson's discharge, a reasonable jury could conclude that Lentz shifted the reasons for his decision over time**. **Such shifting justifications raise an inference that the proffered reasons are false and are pretext for discrimination**. (Emphasis added)
>
> * * *
>
> Any one of these issues, or all of them in combination, provide a jury with a basis to conclude **that poor performance was a pretextual justification for Gaglioti's firing**. (Emphasis added)

*See, Peck v. Elyria Foundry Co.*, 2009 WL 2868831 (6th Cir. Sept. 8, 2009) (slip op.) (hiring decision maker's logically contradictory reasons for not hiring claimant held to be evidence of pretext)

In *Pierson, supra,* the Court stated:.

> Hence, we look not only to whether changes in an employer's rationale have occurred, **but to whether the circumstances could permit a rational factfinder to conclude that these changes are indicative that the currently-proffered explanation is false**. *See Reeves,* 530 U.S. at 148-49 ("Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include . . . the probative value of the proof that the employer's explanation is false."). **Brookdale's many changes in its explanation for Eades's termination may or may not lead to an ultimate conclusion that it retaliated against Eades for engaging in a protected activity, but certainly they show a genuine issue of material fact that should preclude summary judgment**. *See Asmo v. Keane, Inc.,* 471 F.3d 588, 596 (6th Cir. 2006) (inconsistency between what employer told plaintiff and what it asserted in lawsuits as its reasons for terminating plaintiff's employment "is suspicious and is evidence of pretext"). (Emphasis added)

In *Gaglioti v. Levin Group, Inc.,* No. 11-3744 (6th Cir. 2012) the Court stated:

> Again, the question is not whether there are ways to square these two facts, **but whether a juror could reasonably conclude that this inconsistency is enough to discredit Levin Group's account**. A juror could see two incompatible versions of the amount of work needed by the company, and conclude that this justification is pretextual. (Emphasis added)

Similarly, the Court stated in *Wyatt v. Nissan N. Am. Inc.*, 999 F.3d 400 (6th Cir. 2021):

> In addition, the record also contains conflicting evidence as to why Mullen asked Davis to remove Wyatt from the project…**The suspicious timing coupled with the inconsistent explanations make it such that a trier-of-fact would need to weigh the evidence and make credibility determinations to decide whether Wyatt's performance on the project actually was poor and actually motivated her removal or whether Mullen retaliated against her for opposing his sexual advances**. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) (***holding that to survive summary judgment an employee does not have to prove pretext but only needs to "create a genuine issue as to whether the rationale is pretextual"*** (quoting Whitfield v. Tennessee, 639 F.3d 253, 260 (6th Cir. 2011))). **On this record, a reasonable jury could find that Nissan's articulated reason for removing Wyatt was pretextual**. (Emphasis added)

Given the law above outlined, the question to be submitted to the jury on the issue of liability, is whether Defendant's decision to terminate Plaintiff that was *made on February 19, 2021.* If so, was it "motivated" by Plaintiff's alleged "failure to follow direction" or was Defendant's decision to terminate Plaintiff *motivated* by alleged unlawful discrimination and/or retaliation.

It lies within the sole province of the jury to assess the credibility of Defendant's witnesses to determine whether Defendant's "shifting reasons" for

termination represented an attempt to disguise the real reason which represented unlawful discrimination and/or retaliation.

### III. Defendant's failure to cite to the Court the current and applicable law for Title VII hostile work environment claims precludes summary judgment, as a matter of law

Defendant's motion for summary judgment cites law that is currently not applicable to Title VII hostile work environment claims. Therefore, Defendant's motion for summary judgment is necessarily defective because it has no legal support under current law.

Summary Judgment is a mechanism for resolving cases without a full trial when the applicable law dictates the outcome. The Court must apply that law correctly to the material facts to determine whether summary judgment is appropriate. That is why a motion for summary judgment cannot be based on legal arguments that are not relevant to the specific claim or issue in dispute.

It is a fundamental principle in the Sixth Circuit, that a motion for summary judgment cannot be based on legal principles that are not applicable to the case at hand. Essentially, a Court must find that no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law based on the "applicable" law.

A motion for summary judgment is more than just a presentation of facts; it is also a legal argument, and therefore, the Court needs to be presented with the applicable law for the basis of the movant's argument.

