Ex. 8



APPEARANCES:

FOR PLAINTIFF:

LAW OFFICES OF DEWEY RICK MARTIN
By: Dewey R. Martin (P42484)
13900 Woodward Avenue
Highland Park, Michigan 48203
(313) 963-1321
E-mail: drickmartin@glottaassociates.com

FOR DEFENDANTS:

DEPARTMENT OF JUSTICE
By: Christopher J. Doyle (P79376)
211 West Fort Street
Suite 2001
Detroit, Michigan 48226
(313) 670-5589
E-mail: christopher.doyle@usdoj.gov

REPORTER: Robin Darnbrook, CSR-2508, RPR

**you every form of retaliation of what an example would be. Retaliation would be changing the work environment or conditions potentially of an employee for exercising any employee's rights to make a complaint.**

Eric Osterbeck
08/22/2024

Q You agree that employees should not be retaliated against for making complaints or exercising their right to make a complaint, right, you agree that they should not be retaliated against, including you? If you make a complaint, you agree that employees who make a complaint should not be retaliated against, correct?

A **I agree that employees should not be retaliated against, yes.**

Q Did you ever receive any training on hostile work environments at a workplace?

A **Yes.**

Q Just tell us generally what's your understanding, what's your training?

MR. DOYLE: Object to form.

**THE WITNESS: Can you repeat the question, please?**

BY MR. MARTIN:

Q Yeah. Tell me about your training on hostile work environments. You're a supervisor/manager, so I

take it you have to understand what a hostile work environment is, so just tell us about it. What's your training on hostile work environment, what does it mean to you?
Eric Osterbeck
08/22/2024

A **Well, I received -- first trainings would have been with the Postal Service on how to -- an initial management inquiry process, when there is a complaint, it needs to be investigated by the supervisor, gather evidence, witness interviews, interview the person making the complaint, interview any witnesses thereto, have them write statements and then interview the party that the complaint is against and do a fact finding into the matter.**

Q When you were at the Detroit VA, Mr. Osterbeck, did you have hiring responsibilities for employees that worked for you?

A **Yes.**

Q And tell me the procedure that you would go through. Tell us how that works.

A **If it was a position for which I was the selecting official?**

Q Yes.

A **Okay. Well, positions can be posted on the USA Jobs website and applicants would apply, they would provide their documents and a staffing specialist**

would be assigned to work that recruitment action. Once the date closed, any qualified applicants, Eric Osterbeck 08/22/2024 their resume would be forwarded to me as the selecting official and I would set -- well, first I would review all resumes and depending upon the number of resumes that I received, as an example, if I received more than five resumes, I would do a scoring grid, so to speak, and rate all of the resumes and probably interview. If it was less than five, I generally interviewed all five people. If it was more than five, I would rank them and potentially only interview the top three based upon the scoring.

Generally I would have some type of panel where I would engage two other people who would be subject matter experts of that position in order to have their input as well and they would do the same thing, they would independently rate all of the applications and then we would go to the interview process and we would interview the applicants that were selected and move on to the interview phase. Again, rank and rate the candidates based upon their interview, combine the score and the applicant that came out on top would generally be offered the position.

Q And who has the final say on that?
A **If I was the selecting official, I would have the say but we would need to get second-level approval for hiring from -- so for me, I would go to my manager and I would say I went through this process and I want to select this applicant and they would, you know, give the, as you state, final approval.**

Eric Osterbeck
08/22/2024

Q And generally they would agree with you since you're the one that's going to have to be working with that individual?
A **I would say generally speaking, yes.**
Q Have you ever been overruled, to your recollection, on a selection?
A **I believe that I have but I cannot give facts.**
Q I understand. Okay. How is the pay -- I'm looking at the policies and looking at the G -- the schedule, the GS and the schedules and stuff and it looks like there could be a range, let's say, a G-7 can have a range, a G-12 can have a range of pay, a minimum and a maximum; are you familiar with that?
A **Yes, I'm familiar. It depends on the position. If it is a position in which it is a career ladder position where there are more than one grade for that position, those are career ladder positions, but some positions are only a set grade, there's**

