**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TARA MILLER,

Plaintiff, Case No. 22-12865

-v-

U.S. DEPARTMENT OF VETERANS AFFAIRS, ET AL.,

Defendant.
_____________________________________/

**MOTION HEARING (via Zoom)**

BEFORE THE HONORABLE F. KAY BEHM
United States District Judge
600 Church Street
Flint, Michigan
Wednesday, June 4, 2025

APPEARANCES:

FOR THE PLAINTIFF: D. Rick Martin
220 Bagley
Suite 808
Detroit, MI 48226-1409

FOR THE DEFENDANT: Christopher Doyle
United States Attorney's Office
Defensive Litigation
211 W. Fort Street
Detroit, MI 48226

**To Obtain a Certified Transcript Contact:**
Christin E. Douglas
RDR, FCRR, CRR, CSR - (248) 420-2720
Proceedings produced by mechanical stenography.
Transcript produced by computer-aided Transcription.

TABLE OF CONTENTS


| Motion Hearing | Page |
|---|---|
| Argument by Mr. Doyle | 3 |
| Argument by Mr. Martin | 6 |
| Rebuttal by Mr. Doyle | 30 |
| Surrebuttal by Mr. Martin | 35 |

EXHIBITS:
(None Offered.)

| | |
|---|---|
| CERTIFICATE OF REPORTER | 38 |

Flint, Michigan
June 4, 2025
2:04 p.m.

* * *

(Call to Order of the Court; all parties present.)

THE COURT: Okay. It looks like we have everybody. We have the matter of Miller vs. McDonough, Secretary of the Department of Veterans Affairs. The case number is 22-12865. I have Mr. Martin, I believe, though I can't see him on the frame on behalf of the plaintiff. And I have Mr. Doyle on behalf of the Government, the defendant.

We are here today on Defendants' motion for summary judgment and Plaintiff's motion to amend.

Mr. Martin, if you could maybe go off mute and confirm that you can hear me?

MR. MARTIN: Yes, I can hear you, your Honor.

THE COURT: Wonderful.

So if, Mr. Doyle, if you'd like to continue with your arguments, please?

MR. DOYLE: Thank you very much, your Honor.

The VA terminated Tara Miller's probationary employment for two legitimate, non-discriminatory reasons. First, Miller refused to follow basic instructions from her supervisor, Eric Osterbeck. Most notably, Miller clashed with Osterbeck in January 2021 after he asked her to cut down on

unnecessary reply-all emails. Instead of taking Osterbeck's guidance, Miller pushed back, asserting her right to continue sending unnecessary emails and further distracting from the VA's important work.

After that interaction, Osterbeck had serious concerns about keeping Miller on his team, so he requested that the VA end her probationary employment. That request went first to the Labor Relations Department, and was eventually sent for approval by Osterbeck's supervisor, Eric Gonzales.

The termination request had not yet been approved by Gonzales when the VA learned of an additional reason for Miller. One of Miller's co-workers suspected that Miller had accessed her personnel file and Osterbeck confirmed that suspicion by running a report in the personnel system. During her deposition in this case, Miller admitted that she accessed her co-workers' personnel files without authorization. With knowledge of both of these infractions, Eric Gonzales decided to terminate Miller's probationary employment.

In a Hail Mary effort, Miller attempts to create a doubt about the date on which she was terminated. But for several reasons, this argument fails to create a material factual dispute. Most notably, Miller alleged in her complaint and testified several times during her deposition that she was terminated on February 24th, the date on which Gonzales signed her termination letter. When she gave that testimony, she had

knowledge the termination letter was drafted on February 19th. There is also un-rebutted testimony from Eric Gonzales that he made the termination decision on February 24th after learning of the wrongful access and giving Miller a chance to explain herself.

Miller's response brief raises dozens of irrelevant side issues, but to refocus things, Miller fails to make a prima facie case of either discrimination or retaliation. She's all but abandoned the discrimination claim offering no direct evidence of discrimination or arguments about similarly situated co-workers.

And her retaliation claim fairs no better. Nothing in the record shows that Miller engaged in protected conduct by opposing an employment practice made unlawful by Title VII, the ADDA or the Rehabilitation Act. And there is also no evidence that Miller's supervisors knew of any such opposition, if any existed. That's especially true for the actual decision-maker, Eric Gonzales.

In addition, the overwhelming legitimacy of the basis for Miller's termination erases any doubt about pretext, especially because the mixed motive theory is inapplicable to retaliation claims.

Finally, Miller fails to establish a hostile work environment claim because she cannot show that any of the alleged hostility was discriminatory based on age, race, sex or

disability, and because the alleged harassment was not severe or pervasive enough to affect the terms or conditions of her employment.

I appreciate the Court holding this hearing, and I welcome the Court's questions.

THE COURT: All right. Thank you, Mr. Doyle. I don't have any questions for you at this time.

Mr. Martin, your response, please?

MR. MARTIN: Yes. Thank you, your Honor.