On page 21 of Defendant's brief, Defendant states:

> Under the fourth prong, the plaintiff must demonstrate, based on the totality of the circumstances, that the **harassing conduct was sufficiently severe or pervasive to alter the terms and conditions of her employment**. *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). (Emphasis added)

However, the Defendant fails to inform the Court that the Plaintiff no longer needs to prove that Plaintiff suffered "significant harm." Since the Plaintiff need only prove "some harm," *McNeal v. City of Blue Ash,* 117 F.4th 887 (6th Cir. 2024), the fact that Plaintiff was forced to do the work of another employee who was participating in Osterbeck's sexual bantering, that Plaintiff was blamed by Osterbeck for disagreements with the same younger co-worker who was chronically late, thereby increasing Plaintiff's workload, that Plaintiff was repeatedly denied the proper training Osterbeck provided the same co-worker who acceded to his sexual advances, that Plaintiff was denied COVID award given to the same younger co-worker, and that Plaintiff was repeatedly demeaned, embarrassed and humiliated by Osterbeck for customer complaints made against

the younger co-worker, that Plaintiff was repeatedly threatened with being fired for minor mistakes, even those committed by the younger co-worker, that Osterbeck mocked and ridiculed Plaintiff's known psychological disability, which included referring to Plaintiff "crazy" and accusing Plaintiff of not having "common sense" and lacking the ability to complete "simple tasks" or follow "simple directions," that Osterbeck repeatedly denied Plaintiff her right to disabled veteran medical leave benefits for medical appointments, despite his knowledge that Plaintiff was a "Scheduled A" hiring with a service-connected severe physical, psychological or intellectual disability, and that Osterbeck constantly demeaned and humiliated Plaintiff for minor mistakes, including, those that were made by Plaintiff's younger co-worker, who was also allowed to come **late to work** almost daily without punishment, is sufficient harm under *McNeal, supra*, to establish a questions of fact and assessments of credibility that can only be determined by the jury.

The Sixth Circuit in *McNeal, supra,* recently established the current legal standard for Title VII hostile work environment claims. Specifically, the Court clarified that the plaintiff in hostile work environment cases, no longer needs to demonstrate "significant harm" to their job conditions to establish a claim. Instead, they only need to show "some harm" to an identifiable term or condition of employment. This significant change was a result of the Supreme Court's

landmark decision in *Muldrow v. City of St. Louis,* 600 U.S.______ (2024) which lowered the bar for proving adverse action under workplace discrimination laws.

In *Muldrow, supra,* the High Court articulated the new standard as follows:

> To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment. **What the transferee does not have to show is that the harm incurred was "significant" or otherwise exceeded some heightened bar. "Discriminate against" means treat worse, here based on sex**. *See, e.g., Bostock, 590 U. S.*, at 657. Neither that phrase nor any other establishes an elevated threshold of harm. **To demand "significance" is to add words to the statute Congress enacted. It is to impose a new requirement on a Title VII claimant, so that the law as applied demands something more than the law as written. That difference can make a real difference for complaining transferees**. Pp. 5–7. (Emphasis added)
>
> * * *
>
> Recall her principal allegations. She was moved from a plainclothes job in a prestigious specialized division giving her substantial responsibility over priority investigations and frequent opportunity to work with police commanders. She was moved to a uniformed job supervising one district's patrol officers, in which she was less involved in high-visibility matters and primarily performed administrative work. Her schedule became less regular, often requiring her to work weekends; and she lost her take-home car. **If those allegations are proved, she was left...worse off several times over. It does not matter, as the courts below thought...that her rank and pay remained the same, or that she still could advance to other**

> **jobs**. See supra, at 3–4; post, at 2. **Title VII prohibits making a transfer, based on sex, the consequences Muldrow described**. (Emphasis added)

Recognizing the High Court's explicit abrogation of the "heightened" standard, the Sixth Circuit decision in *McNeal supra*, marks a significant development in employment discrimination law by reinforcing the viability of hostile work environment claims in the face of discrete discriminatory acts. The Court stated:

> Although Muldrow involved transfers, the Court made clear that its interpretation stemmed from Title VII's generally applicable statutory language, mirrored in the ADEA, which contains no language requiring plaintiffs to show a high level of harm. Id. **Thus, to challenge a discrete act in a disparate-treatment claim, the statute requires only that a plaintiff show "some harm respecting an identifiable term or condition of employment**." *Id.* at 355**. Crucially, the harm does not have to be "significant" or "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar**." *Id.* **In short, the employment action is adverse if it leaves the employee "worse off respecting employment terms or conditions."** Id. **We thus recognize that Muldrow may displace prior cases from our circuit requiring disparate-treatment plaintiffs to show heightened levels of harm**. (Emphasis added)
>
> * * *
>
> McNeal does not argue simply that the work he had to complete was itself harassment. Rather, McNeal asserts that traffic studies require "specialized