Eric Osterbeck
08/22/2024

position and competing against others, they can ask to be hired that way. A manager does not have to accept it, they can tell the person I appreciate it but you need to compete for this position or they can accept the person's claim of Schedule A with the documentation and they can review that and determine, you know, to hire them that way.
Q And I see a letter where you yourself recommended that Ms. Miller be hired as a Schedule A, correct?
A I know that Ms. Miller when she submitted her documentation, and again I said that was to Ms. Uselton, she would have provided that documentation along with her resume to Ms. Uselton. In turn, Ms. Uselton would inform me as a selecting official that an applicant qualifies under Schedule A. I wouldn't get the document from her treating physician but I would be told that she qualifies under that hiring authority. I would get her resume and I would be told that she qualifies under Schedule A and if I elect to do so, I could hire her through the Schedule A authority in lieu of the traditional hiring route where a person has to apply for and compete for a position.
Q But someone gets the doctor's letter to justify or to establish the disability, as you stated?

Eric Osterbeck
08/22/2024

A Correct.

Q The treating doctor. Okay, it has to come to the VA?

A **Yes, it would come to the staffing specialist who worked the hire in this case, which would be Ms. Uselton.**

Q That's Janice?

A **Yes, sir.**

Q Okay. And what did she do with that letter, that doctor's letter? This all goes into the person's file?

A **It would go into the recruitment file for that position that staffing deems. It doesn't go into their electronic personnel file.**

Q Okay.

A **Only specific documents related to a person's personnel file go on the electronic form. All the hiring records, now that things are automated, all hiring records are electronic in a system called USA Staffing, which is another system that HR employees work in.**

Q Got you. Okay. So like you said, a recommendation is made but you as a supervisor do not have to accept the applicant as a Schedule A and you have the authority to say you're going to have to

Eric Osterbeck
08/22/2024

Q Yes, if they had a doctor's appointment and you knew in advance or they put it in in advance, you wouldn't give them a hard time about that, would you?

**A I don't believe that I would, no.**

Q And it wouldn't be appropriate, correct?

MR. DOYLE: Object to form.

**THE WITNESS: I would think that that would not be appropriate if an employee needed to have a medical appointment.**

BY MR. MARTIN:

Q Did you also terminate Ms. Miller for identity theft?

**A I don't believe that that was part of the termination. I think that may have been after when an issue was raised to the VA police because she had unauthorized documents that were found in her work station that she should not have.**

Q Who found those documents?

**A I don't know specifically but it would have been Erica Bethany, Shavon Render or Angela Thompson because they were the ones that were tasked with going through Ms. Miller's work station after she failed to follow instructions after she received her termination letter.**

Q And what did they find? What did they tell you they found anyway?

Eric Osterbeck
08/22/2024

A **Well, they told me and then they brought to me leave and earnings statements that belonged to a deceased individual, Gary Hollenquest.**

Q Where did they say they found these statements?

A **They found the statements in her locked file cabinet, I believe.**

Q If it's locked, how did they get in there?

A **We had to have the VA police come because Ms. Miller was not responding to anyone.**

Q No, I understand that but how did they -- you didn't have the police come until --

A **The police --**

Q -- they found the documents. How did they get into her locked -- okay, maybe I'm not understanding. Go ahead.

A **If police came to unlock the -- anything that was locked. There was several cabinets in a work station, desk drawers, things like that. So they came and unlocked it, the VA police.**

Q Why did they come? That's what I'm trying to get at. Who called the VA police to come unlock her drawers and lo and behold we find leaves and earnings statements, which I thought you said that

these individuals found them first and came to you.

Eric Osterbeck
08/22/2024

A They -- I contacted the VA police because Ms. Miller after receiving her termination failed to follow instructions and left the facility without clearing the facility properly. Because they were locked, only Ms. Miller had the keys and she failed to turn in her keys to me after she cleared the facility and since she didn't clear the facility, she left without following the instructions once again, I had to contact the VA police because she retained her keys, which is VA equipment, after her termination.

The VA police came and opened the cabinet and then those three employees began to go through the office cubicle space of Ms. Miller and found documents that were older and should have been processed for employees that had requested benefits, changes, things of that nature. There was work that was shoved into these cabinets that wasn't completed by her that should have been completed. In addition to that, they did find the leave and earnings statements for Mr. Hollenquest and they brought them to my attention.

Q And what did you do?