Your Honor, I would respectfully submit to the Court that the most important document in this case is the February 19th, 2021 termination letter addressed to Tara Miller. The subject of the letter is "Termination During Trial Period."

I'm not going to go through -- I don't think it's necessary to read the whole letter, Judge, but I do want to say this, at number 2, it says, "Your supervisor, Eric Osterbeck, has recommended that you be terminated from your position for failure to qualify during your trial period. Your termination is due to failure to follow direction." It's not directions, plural, as counsel indicate. It says direction. It does not state specifically -- and again, we're talking motion for summary judgment. It does not state anywhere in the letter what direction. It just says direction.

Just to make sure that Tara Miller knew -- knew that this was final, this is not preliminary, this is not you're on

a performance improvement plan, this is not we're going to give you another chance, we're going to look at something else, to make it clear that this is final, the letter provides appeal procedures. You don't provide appeal procedures unless the decision to terminate is final.

It goes through very elaborate appeal procedures. The letter was signed by Eric Gonzales. The same individual that brother counsel just indicated had not made up his decision yet. Brother counsel says his, his affidavit, where he says it was pending, Mr. Doyle says it's un-rebutted. That's not accurate, Judge. It's rebutted by his own letter. A jury looking at this letter would see it as it is. This individual, Mr. Gonzales, informed Tara Miller that she is being terminated, that the decision was made to terminate her on February 19th, 2021. For what reason, the jury would hear? Failure to follow direction. What directions? The letter tells the jury -- does not tell the jury what direction. Failure to follow direction.

Now, what the VA was doing, your Honor, was taking advantage of a probationary period, an employee that they could basically get rid of. She wasn't in the union because they didn't tell her she had a right to join the union. So they kept her as a non-union person when she was supposed to be in the union. Why? Because it's easier to terminate her as a non-union person.

The only thing the letter says with respect to date of, and any other date, is it would become effective on February 24th, 2021. Not that we will make our final decision then, no. Our final decision is made. It's made on February 19th. What reason? Failure to follow direction.

Now, speaking of Hail Mary's, it appears Mr. Gonzales attempted a Hail Mary with an affidavit that we would submit is filed in bad faith. The affidavit contradicts his own letter. For, for Mr. Gonzales to tell the Court, "I was still thinking about it," that's not what his letter says.

Now, the reason why that affidavit was filed, your Honor, is because the VA realized it has a big problem with this case on after-acquired evidence law, the *McKennon* case. It makes clearly that Title VII's focus is to eradicate any form of discrimination in the workplace based on sex, based on race, disability. And it doesn't want employers after discriminating looking for other reasons to strengthen that up with discovery, or just like what happened in this case, let's check and see if she went in and looked at any files.

But that does not change the fact, your Honor, that the decision was already made on the 19th. If there was a motion for summary to be filed, it should have been filed challenging the 19th saying that the decision on the 19th was legitimate.

Instead, the defendant argues no, no, no, no, not the

19th, the 24th, because we have all this other evidence. Well, *McKennon* says no, you can't do that. You cannot do that. This, the 19th is something we're saying, Judge. It's not something the plaintiff is saying. It's the letter itself. Not some other person, but Gonzales himself.

Under the after-acquired evidence doctrine, which, your Honor, by the way, the defendant did not address in their reply, even though they had an opportunity to do so, that's additional evidence that the defendant realizes that this motion is improperly before the Court on the question of liability. Because under the after-acquired evidence doctrine, you can't use after-acquired to challenge liability. You can use that, as the Supreme Court says, only to limit damages. Only to limit damages.

So in this case, the defendant can argue if a jury comes back with a verdict based on the 19th termination, the defendant can use the evidence it discovered, which had nothing to do with their decision on the 19th because the defendant admits it was discovered after the 19th. So the defendant can use that, under the, the law set forth by the Supreme Court, the defendant can use that evidence of accessing employees' files, who she felt was getting favorable treatment to see if they received their COVID award, because she did not, they can use that evidence if the defendant proves to the jury it was severe enough that they would have terminated her for that.

And they have to prove that to the jury. They can't just say we would have or we did. They have to prove to the jury and the jury has to be -- has to be convinced that what she did was severe enough to warrant termination.

If the defendant can satisfy that burden, then the Court can limit damages with respect to backpay and reinstatement. The Court could say you cannot get reinstatement and you cannot get back pay after February 24th, 2021, the date that they discovered additional reasons to terminate your employment.

Now, another important thing, Judge, I think that the Court should consider regarding this letter, defense counsel says they had all these other reasons on the 24th. It's not in the letter. The letter became effective on the 24th. The letter that they asked her to sign on the 24th, it's the same letter, Judge. It's not a different letter.

This letter was never rescinded by the defendant. If they had rescinded it before the 24th, they'd say, oh, we changed our mind on the 22nd, you're no longer terminated, we're going to give you another chance, and then something happened on the 24th that they allege. That's a different case. They never rescinded this letter.