> training or experience," and he was set up to fail from the beginning because he was "provided no training or direction."
>
> * * *
>
> **Thus, the evidence supporting a hostile-work-environment claim is not the unfavorable assignment itself but the fact that the Department allegedly engaged in conduct designed to (1) frustrate, demean, and embarrass him in front of his coworkers; (2) justify more disciplinary action against him when he inevitably fell short of the unreasonable expectations; and (3) force him further under the microscope by requiring him to report to two supervisors on his progress weekly**. The significance of the traffic study for hostile-workenvironment purposes is that the Department allegedly used the assignment strategically in a broader effort to discredit McNeal. (Emphasis added)
>
> * * *
>
> We focus on the harassing effect of these incidents to assess whether the ongoing monitoring created a climate of hostility in the aggregate (and combined with other actions), **not whether each incident alone changed McNeal's employment status**. Therefore, McNeal's evidence of higher and disproportionate scrutiny may be used to support his hostile-work-environment claim. (Emphasis added)

The Sixth Circuit in *McNeal, supra,* also held that whether the hostile work environment was "severe and pervasive under the lowered standard, was a question for the jury to resolve, not the Court:

> Thus, when we consider whether a hostile-work environment was severe or pervasive enough to violate Title VII, we effectively ask whether it left

> an employee "worse off respecting employment terms or conditions." *Id*..."**Whether harassment is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a question of fact**.'" *Crawford,* 96 F.3d at 835–36...**McNeal cites enough evidence for a reasonable juror to conclude he was subjected to a hostile work environment**. (Emphasis added)

The Plaintiff has submitted extensive evidence of the harm she suffered because of supervisor Osterbeck's discriminatory and retaliatory actions creating a hostile work environment based upon her sex, age and mental disability. *McNeal, supra,* states that the severity and persuasive actions of her supervisor is "essentially a factual question." *Id.*

Given the change of the legal framework, and the Defendant's failure to cite the current law, the degree of harm suffered by Plaintiff lies completely within the province of the jury. It is the jury that must assess the credibility of the respective witnesses. Said assessment is not subject to a motion for summary judgment.

In summary, by failing to cite to the Court the applicable law, Defendant's motion for summary judgment relies on a legal framework that is not relevant to Plaintiff's factual situation. Therefore, Defendant's motion for summary judgment must be denied, as a matter of law.

## VI. CONCLUSION

As previously stated, the Defendant is the moving party filing the motion for summary judgment. As such, Defendant carries a heavy burden to establish that the Plaintiff, Tara miller, can be denied the right to have the jury decide the factual disputes that do exist.

The Defendant's motion seeks to avoid the date the *decision* was actually made to terminate Plaintiff "due to failure to follow direction." The document dated February 19, 2021 is explicit that plaintiff was fired on that date, essentially ordering Plaintiff to clear out and return all government property by February 24, 2021. Plaintiff was given no alternative, except to appeal the invalid basis for Defendant's "decision." The Defendant never cited the controlling authority of *McKennon, supra,* explicitly holding that after-acquired evidence cannot be used to avoid liability, only to limit remedies. The Defendant's motion for summary judgment used subterfuge to disingenuously claim the decision to discharge Plaintiff was not made until February 24, 2021. Defendant's assertion is belied by Defendant's own **February 19, 2021** notice to Plaintiff entitled: "**Termination during Trial Period.**"(Emphasis added)

Ironically, the effort of Defendant to "change" the reason for Plaintiff's termination also sets up a question for the jury to decide. The process of "shifting"

the reason for discharge requires the jury to determine whether the Defendant is being dishonest in contending the reason for the discharge was lawful.

The Defendant's motion for summary judgment, therefore, actually outlines two disputes that can only be decided by the jury. Credibility assessments can never be the basis for deciding a motion for summary judgment. Therefore, Defendant's motion must be denied, as a matter of law.

On the question of hostile work environment, the Defendant's motion for summary judgment failed to cite the correct law to be applied to the case. When the *current* law is applied to the case at bar, Defendant's motion for summary judgment must be denied.

Defendant's motion for summary judgment is, by definition, legally defective, and for that reason alone, is improperly before the Court, and therefore, must be denied.

## VII. RELIEF REQUESTED

For the foregoing reasons, Plaintiff, Tara D. Miller, respectfully requests that the Honorable Court deny Defendant's motion for summary judgment.

Respectfully Submitted:

By: /s/D. RICK MARTIN
D. Rick Martin (P42484)
13900 Woodward, Avenue
Highland Park, MI 48203
(313) 963-1320

Attorney for Plaintiff

**Certification of Service**

I hereby certify that on May 22, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which resulted in service on counsel for the other parties to this case.

Respectfully Submitted:

By: /s/D. RICK MARTIN
D. Rick Martin (P42484)
13900 Woodward, Avenue
Highland Park, MI 48203
(313) 963-1320
Attorney for Plaintiff