A I contacted the VA police and I believe I completed a statement, a report of contact and that I felt

that it was potentially an attempt at identity theft because also the reports of the improper access to the EOPF showed that Ms. Miller had modified Gary Hollenquest's, some of his documents within his EOPF. Therefore, I thought that it was -- it appeared to be an attempt at identity theft because there's no reason that she should have leave and earnings statements of a deceased employee. So I contacted the VA police on that matter.

Q So you contacted them twice is what you're telling me?

A Yes.

Q The first time you contacted them was so they could unlock her cubicle or her cabinets?

A Correct.

Q Then you had the three employees who she complained about from time to time, they went through and found -- at least they claim that they found these documents, correct?

A Well, first off, I don't recall Ms. Miller complaining about Shavon Render, so to lump her in that group, I think, would be incorrect as far as three people that she complained about.

Q Two, okay. Two of the three?

A Yes, sir.

Q Okay.
A **I just want to be clear.**
Q And that's fair. That's fair. I thought she complained about Shavon but you've corrected me, that's fine. Thank you.
So you were not present and you didn't go through these files personally yourself, did you?
A **No, I was present in the office, I was not present at the cubicle. There was things that they brought to me to show me. I did not see every document that was found but in regards to forms that needed to be worked, that should have been worked that employees had requested different things, I did see some of them, not all of them and I had to prioritize the work of what needed to be done that was supposed to have been previously done by Ms. Miller.**
Q Where is your office in respect to Ms. Miller's cubicle?
A **From my office door to her cubicle was about maybe 12 steps, 12 to 15 steps.**
Q And you were in your office doing some work when the police came and unlocked the doors or unlocked the cabinets and you instructed the three people to go through her drawers, correct?

A Correct. So she had several like personal items and we set those aside. I think we got a box and put her personal items in a box that wasn't --
Q Hold on one second. I got you but I just want to be clear. You assigned that task to them, that's not something a manager, yourself did, right, you didn't go through the stuff, you assigned it to these three employees, correct?
A Correct.
Q Okay. You're back in your office doing your other work, right, you got a lot of work to do, it's fair to say?
A Correct.
Q Okay. And then at some point in time, how long was it that they came and said look, this is what we found?
A I can't recall specifically. I believe it to be, you know, that day as they were going through it but I don't know how much time it was.
Q I understand, but it's a lot of work to go through because they got to separate her personal stuff from VA materials, correct?
A Correct. I mean just to give you a context about like the distance, the cubicles were, let's say, six feet high, so you know, I could see over them, so to

speak, but not down into them from my office but they were right outside my office.
Q I understand.
A And then there was probably three or four top cabinets and then they have like a work desk this way. There would have been probably usually a two-file drawer cabinet underneath that had documents. Some of them had like bins with documents in it and -- because they're --
Q Excuse me, Mr. Osterbeck, I got you. Let's just say it's fair to say there's a lot of document to go through, a lot of work, fair to say?
A Yes.
Q And this is something that has to be done with respect to any employee who's terminated, correct, there's a procedure?
A Anybody that leaves or is terminated or takes another job, yes. There's a turnover that has to take place because you need to get that work space ready for the next person.
Q Right. And like you said, you find documents that should have been processed, you have to take care of that, correct?
A Correct.
Q Okay. But you cannot testify under oath that you

actually saw in her desk, Ms. Miller's desk the
individuals pull out earnings of Gary Hollenquest or
anything like that, you didn't see them pull it out
and they said hey, look; that did not happen,
correct?
A **I did not physically observe them pull those**
**specific leave and earnings statements out of her**
**cubicle. I was not physically standing there**
**watching them from start to finish go through all**
**the documents.**
Q I understand. Okay. And that's because you have
other responsibilities, correct?
A **Yes.**
Q So identity theft, she was already terminated when
the identity theft issue came up, correct?
A **Yes, I believe so.**
Q Well, you said that she had left and you said it was
after her termination and that's why you had to call
the police and go through everything.
A **Correct.**
Q Did you ever have any meetings with the police
officers regarding Ms. Miller?
A **I did actually on the day of her termination. I**
**recall that as well.**
Q So why were they there on the date of her