And even more importantly, the reasons counsel just gave you, none of them appear in the letter. This is the letter that was presented to her. If they believed they had

evidence, additional evidence, they could have included it in the letter, but that still would be after-acquired evidence, Judge.

The Supreme Court looks at the focus, the motive at the time. The issue is what motive did they have to terminate an employee; was it discriminatory.

THE COURT: Wasn't the -- wasn't the electronic signature from, from February 24?

MR. MARTIN: Yes.

THE COURT: So doesn't that mean the letter was actually, even though it was dated the 19th, doesn't it mean it was actually effective and signed the 24th, consistent with the affidavit?

MR. MARTIN: Well, No, Judge, because under *McKennon* -- and again, because Title VII and the Supreme Court wants to eradicate discriminatory motives. The issue is what was the motive on the 19th, not what was the motive on the 24th.

THE COURT: But if she wasn't fired on the 19th, and they didn't send it or the electronic signature wasn't -- they didn't fire her until the 24th, then how can -- I'm not sure why the 19th is the date, not the 24th.

MR. MARTIN: Because the 19th is the date that they made the decision to fire her. Regardless if they said this will be six months later, it doesn't make any difference, your

Honor.

THE COURT: But they didn't, they didn't give it to her or send it or do anything with it until the 24th; is that right? I mean, they -- like, I may draft an opinion that's dated today, but then not send it out until next week and it's not effective until next week, even if my date still says today, right?

MR. MARTIN: Your Honor, that's the difference between the after-acquired evidence doctrine. The after-acquired evidence doctrine is trying to get into the motive of a decision. And so we're not talking about when it's effective. If they made a decision to fire her on the 19th and stated the reason for their decision, then the Supreme Court looks at, okay, what was your motive, was it discriminatory. That's why they said you can use everything else for damages, because the sole focus is motive on the date that you decided to terminate an employee who claims it's discriminatory, who claims it's retaliatory.

The question is what was in Osterbeck's mind and Gonzales' mind on the 19th because that's when this letter says they made the decision. So the focus, your Honor, is on the motive at the time the decision is made, not at the time it became effective. It's when the decision is made.

THE COURT: Other than the date on the letter, do you have anything that shows, or any testimony that shows that the

final decision was made on the 19th, other than the date of that letter? Was it given to her -- it wasn't given to her on the 19th, correct? It wasn't, it wasn't sent on the 19th. Other than the date on the letter itself, what else do you have to corroborate your position?

MR. MARTIN: The signature and the fact, your Honor, that there is no changes in the letter -- sorry. There is no changes in the letter.

So if the Court wants to entertain that, the argument you just stated, then why isn't the reasons in this letter? That he signed purportedly on the 24th, which it doesn't make any difference.

So there is two grounds here, your Honor, where after-acquired evidence applies. One, the 19th is when Eric Gonzales made his decision. He signed that letter on the 24th, but he made a decision on the 19th telling her she was terminated. And two, Judge, if all this went on on the 24th, then why didn't they put this in the letter? That's not for the Court to straighten out. That's not for the Court to say, hey, you guys kind of screwed up here. They claim they had the evidence on the 23rd, and it should have been in the letter. That would help the Court with that hypothetical you just gave me. But it's not there. And the Court must go on the law and on the documents that have been produced. This letter cannot be helped by an affidavit. Everything after the 19th is

after-acquired evidence. They didn't come up with all these other reasons, Judge, until she filed her appeal. That's when they put these other reasons in there.

This is the quintessential after-acquired evidence case, your Honor. And Title VII is trying to root out discriminatory motives against females, against males, against disabled, people with disabilities. They know it's very tricky with employees. It's very tricky. We wouldn't have this law if employers did not discriminate. They do. We all know they do. And the after-acquired evidence doctrine is to eradicate that, but it needs the Court's assistance in doing this.

One reason, *McKennon*, it says nothing about when something becomes effective. That has nothing to do with the motive at the time you made the decision. Now, if they made the decision and they sent her a letter saying we're thinking about terminating your employment, Ms. Miller, because of your failure to follow directions -- which we dispute, Judge. Counsel was incorrect. She disputed in her deposition that she did not continue doing anything that she, she was told not to do. And in that email, it was hit "reply to all," because she received it. That's what it was.

What they did is try to look for stronger reasons. And that's why they dug and looked into, oh, see if she accessed any files. And they knew that she was concerned about the COVID award, which she did not receive. So when counsel

says there is no disparate treatment, the two co-workers, who welcomed the sexual hostile work environment, they received CO- -- they received COVID awards for working at the COVID station, checking people when they come in, their temperature. When Tara Miller says, why didn't I receive any COVID award at all? They said we'll check into it. Well, she actually did work one time; they worked a few more. But if the criteria is working that station, she should have received something. They received $500. She should receive 100, $150.

The defendant attacks the documents showing the criteria? No, there is nothing. All you have, your Honor, is Osterbeck's, the perpetrator's word about why he didn't give her a COVID award.

So with respect to the after-acquired evidence doctrine, your Honor, which the defendant did not address, at all in the reply. That alone, your Honor, should preclude summary judgment.