termination?
A Okay, I'll try to explain. When an employee is terminated or transfers, resigns or retires, if they're leaving the facility, there's a clearance process that the facility has in place. When a person is clearing the facility, they are given a clearance checklist, a piece of paper that has numerous tasks of different places within the facility that they need to go check out of, okay? Does that make sense? Are you with me?
Q Yeah.
A So on the morning of her termination, I issued her the termination, I gave her her rights to go along with it that are in the termination letter.
Q And the termination, excuse me, was for the reasons you testified to earlier, right, failure to follow instructions, resistant to training and accessing five employees' files and making a modification on Gary Hollenquest's?
MR. DOYLE: Asked and answered.
BY MR. MARTIN:
Q We're going through this thing again. I just want to make sure. That is what you --
A Yes, sir, the reasons that I previously stated were the reasons for the termination.

Q And she's in your office and you go over these reasons with her, is that fair to say, or you didn't?
**A I did. I read her the letter.**
Q Okay. At what point did you call the police so she could clear out, go through the clearance procedure?
**A Okay, I'm trying to explain it to you. After the termination was issued, I provided her with a clearance sheet and said you need to go to all of these different departments within the facility and clear. So what they do is when a person leaves, they present the clearance sheets to the manager or designee of that department, they check to make sure, you know, they turn in any equipment, they turn in their badge, they turn in anything, they get cleared from records, there's a bunch -- it's a whole process. It takes a couple hours to do, okay?**
Q Okay.
**A Her instruction was to go and clear and then I was the last stop on the clearance sheet. HR is one of the last stops.**
Q Okay.
**A So her instructions were to go and do this clearing, okay, go and clear at all these places and then come**

back to me. When you come back to me, I will sign your clearance sheet and then the very, very end stop after me was payroll, fiscal because of getting information about where to send the last check, things like that.

And then I said -- and then you know, once you clear and come back, you can gather all of your personal belongings from your cubicle and then, you know, leave the premises. So as I said, it takes a few hours to do clearing but it's not a -- I would say on average it would take a person about three hours, not a whole day event.

So I want to say about four hours after she was given the piece of paper and said go clear, I was starting to think where's Ms. Miller, okay? So I started to contact some of the departments that are in order of how you clear. Every department that I contacted said she has not been here. So basically she was given the instruction to go clear and hadn't completed a single task and it had already been four hours.

So I went down to the basement of the facility where the police offices are, where they're located and they said well, we'll try to contact her, we'll try to find her. I gave him her cell

phone, she was not answering her phone. I tried to call her as well, she didn't answer the phone. And the police actually started to look for her on the video surveillance. They could not find her for a period of time and if my memory serves, I think they saw her exiting a patient exit-entrance like a couple hours before this was happening and so that's how the police were involved.

Q What did they do? So tell me what happened next. So she doesn't -- they can't find her, she leaves, so what happens next?

A So written right on the clearance form says if you fail to clear properly, your last paycheck will be withheld. So I notified Cincinnati, which is where -- because again, we are network employees, not facility employees, so they do our payroll. It's not done locally out of the Detroit VA facility. I contacted them and I said here's an employee who was terminated, they failed to clear properly, you know, until they clear properly and check off every box on that form and, you know, they should not get their final paycheck.

The police finally got in touch with Ms. Miller, the police chief was Mohammed Kazan and the deputy, I believe his last name was Chester, and

**it was Chester who actually got Ms. Miller on the phone, spoke with her on a few occasions and agreed --**

Q Is this all the same day? Excuse me, is this all the same day?

A **No. I think he didn't get ahold of her for a day or two on the phone.**

Q So which police officer made the first contact, Mohammed, Police Chief Mohammed Kazan or Deputy Chester? Which one was the first one to contact her and when?

A **I'm not sure which one contacted her first but it would have been -- the first contact would have been made the day of the termination.**

Q Because you said before you tried to call her and they tried to call and no one could get ahold of her.

A **On the day of the termination, all three of us, I believe, tried to contact her.**

Q So at what point in time was she contacted by Deputy Chester?