On the question of liability, with respect to the hostile -- well, the discriminatory treatment, Mr. Doyle says Plaintiff has presented no evidence of discriminatory treatment. Your Honor, that is a misstatement. Her affidavit spells out she was denied proper training that the other female, similarly situated female, Erica Bethany received. And this all happened, your Honor, after she was subjected to a sexually hostile work environment.

And I indicated in our brief, Judge, I wanted the Court to see why she could be so sensitive to sexual banter, especially from a boss, someone with power. She was unfortunately sexually assaulted twice while serving this country, once at Fort -- at Georgia at Fort Benning, I think, and the other, on duty in Iraq, I'm sorry, Afghan- -- Kuwait. It was violent. In fact, it was going on quite a bit. They would even -- well, I'm not going to get into that.

But so she was given a 70 percent disability and was receiving psychiatric treatment -- psychiatric treatment. Mr. Osterbeck knew that because he hired her. And he also knew that because she received preferential hiring, any disabled veteran, they are given preferential hiring, so he knew that. The first day she comes to work -- well, not the first day. I think it was the second week after his orientation where he did not tell her she had the right to join the union -- and we believe a jury could find that was intentional -- but he said, "you can get anything, have any candy, here, I have candy on my desk, crispy treats, feel free, Tara, to come in here and get anything you want." And then he said, he looked at her, "because around here, they call me the candy man." And he leaned over and he had a grin.

Of course, she didn't know how to respond. She was afraid to say I don't -- what do you mean, I don't appreciate that, what are you talking about. She quietly just stood up

and left. She knew she was a probationary employee. And, Judge, she really needed this job to continue her Army service and benefits because she's being deployed -- she's a reservist. So she may be deployed for three weeks. Well, if you have a VA job or government job, there is a policy that they will protect your job, and even give you the promotion you would have had while you were gone. No, she taught -- she was teaching school for awhile as an adjunct professor, but they would not guarantee her her job when she returned. So she needed this job.

She had already signed up for another eight years. She's already did eight. She really needed this job, so she did not say anything. Then two weeks later, Mr. Osterbeck, undeterred -- she didn't respond with "oh, thank you," when he offered the candy, because she knew what he was talking about. So he decided, let me try again. They are passing each other in the hallway, and she made it clear in her affidavit, as he was approaching her, he was staring up and down from her hips to her breasts, and when he got to her face, they were looking at each other, and he said, "You look nice."

At that time, she decided I need to be a little stronger with my rejection. And she said "I gave a strong sigh, and I gave a look of disgust, but quickly walked away." Because she didn't want any conversation. Obviously he got -- got the message, Judge.

So when counsel says that she did not show my opposition, oh, she did. An opposition does not have to be verbal. You can do it with a look, we know that. I've gotten looks from judges to sit down before. They didn't have to say anything. So we know as human beings we can give looks and eyes. My dad used to just look at us when we were three years old and we knew to stop. He would give us that look. He didn't say a word. So Mr. Osterbeck got that look. And he realizes I will not be able to play my sexual banter games with Tara, so I'm going to hire someone else and I'm going to hire someone who may be more vulnerable to go along with this.

And why do I say that, Judge? Because he hired one of the -- well, he hired Erica Bethany who had a horrendous turbulent work history. She was in the union and she was a former union representative. But he hired her. In fact, she was about to get discharged. And as Tara stated in her affidavit, another HR person, higher-level person named -- a person by the name of Glenn Belcher, he said that he doesn't understand how -- why Eric hired her into their department, and that had he followed the protocol, which they have a panel, which Mr. Belcher is a panel member for hiring, Mr. Belcher said she wouldn't have been hired. Why would we take on this person with this turbulent work history? But Mr. Osterbeck knew this is the perfect person to hire to go along with my sexual games that I enjoy playing.

What evidence do we have that that's the reason why he hired her? Well, first of all, she came to work late the very first day, Judge. And she continued to come to work late virtually 3 or four times a week. They were similarly situated, Ms. Bethany and my client. They were both HR generalists, and they had to deal with 2,700 employees regarding benefits and things of that nature. And we stated in the brief all of their job duties, the job duties or the job description. It's tremendous.

Every time that she would be a half an hour, 45 minutes late, Eric Osterbeck knew that that would put a heavy workload on Tara Miller. He allowed it to happen. They had to do training on new employee benefits, certain benefits; she would come late for that. And when Tara Miller would see her later, she was at her desk. She would come in late and she will be at her desk. No discipline.

She was allowed to use profanity at her leisure. The "F" word. On one occasion she used the "N" word. That was reported. No disciplinary action. Osterbeck's response was, well, she didn't do it in front of me.

She was allowed to be rude, to even VA patients who are calling for benefit information, and belligerent. No discipline.