A **On the day of termination we all tried. She did not pick up, I believe, on the day that the termination happened. I think it was the next day or maybe two days after where I wasn't with the two of them but**

they had, I believe, contacted me and said we got in touch with Ms. Miller. By that time, the cubicle had been opened and her personal belongings were gathered, they were delivered to the VA police and they without me coordinated that exchange.
Q What do you mean? Tell me what happened.
A I wasn't there. All I know is we gave her personal belongings to the VA police and the VA police is where she picked them up at. I wasn't part of the exchange.
Q And what did he tell you occurred? Did it go without incident? I'm sure you wanted to know what happened, so what did they tell you?
A I don't recall specifically what they told me about whatever reason she gave for leaving without properly clearing.
Q Well, why tell the VA police your suspicions of identity theft?
A Yes, I've already responded to that, that I provided the statement to them about my suspicion of identity theft.
Q Did they agree with you?
A If I recall correctly, I think they said that they would -- you know, they obviously took my statement and would look into it. Nothing came of it as far

**as any type of charges against her that I'm aware of.**

Q So she wasn't terminated for identify theft, she was terminated for the reasons you gave earlier. Now, why didn't you just -- first of all, you agree with me that to terminate an employee, especially a veteran, it's very serious to terminate their employment; you agree that's a serious act, right?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q Taking away someone's livelihood, that's a serious act, correct?

MR. DOYLE: Object to form.

**THE WITNESS: I believe termination of any employee, no matter what their background is, whether they're a veteran or not a veteran, I understand it's what we call an adverse action and it's a serious nature.**

BY MR. MARTIN:

Q It's the ultimate, right, as far as ultimate form of discipline? There's nothing else after termination, you're out of work, correct? That's what I mean by disciplinary action, it's the ultimate, it's the final step of a disciplinary action.

**A From --**

Q The most serious.
**A From employment, yes.**
Q Yeah. It's the most serious, correct?
**A No, I guess it's not. I mean people do things that they could be imprisoned for or fined when they work for the federal government, so I think that would be worse than termination.**
Q I agree, if it's justified. She didn't do anything that she should be imprisoned for, right?
MR. DOYLE: Object to form, foundation.
BY MR. MARTIN:
Q Correct, to your knowledge?
**A The VA isn't the ones that make that -- any type of determination like that. We don't -- that's not our call, that's up to the State's attorney.**
Q I understand. But you have no evidence that she did anything that warrants a State attorney looking at this as something of a criminal nature, right? You have nothing on that, correct?
MR. DOYLE: Object to form.
**THE WITNESS: Not to my knowledge.**
BY MR. MARTIN:
Q Okay. And you talked earlier about different forms of disciplinary action that could take place even

though you said that it wouldn't apply to her necessarily because she's probationary. But you could have suspended her for a period of time, correct?

MR. DOYLE: Object to form.

BY MR. MARTIN:

Q As a form of discipline?

**A As a form of discipline, could I have? Could I have suspended her in lieu of terminating her?**

Q Yes.

**A If she was a non-probationary employee, a suspension may have been warranted but she was not in that category, she was a probationary employee where termination was warranted.**

Q I understand, but that's your judgment, right, you're the boss, that's the judgment call. There's nothing that required you to terminate her, right, there's no policy or rule that says you must terminate her, correct?

**A Well, the VA has handbooks and policies on disciplinary action in a table of penalties and the infractions which she did warranted termination.**

Q Tell me -- point to the policy that says one should be terminated automatically, in other words, there's no discretion, it's automatic termination. Please

point me to that policy so we could look at it.

A I don't have anything in front of me at the moment and I --

Q You're not certain under oath that one exists that says that you were required to terminate her for what you accused her of?

A I don't believe that the policy says you are required to do it. A table of penalties shows vague, very broad types of infractions and what an appropriate penalty would be.

Q Right, and you decided to terminate?

A It was my decision to --

Q Recommend termination?

A -- recommend termination, yes.

Q Now, I gave you Exhibit Number 2. Now, did you hire Eric Bethany?

A Did I hire Erica Bethany?

Q Yes, I'm sorry, Erica.

A Yes, sir.

Q And what was her background when you hired her?

A I believe she had a lot of office and clerical duties. She may have been a medical support assistant. I know she was within the facility. To the best of my recollection, I believe that's what her position was.