She also received proper training from Angela Thompson, which is the person who claims she found out that

she, that she -- she told Eric Osterbeck, "I think she went into our files." It was Angela Thompson. She's the next level above them, but she was responsible to train both. She did not properly train Tara Miller. She gave her very little training. Erica Bethany received proper training. That's discriminatory treatment, because that does effect your job. As a result, Tara Miller made minor mistakes. Even Bethany made minor mistakes. But you don't want to make minor mistake if you can help it. And if you're properly trained, you may not make those mistakes. That put a lot of stress on her.

And just briefly, going back, because I don't think this should be overlooked at all, Tara Miller affirmed in her affidavit that when Mr. Osterbeck made those two sexually inappropriate advances, unwelcomed, she didn't see him when he leaned over across the desk and said, "around here, they call me the candy man." She didn't see him. She says she saw the two soldiers. She was continuing to get treatment, your Honor. She is still getting treatment. It's bad enough to be sexually assaulted once. But twice in a place you feel you should be protected, serving the mil- -- in the military? And then the second time he did it, she saw those two soldiers again, as she said, objectifying her body. The one who attacked her in that Kuwait came from behind. He came up from behind.

So we attached all the times that Erica Bethany was allowed to be late on a job that directly not only impacts Tara

Miller, but the 2,700 people they serve.

In his deposition, I said does she continue to be late after this warning letter in July? She was late nine times from May to July. At least that's what he documented. Tara Miller attested that oh, no, it was three or four days a week, because sometimes she wouldn't even call Mr. Osterbeck. But he had it -- he documented nine times. In that letter, July letter, he stated, "This will not be acceptable. This is causing problems." He admitted under oath that she continued to be late and she was never disciplined, even though he warned her in the letter you will be disciplined.

Now, on one occasion, Erica Bethany told Tara Miller, "You have to know how to play the game." This is the employee with a turbulent work history. "You have to know how to play the game." And how does she play it? She wore sexually provocative clothing, very tight-fitting. She would engage in sexual banter with Eric Osterbeck, both of them, Erica Bethany and Angela Thompson, the one who did not give Tara proper training. She would see them wearing these outfits, laughing with Eric Osterbeck, and then go into his office and close the door. Tara Miller attested she was never invited in there when they were in there.

She continued -- and we attached after July, the warning letter about disciplinary action, we attached documents showing she continued to be late October, November, December,

almost right up to the point that Tara Miller was terminated.

Now initially, your Honor, Tara Miller, initially because she was afraid to challenge Eric Osterbeck, in August, she complained about her co-workers and the way they were treating her. After that did not work, and after Osterbeck continued to allow Eric Bethany to receive favorable treatment, being late, being disrespectful, then Tara Miller filed her complaint outside with Donald Scott, EEO specialist and representative, I think she said it's Indiana. Donald Scott -- and that's his job. His job is to eradicate the work places of discrimination. But he knows some certain realities. And one of them, he says, "Tara, you need to know that because you're a probationary employee, if you file this complaint, you may be terminated."

This is in December -- this is in December, your Honor, December 28, and we attached some emails. But December 28, 2020, is when she made contact with Donald Scott and complains specifically about the "candy man" comment and the ogling. And prior to that -- your Honor, I should back up.

December 17th -- and this is what led her to go to complain to Donald Scott. December 17th, she had a crisis medical appointment scheduled for her psychiatric disability. She called on the 16th to her therapist. She told her the situation. The therapist notes show that this workplace -- it's caused by the workplace, her problems that she is -- that

she was dealing with then. Her therapist said because it's a crisis, I'll get you in on the 17th. Mr. Osterbeck gave her a hard time. She went, but he documented it as sick time instead -- instead of allowing her to use 104 hours she had for disability. A law was passed to allow the VA veterans a one-time benefit of 104 hours for any medical appointments or things like that. He told her she was not disabled. That argument continued all the way to January 16.

So after this happened on the 17th, December 17th and 18th, that's when she went to Donald Scott, and that's when she told him this is why I think this is all happening to me, the candy man comment and the other incident. And that's when he said you may get terminated, I just need to tell you. That was the 28th.

Emails attached in the record shows that Mr. Osterbeck continued to give her a hard time on a disability, which is a protected category. He shows animus. He -- he was not truthful when he said you're -- I didn't know you were disabled. He continued to give her a hard time all the way up to January 16th.

On January the 25th, that's when he contacted a gentleman by the name of Earl Lee in Labor Relations, and says I would like to terminate her.

On the 29th of January, Tara Miller found out that Eric Osterbeck contacted Roberta Jenkins and Michael Jenkins,

employees who were off on disability or retirement or something. Anyway, they said that Mr. Osterbeck wanted them to file a complaint against her that was not true. And they told him no. That's attached to the document, Roberta Jenkins. That's the 29th of January.

On the 2nd, on February -- I'm sorry, February the 4th, I believe, there is a letter from an investigator, Jerold Rushing. He sent the letter directly to Mr. Osterbeck letting him know that we are investigating you for harassment. That's on the 4th -- I'm sorry, I think the 2nd. Because 17 days later, your Honor -- and I also asked Mr. Rushing in his deposition, when you investigate suborn- -- supervisors for sexual harassment or any kind of harassment, could it lead to discharge? He said yes.