Q And you hired her as a G-6, correct?
**A I believe she started as a GS-6, yes, not a -- yes, as a 6, I believe.**
Q And she started around May 1st?
**A Of what year are you speaking, sir?**
Q I'm sorry, 2020. With you in your department.
**A I'm not exactly sure of her start date.**
Q She started after Ms. Miller, correct?
**A Yes, I believe so.**
Q Now, Exhibit 2 shows that you issued a written counseling to Ms. Bethany, correct, on July 23rd, 2020, correct?
**THE WITNESS: Chris, is this what you -- did you send me this?**
MR. DOYLE: Right. So for the record, it was e-mailed over, it should say Ex 2 on the upper corner.
**THE WITNESS: Okay, let me -- okay, written counseling for Erica Bethany. Yes, I see it. My apologies.**
BY MR. MARTIN:
Q Okay. And so the dates -- well, you state, "I have reviewed your attendance and leave record for the period of 5/19/2020 through 7/20/2020. This review reflects the following about your use of unplanned,

unscheduled sick leave."
What does that mean right there, unplanned, unscheduled sick leave?

A Again, like I said, if I have a doctor's appointment and it's for September 30th, then I would go into the leave request system and put in my leave request and my supervisor would then know on September 30th I'm going to be out of the office for however much time that I said I needed on that date.
Unplanned and unscheduled means there was no communication between the employee and the supervisor about the need for leave and so it was like, for lack of a better term, like on 5/19 the person said, in this case Bethany said I'm going to be late and again, as you can see by that, leave is done in 15-minute increments, so it's 30 minutes, 15 minutes or 45 minutes and then an hour with, you know, that as well.

Q And the reason why you issued this counseling is because she violated the work rule with respect to unplanned, unscheduled sick leave and you're just applying it, correct?

A Well, yes, obviously, you know, from me looking at this document, that was of a very repetitive nature.

Q But this is the first counseling, correct?

**A That I am -- I'm not sure if it was the first or not. I can't say for certain.**

Q Okay. And I take it it's the first because I think she got hired around May, May 1. Ms. Miller started working, just to help refresh your recollection, April, around April 1st and she was hired after Ms. Miller. So if she was hired in May, May 1, then this probably is the first written counseling, correct?

**A Again, I don't have dates. It's possible. I'm not specifically sure.**

Q And the reason I say it's probably the first because the first date you have in here is 5/19, 30 minutes. And then you have 6/30 -- 6/03 -- let's just say you have one, two, three, four, five, six, seven, eight, so there's nine infractions of the policy, of attendance policy, correct?

**A Yes.**

Q And then you state in your letter number 2, "This letter of counseling is to inform you that this type of performance is unacceptable and will not be tolerated."

Were you serious about that?

**A What do you mean was I serious about it?**

Q Were you serious when you made that statement, it's

unacceptable and will not be tolerated?

A Of course. It's written there and I signed it.

Q Doesn't mean you're serious. I'm asking you now were you serious when you made that statement?

MR. DOYLE: Asked and answered.

BY MR. MARTIN:

Q You can make a statement and not be serious about it. My dad used to say he's going to punish me but he wasn't serious, he gave me a break. So I'm saying were you serious, did you really take this as a serious violation that needed to be corrected?

A Serious, I mean yes, it's a violation that -- in performance that needed to be changed. It also says that you're a valued employee and that we don't want these things to occur again, that we give the employee assistance program information.

If I took the time to create the document, then as a supervisor, yes, I would think that a counseling is serious and you can see at the bottom it says it may be retained for a period of one year or it could be withdrawn and destroyed after six months, depending on future conduct.

Q You also say that it can result in disciplinary action, right?

A Yes.

Q Were you serious about that, taking disciplinary action if the conduct continued?
**A I would say that every case is looked at on its own merit, but yes, if --**
Q Well, we're talking about this case. This is a letter that you wrote to her. We're talking about one person right now. You stated any future incidents involving this type of conduct may lead to disciplinary action being taken against you.
**A Yes, it may or may not. It says may lead to it.**
Q Right. And you make a decision whether disciplinary action will be taken if the conduct continues, right?
**A Correct.**
Q You make that decision. Now, isn't it fair to say when we get her records it will show that she continued to be late after this, after this warning of July 23, 2020? I have records showing October, November, December, she continued to have a tardiness problem, correct?
MR. DOYLE: Object to form and foundation.
**THE WITNESS: Without seeing her record, I can't answer yes or no.**
BY MR. MARTIN:

Q So you don't remember whether she continued to have a tardiness problem without seeing records? In general, Mr. Osterbeck, she had a problem being on time, isn't that true, for whatever reason?