So now Osterbeck, we're talking motive, Osterbeck knows he's being investigated for sexual hara- -- for harassment, which included disability and the sexual. He knows from Donald Scott and he knows from Jerold Rushing. Seventeen days later, he then recommends to Mr. Gonzales, his supervisor, that Tara Miller be terminated.

Well, he doesn't have much to go on. She comes to work all the time. She's never late. She received a lot of compliments from employees and people that she assisted. Not a problem at all. Knowing that they don't have to put much in this 19th letter, well, just say failure to follow direction.

And the last thing that Mr. Doyle talked about, really only one, which is she replied to an email to all, and send it out to all, which was unnecessary. Well, I don't think a jury would say that's severe enough to be terminated for what she did, especially when you look at her work history and record.

But Mr. Osterbeck was bent on, I am getting rid of her, and I don't need much of a reason. She's a probationary employee. And so he didn't put much of a reason. He just put failure to follow direction without stating what specific direction.

Your Honor, with respect to the -- and, and we would submit that that is retaliation, also a form of discrimination under the Disability -- under the Disability Act.

Your Honor, with respect to -- I'm sorry. With respect to the hostile work environment, once again, the defendant fails to cite the applicable law, not only once in the motion for summary judgment, the defendant also failed to cite the applicable law and address it in the reply. In fact, the defendant says the standard is still -- I guess they want the Court to go for it -- it's still severe, must be significant harm. The Supreme Court said no, it does not have to be severe and pervasive. And if that is a question, that's a jury question. The words that the Supreme Court is it's a quintessential jury question. And I'm sorry, your Honor, that may be the Supreme Court for the Sixth Circuit in *McNeal*, the

*McNeal* case.

And *McNeal* said that we are following the Supreme Court in *Muldrow*, so we are changing the standard in the Sixth Circuit. You just have to show you're worse off. You just have to show some harm, not significant.

Well, that's probably why the defendant probably didn't cite that case, because it changes the standard. It lowers the standard. In the motion for summary, they are telling the Court there's a heightened standard; it must be severe, significant. That's not accurate. That's not the law.

Your Honor, I think the motion should be denied on the hostile work environment claim, number one, because they've failed to supply the Court with the applicable law. The Court has to go on the applicable law. And that burden was on the defendant. If it failed to do that, I would submit, your Honor, the motion has to be denied on the claim.

In addition, though, it's pretty clear that she met even severe harm. If you look at her medical notes, it shows she was receiving treatment all the way through her employment. And all the way through her employment, she was dealing with Bethany being allowed to come in late, come when she wants to, not getting a COVID award, not getting proper training which materially affects your ability to do your job, the terms and conditions of your employment. Bethany being belligerent, and Eric Osterbeck allowing her to be that way because he's

Case 4:22-cv-12865-FKB-KGA ECF No. 55, PageID.1173 Filed 08/01/25 Page 27 of 38



retaliating against her, Tara Miller, for rejecting his sexual advances. He's allowing Erica Bethany to do it, to cause a hostile work environment, and to subject Miller to a hostile work environment because Bethany welcomed his sexual advances.

Your Honor, I would respectfully submit that the motion should be denied under the after-acquired evidence doctrine, number one. The date of termination was February the 19th. When I say date of termination, that is the date the decision was made. The Court has to look at what -- what was the motive on that date, not on some other date. The decision was made. Eric Osterbeck signed the letter and he did not add anything else in that letter. He did not add all the other things, which is after-acquired evidence. He didn't even add that in the letter.

The motion should be denied, and the issue, because -- excuse me. The motion should be denied because what happened after the 19th, your Honor, could not have been known on the 19th, which is the date, again, they made the decision. They made the decision on the 19th. And that's what the -- that's what *McKennon* says. It says the employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the non-discriminatory reason. That's *McKennon*. So the question is motivated, not when it was effective.

THE COURT: Right. Okay. So after-acquired evidence

doctrine. And then was there a second reason why you --

MR. MARTIN: Yes.

THE COURT: I think I've heard -- I think I've heard -- you're starting to repeat yourself a little bit.

MR. MARTIN: Okay. Thank you, Judge. I'm sorry.

Yeah. The other is on the hostile work environment, they cited the wrong standard to the Court.

THE COURT: Okay.

MR. MARTIN: And we believe that even under the standard that they cited, which is no longer applicable, we meet that standard. But we certainly meet the applicable standard of showing some harm.

THE COURT: Okay.

MR. MARTIN: And third, similarly -- she's shown she was treated differently than the similarly situated coworker, Erica Bethany, who welcomed the sexual advances and sexual banter. We listed the ways she was treated differently, increased workload; because she was allowed -- Erica Bethany was allowed to be late without any punishment; she was denied proper training which Erica Bethany received which directly affects your job; denied a COVID award, which Erica Bethany received, even though she did work the COVID station.

THE COURT: Okay.