A **Well, case fact circumstances for an employee are something that any manager would look at as well.**

Q I'm saying she had a problem being on time and people complained about it; isn't that true? She just had a problem, for whatever reason it was, she had a problem being on time?

A **I don't know that anyone complained about her attendance specifically. Quite frankly it's not the business of anyone's other than her direct supervisor.**

Q Yeah, that's a problem, isn't it, because you testified earlier -- that's a problem because you testified earlier that it does impact the operation, it's unfair to the other employees because they got to pick up and do work. You remember that testimony earlier about three or four hours ago where you said there's a reason, it impacts everybody when people come in late, you remember that?

A **I remember it clearly. What I'm saying is that it is the supervisor's responsibility to monitor attendance. It's not another employee's**

**responsibility to be checking when people walk in and walk out of an office.**

Q And you did monitor this attendance. How did you know she was 30 minutes, 45 minutes, one hour, 45 minutes, eight hours, eight hours, how did you know she was late the times she were late? How did you know that? You say you monitor. How did you do that?

**A Because employees were responsible for contacting me as the only supervisor if they were going to be late. That's why. See how it says call in? That means they call.**

Q Okay. So she called in to tell you she was going to be 30 minutes late. Did she ever tell you why she was going to be 30 minutes late?

**A I'm sure she provided reasons for being late, just like any employee would state why there was a need for leave.**

Q We can't make those assumptions. Some people may not state.

**A No.**

Q Again, don't try and put these people -- don't try and protect her --

**A I'm not protecting her.**

Q -- by saying what other people may do. It's obvious

that's what you're doing, but anyway, we can move on.

A I didn't know you were going to. I thought you were just asking.

Q So you're not going to say under oath that she was never -- you're not saying under oath that she did not have a tardiness problem after your July 23rd, 2020 letter, you're not going to say that under oath that she did not continue to be late? You're not going to say that, are you?

MR. DOYLE: Object to form.

THE WITNESS: Well, you're talking four and a half years ago and I don't have an employee's leave record in front of me. As a reasonable person, do I think it just all of a sudden ceased? I've seen it happen. I don't know for her specifically because I'm not looking at her record. Unfortunately --

BY MR. MARTIN:

Q I understand.

A Unfortunately, she was a single mother with a toddler who had severe medical complications and she was trying to deal with being a single parent and a toddler with severe medical complications and it was difficult for her because the child needed breathing

**treatments and care that the daycare could not do. So she was in a difficult predicament. So do I think it ended? No, she's probably still going through it today.**

Q And I appreciate that explanation. That's what she told you, correct?

**A Yeah.**

Q That's why I asked you.

**A Let's crucify her, sure.**

Q Well, you're just telling me this now, aren't you?

**A You just asked.**

Q Okay. So therefore, I did not know then, right? So don't say let's crucify her. I asked you specifically about this. You could have told me at any point in time. Mr. Martin, well, the reason why she had all these call-ins is because she had a kid that had severe problems. That's all you had to say but you didn't.

MR. DOYLE: Rick, I think he tried but you cut him off.

MR. MARTIN: No, I didn't hear anything like that. But anyway, let's move on.

MR. DOYLE: Rick, let's get to the next question. We're coming up on seven hours, too.

BY MR. MARTIN:

Q All right. So when you stated here any future incidents involving this type of conduct may lead to disciplinary action being taken against you, you never disciplined her for any of these infractions or any other infractions, correct, you never did that? For whatever reason, you never did?

A Hold on, sir. First off, these infractions cannot be used for later discipline because they are used in this written counseling that put the employee on notice.

I do not recall whether or not I did give formal discipline to her or not. I do know that there was some things, like you stated earlier, about accommodating a request. I think that she did try a slight tour change so that she could have more accessibleness to daycare.

Generally because of employees and everybody has things outside of work, you know, there's business hours somewhere between 7 a.m. and 5 p.m. I had some employees start at 7 a.m., I had some employees start at 7:30 a.m. and I had some employees that started at 8 a.m. to try to work with any employees who requested one of those three tours that fit within their own personal needs. So additional --

Q Did you do that with Ms. Bethany? I don't have a problem with that. Did you do that with her?