MR. MARTIN: And fourth, she was disciplined for failure to follow direction, where Erica Bethany did not follow

directions to come to work on time.

THE COURT: So is your only claim based on sex? On gender?

MR. MARTIN: I'm sorry?

THE COURT: Is your -- I mean, all of your arguments have gone back to gender discrimination. Is that your only claim? That evidence, all you --

MR. MARTIN: Age. I'm sorry, Judge. And age. Age discrimination. Erica Bethany is substantially younger. She is in her early 30's, and Tara Bethany was early 50's, even though she doesn't look like she's in her 50's.

And then we have disability discrimination or retaliation for exercising her rights under the Disability Act, which our amended complaint would like to specifically name the Rehabilitation Act. She was treated diff- -- she was retaliated against when she exercised her rights to medical treatment, which is what she did. She was retaliated by Mr. Osterbeck, not giving her the leave that she was entitled to under the benefits that are given to disabled workers. Instead, he forced her to take her sick leave. So she was punished. And then he retaliated by recommending her termination a month or so later.

He also retaliated when she complained about the sexually hostile work environment to Donald Scott and about the disability discrimination, she complained about that to Donald

Scott on December 28th. He recommended that she be terminated -- he began the process of recommending termination on January 25th. It was finalized on February 19th, 2021. There is nothing in that letter that says we're thinking about it. Nothing.

Thank you, Judge.

THE COURT: Okay. Mr. Doyle, your reply?

MR. DOYLE: Thank you, your Honor, I'll try to be brief.

Circling back to the termination letter, I think, as your Honor pointed out, the letter is signed on the 24th. That's the date when, I think everyone agrees, the final decision was made. And the best evidence of that is something that I don't know if I've talked about yet, but the way Ms. Miller testified about what happened on the date of her termination. That basically she was called to discuss these infractions and was asked to explain why she accessed the personnel record systems. At that time, she declined to give a statement without an attorney present. And only after that is the final decision made to, to terminate her. So I think that that's just more evidence showing that the final decision wasn't made until after they spoke to her on the 24th.

The next point, I think this came later in Mr. Martin's discussion, but on the hostile work environment standard, as we tried our best to explain in our reply, I don't

think the hostile work environment standard changed very significantly. I recognize that the *McNeal* court said, you know, they were taking *Muldrow* into account, but *Muldrow* is not a hostile work environment case. So they're sort of going back to what I saw as the pretty ordinary severe and pervasive standard that existed before *Muldrow*. And they even continued to use, you know, look for evidence that, that the environment was severe and pervasive enough to change a condition of employment. That's the same hostile work environment standard that existed before Muldrow.

There was some discussion of the complaints that Ms. Miller made to various people. We tried to address these in our motion and reply also. But to start with, the complaints to Zenia Berry and Jerold Rushing in the Detroit VA's EEO Department were not about anything protected by Title VII or ADDA, or the Rehabilitation Act. Instead, they appeared to be about disputes with co-workers and that Mr. Osterbeck was biased in favor of those co-workers, but not based on any, you know, protected classification, just generally biased. And that comes -- the best evidence of that comes in that of Zenia Berry's deposition where she explains she understood the nature of those complaints. Mr. Rushing didn't remember the nature of the complaints, so he doesn't have any evidence of that.

Donald Scott is not in Detroit. He was -- Ms. Miller testified he was in Florida. So I don't think there is any

evidence that a complaint to him worked its way back to Eric Osterbeck or Eric Gonzales. I don't think there is any evidence at all.

That's similar to the complaint to Pamela Reeves. She was technically head of the Detroit's VA but outside of Ms. Miller's chain of command. And as the email to her email and response which is attached to Ms. Miller's response to the motion shows, it doesn't seem like Ms. -- that Director Reeves would have forwarded that complaint. She basically said I'm not in your chain of command and this is something that you just have to try to work out with your supervisor.

Finally, just as to a few of the stray allegations about what the alleged hostile work environment were or what, what factors made the environment allegedly hostile, there was an allegation about failure to train. But I think the only real concrete evidence in the record about training is the description of an incident by Shavon Render that Angela Thompson conducted a training with Erica Bethany and two of her co-workers -- or Ms. Miller, Ms. Bethany, and this other coworker, Shavon Render. And that after the training, Mrs. Miller asked Ms. Render to re-explain everything that was taught in the training because she wasn't paying attention.

There is also evidence from Eric Osterbeck that Ms. Miller received a lot of training from Mr. Charles Sharkey so, you know, at least was getting a lot of training. These were

COVID times. I don't -- if someone didn't get any particular training, it might just be because things were very strange at that time, I think is the evidence actually in the record about that.

As to the COVID award, I think it was conceded that Angela Thompson and Erica Bethany worked the screening station more times than Ms. Miller, meaning they are not similarly -- similarly situated to her. They also both, when, when considered together, share really all of her protected characteristics between age, race, disability status, and sex.