**A I just said that I believe that that was one of the things that was done. She also spoke to EAP, which is the reference there, which is like a counseling service program, and I think that she used some other type of facility resources that are outside of HR in order to find daycare that would be accessible for a child with her special needs.**

Q Now, you talk about crucifying her. That's not what I'm doing, but what I am concerned about is isn't it true that many employees and customers complained about her rudeness, her being belligerent; isn't that true? Now, maybe it was because of her kid because she got a lot of complaints from customers, didn't she, and employees? Some of them are documented.

**A Yes, there was complaints about Erica Bethany, there was complaints about Tara Miller, there was complaints about other employees within the department as well.**

Q There was specific complaints about Erica Bethany. Well, first of all, is profanity accepted in your workplace or at the VA pursuant to policy, use of profanity among employees?

A No. Profanity is not accepted and I believe that Ms. Miller had brought to my attention that Ms. Bethany had used profanity. She did not use profanity in front of me. I believe that Ms. Miller had reported that there was profanity and I know that I spoke to Ms. Bethany and stated that that was improper conduct and there's no room for that.
Q What was her response?
A I can paraphrase. I don't know what her exact response is, was at the time. Again, four years --
Q Just to be clear, let's not make it a Tara Miller versus Ms. Bethany thing. There are other people that talked about Ms. Bethany using profanity, correct?
A Not that I can recall at this time.
Q They talked about her being belligerent and rude, correct?
A I believe that I did receive some complaints about the way that she spoke and conducted herself.
Q Okay. Now, did she receive a written counseling or was that verbal?
A I believe -- or I know initially it would have been verbal and -- but I believe there may have been a written counseling for her conduct but I can't say specifically.

Eric Osterbeck
08/22/2024

take it you have to understand what a hostile work environment is, so just tell us about it. What's your training on hostile work environment, what does it mean to you?

A **Well, I received -- first trainings would have been with the Postal Service on how to -- an initial management inquiry process, when there is a complaint, it needs to be investigated by the supervisor, gather evidence, witness interviews, interview the person making the complaint, interview any witnesses thereto, have them write statements and then interview the party that the complaint is against and do a fact finding into the matter.**

Q When you were at the Detroit VA, Mr. Osterbeck, did you have hiring responsibilities for employees that worked for you?

A **Yes.**

Q And tell me the procedure that you would go through. Tell us how that works.

A **If it was a position for which I was the selecting official?**

Q Yes.

A **Okay. Well, positions can be posted on the USA Jobs website and applicants would apply, they would provide their documents and a staffing specialist**

would be assigned to work that recruitment action.

Eric Osterbeck
08/22/2024

Once the date closed, any qualified applicants, their resume would be forwarded to me as the selecting official and I would set -- well, first I would review all resumes and depending upon the number of resumes that I received, as an example, if I received more than five resumes, I would do a scoring grid, so to speak, and rate all of the resumes and probably interview. If it was less than five, I generally interviewed all five people. If it was more than five, I would rank them and potentially only interview the top three based upon the scoring.

Generally I would have some type of panel where I would engage two other people who would be subject matter experts of that position in order to have their input as well and they would do the same thing, they would independently rate all of the applications and then we would go to the interview process and we would interview the applicants that were selected and move on to the interview phase. Again, rank and rate the candidates based upon their interview, combine the score and the applicant that came out on top would generally be offered the position.

Q And who has the final say on that?

Eric Osterbeck
08/22/2024

A **If I was the selecting official, I would have the say but we would need to get second-level approval for hiring from -- so for me, I would go to my manager and I would say I went through this process and I want to select this applicant and they would, you know, give the, as you state, final approval.**

Q And generally they would agree with you since you're the one that's going to have to be working with that individual?

A **I would say generally speaking, yes.**

Q Have you ever been overruled, to your recollection, on a selection?

A **I believe that I have but I cannot give facts.**

Q I understand. Okay. How is the pay -- I'm looking at the policies and looking at the G -- the schedule, the GS and the schedules and stuff and it looks like there could be a range, let's say, a G-7 can have a range, a G-12 can have a range of pay, a minimum and a maximum; are you familiar with that?

A **Yes, I'm familiar. It depends on the position. If it is a position in which it is a career ladder position where there are more than one grade for that position, those are career ladder positions, but some positions are only a set grade, there's**