And then as to the issue of Mrs. Bethany being late or use of profanity, you can look to Mr. Osterbeck's deposition where he explains that he did give a written counseling to Mrs. Bethany about being late, but that she, you know, might have continued to be late because she had a child with medical needs. Now, during Ms. Bethany's deposition, Plaintiffs were trying to sort of poke holes in that, but it doesn't -- I don't really think that is really a factor, whether she actually needed that. That's the reason that she gave to Mr. Osterbeck. That's what she told him about why she was late sometimes.

And as to profanity, Mr. Osterbeck also testified that he corrected -- talked to Mrs. Bethany about her use of profanity. He didn't just let it slide as was alleged.

Then as to, just finally circle back to the issue of the reply-all email, I think the issue is not so much in that

baseline infraction, like accidentally sending a reply-all email. That's not -- that is not the thing that Mr. Osterbeck took issue with. It's really more the response, when after she sends the reply-all email, Mr. Osterbeck says, hey, do you remember, we talked about this. I told you to try to cut down on these. And her response is, is really indicative of the problem I think he had with it. So this is at Exhibit No. 14 to our motion for summary judgment, the, the email that she sent in response which says, you know, basically I think I should be allowed to do this, you know, I want to keep sending these reply-all emails, and I'm sorry if I offended you by sending these reply-all emails.

So it's really more a matter of the reaction to the offense and the, you know, the reaction to the guidance that I think more of a problem. When you're a supervisor and you get pushback about something so simple, you know you might have problems going forward basically.

And I think that's all I had to cover. But again, if there are any outstanding questions the Court has, I'd be glad to address them.

THE COURT: No. I think I've heard everything from both sides.

We will --

MR. MARTIN: Your Honor, may I just -- may I just say a couple things with respect to --

THE COURT: Well, you've argued I think for about 50 minutes. Is it something new?

MR. MARTIN: Yeah, Judge. Yeah.

THE COURT: I'll give you five at the most.

MR. MARTIN: Okay.

THE COURT: Because like I said, you've already taken significant more time than Mr. Doyle has allowed -- allotted. So briefly, Mr. Martin.

MR. MARTIN: Okay. Thank you, your Honor. I appreciate it.

Mr. Doyle said that the Sixth Circuit did not adopt the *Muldrow* standard, the Supreme Court standard announced in Muldrow, but it did. On page 20 of the *McNeal vs. City of Blue Ash*, Ohio, it specifically states the very pervasive -- it says because of hostile work environment -- so they are not talking about transfer -- arises out of the same statutory language as the disparate treatment claim, *Muldrow's* holding does not require plaintiff to show significant harm applies to both type of claims. And then it says, "Instead, employer's discriminatory action, or as in this case here, the work environments needs to produce 'some harm respecting identifiable term of condition of employment.'" And it cites *Muldrow*. It says, "Thus, when we consider whether a loss still work environment was severe -- pervasive enough to violate Title VII, we effectively ask where it left an employee 'worse

off respecting terms and conditions.'" And then it also cited *Crawford*, Sixth Circuit decision in Crawford where it says where harassment is sufficiently severe or pervasive to create an abusive treatment is, "quintessentially a question of fact."

With respect to Mr. Doyle made a lot of factual arguments. He, he is disputing what Ms. Miller said that Rushing said. He's is -- he's disputing whether she got proper training. He is disputing the COVID award issue. He says, well, they did it more times. Well, if she did it at all, she should have gotten a COVID award. A jury can find that. That's a disparate treatment.

And then with respect to late, Mr. Doyle says that in his deposition -- and he's right. In his deposition, Mr. Osterbeck said, well, I allowed her to continue to be late all those times because of child care, medical needs. She had to care for her child that's purportedly going to work, on her way to work. Well, we took her deposition, your Honor, and she said that's not true. Erica Bethany said her child was being cared for by the father because she had a job where she had to be there and she was dealing with possible COVID, she did not want to have the child with her, that -- during the week. So she testified, and we attached it, that the father kept the child during the week. She would pick the child up on Friday night or Saturday. She would have the child over the weekend, and then the father would pick up the child Sunday so she would

be able to work without having to deal with the child. Now, that is a direct contradiction, if not, if worse, a lie by Osterbeck in his deposition.

Again, these are all jury questions, and the Court has to look at the inferences to be drawn. Mr. Doyle is asking you to draw all inferences on failure to train, COVID award, being late, in favor of the defendant. That's not the law. The inference must be drawn in favor of the plaintiff, the non-moving party.

Thank you, your Honor.

THE COURT: All right. Thank you, both. We will take your arguments under advisement and issue a written opinion.

Have a good day, everybody.

(Proceedings concluded, 3:14 p.m.)

* * *

**CERTIFICATE OF REPORTER**

As a Federal Official Court Reporter for the United States District Court, appointed pursuant to provisions of Title 28, United States Code, Section 753, I do hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date hereinbefore set forth.

Dated this 4th day of June, 2025.

__s/ Christin E. Douglas______
Christin E. Douglas
RDR, CRR, FCRR, CSR
Federal Official Court Reporter